UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 09-11435

Adv. Case No. 09-01132

- - - - - - - - - - - - - - - - - - - - -x

In the Matter of:

CHARTER COMMUNICATIONS, INC., ET AL.

   Debtors.

AND

JPMORGAN CHASE BANK, N.A., as Administrative Agent,

     Plaintiff,

   -against-

CHARTER COMMUNICATIONS OPERATING, LLC and CCO HOLDINGS, LLC,

     Defendants.

- - - - - - - - - - - - - - - - - - - - -x


     United States Bankruptcy Court

     One Bowling Green

     New York, New York

     April 6, 2009

     11:01 AM

B E F O R E:

HON. JAMES PECK

U.S. BANKRUPTCY JUDGE

1

2      Scheduling Conference

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24      Transcribed by:  Hana Copperman

25

1

2    A P P E A R A N C E S :

3    KIRKLAND & ELLIS LLP

4        Attorneys for Debtors other than Charter Investment, Inc.

5        655 Fifteenth Street, N.W.

6        Washington, DC 20005

7

8    BY:   JEFFREY POWELL, ESQ.

9          PAUL M. BASTA, ESQ.

10         DANIEL T. DONOVAN, ESQ.

11         BRIAN LENNON, ESQ. (BY TELEPHONE)

12

13   KIRKLAND & ELLIS LLP

14        Attorneys for Debtors other than Charter Investment, Inc.

15        200 East Randolph Drive

16        Chicago, IL 60601

17

18   BY:   RAY C. SCHROCK, ESQ. (BY TELEPHONE)

19

20

21

22

23

24

25

1

2    TOGUT SEGAL & SEGAL LLP

3         Attorneys for Debtor Charter Investment, Inc.

4         1 Penn Plaza

5         Suite 3335

6         New York, NY 10119

7

8    BY:   ALBERG TOGUT, ESQ.

9          RICHARD K. MILIN, ESQ.

10

11   SIMPSON THACHER & BARTLETT LLP

12         Attorneys for JPMorgan Chase

13         425 Lexington Ave

14         New York, NY 10017-3954

15

16   BY:   PETER V. PANTALEO, ESQ.

17   BY:   BRUCE ANGIOLILLO, ESQ.

18

19   PAUL WEISS RIFKIND WHARTON & GARRISON LLP

20         Attorneys for Crossover Committee

21         1285 Avenue of the Americas

22         New York, NY 10019-6064

23

24   BY:   ALAN W. KORNBERG, ESQ.

25   BY:   ANDREW J. EHRLICH, ESQ.

COVINGTON & BURLING LLP

     Attorneys for Wilmington Trust Company

     The New York Times Building

     620 Eighth Ave

     New York, NY 10018


BY:   SUSAN POWER JOHNSTON, ESQ.

     JENNIFER MCNEIL, ESQ.

     DAVID W. HALLER, ESQ.


SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

     Attorneys for Paul Allen

     Four Times Square

     New York, NY 10036


BY:   ROBERT E. ZIMET, ESQ.

     JAY M. GOFFMAN, ESQ.

1

2    BROWN RUDNICK BERLACK ISRAELS LLP

3         Attorneys for Wells Fargo, Agent for the Third Lien

4         Holders

5         Seven Times Square

6         New York, NY 10036

7

8    BY:   DAVID MOLTON, ESQ.

9          DANIEL A. SAVAL, ESQ.

10

11   CIT GROUP INC.

12         383 Main Avenue

13         Sixth Floor

14         Norwalk, CT 06851

15

16   BY:   VINCENT DEVITO (BY TELEPHONE)

17         ANDREW RUNK (BY TELEPHONE)

18

19   BABSON CAPITAL MANAGEMENT LLC

20         340 Madison Avenue

21         18th Floor

22         New York, NY 10017

23

24   BY:   JOSEPH GALZERANO (BY TELEPHONE)

25

1

2    OAK HILL CAPITAL PARTNERS, L.P.

3         65 East 55th Street

4         32nd Floor

5         New York, NY 10022

6

7    BY:   GREGORY S. RUBIN (BY TELEPHONE)

8

9    CHARTER COMMUNICATIONS, INC.

10        12405 Powerscourt Drive

11        St. Louis, MO 63131

12

13   BY:   RICHARD K. DYKHOUSE, ESQ. (BY TELEPHONE)

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Be seated.  I've seen the paperwork on

2     this, including the JPMorgan response to the debtors' motion

3     for a scheduling order.  I know there's some people on the

4     phone as well.  I'm not sure -- we have a number of people

5     here -- how many people will be talking.  I assume Mr. Pantaleo

6     will be one.

