Bruce D. Angiolillo
Peter V. Pantaleo
Bryce L. Friedman
George S. Wang
SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Telephone: (212) 455-2000
Facsimile: (212) 455-2502

Counsel for JPMorgan Chase Bank, N.A.,
as Administrative Agent for the Prepetition Lenders

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>CHARTER COMMUNICATIONS, INC.<br><br>       Debtors. | Chapter 11 Cases<br><br>09-11435(JMP)<br><br>(Jointly Administered) |
| JPMORGAN CHASE BANK, N.A.,<br>as Administrative Agent,<br><br>       Plaintiff,<br><br>-against-<br><br>CHARTER COMMUNICATIONS OPERATING,<br>LLC and CCO HOLDINGS, LLC,<br><br>       Defendants. | Adversary Proceeding<br>No. 09-01132(JMP) |

**JPMORGAN'S MEMORANDUM OF LAW IN OPPOSITION**
**TO DEBTORS' MOTION TO DISMISS JPMORGAN'S**
**ADVERSARY COMPLAINT AND REQUEST FOR A**
**DETERMINATION UNDER SECTION 157(b)(3)**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ iv

PRELIMINARY STATEMENT .......................................................................................... 1

BACKGROUND ................................................................................................................. 4

    A.    The Prepetition Credit Agreement ............................................................. 4

    B.    Section 8(g)(v) ............................................................................................ 4

    C.    CCO Made Representations Of "No Default" In Order To Borrow An Additional $750 Million From Lenders In The Fourth Quarter Of 2008 ............................................................................... 5

    D.    Charter Holdings And CIH Were Each "Unable to . . . Pay Its Debts As They Become Due" ..................................................................... 5

    E.    CCO's "No Default" Representations Were False ..................................... 6

    F.    CCO Committed Additional Breaches ........................................................ 6

    G.    CCO Makes Additional Misrepresentations In February 2009 ............................................................................................................ 7

    H.    CCO Asks JPMorgan To Delay Filing Its Breach Of Contract Lawsuit Until After CCO Files For Bankruptcy ...................... 7

    I.    CCO Files For Bankruptcy Protection ...................................................... 7

ARGUMENT ...................................................................................................................... 8

    I.    This Dispute Over A Prepetition Breach Of Contract Is Not Core ................... 8

        A.    This Adversary Proceeding Is Not Core Under The Statutory Test In 28 U.S.C. § 157(b) ....................................................... 8

            1.    Under 28 U.S.C. § 157(b), A Proceeding Is Core Only If It (i) Invokes A Substantive Right Under The Federal Bankruptcy Laws Or (ii) Is Of A Nature That Could Arise Only In A Bankruptcy Case ....................................................................................... 9

            2.    This Contract Action Does Not Invoke Substantive Bankruptcy Rights And Is Not Unique To Bankruptcy ................................... 11

            3.    The Need To Cure Breaches In Connection With A Core Proceeding Does Not Make The Dispute Core ........................... 14

        B.    JPMorgan Has Not Subjected Itself To The Blanket Jurisdiction Of The Bankruptcy Court ...................................................... 17

        C.    *Marathon* And Its Progeny Mandate Resolution Of This Proceeding By An Article III Court.......................................................... 19

II.    The Court Does Not Have Discretion To Dismiss The Adversary Proceeding ......................................................................................... 20

III.    The Complaint States Valid Causes of Action ..................................... 21

        A.    The Plain Reading Of "Unable To . . . Pay Its Debts As They Become Due" Is Prospective .......................................... 22

                1.    Section 8(g)(v) Is Not In Conflict With Any Other Provision Of the Prepetition Credit Agreement.....................................25

                2.    The Complaint Pleads Charter Holdings' And CIH's Inability To Pay Their Debts As They Become Due..............................26

        B.    Defendants' Interpretation Of Section 8(g)(v) Requires Resort To Extrinsic Evidence And Thus Cannot Be A Proper Basis For The *Grant* Of A Motion To Dismiss............................ 28

CONCLUSION ............................................................................................. 29

# TABLE OF AUTHORITIES

## Cases

*CFTC v. Schor*, 478 U.S. 833 (1986) .......................................................................... 20

*Drexel Burnham Lambert Production Corp. v.*
*MCorp.*, No. 88C-NO-80, 1989 Del. Super.
LEXIS 69 (Del. Super. Ct. Feb. 23, 1989) ................................ 24, 25, 27

*Germain v. Conn. Nat'l Bank*, 988 F.2d 1323 (2d
Cir. 1993) ................................................................................................................ 18

*Gregory v. Daly*, 243 F.3d 687 (2d Cir. 2001) ............................................................ 21

*Halper v. Halper*, 164 F.3d 830 (3d Cir. 1999) .......................................................... 10

*In re Adelphia Commc'ns Corp.*, 307 B.R. 404
(Bankr. S.D.N.Y. 2004) .................................................................................... 14

*In re Allied Mech. & Plumbing Corp.*, 62 B.R. 873
(Bankr. S.D.N.Y. 1986) .............................................................................. 10, 11

*In re Best Prods. Co.*, 68 F.3d 26 (2d Cir. 1995) ........................................ 9, 13, 16, 17

*In re Burger Boys, Inc.*, 183 B.R. 682 (S.D.N.Y.
1994) .............................................................................................................. 10, 16, 20

*In re CBI Holding Co.*, 529 F.3d 432 (2d Cir. 2008) ........................................ 9, 13, 14

*In re Charter Commc'ns, Inc.* (Mar. 30, 2009) (No.
09-11435(JMP) .................................................................................................... 27

*In re City of Bridgeport*, 129 B.R. 332 (Bankr. D.
Conn. 1991) ................................................................................................... 23, 24

*In re Delta Air Lines, Inc.*, No. 07-1561 (ASH),
2007 WL 3166776 (S.D.N.Y. 2007) ............................................................. 14

*In re Enron Corp.*, 353 B.R. 51 (Bankr. S.D.N.Y.
2006) ....................................................................................................... 9, 14, 17, 18

*In re Gardner*, 913 F.2d 1515 (10th Cir. 1990) ...................................................... 9, 11

*In re Iridium Operating LLC*, 285 B.R. 822
(S.D.N.Y. 2002) ................................................................................... 14, 17, 18

*In re J.T. Moran Fin. Corp.*, 124 B.R. 931 (S.D.N.Y. 1991) ................................................................................................ 16

*In re Kolinsky*, 100 B.R. 695 (S.D.N.Y. 1989) ............................................. 10

*In re Manville Forest Prods. Corp.*, 896 F.2d 1384 (2d Cir. 1990) ................................................................................ 8, 9, 13

*In re Northwest Airlines Corp.*, 384 B.R. 51 (S.D.N.Y. 2008) ............................................................................... 18

*In re Orion Pictures Corp.*, 4 F.3d 1095 (2d Cir. 1993) ...................................................................................... passim

*In re PSINet*, 271 B.R. 1 (Bankr. S.D.N.Y. 2001) ................................... 14, 17

*In re S.G. Phillips*, 45 F.3d 702 (2d Cir.1995).................................... 8, 13

*In re Toledo*, 170 F.3d 1340 (11th Cir. 1999)................................... 10, 11

*In re Town of Westlake*, 211 B.R. 860 (Bankr. N.D. Tex. 1997) ............................................................................... 24

*In re U.S. Brass Corp.*, 110 F.3d 1261 (7th Cir. 1997) ......................................................................................... 15

*In re U.S. Brass Corp.*, 301 F.3d 296 (5th Cir. 2002) ......................................................................................... 11

*In re U.S. Lines, Inc.*, 197 F.3d 631 (2d Cir. 1999) ............................... passim

*In re Winimo Realty Corp.*, 270 B.R. 108 (S.D.N.Y. 2001) ............................................................................................. 9