7          MR. PANTALEO:  I'll be one and my partner, Bruce

8     Angiolillo.

9          THE COURT:  Okay.

10         MR. ANGIOLILLO:  Good morning, Your Honor.

11         MR. POWELL:  Good morning, Your Honor.  Jeff Powell

12    for the debtors.  I'll be one from the debtors' side.

13         THE COURT:  Are those the speaking parts or I'm

14    almost going to hear from Mr. Allen's counsel and from

15    crossover committee counsel?

16         MR. POWELL:  Yes.

17         MR. ZIMET:  Robert Zimet of Skadden, Arps for

18    Mr. Allen.

19         MR. KORNBERG:  Alan Kornberg and Andrew Ehrlich for

20    the crossover committee, to the extent we need to be heard.

21         THE COURT:  Does anyone else anticipate speaking?

22         MS. JOHNSTON:  Your Honor, Susan Johnson on behalf of

23    Wilmington as a second lien indenture trustee.  We don't have a

24    position on the schedule as proposed, but we do have a position

25    regarding our right to monitor the adversary proceeding,

1    because it affects our interests, and I wanted to let Your

2    Honor know about that on this occasion. But I don't anticipate

3    having anything to say about the schedule.

4            THE COURT: All right.

5            MR. MOLTON: Your Honor, David Molton, Brown Rudnick,

6    for Wells Fargo, agent for the third lien holders, and we also,

7    like the seconds, would like to voice our presence here as a

8    party in interest, possibly, with respect to monitoring the

9    adversary proceeding, and to the extent that this scheduling

10   order pertains to the confirmation hearing and the trial

11   thereof, that's something we would be interested in as well.

12           THE COURT: All right. Why don't I identify a number

13   of issues that concern me, and these issues may not necessarily

14   be the ones that concern the parties but you might as well know

15   what I'm thinking.

16           The first is, and this shouldn't come as a surprise,

17   some concern that I have that this is being turned into an

18   adversarial process as it relates to scheduling. Ordinarily

19   the one week mark in a case of this size, which is unusual in

20   that discovery started pre-bankruptcy and that issues that are

21   identified for discovery are issues that the parties themselves

22   have recognized as critical to the plan process, ordinarily one

23   would expect there to be an agreement. So one of my questions

24   is why isn't there an agreement, particularly since as I read

25   the JPMorgan papers they consent to the trial date provided

1    they get certain things that they want with regard to

2    discovery, recognizing that their dates may be aggressive.  It

3    seems to me that some discussion regarding adjustment of those

4    dates could lead to a consensual outcome.  That's sort of a

5    simple answer to this.  It may be less simple than I see, but

6    I'd like to know why that hasn't happened.

7            Secondly, there's nothing in the papers that I've

8    seen addressing the core versus noncore issues in the adversary

9    proceeding.  I'd like to know when and how that issue is going

10   to be resolved, what happens if it isn't resolved but the

11   issues related to the adversary proceeding are, nonetheless,

12   presented during the confirmation hearing, as I expect they

13   will be.

14           What's the projected length of the trial?  Something

15   tells me this isn't going to be a one day hearing.  Have the

16   parties given thought to how many trial days are contemplated?

17   If you haven't done that, you should.  And those are my

18   questions.  I may have some more.

19           MR. POWELL:  Good morning, Your Honor.  Jeff Powell

20   for the debtors.  Let me go in reverse order and try to address

21   those questions right now.  With respect to the trial, you

22   asked last Monday what the trial would encompass.  Would it be

23   just the adversary proceeding or would it be all issues?  And

24   the answer, from our perspective, is all issues.

25           You also asked last week, and asked again today, how

1    long we envision the trial would last.  And it's the debtors'

2    view that this trial should last no more than three days.

3           Your second question today, core versus noncore.  I

4    was going to address that as well, and our response is this.

5    The debtors intend to file a motion to dismiss this week, going

6    to two issues.  The first, the allegation that this is noncore,

7    and the second, the core factual allegation, the complaint that

8    two designated holding companies, that there was a default or

9    an event of default because two designated holding companies

10   were unable to pay debts as they would become due.  Our

11   position is that's not either an event of default or default

12   under the credit agreement.  So we intend to move to dismiss

13   the complaint on both of those grounds this week.  We've been

14   in discussion with the banks.  We'd like to ask Your Honor for

15   a return date on that motion of April 29, the disclosure

16   statement hearing, and as of thirty minutes ago we did not have

17   an agreement from the banks on that.  I don't know what their

18   position is.  Ours is we want to tee that issue up, and we'd

19   like to have it heard, Your Honor, on April 29th.

20          With respect to your first question, both as to the

21   possibility of adjusting the dates and why we don't have an

22   agreement on scheduling, with respect to the dates themselves

23   they are driven entirely by the trial date, and the trial date

24   is driven entirely by the lockup agreements that Mr. Basta and

25   Mr. Schrock referred to last week.  We don't think there really

1  is any flexibility there.  However, in response to your other

2  question, why isn't there an agreement on scheduling, I think,

3  in light of the papers filed by the banks on Friday, that we

4  should have an agreement.  And let me address that right now.