*In re Wood*, 825 F.2d 90 (5th Cir. 1987) .......................................... 13

*LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195 (2d Cir. 2005) ................................ 23

*Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982) ......................... 8, 10, 15, 19, 20

*PaineWebber, Inc. v. Bybyk*, 81 F.3d 1193 (2d Cir.1996) ...................................................................................... 23

*Public Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237 (1952) ............................................................................. 21

*Sanders Confectionery Prod's v. Heller Fin.*, 973
    F.2d 474 (6th Cir. 1992) ................................................................ 11

*Security Farms v. Int'l Bhd. of Teamsters,*
    *Chauffers, Warehouseman & Helpers*, 124 F.3d
    999 (9th Cir. 1997) .................................................................... 11

*Specialty Mills, Inc. v. Citizens State Bank*, 51 F.3d
    770 (8th Cir. 1995) .................................................................... 11

*Starter Corp. v. Converse, Inc.*, 84 F.3d 592 (2d Cir.
    1996) ........................................................................................ 21

*Valley Historic Ltd. P'ship v. Bank of New York*,
    486 F.3d 831 (4th Cir. 2007) .................................................... 12

*Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995) ............................. 21

**Statutes and Rules**

11 U.S.C. § 101(32)(c) .................................................................... 23

11 U.S.C. § 109(c)(3) ...................................................................... 23

11 U.S.C. § 365 ............................................................ 14, 15, 16, 17

11 U.S.C. § 510(a) .......................................................................... 13

11 U.S.C. § 1124 ............................................................................. 14

11 U.S.C. § 1124(2) ........................................................................ 16

28 U.S.C. § 157 .......................................................................... 8, 10

28 U.S.C. § 157(b) ............................................................... 2, 8, 9, 10

28 U.S.C. § 157(b)(2) ............................................................. 7, 9, 12

28 U.S.C. § 157(b)(2)(A) ............................................................ 9, 12

28 U.S.C. § 157(b)(2)(B) ............................................................ 9, 12

28 U.S.C. § 157(b)(2)(C) ............................................................ 9, 14

28 U.S.C. § 157(b)(2)(L) ............................................................ 9, 12

28 U.S.C. § 157(b)(2)(O) ............................................................ 9, 13

28 U.S.C. § 157(b)(3) ............................................................ 1, 3, 9

Fed. R. Civ. P. 8................................................................................................. 3, 22

JPMorgan Chase Bank, N.A. ("JPMorgan"), as Administrative Agent for prepetition secured lenders (the "Prepetition Lenders") to Defendant Charter Communications Operating, LLC ("CCO") under the Prepetition Credit Agreement[1] submits this Memorandum of Law and the accompanying Declaration of George S. Wang, dated April 26, 2009 ("Wang Decl.") in opposition to Defendants' Motion to Dismiss the Adversary Complaint and Request for a Determination Under Section 28 U.S.C. § 157(b)(3) (the "Motion").

## PRELIMINARY STATEMENT

This is a prepetition state law breach of contract action against a solvent debtor. This action was commenced in a bankruptcy case solely because CCO has filed for Chapter 11 protection, notwithstanding that there is nothing to reorganize, no debt to compromise and no business to rehabilitate. Because CCO has the means to pay all of its creditors' claims in full, there is nothing about this action that implicates the bankruptcy court's core functions, such as claims allowance, "[f]ixing the order of priority of creditor claims against a debtor, plac[ing] the property of the bankrupt, wherever found, under the control of the court, for equal distribution among the creditors, and administer[ing] all property in the bankrupt's possession." *In re U.S. Lines, Inc.*, 197 F.3d 631, 637 (2d Cir. 1999) (citations omitted).

This case is about a prepetition loan contract with JPMorgan, under which CCO borrowed over $8.2 billion. In its borrowing requests continuing through February 2009, CCO made representations that there were no Defaults or Events of Default. However, no later than by the fourth quarter of last year, at least one Designated Holding Company ("DHC"), as defined in the Prepetition Credit Agreement, was "unable to pay . . . its debts as they become due." That condition constituted a Default and Event of Default under Section 8(g)(v) of the Prepetition

---

[1]     Capitalized terms not otherwise defined herein have the same meaning as ascribed to them in the Complaint.

Credit Agreement. By falsely representing that there were no Defaults or Events of Default when it made its borrowing requests, CCO further breached the Prepetition Credit Agreement.

Defendants' Motion seeks three things: (1) a ruling that the adversary proceeding is a core proceeding; (2) a deferral of the issues raised in the Complaint until confirmation; and (3) dismissal of the Complaint for failure to state a claim. Defendants are not entitled to any of the relief they seek in this motion.

*First*, this is a non-core action. This adversary proceeding (i) is between parties who are solvent, (ii) involves classic state law claims, and (iii) arises out of breaches of contractual obligations that occurred *prior to* CCO's filing for bankruptcy. All of the claims are controlled by New York state law, which governs the Prepetition Credit Agreement. But for CCO's strategic bankruptcy filing, this case would indisputably be litigated before the District Court (or in state court). The Complaint asserts declaratory judgment claims against CCO, the sole Borrower under the Prepetition Credit Agreement.[2] CCO is solvent. Its assets exceed its liabilities by billions of dollars. CCO can pay all of its creditors' claims in full. While this Court may have to engage in the claims allowance process in the separate bankruptcy cases of Charter Communications, Inc. ("CCI") and its other affiliates (collectively, "Charter"), each of these bankruptcy cases is separate. CCO's bankruptcy case will not involve any process by which claims will be either allowed or disallowed.

Defendants concede that a bankruptcy court's power to hear and determine proceedings under Section 157(b) is limited to "core proceedings that either arise under title 11 or in a case under title 11." Motion at 3. This proceeding does not involve a substantive right created by federal bankruptcy law. It thus does not arise under title 11. Nor is this proceeding

---

[2] The Complaint also names CCO Holdings, the only other Charter party to the Prepetition Credit Agreement, as Defendant.

one that, by its nature, could arise only in the context of a bankruptcy case. Thus, it is not arising in a case under title 11. Rather, this is nothing more than a straightforward, state law contract dispute between a lender and a solvent borrower. As such, it is a classic "related to" proceeding, which by definition is not core. 28 U.S.C. § 157(b)(3).

*Second*, Defendants' request that this Court dismiss the adversary proceeding and consider the objections at confirmation must be denied under *In re Orion Pictures Corp.*, 4 F.3d 1095 (2d Cir. 1993). *Orion* specifically instructs that prepetition contract disputes *must* be resolved through a separate adversary proceeding even where related to a core bankruptcy function, such as assumption of executory contracts. *Id.* at 1098. Defendants, by contrast, cite not a single case requiring prepetition defaults to be resolved within a plan confirmation hearing.

*Third*, the Complaint plainly states a claim. The Complaint pleads the conclusion that a DHC was unable to pay its debts as they become. Compl. ¶¶ 57, 59, 60, 90. Such factual allegations, without more, satisfy the applicable notice pleading standard under Rule 8 of the Federal Rules of Civil Procedure, and thus automatically defeats Defendants' motion to dismiss. Defendants' interpretation of Section 8(g)(v) requires looking outside the contract to extrinsic evidence and by definition is not a proper basis for the grant of a motion to dismiss.

In any event, Defendants misconstrue the plain language of the Prepetition Credit Agreement. They maintain that a Section 8(g)(v) default is triggered only if a DHC failed to make a payment *in the past*. This constricted, backward looking interpretation cannot be reconciled with the plain language of the contract, which provides for a Default or Event of Default where a DHC is "unable to pay . . . its debts as they *become* due" (emphasis added). Courts analyzing identical language have held such language to be forward looking. Moreover, Defendants' own documents confess that their understanding of "ability to pay" is forward looking. At a minimum, such material issues of fact preclude dismissal.