5          The banks have served two document requests on the

6  debtors.  The first request went to issues in the complaint,

7  and that was served on Sunday, March 1st.  We've already

8  produced over 50,000 pages of documents responsive to that.

9  And in response to the bank's issue, can we be substantially

10 complete by April 9 with a privilege log by April 16, the

11 answer is yes, we can.  So I'm hoping that with respect to that

12 request there is no disagreement on scheduling.

13         There is, however, a second document request, and I'm

14 not entirely sure whether the bank's proposal of April 9 and

15 April 16 applies to that as well.  But that request is

16 different.  That was served on us on March 11.  It doesn't go

17 to issues in the complaint.  Rather, it goes to classic

18 confirmation issues.  Documents concerning valuation.  NOLs.

19 Cancellation of debt income.  Many of those requests, with

20 respect to many of those requests we will be substantially

21 complete by April 9th.  With respect to a couple of the other

22 requests we can be substantially complete with that production

23 by April 16th, just a week later.  So with respect to the first

24 request we can be done by April, or substantially complete by

25 April 9.  With respect to at least half of the second request,

we'll be substantially complete by April 9, and with respect to

the second half we're about a week behind.  And, Your Honor, I

would submit that to blow up the schedule or defer setting the

schedule, especially in light of these lockup agreements,

because we're only a week behind with respect to the second

request, which came later, would be unreasonable.

So I'm hoping, in light of our positions, that we

will, today, have an agreement on the schedule that we

proposed.

THE COURT:  All right.  Thanks.

MR. POWELL:  Thank you.

THE COURT:  Mr. Pantaleo, can we have an agreement?

MR. PANTALEO:  Your Honor, I guess a couple of

issues.  I'll let my partner, Mr. Angiolillo, address the

length of trial, Your Honor, and the issues surrounding the

schedule.  With respect to the core/noncore, we heard last

night that they wanted to move to dismiss.  And I agree, by the

way.  We hadn't heard that within that motion they wanted to

address core/noncore.  We agree it makes sense to address this,

obviously, sooner rather than later.  In fact, there was a

suggestion that I had made before they filed, when I spoke to

Mr. Basta I told him to focus on that, and I said when we talk

about the schedule that's something that we'll probably need to

tee up sooner rather than later.  So I think we're okay with

dealing with that in terms of an argument and briefing prior to

1    and then an argument when the disclosure statement is heard.

2    We haven't seen the motion to dismiss on the merits.  If they

3    want to make the motion they'll make the motion.  Our principal

4    focus, Your Honor, really, is just getting our documents,

5    because what we're concerned about is having kind of, like, led

6    with our chin, so to speak, by agreeing to their date, which

7    was not our date.

8            When we initially spoke to them, back in March 1st,

9    over that weekend, when we showed them our complaint and gave

10   them our discovery, we actually were suggesting a trial date at

11   the end of September.  They were pushing back, talking about

12   their deadlines, and, initially, our reaction was not, you

13   know, frankly, we said well, the deadlines were negotiated

14   without us even though you knew you had to litigate with us.

15   So now we'd like to talk about the deadlines, but in the scheme

16   of things, particularly in light of a commitment they made to

17   us that they'd give us their documents, Charter would, by the

18   end of March, we agreed.  We just decided we would take their

19   schedule, make it easy, but we really do want our documents.

20   And I'll let Mr. Angiolillo sort of speak to what Mr. Powell

21   had proposed.  So if they want to file a motion to dismiss

22   they're free to do that.  I mean, I'm not certain it makes

23   sense other than to address core or noncore.  But we'll

24   obviously take a look at it and address their schedule with

25   them once we see it, perhaps, if that makes sense to Your

Honor.

Alternatively, if Your Honor feels you have to set a schedule now with respect to both core and noncore as well as the motion to dismiss then we can agree to the schedule although, again, our principal focus, Your Honor, is not to get distracted with the sideshow and just get our documents so we can really address the issues that we know need to be addressed.

I think that's all I wanted to address for Your Honor, and I think I'll turn it over to Mr. Angiolillo to talk about both length of trial as well as the scheduling issues and the document production issues that we have and our concerns.

THE COURT: Okay.

MR. PANTALEO: Thank you.