## BACKGROUND

**A.      The Prepetition Credit Agreement**

Since 1999, the Prepetition Lenders and CCO have been parties to the Prepetition Credit Agreement, which has been amended from time to time, most recently in 2007.  Compl. ¶ 2.  CCO has borrowed approximately $8.2 billion under the Prepetition Credit Agreement. *Id.* ¶ 4.  CCO Holdings guaranteed CCO's obligations under the Prepetition Credit Agreement and undertook various other obligations under it.  *Id.*

**B.      Section 8(g)(v)**

CCO's business is fundamentally affected by the financial condition of several of CCO's affiliates.  *Id.* ¶¶ 5, 33.  For example, certain affiliates serve as the manager for and provide management services to CCO.  *Id.* ¶ 33.  CCO thus relies on the employees, officers and services of these affiliates in connection with its business and operations.  *Id.*  CCO also obtains programming content through contracts between its affiliates and cable content providers.  *Id.*  In addition, CCO is the sole source of operational cash flow for repayment of the debt of CCO's parents.  *Id.*

In light of this, JPMorgan requested the inclusion of an Event of Default tied to the financial condition of CCO affiliates designated as Designated Holding Companies.  *Id.* ¶ 5.  Section 8(g)(v) of the Prepetition Credit Agreement thus makes it a Default and Event of Default if any DHC, among other things, "shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due."  *Id.* ¶ 37(a).  Two of the DHCs are Charter Communications Holdings, LLC ("Charter Holdings" or "CCH") and CCH I Holdings, LLC ("CIH").  *Id.* ¶ 12.

**C.    CCO Made Representations Of "No Default" In Order To Borrow An Additional $750 Million From Lenders In The Fourth Quarter Of 2008**

From October 2 through November 5, 2008, CCO borrowed funds totaling $750 million from the Prepetition Lenders in four separate borrowings. *Id.* ¶¶ 41-45. On November 17, 2008, CCO obtained a letter of credit in the amount of $3.5 million. *Id.* ¶ 46.

Each time CCO borrowed more money or obtained a letter of credit, CCO represented to the Prepetition Lenders that "[n]o Default or Event of Default shall have occurred and be continuing on" such date. *Id.* ¶¶ 41-46.

**D.    Charter Holdings And CIH Were Each "Unable to . . . Pay Its Debts As They Become Due"**

As pleaded in the Complaint, two Designated Holding Companies, Charter Holdings and CIH, were each "unable to . . . pay its debts as they become due" no later than by the fourth quarter of 2008. *Id.*[3]

Historically, Charter Holdings paid the interest due on its debt using dividends upstreamed from CCO to CCO Holdings to CCH II, LLC ("CCH") to CCH I, LLC ("CCH I") to CIH to Charter Holdings. *Id.* ¶ 49. Every 2008 interest payment by a DHC through October 1, 2008 was made via this "daisy chain" of dividends. *Id.* ¶¶ 50- 54; Wang Decl., Ex. A (spreadsheet entitled "Charter Communications Restricted Payments by Bank Group to Allow Holding Companies to Pay Interest").

Under applicable law, however, each entity in this chain had to "

Filed Under Seal                          ." Wang Decl., Ex. B, at CTR-0004005

(minutes of October 28, 2008 CCI board meeting). This meant, for example, that only if CIH

---

[3]    The fact that these DHCs have filed for bankruptcy and proposed a plan of reorganization with limited distributions to creditors confirms their continuing inability to pay their debts as they become due. *See* Wang Decl., Ex. C., at 31-38 (Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code, Mar. 27, 2009).

had a financial surplus (net market salable value in excess of liabilities) equal to or exceeding the proposed distribution could CIH make a distribution to its parent Charter Holdings to enable Charter Holdings to make its interest payment.

By the fourth quarter of 2008 (the exact date will be determined in discovery), CIH knew or should have known that it had no surplus and could no longer pay dividends to Charter Holdings. Compl. ¶¶ 55, 62. This made Charter Holdings "unable to . . . pay its debts as they become due" because it lacked access to funds needed to make its debt payments in early 2009. Likewise, CCH I knew or should have known that it too had no surplus, which rendered its parent, CIH, "unable to . . . pay its debts as they become due" as well. Wang Decl., Ex. D at CTR-00040067 (minutes of Dec. 9-10, 2008 CCI board meeting) (

Filed Under Seal

).

### E.     CCO's "No Default" Representations Were False

The inability of Charter Holdings and CIH to pay their debts as they become due constituted Events of Default under Section 8(g)(v). Compl. ¶ 57. Because Charter Holdings and CIH were each unable to pay its debts as they become due, CCO's repeated representations of "No Default" during the fourth quarter of 2008 were false. *Id.* ¶¶ 41-47.

### F.     CCO Committed Additional Breaches

On November 17, 2008, CCO made intercompany transfers including prepayments of intercompany loans and payments of dividends. *Id.* ¶¶ 69, 73. The Prepetition Credit Agreement, however, prohibits both prepayments of intercompany loans and payments of dividends (with exceptions not relevant here) where a Default or Event of Default has occurred and is continuing. *Id.* ¶ 67. Because a Default and Event of Default had occurred and was

continuing as of November 17, 2008, these intercompany transfers were breaches of the Prepetition Credit Agreement. *Id.* ¶ 70, 77.

### G. CCO Makes Additional Misrepresentations In February 2009

Again, on or about February 3, 2009, CCO made the same "no default" representation in its additional borrowing requests to the Prepetition Lenders. *Id.* ¶ 80-81. These representations were false. Charter Holdings and CIH each remained "unable to . . . pay its debts as they become due."

### H. CCO Asks JPMorgan To Delay Filing Its Breach Of Contract Lawsuit Until After CCO Files For Bankruptcy

In light of the numerous breaches of the Prepetition Credit Agreement, JPMorgan informed CCO on February 27, 2009 of its intent to file a lawsuit concerning breaches of the Prepetition Credit Agreement. Wang Decl. ¶ 4. As a courtesy, JPMorgan provided CCO a copy of the intended complaint. *Id.*.

CCO immediately asked JPMorgan to delay filing this lawsuit. *Id.* ¶ 5. CCO claimed that the lawsuit would complicate and harm CCO's restructuring efforts, and asked JPMorgan to wait until CCO filed for bankruptcy to commence its contract lawsuit. *Id.*

In an effort to be as cooperative as possible with CCO, JPMorgan agreed to delay filing its complaint in exchange for CCO's agreement to respond to discovery requests on an expedited, pre-litigation basis. *Id.* ¶ 6.

### I. CCO Files For Bankruptcy Protection

On March 27, 2009, CCO and numerous of its affiliates filed voluntary petitions for bankruptcy under Chapter 11. JPMorgan filed the instant adversary proceeding the same day that CCO filed for bankruptcy. In its Complaint, JPMorgan pleaded that the proceeding was not

a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(1) and (b)(2) and that it did not consent to entry of final judgment by the Bankruptcy Court. Compl. ¶ 24.

**ARGUMENT**

**I.     This Dispute Over A Prepetition Breach Of Contract Is Not Core**

> **A.     This Adversary Proceeding Is Not Core Under The Statutory Test In 28 U.S.C. § 157(b)**

This adversary proceeding is not core under the statutory test Congress enacted in response to *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 71 (1982). There, the Supreme Court held, as a matter of constitutional law, that a non-Article III court lacks the power to issue final orders without the consent of the litigants. The Court explained that "the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages." *Id.* at 71. Providing Congress and the lower courts with guidance regarding the limits of bankruptcy courts' jurisdiction, the Court stressed that the adjudication of "right[s] created by state law, right[s] independent of and antecedent to the reorganization petition that confer[s] jurisdiction on the Bankruptcy Court" is properly the province of Article III courts. *Id.* at 84.