MR. ANGIOLILLO: Good morning, Your Honor. Again, Bruce Angiolillo from Simpson Thacher for JPMorgan Chase as agent. I'm the litigator, and if I may address Your Honor's first question with respect to how we find ourselves one week into a reorganization process that has become adversarial, let me address it and with respect to what the open issue is. As Mr. Powell indicated, it appears that the friction between the interested parties at this point is when will the document productions be complete? And in that regard, Your Honor, the schedule that they've proposed that we are prepared to live with is fundamentally, Your Honor, if I may be colloquial, a

1    very big ask.  And it's a very big ask because they want to

2    just -- they want to start depositions this month.  They want

3    to complete them in sixty days.  They want a very early trial

4    date.  And --

5         THE COURT:  Well, welcome to bankruptcy court.

6         MR. ANGIOLILLO:  Yes, Your Honor.  And it's for that

7    reason that back in February, and, indeed, back in January,

8    faced with a process that was unfolding to the exclusion of the

9    senior lenders we reached out and said we understand that

10   you're going to want to move aggressively.  Let us work with

11   you so that with respect to the disputes that we apparently

12   have that we will have the documents and we'll be able to move

13   as expeditiously as you want to move.  Because the reason why

14   there is a July 27 proposed trial date is one that's been

15   created by the parties.  July 23.  Excuse me, Your Honor.

16        THE COURT:  I was double checking because it was the

17   wrong date.

18        MR. ANGIOLILLO:  I'm supposed to be in trial in

19   Washington, DC on the 27th, but that's neither here nor there.

20        What's missing from the schedule is a completion date

21   for document production.  Now, Your Honor, as Mr. Powell

22   indicated, that we couldn't get anyone's attention until

23   Mr. Pantaleo delivered to Mr. Basta the complaint.  And then we

24   finally got someone who would return our calls.  And that led

25   to face-to-face discussions between the bankruptcy

1   practitioners and the litigators, with the assurances from

2   Charter, both on its own behalf and on behalf of advisors and

3   offering their good offices with respect to the bondholders and

4   the Paul Allen Group, that if we held off from commencing this

5   breach of contract action relating to prepetition conduct,

6   which we were prepared to file, which the clients had

7   authorized us to file, we would hold off, and they indicated

8   that they anticipated filing for bankruptcy possibly at the end

9   of the month of March.  We would hold off if you gave us your

10  documents.

11          And so that there wouldn't be any dispute, and so

12  there wouldn't be any confusion, within a matter of days we

13  delivered a written document request.  In response to that

14  written document request, which relates to the allegations in

15  the complaint, Mr. Basta said, you know, we understand that you

16  have other issues that are going to be ripening when we file.

17  So rather than put that off, contrary to what Mr. Powell was

18  saying today, we want a second request from you.  And we want

19  you to lay out all the other requests with respect to change of

20  control issues, feasibility of the plan issues, because we want

21  to get you all of those documents before the end of March.

22          And we said okay.  And we said we will not file the

23  complaint, and we will abide the process.  And, as Your Honor

24  heard last week at the first day hearing, that what did we end

25  up with by the end of the month of March?  Two boxes of

1    documents before they filed.  And then, because of a conference

2    call on that Friday before we came to see Your Honor on Monday,

3    where we figured out that they have a data room.  A data room.

4    We're talking a data room.

5           THE COURT:  Are we talking a --

6           MR. ANGIOLILLO:  And everybody else has had access to

7    them.

8           THE COURT:  Are we talking a data room or are we

9    talking a virtual data room?

10           MR. ANGIOLILLO:  We're talking, I think, a virtual

11    data room, Your Honor.  That only upon figuring that out, then,

12    over the weekend, well, now, maybe we'll have access to the

13    data room.  After we saw Your Honor last week, and after

14    hearing what their proposed schedule was, we wrote, my partner

15    Mr. Wang, wrote a letter and said so we can come in today

16    without this dispute, notwithstanding the commitment to produce

17    the documents by March 31, which you are unable to do, make a

18    commitment to us that you'll get them to us by the end of the

19    week.  Can't do that.  Well, make us a commitment that you can

20    get to them by April the 9th.  I can't really do that either.

21    And with respect to your advisors, the lawyers who represented

22    you at the time you entered into the credit agreement, with

23    respect to the bondholders, with respect to Mr. Allen, we have

24    virtually nothing and no commitments.  And that was part of the

25    deal back at the beginning of March as well.

1          So, Your Honor, where we end up is we'll live with

2    this schedule.  But what we need from the Court as part of this

3    schedule, which we have requested but has been rejected, we

4    need Your Honor to say if you're inclined to embrace the

5    schedules being proposed which JPMorgan Chase, as agent bank,

6    will live with, set a date certain for the document production

7    to be completed by Charter, by the Allen Group and by the

8    bondholders and their advisers, as they previously committed,

9    as they indicated that they would do by the end of March.  Set

10   a date, respectfully, Your Honor.  We need a date.  We can live

11   with April the 9th.

12          THE COURT:  Before you sit down --

13          MR. ANGIOLILLO:  Yes, Your Honor.

14          THE COURT:  I just want a clarification on something

15   you just said.  It's not clear to me in what manner the

16   document production agreement has been set forth in a binding

17   writing or whether or not it's simply an exchange of e-mails or

18   correspondence.  I'd like to know how it is documented.