Congress enacted 28 U.S.C. § 157 in direct response to *Marathon*. Section 157 categorizes all proceedings as core or non-core. *In re Manville Forest Prods. Corp.*, 896 F.2d 1384, 1389 (2d Cir. 1990). "Bankruptcy judges have the authority to 'hear and determine all . . . core proceedings arising under title 11 . . . and may enter appropriate orders and judgments, subject to review under section 158 of [title 28].'" *In re S.G. Phillips Constructors, Inc.*, 45 F.3d 702, 704 (2d Cir. 1995) (quoting 28 U.S.C. § 157(b)(1)). In a non-core proceeding, unless the

parties otherwise agree, the bankruptcy court can only recommend findings of fact and conclusions of law to the district court. *Id.*

      **1.**      **Under 28 U.S.C. § 157(b), A Proceeding Is Core Only If It (i) Invokes A Substantive Right Under The Federal Bankruptcy Laws Or (ii) Is Of A Nature That Could Arise Only In A Bankruptcy Case**

Core proceedings are those either "arising under title 11, or arising in a case under title 11." 28 U.S.C. § 157(b)(1); *accord* Motion at 3. A proceeding is "arising under title 11" if it invokes a substantive right provided by title 11. *In re Enron Corp.*, 353 B.R. 51, 57 (Bankr. S.D.N.Y. 2006). A proceeding is "arising in a case under title 11" if, by its nature, it could arise only in the context of a bankruptcy case. *Id.* Thus, a proceeding is core if it either (i) invokes a substantive right provided by title 11 (*i.e.* "arising under title 11") or (ii) is a proceeding that, by its nature, could arise only in the context of a bankruptcy case" (*i.e.* "arising in a case under title 11"). Section 157(b)(2) sets forth an illustrative list of proceedings that may be considered "core." 28 U.S.C. §§ 157(b)(2)(A)-(b)(2)(O).

In contrast to "arising under" or "arising in" proceedings, "related to" cases are not core: "Non-core proceedings, on the other hand, are those which are 'otherwise related to a case under title 11.'" *Manville*, 896 F.2d at 1389. "Actions which do not depend on the bankruptcy laws for their existence and which could proceed in another court are not core proceedings." *In re Gardner*, 913 F.2d 1515, 1518 (10th Cir. 1990). A proceeding is not non-core merely because its resolution may be affected by State law. 28 U.S.C. § 157(b)(3).

This basic distinction between core and non-core cases is well established in Second Circuit case law. *In re Best Prods. Co.*, 68 F.3d 26, 30-31 (2d Cir. 1995) (distinguishing "arising under" and "arising in" core proceedings from "related to" non-core proceedings); *In re CBI Holding Co.*, 529 F.3d 432, 460 (2d Cir. 2008) (drawing same distinction); *In re Winimo Realty Corp.*, 270 B.R. 108, 119 (S.D.N.Y. 2001) ("'Core' proceedings are matters 'arising

under' the Bankruptcy Code or 'arising in' bankruptcy cases. 'Non-core' proceedings are

'merely 'related-to' bankruptcy cases.'"); *In re Burger Boys, Inc.*, 183 B.R. 682, 685 (Bankr.

S.D.N.Y. 1994) ("In contrast [to a "related to" proceeding], a proceeding that 'arises under' title

11 or 'arises in' a case under title 11 is a 'core proceeding.' A core proceeding is generally

defined as a matter which would have no existence outside of the bankruptcy case."); *In re*

*Kolinsky*, 100 B.R. 695, 701 (Bankr. S.D.N.Y. 1989) ("If this adversary proceeding does not

arise under title 11, in order for the plaintiffs to establish that it is a core proceeding, it must arise

in a case under title 11."); *In re Allied Mech. & Plumbing Corp.*, 62 B.R. 873, 877 (Bankr.

S.D.N.Y. 1986) (defining "related to" case as one that does "not 'arise under' the Title 11 case or

'arise in' the Title 11 case; "In other words the right to relief in the adversary proceeding must

not depend upon the construction or application of bankruptcy law as expressed in Title 11.").

   This requirement, that a core proceeding must either (i) invoke a substantive

bankruptcy right or (ii) be of a nature that could arise only in the context of a bankruptcy case,

ensures that core jurisdition is exercised in a manner consistent with *Marathon*:

> [A] proceeding is core [1] if it invokes a substantive right provided by
> title 11 or [2] if it is a proceeding, that by its nature, could arise only in
> the context of a bankruptcy case. This Court and other courts of
> appeals have relied on this test to ensure that § 157(b) core proceeding
> jurisdiction is exercised in a manner consistent with *Marathon*.

*Halper v. Halper*, 164 F.3d 830, 836 (3d Cir. 1999) (internal quotation marks and citations

omitted). This test flows directly from the plain language of Section 157 itself:

> The linguistic structure of § 157 lends further support to this
> conclusion. Subsection (b)(1) equates core proceedings with those
> 'arising under title 11, or arising in a case under title 11,' whereas
> subsection (c)(1) makes 'non-core' proceedings synonymous with
> 'otherwise related to' proceedings. . . . [The] adversary proceeding
> neither 'arose under' nor 'arose in' the Bankruptcy Code as those
> terms of art have been understood, and therefore it must necessarily
> fall within the residual category of 'otherwise related,' *i.e.*, non-core
> matters.

*In re Toledo*, 170 F.3d 1340, 1349-50 (11th Cir. 1999).

Thus, courts have essentially universally adopted this test. *E.g., In re U.S. Brass Corp.*, 301 F.3d 296, 304 (5th Cir. 2002) (explaining that "a proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case"); *Security Farms v. Int'l Bhd. of Teamsters, Chauffers, Warehouseman & Helpers*, 124 F.3d 999, 1008 (9th Cir. 1997) ("Actions that do not depend on bankruptcy laws for their existence and that could proceed in another court are considered 'non-core.'"); *Specialty Mills, Inc. v. Citizens State Bank*, 51 F.3d 770, 773 (8th Cir. 1995) ("Core proceedings under 28 U.S.C. § 157 are those which arise only in bankruptcy or involve a right created by federal bankruptcy law."); *Sanders Confectionery Prods. v. Heller Fin., Inc.*, 973 F.2d 474, 483 (6th Cir. 1992) ("A core proceeding either invokes a substantive right created by federal bankruptcy law or [is] one which could not exist outside of the bankruptcy."); *Gardner*, 913 F.2d at 1518 ("Actions which do not depend on the bankruptcy laws for their existence and which could proceed in another court are not core proceedings.").

## 2. This Contract Action Does Not Invoke Substantive Bankruptcy Rights And Is Not Unique To Bankruptcy

The instant action raises straightforward, conventional state law contract questions such as whether CCO made misrepresentations and whether any DHC was unable to pay its debts as they become due. These issues are routinely decided by District Courts, as well as by state courts. The claims asserted in the Complaint are thus paradigmatically not core: "Where the issues raised in the adversary proceeding involve a state law breach of contract dispute which would not have been commenced in the bankruptcy court but for the bankruptcy filing, the adversary proceeding should be regarded as a 'related to case' which does not 'arise under title 11' or 'arise in' a case under title 11." *Allied Mech.*, 62 B.R. at 877. "It seems self-evident that a

claim, like the Debtor's breach of contract claim, that pre-dates the filing of the Chapter 11 case cannot be said to have arisen within that case." *Valley Historic Ltd. P'ship v. Bank of New York*, 486 F.3d 831, 835 (4th Cir. 2007); *see also id.* ("It follows that because the Debtor's breach of contract claim and tortious interference claim would have existence outside of the bankruptcy, they were not within the bankruptcy court's 'arising in' jurisdiction.").