19          THE COURT:  And it's also --

20          MR. ANGIOLILLO:  It is --

21          THE COURT:  I'm not quite done.

22          MR. ANGIOLILLO:  Oh, excuse me, Your Honor.

23          THE COURT:  And it's also not clear to me whether the

24   understandings that you have described relating to document

25   production that occurred during March, presumably as an

1    inducement for you to forbear from filing your complaints

2    sooner, presumably in district court or New York Supreme, it's

3    not clear to me whether other parties in interest were also

4    subject to the same understanding, namely Mr. Allen and the

5    crossover committee members.  I'd like a clarification on those

6    two issues.

7         MR. ANGIOLILLO:  Yes, Your Honor.  If I may, the

8    agreement with respect to proceeding that was set forth back

9    in -- on March the 5th it was memorialized, I believe, Your

10   Honor.  And the body of an e-mail exchange between my partner,

11   Mr. Pantaleo and Mr. Basta set forth the agreement that had

12   been reached.  If Your Honor wishes to have a copy we can

13   provide it to you.

14        THE COURT:  I don't need it.

15        MR. ANGIOLILLO:  Okay.

16        THE COURT:   I was just wondering how it was

17   evidenced.

18        MR. ANGIOLILLO:  Right.  Now, least I create any

19   misimpression with the Court, I stand here not today to ask the

20   Court to enforce an agreement among counsel that proceeded the

21   commencement of this proceeding.  I'm also not asking the Court

22   to rule with respect to the good faith or the past performance

23   of any of the interested parties.  What I'm here to say is I'm

24   reporting to the Court what has happened.  And given the

25   schedule that is being put forward here, and given that it all

1    hangs on the ability to obtain the documents, that if past is

2    prologue we need a date certain for them to complete

3    production.  And that's the only ingredient that's missing, at

4    this point, from the proposed schedule.

5            Your Honor also asked earlier with respect to the

6    amount of time that the parties anticipate the confirmation

7    processing hearing/adversary proceeding would take.  Your

8    Honor, at this point in time we're in the realm of

9    guesstimates, but based upon past experience I think three days

10   is probably the minimum, but I don't expect, Your Honor, that

11   it would stretch more than a working week.  That's my best

12   judgment at this point in time.  If there are any other

13   questions, Your Honor?

14           THE COURT:  No.  Thank you.

15           MR. ANGIOLILLO:  Thank you.

16           MR. POWELL:  Your Honor, I'm sorry.  I just wanted to

17   respond very briefly, if I could.

18           THE COURT:  All right.  And then I'll hear from

19   counsel for the crossover committee.  No, you can respond.

20           MR. POWELL:  Okay.

21           THE COURT:  And then I'll hear from counsel for the

22   crossover committee, and then I'll hear from counsel for

23   Mr. Allen.

24           MR. POWELL:  As I started with, the bank's response

25   on Friday said that they would live with this schedule if we

were substantially complete by April 9.  And I said to Your

Honor, with respect to the first request, we would.  With

respect to the second request, part of that is going to come a

week later.  So in my view we have addressed the bank's

concerns.

I do want to, Your Honor, respond to some of the

statements and implications about the pace of our document

production.  Within the last four weeks, after getting this

draft first document request, we have retained an outside

vendor, we have enlisted, I would say conscripted, ten to

thirty Kirkland & Ellis document reviewers.  We've collected

more than 55,000 documents, and we've produced more than 50,000

pages of documents.

There was just a statement made that by the end of

March we had only produced a box or two of documents.  That's

incorrect.  By the end of March, which was the date reflected

in our agreement, we had produced more than 44,000 pages of

documents.  All of that before the terms of a protective order

were even agreed upon.  So the suggestion that we were dragging

our feet, Your Honor, is untrue.

Last point.  With respect to this data room, there is

a data room.  The data room, as Your Honor could imagine,

contains many, many documents that are not responsive to their

requests.  By the time we got the request from the banks to

have access to the data room we had already gathered the

responsive documents from the data room.  They wanted access to

the data room in its entirety.  Within twenty-four hours we

gave them access.  Within forty-eight hours they had a hard

copy of all the responsive documents.  So, I think the

implications of what counsel just said are unfair and

inaccurate, Your Honor.

THE COURT:  Okay.

MR. EHRLICH:  Good morning, Your Honor.  Andrew

Ehrlich from Paul Weiss for the noteholder clients.  Your

Honor, we're slightly differently situated than Charter in

several respects, and I should preface my comments by the fact

that our clients want to get this result expeditiously and have

been working very, very hard to get all the information that

our colleagues at Simpson Thacher have requested, and we're

trying to do that in as collegial a fashion as possible.  We

got draft document requests on March 11th, so we were a couple

of weeks behind the draft requests from Charter.  We also have,

including advisors, roughly a dozen clients from whom we are

collecting.  So, as Your Honor might imagine, the burden, the

logistical burden, is substantial.