This proceeding does not invoke substantive bankruptcy rights, so does not arise under title 11. Nor are the asserted claims either unique to bankruptcy proceedings or uniquely affected by CCO's bankruptcy case. This adversary proceeding will not require this Court to perform any of the core bankruptcy functions which might otherwise convert this action into something core. CCO is solvent. CCO's counsel said so at the first-day hearings. CCO can pay all of its creditors in full. This means there will be no "claims allowance process" for this Court to supervise. While this Court may have to engage in the claims allowance process in *other* Debtors' cases, this Court will not be called upon in CCO's bankruptcy case to prioritize the claims of competing creditors or to equitably divide up a limited asset pool among creditors.

In their Motion, Defendants cite four subsections of Section 157(b)(2) as supposedly relevant. None applies:

- Section 157(b)(2)(A), "matters concerning the administration of the estate": CCO is a solvent debtor and all of its claims can be paid in full regardless of the outcome of this proceeding. Thus, this proceeding does not concern the administration of the estate, other than in respect of augmenting the estate. That does not make a proceeding core. *See* Point I-A-3, *infra*.

- Section 157(b)(2)(B), "allowance or disallowance of claims": The claims allowance process is not at issue. All claims against CCO are allowed.

- Section 157(b)(2)(L), "plan confirmation": Proceedings found to be core under this provision are those about (i) approval of or objections to disclosure statements, (ii) objections to plan confirmation or (iii) interpretation of plan terms. This proceeding is none of the above. This is an adversary proceeding required to be brought as such under *Orion*. The need to cure breaches in

12

connection with a core proceeding such as plan confirmation does not make the dispute core. *See* Point I-A-3, *infra*. In any event, a plan of reorganization can be confirmed whatever the outcome of this proceeding.

- Section 157(b)(2)(O), "other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship": CCO is solvent and its assets will not be liquidated, nor will there be any adjustment to any of CCO's relationships with its creditors or equity security holders as a result of the adversary proceeding.

The nature of the prepetition state law contract issues raised by the Complaint stands in marked contrast to those in the Second Circuit cases relied upon by Defendants:

- *S.G. Phillips* involved disallowance of a claim, which the Second Circuit explained "could arise only in the context of bankruptcy." 45 F.3d at 706 (quoting *Manville*); *accord Manville*, 896 F.2d at 1390 ("'*Understood in this sense, a claim filed against the estate is a core proceeding because it could arise only in the context of bankruptcy.*'") (quoting *In re Wood*, 825 F.2d 90, 97 (5th Cir. 1987)) (emphasis supplied by the court).

- *Best Products* involved a contractual subordination dispute under 11 U.S.C. § 510(a). The *Best Products* court determined that an adversary proceeding to enforce a subordination agreement between creditors was core because it affected the priority rights of creditors and "the power to prioritize distributions has long been recognized as an essential element of bankruptcy law." 68 F.3d at 31-32. Here, by contrast, there is no need to determine priority among creditors because CCO can pay all claims in full. No one disputes that the Prepetition Lenders have highest priority as perfected first-lien secured lenders to CCO.

- *CBI* involved an adversary proceeding in which all of the claims at issue either directly affected allowance of a claim or were counterclaims by the estate against a creditor who had filed a proof of claim against the estate. *CBI Holding Co.*, 529 F.3d at 460-61. Here, by contrast, this Complaint does not affect allowance of any claims against CCO. Nor does it involve a counterclaim or other challenge to the Prepetition Lenders' claims.

- In *U.S. Lines*, the Second Circuit found an adversary proceeding to be core because it was the only way to avoid "an inequitable distribution among the creditors" as any proceeds "represent[ed] the only source of cash available to [a] group of creditors" of the debtor. 197 F.3d at 638-39. This proceeding, by contrast, will have no effect on the distribution of CCO's assets among its creditors. All can be paid in full whatever the outcome.

13

The District and Bankruptcy Court cases cited by Defendants are equally inapposite. They all concern the claims allowance process or other matters historically within the purview of bankruptcy courts. *See In re Delta Air Lines, Inc.*, No. 07-1561 (ASH), 2007 WL 3166776, at *3 (S.D.N.Y. 2007) (involving a claim characterized by the court as "tantamount to a counterclaim" against creditor who had filed a proof of claim); *In re Iridium Operating LLC*, 285 B.R. 822, 832 (S.D.N.Y. 2002) (involving an adversary proceeding that bore on the allowance or disallowance of a claim); *In re Enron Corp.*, 349 B.R. 108, 110 (Bankr. S.D.N.Y. 2006) (involving complaint "filed as a counterclaim to any proofs of claim by the Banks," which, as noted by the *CBI* court, is axiomatically core under 28 U.S.C. § 157(b)(2)(C)); *In re Adelphia Commc'ns Corp.*, 307 B.R. 404, 417-20 (Bankr. S.D.N.Y. 2004) (involving an adversary proceeding that implicated the claims allowance process triggered by a proof of claim filed by the plaintiffs and arose out of the same transaction as the proof of claim); *In re PSINet, Inc.*, 271 B.R. 1, 10-11 (Bankr. S.D.N.Y. 2001) (involving a claim to recharacterize rights in property in the physical possession of the estate, a matter historically decided by bankruptcy courts).

### 3. The Need To Cure Breaches In Connection With A Core Proceeding Does Not Make The Dispute Core

There is no disagreement that whether CCO breached the Prepetition Credit Agreement is relevant to whether the Prepetition Lenders are impaired under Section 1124 of the Bankruptcy Code. That relevance, however, is not determinative of whether the adversary proceeding is a core proceeding.

Defendants conflate two issues that are conceptually and procedurally separate. The first is whether there is a pre-petition default or breach. The second, whether a contract can be assumed under Section 365 (as addressed in *Orion*) or reinstated under Section 1124 (as relevant here), is properly decided by the Bankruptcy Court in the context of a motion to assume

or plan confirmation. This is so even if the contract dispute is effectively a predicate to the assumption/reinstatement determination. *Orion,* 4 F.3d at 1098-1102.

In *Orion,* Orion filed an adversary proceeding against Showtime seeking, *inter alia,* a declaration that it was not in breach of a movie licensing agreement with Showtime. Simultaneously, Orion filed a motion to assume the licensing agreement. A motion to assume is as core a bankruptcy function as reinstatement and confirmation. Section 365 allows a contract to be assumed only if defaults are cured. Hence, the determination of whether there are defaults that need to be cured is a predicate to the core bankruptcy determination of whether a debtor can assume a contract under Section 365. The Second Circuit nevertheless held that such a determination regarding a prepetition breach of a prepetition contract was not core and must be resolved in the context of an adversary proceeding.

The *Orion* court acknowledged that "the outcome [of the adversary proceeding] could determine Orion's continued viability as an enterprise." *Id.* at 1102. Thus, in a sense, the adversary proceeding affected and was inextricably linked to the administration of the debtor's estate, but the Court held that: "Nonetheless, the Adversary Proceeding remains a pre-petition contract action that the Supreme Court held in *Marathon* may not be finally adjudicated by a non-Article III judge." *Id.*

Citing the Second Circuit's analysis in *Orion,* Chief Judge Posner rejected a similar claim that an adversary proceeding was core because it affected an important right of the debtor. *In re U.S. Brass Corp.,* 110 F.3d 1261, 1268 (7th Cir. 1997). In *U.S. Brass,* the debtor claimed that its adversary proceeding seeking a declaratory judgment establishing its right to insurance coverage was core. Chief Judge Posner readily rebuffed this contention:

> Core proceedings are actions by or against the debtor that arise under the Bankruptcy Code in the strong sense that the Code itself is the source of the claimant's right or remedy, rather than just the procedural vehicle for

15

the assertion of a right conferred by some other body of law, normally state law. The right to complain about a preference is created by the Bankruptcy Code itself, whereas Eljer's claimed right to insurance coverage is a creation of state contract law and one that could be vindicated in an ordinary breach of contract suit if Eljer were not a bankrupt. The fact that it is an important right to the bankrupt—Eljer claims to be seeking $500 million in insurance coverage—is irrelevant. *In re Orion Pictures Corp.*, 4 F.3d 1095, 1102 (2d Cir.1993).