Notwithstanding that, I advised Mr. Wang of Simpson

Thacher on Friday afternoon, prior to his filing his papers,

that we expected to be roughly a week to ten days, at the most

two weeks, behind Charter in terms of completing our

production.  I could represent to the Court that we feel

1    comfortable we could substantially complete by April 20th,

2    which would be roughly ten days before depositions begin, with

3    substantial rolling production before then, so that by the

4    April 9th date the banks would have a large quantity of our

5    documents, and by April 20th we would be fully complete and

6    that we'd produce a privilege log by April 22nd.  So we believe

7    that's a very reasonable schedule.  I proposed it to Mr. Wang

8    on Friday.  I didn't hear a response as of yet, and I'm hoping,

9    in response to your first question, we can work it out.  The

10   motion appeared to call for an April 9th date, but given the

11   circumstances of when we first got the requests, the number of

12   clients, I will not bore the Court with the complexities of

13   twelve different information technology platforms and the like.

14   It has been a truly Herculean effort, but we are quite

15   optimistic we can do this quickly and get them everything

16   they've asked for by April 20th.  I should note that they have

17   been quite reasonable.  We've met and conferred numerous times

18   about the scope and time frame and the like, and we've, I

19   think, reached common sense ways of narrowing the request that

20   both parties can live with.

21         THE COURT:  Okay.

22         MR. EHRLICH:  Thank you, Your Honor.

23         MR. ZIMET:  Your Honor, Robert Zimet for Mr. Allen.

24   To answer Your Honor's question with respect to timing for

25   completion we expect to have made a very substantial dent, and,

1    perhaps, even close to completion, later this week and view the

2    16th as a date where we could anticipate that we'll be

3    essentially done with our document production, barring

4    something going wrong.  We have about sixteen lawyers who are

5    sleepless in Seattle going through the documents that have been

6    requested.  Part of the reason why it is taking so long is

7    because of the natural difficulties that one has in formulating

8    computer searches and then coming to agreement with counsel

9    about them.  For example, and this is not meant in any way to

10   cast dispersion on anybody, they propose a search term trying

11   to capture communications with Paul Weiss, and they say well,

12   search for everything with Paul on it.  Of course Mr. Allen's

13   first name is Paul, so that has unintended consequences.  But

14   we've been able to solve those problems, and, I think, in

15   fairness to everybody, getting documents essentially complete

16   two weeks before fact deposition starts is a luxury that we

17   often don't have in expedited proceedings, and I think that's

18   adequate to the circumstance.  So unless Your Honor has any

19   questions, that's Mr. Allen's position.

20            THE COURT:  No, I have no questions.  Thank you.

21            MR. ZIMET:  Thank you.

22            THE COURT:  Is there anyone else who wishes to be

23   heard on this subject?  Well, based on what I've heard and what

24   I've read it seems to me that there is substantial agreement on

25   the schedule that has been originally proposed by the debtor

1    for dealing with both the adversary proceeding and the issues

2    relating to confirmation, with the exception of the timing for

3    substantial completion of document productions by the debtors,

4    the crossover committee, and the Paul Allen Group and the date

5    for substantial completion of privilege logs.  Not a lot has

6    been said about privilege logs, and I assume that that's

7    something that is being developed in the ordinary course of

8    document review and will not be an issue.  If I'm wrong

9    somebody should break in and tell me that.

10            MR. ZIMET:  I stand to break in, Your Honor, if I

11   may.  I didn't address it, the subject of privilege logs,

12   because I hoped we could come to some agreement.  One of the

13   things I would propose, for example, because if we're dealing

14   with many thousands of documents that are privileged, and the

15   communications between Mr. Allen and his counsel are many and

16   are electronic, and, what I would think is, if we could agree,

17   for example, that communications that are strictly between

18   Mr. Allen or principles of Vulcan and counsel, with nobody else

19   in the communication, that we don't have to -- and where

20   counsel believes they are requests for advice and advice going

21   back, we don't have to list them individually.  That would

22   substantially ease the problem if we would -- we would provide

23   a conventional log, certainly, with respect to communications

24   where privilege is claimed where there may be third parties

25   involved in the communications so counsel can test it.  That

1    type of accommodation, I hope, we could work out with counsel,

2    and that's a problem with producing a privilege log that I hope

3    wouldn't have to ask the Court to decide.  But I hope that

4    would not.