*Id.* at 1268-69 (certain citations omitted).

Section 1124(2), like Section 365, requires the debtor to cure prepetition defaults (with stated exceptions) in order to reinstate an obligation. As *Orion* and its progeny hold, however, such a relationship does not, in itself, make a breach of contract proceeding core. *Orion*, 4 F.3d at 1102; *Burger Boys*, 183 B.R. at 685-86 (breach of contract action that would determine debtor's right to assume lease of property in which it operated business was non-core because underlying dispute involved a state law contractual dispute implicating no core functions of bankruptcy court); *In re J.T. Moran Fin. Corp.*, 124 B.R. 931, 938-39 (Bankr. S.D.N.Y. 1991) (dispute over whether debtor had contractual right to funds in possession of defendant was non-core even though critical to determining debtor's right to turnover order against defendant).

Defendants' quotation to *U.S. Lines* and other cases for the proposition that an action is core where it "directly affects the bankruptcy court's core administrative function of asset allocation among creditors" or will "have a significant impact on the administration of the estate" is inapposite. Motion at 7-8 (quoting *U.S. Lines*, 197 F.3d at 638, 639). This case is unlike *U.S. Lines* or any of the other cases in which a debtor's success in the adversary proceeding was critical to its ability to make a distribution to or prioritize among its creditors.

The cases relied upon by Defendants, including *U.S. Lines* and *Best Products*, make clear that whether a state law contract dispute is non-core, as in *Orion*, or core, as in *U.S. Lines* and *Best Products*, turns on whether the adversary proceeding (i) "simply seeks to augment

the estate" or instead (ii) seeks judicial determinations affecting priority among creditors or are otherwise essential for the administration of the estate. *U.S. Lines,* 197 F.3d at 638; *Best Prods.,* 68 F.3d at 32. Here, regardless of whether the Prepetition Lenders or CCO prevails in this adversary proceeding, CCO has enough assets to pay all its claims in full. Whoever prevails, a plan for CCO can be confirmed. The only other economic interests from a bankruptcy reorganization perspective that will be affected by the outcome of this adversary proceeding are those of holders in other, separate bankruptcy cases, not CCO's. Thus, this case is like *Orion* because CCO seeks to augment its estate for the benefit of holders of interests in CCO's affiliates. This case is unlike *U.S. Lines* or *Best Products,* where creditors' recoveries were dependent upon the outcome of the proceeding.

Finally, Defendants' reliance on dicta in the Bankruptcy Court's opinion in *PSINet* goes nowhere. The dicta proposition that a proceeding can be core if "it was a necessary prerequisite to dealing with undisputedly core matters," *PSINet,* 271 B.R. at 22-23, is irreconcilable with the Second Circuit's holding in *Orion* that an adversary proceeding to determine default issues is *not* core even where such default issues are a prerequisite to a Section 365 motion to assume a contract.

### B. JPMorgan Has Not Subjected Itself To The Blanket Jurisdiction Of The Bankruptcy Court

Defendants misstate controlling case law in contending that, by participating in CCO's bankruptcy case, JPMorgan subjected itself to the jurisdiction of this Court over all matters relating to Charter. Defendants rely entirely on cases adjudicating a dispute between a debtor and a creditor who has filed a proof of claim over the allowance of or counterclaim to such claim. Motion at 8-9 (citing *Enron,* 349 B.R. at 112 and *Iridium,* 285 B.R. at 834). Those cases are inapposite because JPMorgan has *not* filed a proof of claim.

17

In any event, these cases establish merely that a creditor's filing of a proof of claim makes core any proceeding *about the allowance or priority of that creditor's claim*. *Enron*, 349 B.R. at 112-115; *Iridium*, 285 B.R. at 834. The filing of a proof of claim does not, however, somehow make core an adversary proceeding that has nothing to do with the allowance or disallowance of the creditor's claim. In *Northwest Airlines*, for example, the court held the debtor's adversary proceeding non-core despite the fact that (i) the creditor had filed a proof of claim and (ii) the adversary proceeding challenged the creditor's right to terminate leases that the creditor "in effect stipulated . . . [were] property of [the] estate." 384 B.R. 51, 57-59 (S.D.N.Y. 2008). The proceeding was not core because nothing in the adversary proceeding complaint implicated the creditor's "right to receive distributions from [the] bankruptcy estate"; the "proofs of claim . . . d[id] not arise out of or relate to . . . the termination provisions" in the leases; and "the causes of action arose wholly independently of the bankruptcy." *Id.*

This adversary proceeding will *not* affect CCO's claims allowance process. Proceedings "which would augment the estate but which have no effect on the allowance of a creditor's claim simply cannot be part of the claims-allowance process." *Germain v. Conn. Nat'l Bank*, 988 F.2d 1323, 1327 (2d Cir. 1993). Confronted with the argument that a creditor waived its right to a jury trial by filing a proof of claim, the Second Circuit explained in *Germain* that "by filing a proof of claim a creditor forsakes its right to adjudicate before a jury any issue that *bears directly on the allowance* of that claim." *Id.* at 1329. There is no such consent or waiver "for the resolution of disputes that are only incidentally related to the bankruptcy process." *Id.* at 1330. Thus, Defendants' reliance on cases holding that the filing of a proof of claim subjects a creditor to the bankruptcy court's jurisdiction over claims allowance is misplaced.

**C.** **Marathon And Its Progeny Mandate Resolution Of This Proceeding By An Article III Court**

This adversary proceeding involves precisely the sort of dispute that the Supreme Court held in *Marathon*, as a matter of constitutional law, requires resolution by an Article III court. 458 U.S. at 84. In *Marathon*, the four-member plurality opinion explained that "right[s] created by state law, right[s] independent of and antecedent to the reorganization petition that confer[s] jurisdiction on the Bankruptcy Court" must be resolved by Article III courts. *Id.* In later opinions, the Supreme Court has returned to then-Justice Rehnquist's concurring opinion's emphasis on the proceeding at issue being "the stuff of the traditional actions at common law":

> [T]he lawsuit in which Marathon was named defendant seeks damages for breach of contract, misrepresentation, and other counts which are the stuff of the traditional actions at common law tried by the courts at Westminster in 1789. There is apparently no federal rule of decision provided for any of the issues in the lawsuit; the claims of Northern arise entirely under state law. No method of adjudication is hinted, other than the traditional common-law mode of judge and jury. The lawsuit is before the Bankruptcy Court only because the plaintiff has previously filed a petition for reorganization in that court.

*Id.* at 90 (Rehnquist, J., concurring). Justice Rehnquist, joined by Justice O'Connor, concluded that the proceeding had to be resolved by an Article III court because it involved a traditional state law prepetition contract dispute.

Drawing upon Justice Rehnquist's concurring opinion, the Supreme Court subsequently noted that, while the "divided [*Marathon*] Court was unable to agree on the precise scope and nature of Article III's limitations," one holding was clear: "The Court's holding in that case establishes only that Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law, without consent of the litigants, and subject only to ordinary appellate review." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 584 (1985) (citing *Marathon*, 458

U.S. at 84 and at 90-92 (Rehnquist, J., concurring)). A year later, the Supreme Court reiterated: "This Court held [in *Marathon*] that 'Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law, without consent of the litigants, and subject only to ordinary appellate review.'" *CFTC v. Schor*, 478 U.S. 833, 838-39 (1986) (quoting *Thomas*, 473 U.S. at 584 and citing *Marathon*, 458 U.S. at 84).