5          MR. ANGIOLILLO:  That's a nonissue, Your Honor.

6    We'll work with them on that.

7          MR. ZIMET:  All right.  Thank you.

8          THE COURT:  All right.

9          MR. ZIMET:  And thank you, Mr. Angiolillo.

10         THE COURT:  All right.  Thanks for the clarification.

11   The privilege log issue is, as a result of that colloquy,

12   really not an issue.  What I understand to be the debtors'

13   position, all posturing by the parties put to one side, is that

14   substantial completion of document production as to request

15   number one is possible, and I think I heard a commitment that

16   it would occur on the 9th as requested by JPMorgan.  As to

17   documents comprehended by the second document request, it's my

18   understanding that those will be produced by the 16th.

19   Correct?

20         MR. POWELL:  Correct, Your Honor, as to both points.

21         THE COURT:  It's also my understanding that counsel

22   both for the noteholder group and Mr. Allen's Group have

23   undertaken to substantially complete document production

24   relating to document requests that were served on March 11 by

25   the 20th.  That's my recollection of what was said.  If I have

1     the dates wrong somebody should correct me.

2          MR. ZIMET:  I think we thought we could do a little

3     better, a few days better, but maybe I shouldn't have stood up

4     and said it.

5          THE COURT:  Great.  Then you'll do better.  I'm just

6     hearing the 20th as an outside date, because I believe counsel

7     for the noteholder group indicated that the 20th was -- is that

8     correct?

9          MR. EHRLICH:  That's correct, sir.

10         THE COURT:  That the 20th was the outside date by

11    which their group should be able to substantially comply with

12    the document requests, and I incorporate, by reference, the

13    enormous burden associated with representing so many different

14    parties you have to go through a document review.

15         All of this seems to me like an agreement, because I

16    see no reason for me to micromanage the difference between the

17    16th of April and the 20th of April or the 16th of April and

18    the 23rd of April.  Ordinarily judges, and this is true of

19    bankruptcy judges, district court judges and state court

20    judges, are loath to become involved in discovery disputes or

21    micromanaging discovery schedules unless it's absolutely

22    necessary to do so.  And that's certainly true in my case.

23         This is, however, an unusual situation in that the

24    discovery at issue started prepetition in contemplation of

25    being completed post-petition.  It's also unusual in that the

1   discovery, and I've seen none of the requests, appears to

2   extend not only to issues relating to the adversary proceeding

3   but also to the kinds of issues that one would ordinarily

4   expect to be the subject of a contested confirmation hearing.

5          As best I can judge from the comments of counsel and

6   the stature of counsel this process is being managed on an

7   extraordinarily expedited basis, in good faith, and I am not

8   aware of any grounds for any party, including the banks, to

9   assert grounds for delay or prejudice on the basis of the

10   delivery of documents a week later than proposed in the

11   JPMorgan response.  In fact, reading between the lines of

12   Mr. Pantaleo's comments it seems that the principal issue that

13   brings this matter to court today is not so much the

14   identification of dates for the trial and for briefing and

15   witness discovery as much as it is providing some certainty

16   with respect to the timing of the turnover of documents.  I

17   think that has been accomplished by virtue of the

18   representations that have made.

19          I'm prepared to approve the schedule as modified to

20   include dates for substantial completion of document

21   productions and a date for completion of privilege logs, but

22   rather than impose my best judgment as to what those dates

23   should be as a result of what I've heard it seems to me that it

24   would be useful for the parties who are present in Court today

25   to use this opportunity to reach an agreement concerning this

1  very narrow question, which is what will the outside dates be

2  for substantial completion of document production for each

3  party.  The dates may differ depending on whether we're talking

4  about the debtor, the crossover group or the Paul Allen Group,

5  and for privilege logs.  I believe that the agreements, once

6  reached, should be codified in a stipulation, which I will so

7  order, both in the main case and in the adversary proceeding.

8       Now, the trial date is something that I think the

9  parties should spend a little bit more time thinking about.

10  I'm not proposing that the 7/23/09 date be adjusted, but that's

11  a Thursday, and a three day trial means that you're all going

12  to be working in the middle of the summer on a Friday and a

13  Monday.  And that's fine.  I wouldn't make any plans for a

14  party in the Hamptons that weekend.  But what I think you

15  should do is consider whether starting on a Thursday is, in

16  fact, sensible, given that both sides view this as a three day

17  trial.  You may want to have the weekend in the middle.  I

18  don't care.  That's up to you.  But you end up with a somewhat

19  broken trial.  I'm indifferent.  But give it some thought.

20       I will also need to check my calendar during the

21  break we're going to take right now to see which days

22  surrounding the 23rd are available.  You may want to start a

23  day earlier.  You may want to start the following week, if

24  that's available on Monday, so you can actually start at the

25  beginning of a work week.  I'd like you to think about that,

just for purposes of having an orderly process.