Both the Second Circuit and the Southern District of New York have also recognized this central holding of *Marathon*. "Within the wake of *Marathon*, courts have been sure of nothing save that the particular fact situation in *Marathon*—a pre-petition state law breach of contract action—definitely constituted a non-core proceeding." *Burger Boys*, 183 B.R. at 685; *see also U.S. Lines*, 197 F.3d at 637 ("The principal holding of *Marathon* is that Congress has minimal authority to control the manner in which 'a right created by state law, a right independent of and antecedent to the reorganization petition that conferred jurisdiction upon the Bankruptcy Court' may be adjudicated.") (quoting *Marathon*, 458 U.S. at 84 and at 90 (Rehnquist, J., concurring) and citing *Thomas*, 473 U.S. at 584)).

Under *Marathon* and its progeny, this adversary proceeding plainly cannot be decided by a non-Article III Court. It is a traditional contract action over a prepetition breach of a prepetition contract. It arises under state law. It does not invoke a substantive right under the federal bankruptcy laws. It is not the type of proceeding that could only arise in a bankruptcy case. And JPMorgan has affirmatively *not* consented to entry of a final order by this Court.

## II.    The Court Does Not Have Discretion To Dismiss The Adversary Proceeding

This Court may not properly exercise discretion to avoid hearing this adversary proceeding. Although a court does have the discretion to decline to hear a declaratory judgment action in many circumstances, a court is "*required* to entertain a declaratory judgment action (1)

20

when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, or (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Starter Corp. v. Converse, Inc.*, 84 F.3d 592, 597 (2d Cir. 1996) (emphasis added). Here, whether this proceeding is core or not, *Orion* expressly requires that prepetition contract disputes be adjudicated in a separate declaratory relief adversary proceeding. 4 F.3d at 1098-99. This clear Second Circuit law requiring an adversary proceeding takes away any discretion a court might otherwise have had to decline hearing a declaratory relief claim.

Defendants' citation to Declaratory Judgment Act case law is unavailing. The purpose of the Declaratory Judgment Act is to provide parties with an opportunity to obtain a declaration of their "rights and other legal relations." *Public Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 241 (1952). Courts are to refrain from exercising jurisdiction where litigants seek "opinion[s] advising what the law would be upon a hypothetical state of facts," as "relief is available only for a concrete case admitting of an immediate and definite determination of the legal rights of the parties." *Id.* at 242-43. Courts should also abstain from adjudicating declaratory judgments where the controversy is better addressed in a parallel state proceeding. *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995). Neither is the case here (unless CCO prefers that JPMorgan litigate this matter in a parallel proceeding in a non-bankruptcy forum).

## III.    The Complaint States Valid Causes of Action

Upon a motion to dismiss, this Court must "accept as true all of the factual allegations set out in the plaintiff's complaint, draw inferences from those allegations in the light most favorable to the plaintiff, and construe the complaint liberally." *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001) (internal quotation marks omitted). The Complaint clearly pleads that two DHCs, Charter Holdings and CIH, were each "unable to . . . pay its debts as they become

21

due." Such pleadings must be accepted as true for purposes of this motion. And such pleadings automatically defeat Defendants' motion to dismiss under the applicable notice pleading standard of Rule 8 of the Federal Rules of Civil Procedure.

In any event, Defendants' motion to dismiss rests upon strawman argument: that Section 8(g)(v) does not have the word "would" in it. Section 8(g)(v) is phrased in the future tense: "any Designated Holding Company . . . shall be unable to . . . pay its debts as they become due." Proper grammar required, in referencing a DHC's *past* inability to pay its debts, the Complaint uses "would become due." The Complaint did not change the contract. The contract states what it states in Section 8(g)(v), and that is the language to be applied.

The plain language of the words "unable to . . . pay its debts as they become due" unambiguously dictates a forward looking analysis. Defendants ignore all of the many cases interpreting identical contract or statutory language. Each such case holds that this clause, by its plain meaning, is prospective. Defendants' interpretation, by contrast, requires looking outside the contract to extrinsic evidence and thus by definition cannot be a proper basis for the *grant* of a motion to dismiss.

## A. The Plain Reading Of "Unable To . . . Pay Its Debts As They Become Due" Is Prospective

Section 8(g)(v) provides for an Event of Default where "any Designated Holding Company . . . shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due." Wang Decl., Ex. E (Prepetition Credit Agreement), § 8(g)(v). This provision sets forth three *alternative* bases for a default.

The first alternative, "shall generally not . . . pay its debts as they become due," is backward looking. That default comes into play only if a DHC missed debt payments.

But, it is separately a default under Section 8(g)(v) if a DHC "shall be unable to . . . pay its debts as they become due."[4] This provision is *prospective*. To read this provision as also being backward looking would render it superfluous, in contravention of hornbook contract law that contracts must be construed "to give full meaning and effect to all of its provisions." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005); *PaineWebber, Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996).

This is not the first time a court has dealt with these specific alternative tests, "generally not paying" and "unable to pay." Section 101(32)(c) of the Bankruptcy Code sets forth the same alternative tests in its definition of "insolvent" as it relates to municipalities. A municipality is insolvent if it is "(i) generally not paying its debts as they become due . . .; or (ii) unable to pay its debts as they become due." 11 U.S.C. § 101(32)(c) ) (emphasis added).[5] In interpreting that statute, courts have universally rejected the argument advanced by Defendants today, that a debtor is not "unable to pay its debts as they become due" so long as it has never missed a debt payment.

In *In re City of Bridgeport*, the State of Connecticut argued that the City of Bridgeport was, by definition, "able" to pay its debts as they became due because Bridgeport had always previously paid all of its debts and had never missed any debt payments. 129 B.R. 332 (Bankr. D. Conn. 1991). The court rejected that argument, holding that the phrase "unable to pay its debts as they become due" is prospective and requires analysis of whether the municipality "will be unable to pay its debts as they become due." *Id.* at 336-37. The court explained that the term "generally not paying its debts as they become due" is a retrospective test. *Id.* It explained

---

[4]     The third alternative default is where any DHC "shall admit in writing its inability to . . . pay its debts as they become due."
[5]     This definition relates to 11 U.S.C. § 109(c)(3), which provides that only municipalities that are insolvent are eligible for Chapter 9 protection.

that "unable to pay," by contrast, is prospective. Applying the "unable to pay" language in subsection (ii) retrospectively would render subsection (i) of the statute meaningless: "If 'unable to pay' means, as the State argues, not paying, *i.e.*, current nonpayment, because of inability to pay, Congress could have omitted (ii) without changing the meaning of the statute." *Id.* at 336. The same reasoning applies with full force in interpreting Section 8(g)(v).

The bankruptcy court in *In re Town of Westlake* ruled similarly: "Westlake alternatively contends that it is insolvent under § 101(32)(C)(ii) because it is unable to pay its debts as they become due . . . . This is a prospective test of inability to pay, not a retrospective test." 211 B.R. 860, 865 (Bankr. N.D. Tex. 1997). Like in *Bridgeport*, the *Westlake* court explained that "unable to pay" was a different test than "generally not paying its debts as they become due." The latter asks merely whether the debtor is "current on all its obligations." *Id.* The former requires looking forward in time.

In *Drexel Burnham Lambert Production Corp. v. MCorp.*, the Delaware Superior Court addressed contractual language that provided for a default where the debtor "fails or is unable to pay its debts generally as they become due." No. 88C-NO-80, 1989 Del. Super. LEXIS 69, at *3-4 (Del. Super. Ct. Feb. 23, 1989). MCorp and Drexel had entered into a series of interest rate swap agreements. Prior to a payment due date, MCorp's board announced a "moratorium on payment of all interest and principal on approximately $470 million of parent company indebtedness generally as they become due." *Id.* at *10. The court found that the "moratorium was a legal act of MCorp's [b]oard of [d]irectors which rendered MCorp unable to pay its debts until the moratorium [wa]s lifted." *Id.* at *15.