Now, there's the pending matter of the motion to dismiss. I am inclined to hear that on the 29th of April, which is the day previously reserved for the disclosure statement, but just because I'm inclined to do that doesn't mean that I'm foreclosing an opportunity on the part of the banks if they wish to argue for a different date after seeing the motion itself. The comment made by Mr. Pantaleo earlier was one based upon a black box theory. He's talking about the scheduling of a hearing in connection with a motion to dismiss which has been characterized by counsel, but while I have no doubt that the issues identified by counsel are, in fact, the issues that will find their way into the motion to dismiss, it may be that the motion itself carries with it some issues that may lead to a request for discovery with respect to the motion to dismiss. And it will, no doubt, be a contested matter and be a matter that could be delayed.

Given the schedule that we have, however, I would encourage the parties to avoid delay and to move each procedural aspect of both the main case and the adversary proceeding forward as expeditiously as possible. That does not mean that delay for a good cause will not be considered.

Now, there were two parties, representatives of the third lienors and Wilmington Trust Company, who expressed some interest in using today's scheduling hearing as some

1  opportunity to make noise about monitoring the adversary

2  proceeding.  And I mean no disrespect in saying making noise.

3  It's, in effect, you're using the opportunity of a scheduled

4  hearing to express a desire to do something which is not

5  presently before me in the form of a motion or any other

6  request that requires my attention.  I'm inclined not to give

7  you the opportunity to speak to the issue, because it's not

8  presently before me, but would suggest that to the extent that

9  there is, quote, "monitoring", close quote, of the adversary

10  proceeding it is probably premature to get into that until

11  after we've heard and considered the motion to dismiss because

12  the adversary proceeding either will live or die, presumably,

13  after that.

14       Additionally, ordinarily parties do not have a right

15  to monitor proceedings in an adversary proceeding unless they,

16  like a creditors' committee, have a statutory obligation to

17  monitor or there is a motion to intervene which is granted.  If

18  the parties to the adversary proceeding, nonetheless, wish to

19  provide access to information relating to the adversary

20  proceeding that's their privilege, and if they choose not to

21  that's their privilege as well.

22       Is there anything more for this morning?

23       MR. POWELL:  Not from our side, sir.

24       THE COURT:  Mr. Basta?

25       MR. BASTA:  I had a very small thing, Your Honor,

1   which is during our first day presentation I used three

2   visuals, a petition date, an organizational structure, a

3   treatment chart and a post-effective date structure, and there

4   was a slight error in our effective date structure that we used

5   that day.  The ownership interest from CCI into Holdco was

6   incorrectly reflected on the chart that I gave to the Court,

7   and I would just like to hand up a corrected version.

8          THE COURT:  That's fine.  Is the error highlighted?

9   Apparently not.

10          UNIDENTIFIED SPEAKER:  It is now, Your Honor.

11          MR. BASTA:  Yes, Your Honor.

12          THE COURT:  Now, it is.

13          MR. BASTA:  Thank you, Your Honor.

14          THE COURT:  Okay.  Thank you.

15          MR. ANGIOLILLO:  Your Honor, if I may?  It was

16   unclear to me with respect to what counsel indicated they were

17   prepared to do regarding the deadlines for producing documents,

18   the matter of their advisors, and, if I may, ask Your Honor if

19   we could just have clarification so that we don't have another

20   set of negotiations regarding the advisors.  Lazard, for

21   example.  We've been working in the context of each of the

22   interested groups and their advisors, and I just would ask,

23   respectfully, if we could have some clarification on that.

24          THE COURT:  Fine.

25          MR. ANGIOLILLO:  Thank you.

1          MR. POWELL:  Jeff Powell for the debtors, Your Honor.

2    I intended my remarks to include the advisors as well.

3          MR. EHRLICH:  Andrew Ehrlich for the noteholders.  We

4    intended to include our advisors as well.

5          MR. ZIMET:  Ditto, Your Honor.

6          MR. ANGIOLILLO:  Thank you.

7          THE COURT:  Everybody's being very cooperative --

8          ALL:  Thank you, Your Honor.

9          THE COURT: -- which is nice to see.  Is there

10   anything more for this morning?  If you'll then submit a form

11   of scheduling order that reflects the understandings reached

12   during this morning's hearing I'll enter that promptly.  We're

13   adjourned.  Thank you.

14        (Proceedings concluded at 11:47 AM)

15

16

17

18

19

20

21

22

23

24

25

I N D E X

RULINGS

|                        | Page | Line |
|------------------------|------|------|
| Approval of Scheduling Order | 29   | 19   |

C E R T I F I C A T I O N

I, Hana Copperman, certify that the foregoing transcript is a
true and accurate record of the proceedings.


_____

HANA COPPERMAN


Veritext LLC

200 Old Country Road

Suite 580

Mineola, NY 11501


Date:  April 7, 2009