The court explained that "unable to pay its debts generally as they become due" is a prospective test. This default "encompasses situations, not only where the debtor fails to pay its debts, but also where the debtor is unable to pay its debts generally as they become due." *Id.*

24

at *12. "Considering these factors together, it is clear that the purpose of [this provision] was to afford one party the opportunity to get out of this Agreement before the other party goes bankrupt." *Id.* at *13.

### 1. Section 8(g)(v) Is Not In Conflict With Any Other Provision Of the Prepetition Credit Agreement

Defendants suggest that reading Section 8(g)(v) as forward looking would create an irreconcilable conflict with Sections 7.6 and 4.21 of the Prepetition Credit Agreement. They are wrong.

*First*, Defendants mischaracterize Section 7.6(b) as allowing CCO to make distributions to cure a Default or Event of Default under Section 8(g)(v) of the Prepetition Credit Agreement. Section 7.6(b) does not permit CCO to do so. It provides:

> the Borrower may make distributions (directly or indirectly) to any Qualified Parent Company . . . for the purpose of enabling such Person to make interest payments in respect of its Qualified Indebtedness . . . provided that (i) no Default or Event of Default shall have occurred and be continuing or would result therefrom, (ii) no DHC Default shall have occurred and be continuing or would result therefrom (unless the use of proceeds of such distribution cures all such DHC Defaults) and (iii) each such Distribution shall be made no earlier than 15 Business Days prior the date the relevant interest payment is due . . . .

Wang Decl., Ex. E, § 7.6(b). The three subsections in Section 7.6(b) set forth three independent requirements, each of which must be met before a distribution is allowed. The first is "no Default or Event of Default shall have occurred and be continuing." A DHC's inability to pay its debts as they become due is a Default or Event of Default under Section 8(g)(v). No distribution can be made under Section 7.6(b) where there is a Default or Event of Default under the Prepetition Credit Agreement. There is no exception allowing a distribution to cure such Default or Event of Default.

The exception cited by Defendants, "unless the use of proceeds of such distribution cures all such DHC Defaults," is contained within and applies only to subsection (ii). That second subsection deals with "DHC Defaults," which are defaults by a DHC *under the terms of a DHC's debt instruments*. Defendants conflate (i) a Default or Event of Default under the Prepetition Credit Agreement, such as one based on a DHC's inability to pay its debts as they become due, with (ii) a "DHC Default." Those are two different things. If there is a DHC Default that would be cured by the distribution, then subsection (ii) of Section 7.6(b) would not prohibit the distribution. But no similar allowance is made in subsection (i). Where there is a Default or Event of Default under the Prepetition Credit Agreement, such as under Section 8(g)(v), the Credit Agreement does not permit Section 7.6(b) distributions.

*Second*, the fact that Section 4.21 requires CCO to make a Solvency representation (that CCO together with its Subsidiaries are Solvent as that term is defined in the Prepetition Credit Agreement) does not override Section 8(g)(v)'s separate and independent requirement that all DHCs be able to pay their debts as they become due. *See* Wang Decl., Ex. E, § 4.21. Section 8(g)(v) imposes a separate, continuing obligation individually upon CCO and other entities including each DHC to be able to pay its debts as they become due. Section 8(g)(v) and Section 4.21 are independent requirements, applicable at both overlapping and different time intervals. There is nothing illogical about having two such separate requirements.

## 2. The Complaint Pleads Charter Holdings' And CIH's Inability To Pay Their Debts As They Become Due

The case law makes plain that an entity is "unable to . . . pay its debts as they become due" where it is reasonably certain that it will not be able to pay its debt as they become due in the near future. This does not mean that each DHC has to have enough money sitting around to pay every debt that will ever mature in the distant future. But, where there are debts

due in the near term that there is no reasonable way for a DHC to pay, such DHC is unable to pay its debts as they become due. *E.g., Drexel*, 1989 Del. Super. LEXIS 69, at *3-4, *10.

There is plenty of evidence that Charter Holdings and CIH were each unable to pay its debts as they become due well before their March 27, 2009 bankruptcy filings. By way of example, Charter's board minutes and presentations make clear that Charter knew or should have known it could no longer upstream payments from CIH to Charter Holdings in order to make Charter Holdings' interest payments.[6] Those same facts show that Charter Holdings had then become unable to pay its debts as they become due because there was no alternative way to get sufficient funds to Charter Holdings to pay its debts even through the first half of 2009.

Charter Holdings made its November 17, 2008 interest payment using cash CCO transferred to Charter Communications Holding Company, LLC ("Charter Holdco") as a prepayment of intercompany debt. But this mechanism, even assuming it was legitimate and lawful,[7] would not have been sufficient to cover Charter Holdings' interest payments due in January and April 2009. There simply was not enough in remaining intercompany obligations owed by CCO to Charter Holdco or any other parent of Charter Holdings.[8] And by December

---

[6]     Wang Decl., Ex. F at CTR-00040044 (minutes of November 14, 2008 CCI board meeting) (

**Filed Under Seal**

); Wang Decl., Ex. G at CTR-00040039 (presentation at November 14, 2008 CCI board meeting) (

**Filed Under Seal**

)

[7]     Certain creditors have alleged Charter Holdco's payment of debt owed by its subsidiary, Charter Holdings, to be a fraudulent transfer. *See* Transcript of First Day Hearings at 60, *In re Charter Commc'ns, Inc.* (Mar. 30, 2009) (No. 09-11435(JMP)) (statement by counsel for Convertible Senior Noteholders of Charter Communications, Inc.).

[8]     *Compare* Wang Decl., Ex. H (Charter intercompany loan balance spreadsheet) (

**Filed Under Seal**                                                                  *with* Wang Decl.,

Ex. I, at CTR-00040054 (presentation at Dec. 9, 2008 CCI board meeting) (

).

**Filed Under Seal**

2008, Charter had even informed the Cross-Over Bondholder Group that there was an "

Filed Under Seal " preventing the continued upstreaming of monies through dividends to Charter

Holdings.[9] The evidence that will be put on at trial will plainly show that a DHC was unable to

pay its debts as they become due.

### B. Defendants' Interpretation Of Section 8(g)(v) Requires Resort To Extrinsic Evidence And Thus Cannot Be A Proper Basis For The *Grant* Of A Motion To Dismiss

Defendants' backward looking interpretation of Section 8(g)(v) can only be

sustained upon consideration of extrinsic evidence. For this reason alone, their motion to dismiss

must be denied. Moreover, Defendants' interpretation is contrary to their internal documents.

For example, Charter's board materials reflect its board of directors' understanding that the

Company needed to show an ability to pay debts for over a year *into the future* Filed Under Seal

:

Filed Under Seal

Wang Decl., Ex. I, at CTR-00040049 (emphasis added) (presentation at December 9, 2008 CCI

board meeting).

---

[9]    Wang Decl., Ex. J, at CTR-00038033 (Dec. 18, 2008 email from Ken Schneider, Paul Weiss to Paul Basta, Kirkland & Ellis) (stating desire Filed Under Seal ).

## CONCLUSION

For the foregoing reasons, JPMorgan respectfully requests that the Court enter an

Order finding this adversary proceeding to be non-core, and denying Defendants' motion to

dismiss in its entirety.

Dated: April 26, 2009
     New York, New York

Respectfully submitted,

SIMPSON THACHER & BARTLETT LLP

By: /s/ George S. Wang
    Bruce D. Angiolillo (bangiolillo@stblaw.com)
    Peter V. Pantaleo (ppantaleo@stblaw.com)
    Bryce L. Friedman (bfriedman@stblaw.com)
    George S. Wang (gwang@stblaw.com)
425 Lexington Avenue
New York, NY 10017
Telephone: (212) 455-2000
Facsimile: (212) 455-2502

COUNSEL FOR JPMORGAN CHASE BANK,
N.A., AS ADMINISTRATIVE AGENT FOR THE
PREPETITION LENDERS