Richard M. Cieri
Paul M. Basta
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York  10022-4611
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

   - and -

Jeffrey S. Powell
Daniel T. Donovan
John C. O'Quinn
KIRKLAND & ELLIS LLP
655 15th Street NW
Washington, D.C.  20005
Telephone:     (202) 879-5000
Facsimile:     (202) 879-5200

Counsel to the Debtors and Debtors in Possession (except Charter Investment, Inc.)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>CHARTER COMMUNICATIONS, INC., <u>et al.</u>,<br>                       Debtors. | Chapter 11<br><br>Case No. 09-11435 (JMP)<br>Jointly Administered |
| JPMORGAN CHASE BANK, N.A.,<br>as Administrative Agent,<br>                  Plaintiff,<br>-against-<br>CHARTER COMMUNICATIONS<br>OPERATING, LLC and CCO HOLDINGS, LLC,<br>               Defendants. | Adversary Proceeding<br>Case No. 09-01132 (JMP) |

**DEBTORS' REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS**
**JPMORGAN'S ADVERSARY COMPLAINT AND REQUEST FOR A**
**DETERMINATION UNDER SECTION 157(b)(3)**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

ARGUMENT .....................................................................................................4

I.    This Court Has Jurisdiction Over JPMorgan's Adversary Proceeding As A Core Proceeding Under 28 U.S.C. § 157. ...........................................................4

      A.    JPMorgan's Dispute Directly Affects the Administration of the Debtors' Estate..............................................................................5

      B.    JPMorgan's Attempts To Circumvent This Court's Jurisdiction Are Unavailing................................................................................8

          1.    JPMorgan's Claims Directly Affect Substantive Bankruptcy Rights Regardless Of CCO's Solvency.......................8

          2.    JPMorgan Has Voluntarily Invoked This Court's Jurisdiction....................................................................10

          *3.*    *Orion* Does Not Apply Because The Connection To The Core Proceedings Of Determining Impairment And Reinstatement Renders This Dispute Core. ....................11

II.    The Court Should Dismiss The Complaint In The Exercise Of Its Sound Discretion Or Hold It In Abeyance Pending Plan Confirmation Proceedings...............14

III.    The Court Should Dismiss The Adversary Complaint For Failure To State A Claim. .........................................................................................15

      A.    JPMorgan's Pleadings Are Conclusory And Therefore Insufficient. .................15

      B.    JPMorgan's Prospective Interpretation of Section 8(g)(v) Is Untenable. ..........................................................................16

      C.    JPMorgan's Construction Of Section 8(g)(v) Is Inconsistent With Basic Principles Of Contract Interpretation........................................19

          1.    JPMorgan's Construction Of Section 8(g)(v) Would Render One Clause Superfluous...............................................19

          2.    JPMorgan's Construction Of Section 8(g)(v) Is Inconsistent With Other Contract Provisions....................................21

          3.    JPMorgan's Construction Of Section 8(g)(v) Is Inconsistent With The Parties' Actions And Course Of Conduct.....................23

CONCLUSION.................................................................................25

## PRELIMINARY STATEMENT

This adversary proceeding brought by JPMorgan goes to the very heart of the federal bankruptcy process. At issue is not a tangential question of contract interpretation between the debtor and a third party otherwise unrelated to the bankruptcy proceeding, the resolution of which might or might not marginally enhance the debtor's estate. Rather, at issue is the fundamental question of whether Charter can expeditiously confirm a plan of reorganization that reinstates its senior debt instruments under Bankruptcy Code § 1124. The resolution of this confirmation issue will be all but dispositive of this entire bankruptcy proceeding. Absent reinstatement, there is no plan. JPMorgan's adversary proceeding is nothing more than a collateral attack on confirmation. Indeed, the entire purpose of this adversary proceeding is to scuttle Charter's bid for reinstatement, as evidenced by the timing of this suit, admissions in the suit, and the forum in which it was brought. This adversary proceeding is not peripheral to the plan, it is central to it.

Despite the fact that the adversary proceeding "directly affect[s] a core bankruptcy function," *In re United States Lines, Inc.*, 197 F.3d 631, 637 (2d Cir. 1999), JPMorgan attempts to avoid this Court's core jurisdiction by arguing that no substantive bankruptcy rights are implicated in this proceeding because CCO is solvent. However, that is beside the point. There is a plan of reorganization before the Court, and CCO creates the value that enables distributions to the other creditors under that plant. JPMorgan has long recognized that "CCO's business is fundamentally affected by the financial condition of its several affiliates," Compl. ¶ 5, and because of that "close interrelationship," it insisted upon the inclusion in the Credit Agreement of Defaults and Events of Default arising from those affiliates' activities. JPMorgan cannot have it both ways and now ask this Court to ignore the effect that deciding this adversary proceeding

will have on the other creditors of these affiliated companies, or the effect that failing to confirm the proposed plan will have not just on CCO's affiliates, but on CCO itself.

In any event, despite its protestations to the contrary, JPMorgan is a voluntary participant in these bankruptcy proceedings, thus conferring core jurisdiction. To be sure, JPMorgan has not filed a proof of claim, but that is precisely because it availed itself of this Court's protections and obtained an order that stipulated that its "liens and security interests" are "valid, binding, perfected, enforceable, first priority … liens." Final Cash Collateral Order at 5, ¶ 3(e). There is, of course, nothing talismanic about filing a proof of claim as such; it merely demonstrates that the party has consented to the bankruptcy court's equitable jurisdiction. Having obtained from this Court an order that gives it even more protection than filing a proof of claim, including interest, default interest, and other forms of adequate protection, JPMorgan cannot be heard to complain about this Court's jurisdiction.

At bottom, the issues in this adversary proceeding are inextricably intertwined with the issues that this Court must decide as part of plan confirmation. Reinstatement, the lynchpin to confirmation in this case, is entirely predicated on the Court finding that Charter has not incurably defaulted on the Credit Agreement. And, indeed, the Complaint concedes this dispute only became ripe as a result of the submission of the Debtors' plan of reorganization. JPMorgan's position would have this entire bankruptcy proceeding put on hold pending the resolution of a state-law issue between debtors and creditors. To make such an argument is to refute it. Because all of the issues raised in the Complaint will be fully and fairly addressed at confirmation in connection with a ruling under 1124 of the Bankruptcy Code, the Court should not allow this collateral attack on confirmation to proceed. It should either dismiss this

adversary proceeding in its entirety, or stay it and hold it in abeyance pending plan confirmation proceedings.

The Court also should properly dismiss the Complaint for failure to state a claim. As demonstrated by its Opposition Brief, JPMorgan proffers an untenable reading of Section 8(g)(v). Relying on inapposite cases about the standard under which municipalities may seek chapter 9 protection, JPMorgan constructs a false retrospective/prospective dichotomy between the first two clauses of Section 8(g)(v). But neither clause is inherently prospective: one addressees the *reliability* of the debtor in paying debts generally, while the other addresses the *ability* of the debtor to pay its debts on a date certain—the day they become due—not some amorphous, undefined date in the future, be it "near term" or otherwise. JPMorgan's construction ignores the only forward-looking provision in 8(g)(v)—"admit[ing] in writing its inability to pay its debts as they become due"—effectively rendering it superfluous. JPMorgan has no answer to the point that its construction renders Section 7.6 of the Credit Agreement a nullity. That provision of the Credit Agreement allows distributions to Designated Holding Companies ("DHCs") for the purpose of making interest payments. Under JPMorgan's theory, even before a DHC defaulted on one of its obligations, it would be deemed "unable to pay" under the Credit Agreement, and thus funds could never be moved up from CCO to prevent the DHC's default, much less cure it. And none of the DHCs had any sustainable ability to pay their debts absent a transfer of funds from CCO. Finally, the parties' dealings under the Credit Agreement plainly demonstrate that the DHCs would not be able to pay their debts out into the future absent obtaining additional sources of liquidity, and JPMorgan's course of conduct demonstrates it did not believe that to be a default.

In the end, JPMorgan is left to fall back on nothing more than "plead[ing] the conclusion that a DHC was unable to pay its debts as they become [due]." Opp. 3. The Court need not accept such conclusory allegations, and should grant the motion to dismiss for failure to state a claim.

## ARGUMENT

### I. This Court Has Jurisdiction Over JPMorgan's Adversary Proceeding As A Core Proceeding Under 28 U.S.C. § 157.

This adversary proceeding is core because it is integral to plan confirmation. In proposing the plan, Charter has validly exercised its right to file a plan that seeks reinstatement of its senior debt instruments pursuant to 11 U.S.C. § 1124. Section 1124 requires debtors to cure certain non-*ipso facto* defaults and to leave the creditor unimpaired, giving it "the full benefit of [its] original bargain" with the debtor. *In re Kizzac Mgmt. Corp.*, 44 B.R. 496, 501 (Bankr. S.D.N.Y. 1984); *see also In re NextWave Personal Communications, Inc.*, 244 B.R. 253, 269 (Bankr. S.D.N.Y. 2000). Rather than simply oppose reinstatement in the normal course of the confirmation proceedings, JPMorgan filed this adversary proceeding as a preemptive strike to "get a conversation going about how to really make this a pre-negotiated plan." 4/30/2009 Hrg. Tr. at 54. Tellingly, it sought no relief other than a declaratory judgment and concedes that its claim only became "ripe" upon Charter's filing of its plan of reorganization, Compl. ¶ 1, demonstrating that its claims have no relevance outside the context of confirmation.

This case lies at the heart of the Court's core jurisdiction. The issues in this adversary proceeding are inseparable from those the Court must decide under Section 1124. Were there any doubt as to jurisdiction, JPMorgan has voluntarily invoked it by availing itself of this Court's protections and actively participating in the chapter 11 proceedings. JPMorgan's reliance on *In*

*re Orion Pictures Corp.*, 4 F.3d 1095 (2d Cir. 1993), in an attempt to defeat jurisdiction, is misplaced.  JPMorgan's claims are core.

**A.      JPMorgan's Dispute Directly Affects the Administration of the Debtors' Estate.**

JPMorgan contends that its Complaint falls outside this Court's core jurisdiction because it involves a prepetition claim for breach of contract.   But its narrow approach to core jurisdiction is at odds with controlling precedent.   JPMorgan has not and cannot overcome Second Circuit authorities making clear that a prepetition breach of contract claim is core if it has a significant impact on the administration of the estate.  *See U.S. Lines*, 197 F.3d at 637.

Both "the Supreme Court and [the Second Circuit] have concluded that the *Marathon* holding was a narrow one and have broadly construed the jurisdictional grant in the 1984 Bankruptcy Amendments."  *Central Vt. Pub. Serv. Corp. v. Herbert*, 341 F.3d 186, 191 (2d Cir. 2003); *see also Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 852-53 (1986).  Indeed, Congress "intended that the 'core' jurisdiction would be construed as broadly as possible subject to the constitutional limits established in *Marathon*."  *In re Petrie Retail, Inc.*, 304 F.3d 223, 229 (2d Cir. 2002).

A "determination of whether a matter is 'core' depends on the nature of the proceeding. *In re Best Prods.Co.*, 68 F.3d 26, 31 (2d Cir. 1995); *In re S.G. Phillips Constructors, Inc.*, 45 f.3d 702, 707 (2d Cir. 1995).  The Second Circuit has thus held that "bankruptcy courts are not precluded from adjudicating state-law claims [as core proceedings] when such claims are at the heart of the administration of the bankruptcy estate."  *Central Vt.*, 341 F.3d at 191 (quoting *In re Ben Cooper, Inc.*, 896 F.2d 1394, 1399 (2d Cir. 1990) (alterations in original)).  The finding that a proceeding is core "may be based upon the nature of the proceeding, and the ramifications of the dispute on the administration of the estate."  *Central Vt.*, 341 F.3d at 191; *see also In re*

*Ionosphere Clubs, Inc.*, 922 F.2d 984, 994 (2d Cir.1990).  Allegations that are "so factually and legally interconnected" with core proceedings may be regarded as core.  *In re CBI Holding Co.*, 529 F.3d 432, 461 (2d Cir. 2008).

For reasons set forth in the Debtors' motion to dismiss, the claims raised in JPMorgan's Complaint go to the heart of these bankruptcy cases because their resolution is the predicate for reinstatement, and reinstatement is the lynchpin of the proposed plan.  *See* MTD 3-8. JPMorgan's claims are "factually and legally interconnected" to confirmation, *CBI Holding Co.*, 529 F.3d at 461, and "directly affect[] a core administrative function."  *In re Enron Corp.*, 349 B.R. 108, 111 (S.D.N.Y. 2006); *see also Petrie Retail*, 304 F.3d at 230-31 (matter core when it is "uniquely affected" and "uniquely affected by" core bankruptcy functions).  Section 1124 of the Bankruptcy Code specifically requires, in connection with confirmation, factual findings regarding whether there are defaults and whether those defaults prevent reinstatement.  That is unquestionably a core proceeding.  JPMorgan cannot select one of the issues to be decided at a Section 1124 hearing (whether there has been a non-curable default) and arbitrarily designate it as non-core, merely because it involves a prepetition contract.  This proceeding is inextricably intertwined with the issues to be decided as part of confirmation, and as such will have tremendous "ramifications" for confirmation and, thus, the administration of the estate.  *See Central Vt.*, 341 F.3d at 191.

JPMorgan does not seriously dispute that determining whether a creditor's claims are impaired is a "core" bankruptcy function.  *See In re Liberty Warehouse Assocs. Ltd P'shp*, 220 B.R. 546, 548 (Bankr. S.D.N.Y. 1998).  Nor can it deny that the issues raised in its Complaint will directly affect confirmation.  To the contrary, its recent letter brief underscores that its state law breach-of-contract claims are intertwined with its forthcoming confirmation objections.  *See*

4/21/2009 Ltr B. Friedman to Hon J. Peck, at 2 & n.3, 3 ("While the prepetition breach of contract claims arise under New York state law, whether CCO can 'cure' these defaults and reinstate the Credit Agreement is a federal question, as is feasibility, good faith, compliance with Section 1129, and the confirmability of CCO's plan."). Nor does it dispute that whether Charter has defaulted under the Credit Agreement is directly relevant to reinstatement. *See* Opp. 14.

JPMorgan nonetheless contends that its claims do not arise under title 11 or in a case under title 11. *See* Opp. 11. But that assertion cannot be reconciled with the fact that this Court cannot make the findings required by section 1124 of the Bankruptcy Code without addressing the issues of contract interpretation (and, potentially, factual issues) raised by the Complaint. It is also belied by the allegations in the Complaint. JPMorgan's own allegations establish that the issues raised in its Complaint "are *ripe* for adjudication" only "[b]ecause the plan of reorganization proposed in the Defendants' bankruptcy cases … purports to leave" the lenders' "legal, contractual and equitable rights" under the Credit Agreement "unimpaired." Compl. ¶ 1 (emphasis added). Indeed, although the alleged "defaults" supposedly occurred in October, JPMorgan never sought to exercise its self-help remedies under the Credit Agreement, accelerate the debt, or take any other action until months later, and did not threaten to file a complaint until after the Debtors disclosed publicly intent to file for chapter 11 protection. Nor has JPMorgan alleged any standalone injury or actual legal controversy that exists outside of, or apart from, these chapter 11 cases.

JPMorgan has no answer to these points. But its own allegations are critical because they demonstrate that no dispute was "ripe" until Charter filed for bankruptcy. *Cf. Dougherty v. Town of North Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 90 (2d Cir. 2002); *J.C. Penney Corp., Inc. v. Carousel Center Co., L.P.*, No. 5:04-CV-1356, 2008 WL 2704916, at *5 (N.D.N.Y. July

8, 2008).  JPMorgan cannot seriously contend that its Complaint is *independent* of these chapter 11 cases.  Because, as JPMorgan had pled, this dispute ripened upon Charter's filing for bankruptcy, it plainly arises from title 11 or a case under title 11.

> **B.**     **JPMorgan's Attempts To Circumvent This Court's Jurisdiction Are Unavailing.**

JPMorgan attempts to avoid this Court's core jurisdiction by arguing that: (1) no substantive bankruptcy rights are implicated in this proceeding because CCO is solvent; (2) it has not filed a proof of claim and thus not voluntarily invoked this court's jurisdiction; and (3) reinstatement under section 1124 only entails the kinds of bankruptcy court functions involved in authorizing assumption under section 365.  None of these arguments has merit.

> **1.**     **JPMorgan's Claims Directly Affect Substantive Bankruptcy Rights Regardless Of CCO's Solvency.**

JPMorgan does not dispute that plan confirmation is a core bankruptcy function and that, there will be a "significant impact on the administration of the estate" if it is permitted to block reinstatement.  *U.S. Lines*, 197 F.3d at 638.  It nonetheless contends that no substantive bankruptcy rights are implicated because "CCO is solvent," "all of its claims can be paid in full," and "there will be no 'claims allowance process'" with respect to CCO.  Opp. 12.

That line of argument ignores controlling precedent making clear that, when a dispute directly affects a core administrative function, the dispute is core even if the dispute could theoretically be litigated outside of the bankruptcy court context.  *Central Vt.*, 341 F.3d at 191; *CBI Holding*, 529 F.3d at 461, *S.G. Phillips*, 45 F.3d at 705-06; *Ben Cooper*, 896 F.2d at 1399.  It is precisely for this reason that the claims against CCO cannot be hermetically sealed from the chapter 11 proceedings involving Charter's other entities.  There is a plan of reorganization before the Court that validly seeks to invoke the reinstatement power.  It is no answer to say that some hypothetical plan not before the Court pertaining solely to CCO might be confirmed

without addressing the issues presented in JPMorgan's Complaint. The debtors are within their exclusive periods and accordingly only the debtors may propose a plan. *See* 11 U.S.C. § 1121; *see also In re Sletteland*, 260 B.R. 657, 669 (Bankr. S.D.N.Y. 2001). JPMorgan's adversary proceeding directly affects this plan.

JPMorgan recognized from the start that "CCO is the sole source of operational cash flow for repayment of debt by CCO's parents." Compl. ¶ 33. Likewise, it knew that "CCO's business is fundamentally affected by the financial condition of its several affiliates." *Id.* ¶ 5. Indeed, it was "[b]ecause of this relationship between CCO and its affiliates" that JPMorgan "negotiated Defaults and Events of Default specifically linked to the … Designated Holding Companies." Id. ¶ 34. JPMorgan cannot have it both ways and now ask this Court to turn a blind eye to the effect that deciding this adversary proceeding will have on the other creditors of these affiliated companies, or the effect that failing to confirm the proposed plan will have, not just on CCO's affiliates, but on CCO itself.

Nor does it make any difference that CCO was solvent. It "was clearly sound business practice … to seek Chapter 11 protection for … wholly-owned subsidiaries when those subsidiaries were crucial to [the parents'] own reorganization plan," *In re U.I.P. Engineered Prods. Corp.*, 831 F.2d 54, 56 (2d Cir. 1987), particularly where, as here, "CCO's business is fundamentally affected by the financial condition of its several affiliates." Compl. ¶ 5. As courts have recognized, it was "clearly Congress'[s] intention to allow a parent and its subsidiaries 'to be reorganized in a single proceeding, thereby effectuating its general policy that the entire administration of an estate should be centralized in a single reorganization court." *U.I.P. Engineered Prods.*, 831 F.2d at 56 (quoting *Duggan v. Sansberry*, 327 U.S. 499, 510-11 (1946)). "Congress realized that the bankruptcy court's jurisdictional reach was essential to the

efficient administration of bankruptcy proceedings and intended that the 'core' jurisdiction would be construed as broadly as possible subject to the constitutional limits established in *Marathon*." *S.G. Phillips*, 45 F.3d at 705. The piecemeal approach urged by JPMorgan would ignore not only Congress's clear intention but also the direct affects this adversary proceeding would otherwise have on the administration of the entire Charter estate.

### 2. JPMorgan Has Voluntarily Invoked This Court's Jurisdiction

JPMorgan has invoked this Court's jurisdiction in obtaining a stipulated order that its "liens and security interests" are "valid, binding, perfected, enforceable," and have "first priority." Final Cash Collateral Order at 5, ¶ 3(e). The order also provides JPMorgan with adequate protection. Because JPMorgan is an active and voluntary participant in these bankruptcy proceedings, including seeking discovery in preparation for confirmation proceedings, there is no constitutional impediment to subjecting JPMorgan to this Court's jurisdiction.

JPMorgan offers no meaningful response to this critical point, except to argue that it has not filed a proof of claim. But that elevates form over substance. *See Virginia Elec. & Power Co. v. Caldor Inc.-NY*, 117 F.3d 646, 650 (2d Cir. 1997) ("in bankruptcy proceedings substance should not give way to form"); *In re PCH Associates*, 949 F.2d 585, 597 (2d Cir. 1991). There is nothing magical about filing a formal proof of claim. Filing a proof of claim merely demonstrates that "the creditor consents to the bankruptcy court's broad equitable jurisdiction." *Central Vt.*, 341 F.3d at 191; *see also S.G. Phillips*, 45 F.3d at 706 (by filing its proof of claim and taking advantage of bankruptcy court's procedures, creditor "not only triggered § 157(b)(2)(B), but also necessarily submitted to the court's equitable power to resolve its claims").

JPMorgan does not need to file a proof of claim because it has already obtained an order from this Court guaranteeing it "first priority" and providing it with adequate protection. In so doing, JPMorgan no less availed itself "of the special procedures present only in the context of a bankruptcy proceeding" than a party filing a proof of claim. *Enron*, 349 B.R. at 112-13. The voluntary participation by a creditor makes clear that this Court may exercise full jurisdiction over this adversary proceeding.

Moreover, JPMorgan is participating in the confirmation proceedings, seeking discovery related to "reinstatement," and preparing to object to the plan based on the very default it asserts in this adversary proceeding. *See* 1st Req. for Prod. at 13; 2d Req. for Prod. at 10 (requesting "all documents concerning valuation or feasibility as it relates to the plan of reorganization"); 4/21/2009 Ltr B. Friedman to Hon J. Peck, at 2 & n.3, 3; 3/30/2009 Hrg. Tr. 45:7-12 (raising "three issues" purportedly "directly on confirmation"); *see also* 4/21/2009 Hrg. Tr. at 45, 53 (arguing the proposed plan "raises several issues that we think [bear] directly on confirmation" which go "directly" to "how we think this Court should evaluate this plan and its prospects," including "one last default, and this is the [adversary] complaint"). JPMorgan is thus "intimately involved in the bankruptcy proceedings." *In re Iridium Operating LLC*, 285 B.R. 822, 834 (S.D.N.Y. 2002). As such, this Court has core jurisdiction.

### 3. *Orion* Does Not Apply Because The Connection To The Core Proceedings Of Determining Impairment And Reinstatement Renders This Dispute Core.

JPMorgan concedes that "whether CCO breached" the Credit Agreement is "relevant" to whether the lenders "are impaired under Section 1124" but contends that the two issues (breach and reinstatement) are "conceptually and procedurally separate." Opp. 14. That argument depends on a strained analogy between reinstating a claim under section 1124 and assuming a contract under section 365 that does not withstand scrutiny. JPMorgan contends that just as a

court addressing a motion to assume under section 365 need not decide whether a prepetition breach exists, so too a court determining impairment and reinstatement under section 1124 need not adjudicate the existence of a prepetition breach.  Not so.

In *Orion*, the Second Circuit focused on the "fundamental nature and purpose of a motion to assume," and concluded that a "motion to assume should be considered a summary proceeding, intended to efficiently review the … debtor's decision to adhere to or reject a particular contract in the course of the swift administration of the bankruptcy estate."  *Id.* at 1098.  Accordingly, a "bankruptcy court's 'business judgment' in deciding a motion to assume is just that—a judgment of the sort a businessman would make."  *Id.* at 1099 ("[i]n no way is this decision a formal ruling on the underlying disputed issues").  Because deciding a motion to assume is not intertwined with adjudicating a prepetition contract dispute, *Orion* held that the mere relationship between these two proceedings did not render the prepetition contract claim a core proceeding.

In contrast, when considering reinstatement, a court is not charged with merely reviewing a "business judgment."  Instead, it is required to determine the parties' legal rights—that is, whether the creditors' claims are impaired or unimpaired under section 1124 of the Bankruptcy Code.  The inquiry required under section 1124 thus entails a substantive analysis readily distinguished from the "business judgment" applied under section 365.  *Cf. In re Chase*, 392 B.R. 72, 84 (S.D.N.Y. 2008) (distinguishing *Orion* in determining whether debt was dischargeable because Code provisions required factual determination of nature and type of underlying debt, not merely "business judgment" analysis).  The issues this Court must decide under section 1124 are indistinguishable from the issues presented in JPMorgan's adversary Complaint.

Perhaps recognizing the weakness of its position, JPMorgan falls back to analogizing this case to "*Orion* because CCO seeks to augment its estate for the benefit of interests in CCO's affiliates." Opp. 17. But that fails to recognize that this is not an "action *by a debtor* against a party to a prepetition contract, who has filed no claim with the bankruptcy court." *Orion*, 4 F.3d at 1103 (emphasis added). What concerned the *Orion* court was the debtor's attempt to use the bankruptcy process as a plaintiff to gain bankruptcy court jurisdiction over a non-consenting party. By contrast, this is an adversary proceeding brought by a creditor, actively participating in the bankruptcy proceedings, seeking a declaration as to the very issues that this Court will necessarily have to decide as part of plan confirmation. *See, e.g.*, *In re McLaren*, 990 F.2d 850, 854 (6th Cir. 1993); *In re Meyertech Corp.*, 831 F.2d 410, 417 (3d Cir. 1987); *In re Adelphia Communications Corp.*, 307 B.R. 404, 417 n.46 (because the debtor was not the plaintiff, "[f]or that reason, in particular, *Orion* is easily distinguished"). Charter is not aware of any cases brought by a creditor under remotely similar circumstances that have been treated as anything other than core.

In any event, *Orion* does not apply unless the state-law contract dispute *solely* seeks to augment the size of the estate. *See U.S. Lines*, 197 F.3d at 638-39; *Best Prods.*, 68 F.3d at 32 ("Unlike a proceeding that simply seeks to augment the estate, the present proceeding involves the priority rights of creditors who have filed claims against the estate"). Here, Charter needs to know whether the agreements at issue can be reinstated before its plan can be confirmed. *See, e.g.*, *U.S. Lines*, 197 F.3d at 639; *see also In re 1115 Third Avenue Rest. Corp.*, No. 98Civ.4007(LMM), 2000 WL 1346824 (S.D.N.Y. Sept. 19, 2000) (case not limited to solely augmenting estate; *Orion* not applicable because dispute involved "principal asset" of estate and non-debtor party was creditor in bankruptcy). Charter is not seeking to augment its estate;

rather, it is JPMorgan that hopes to claim for itself additional value at the expense of Charter's other creditors. JPMorgan is not content with receiving the entire benefit of its bargain with Charter and seeks a declaratory judgment in an attempt to renegotiate the Credit Agreement it only recently entered. This case thus goes to the very heart of debtor-creditor relations and is properly within the ambit of this Court's core jurisdiction.

## II. The Court Should Dismiss The Complaint In The Exercise Of Its Sound Discretion Or Hold It In Abeyance Pending Plan Confirmation Proceedings.

This Court should, in its discretion, dismiss the adversary proceeding if it determines that it falls within its core jurisdiction. The Second Circuit's decision in *Starter Corp. v. Converse, Inc.*, 84 F.3d 592, 597 (2d Cir. 1996), does not prohibit dismissal. It merely holds that a court may not decline to entertain a declaratory judgment when there are not better means of "clarifying and settling the legal relations in issue." Here, clarification and settling of legal relations will be addressed in plan confirmation proceedings. Likewise, *Orion* is completely beside the point—it merely recognizes that a motion to assume is a separate proceeding from a related adversary proceeding regarding the same contract. Thus, this Court retains ample discretion to dismiss this case, and should do so.

Alternatively, the Court may stay this adversary proceeding and hold it in abeyance pending resolution of plan confirmation proceedings. In its Opposition Brief, JPMorgan strains to assert there is some difference between the claims presented in this adversary proceeding, and the issues the Court will have to decide pertaining to default, cure, impairment, and reinstatement as part of plan confirmation. *See* Opp. 14-17. Although there is no daylight between them, the Court may hold the adversary proceeding in abeyance, decide the issues pertaining to confirmation, and then determine if, as JPMorgan would have it, anything else remains. If

JPMorgan's claims are addressed as part of plan confirmation, this proceeding may then be dismissed.

**III.    The Court Should Dismiss The Adversary Complaint For Failure To State A Claim.**

JPMorgan's allegations are predicated on proving that a DHC was unable to pay its debts as they became due, thus giving rise to a default under Section 8(g)(v).  JPMorgan's allegations fail to state a claim for two reasons.  First, they are insufficiently pleaded.  Second, they depend on an untenable reading of Section 8(g)(v).  As demonstrated below, it is Charter's interpretation of that provisions that gives each clause of Section 8(g)(v) meaning; is consistent with the other terms of the Credit Agreement; and is consistent with the parties' course of conduct as alleged by JPMorgan.

**A.    JPMorgan's Pleadings Are Conclusory And Therefore Insufficient.**

Under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1966 (2007), a complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *See also Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007).  It is well settled that "baldly conclusory statements that are unsupported by any factual basis cannot be relied upon to defeat a motion to dismiss."  *J.S. Serv. Ctr. Corp. v. GE Tech. Servs.*, 937 F. Supp. 216, 219 (S.D.N.Y. 1996).  Yet, JPMorgan insists that it has satisfied its pleading requirement because the "Complaint pleads *the conclusion* that a DHC was unable to pay its debts as they become [due]."  Opp. 3 (citing Compl. ¶¶ 57, 59, 60, 90) (emphasis added); *see also* Opp. 21-22.

There are no facially plausible allegations here that two of the DHCs (CCH and CIH) were unable to pay their debts as they become due (an assertion JPMorgan further retreats from in its Opposition Brief, now contending only that "at least one" DHC was unable to pay its debts, *compare* Compl. ¶ 48 *with* Opp. 1).  To the contrary, as JPMorgan concedes, the DHCs, in fact, continued to pay their debts as they became due.  Indeed, the only factual allegation is that CCH

and CIH were unable to pay dividends up through the chain of parent companies. *See* Comp. ¶¶ 48, 55. But Charter's decision not to use dividends to make interest payments on the DHCs' debts is not an event of default under the Credit Agreement and is not evidence that the DHCs had become unable to pay their debts as they became due. Nor could it be, given that the DHCs continued to pay their debts as they became due.

Rather, the Credit Agreement specifically provides for Charter to "upstream monies to enable an interest or principal payment on debt" through "repayment of intercompany indebtedness." Compl. ¶ 7 (citing Credit Agreement §§ 7.6, 7.8). Thus, the allegation that the DHCs were unable to make dividend payments cannot support the inference that the DHCs were unable to pay their debts as they became due and the Complaint must be dismissed. *See Davey v. Dolan*, 453 F. Supp. 2d 749, 754 (S.D.N.Y. 2006) (A "'pleader's … unwarranted inferences do not have to be accepted by the federal court as true, particularly on a Rule 12(b)(6) motion to dismiss.'").

### B. JPMorgan's Prospective Interpretation of Section 8(g)(v) Is Untenable.

Turning to the substance of its claim, JPMorgan's entire argument hinges on the assertion that Section 8(g)(v) is "prospective." Specifically, JPMorgan asserts—without any case citation whatsoever—that "caselaw makes plain that an entity is 'unable to … pay its debts as they become due' where it is reasonably certain that it will not be able to pay its debt [sic] as they become due in the near future." Opp. 26. As an initial matter, that is not what the Credit Agreement provides. Section 8(g)(v) says not a single word about being "reasonably certain" to be able to pay debts in the "near term," just as it does not require DHCs to be able to pay debts

"as they *would* become due."[1]  It simply provides for a default if a DHC is unable to pay its debts on the day "they become due."

In support of its claim that this contractual provision is prospective, JPMorgan relies on two cases applying the Bankruptcy Code's test for insolvency for municipalities seeking chapter 9 protection.  *See In re City of Bridgeport*, 129 B.R. 332, 337 (Bankr. D. Conn. 1991), *In re Town of Westlake*, 211 B.R. 860, 865 (Bankr. N.D. Tex. 1997).  However those cases are simply beside the point because they arise in a very different context—interpreting the Bankruptcy Code's definition of "insolvency" as it applies to municipalities so as to ensure that it "comports with the purpose of Chapter 9." *Bridgeport*, 129 B.R. at 336.  As the *Bridgeport* court observed, "[c]ities cannot go out of business," and "Chapter 9 was intended to enable a financially distressed city to 'continue to provide its residents with essential services.'"  *Id.* at 336-37.  Thus, given that statutory purpose, construing the Bankruptcy Code such that "a city would not be able to seek chapter 9 protection unless and until it was actually not paying its bills could defeat that purpose, as actually not paying bills could lead to the non-delivery of services." *Id*.  Those cases are of no value to interpreting these parties' contract.  Instead, in assessing whether a company is "unable to pay its debts as they fall due," other courts "look[] solely at whether the corporation *has been* paying bills on a timely basis."  *Pereira v. Farace*, 413 F.3d 330, 343 (2d Cir. 2005) (emphasis added);  *see also Vestron v. Nat'l Geographic Soc'y*, 750 F.Supp. 586, 592 (S.D.N.Y. 1990) ("[I]f insolvency is equated with the ability to meet debts as

---

[1]   Tellingly, after inserting the word "would" into the language of Section 8(g)(v) more than ten times in the Complaint, *see* Compl. ¶¶ 12, 42-45, 48, 57, 59, 81, 90, 92, JPMorgan does not even attempt to defend it in its Opposition Brief.

they become due, then Vestron is likely to prevail, since it has not failed to meet its debt obligations."). As discussed in the Debtors' opening brief, that is the proper approach here.

In any event, *Bridgeport* and *Westlake* hardly support JPMorgan's sweeping suggestion that "caselaw makes plain that an entity is 'unable to … pay its debts as they become due' where it is reasonably certain that it will not be able to pay its debt [sic] as they become due in the near future." Opp. 26. To the contrary, they hold only that if "the maturity of the debt is *imminent* and the inability to meet it *certain*," then the debtor is "unable to meet debts as they mature within the meaning of the statute." *Westlake*, 211 B.R. at 865 (internal quotations omitted); *see also Bridgeport*, 129 B.R. at 337. Indeed, both cases make clear that "[m]ere possibility or even speculative probability" of an inability to pay "is not enough." *Westlake*, 211 B.R. at 866; *see Bridgeport*, 129 B.R. at 337. Even if those cases provided the standard applicable here, and they do not, JPMorgan has clearly not alleged facts showing it to be "certain" that the DHCs would be unable to pay "imminent" future debts. Nor could it. The Complaint acknowledges that months after the DHCs allegedly became unable to pay their debts in October 2008, they were continuing to pay their debts, and did not seek to restructure under chapter 11 for nearly another six months. *See, e.g.*, Compl. ¶¶ 69, 79.

Finally, JPMorgan's undefined future-oriented approach to any ability to pay leaves the parties and the Court with no certainty as to when an event of default has occurred. JPMorgan concedes that DHCs need not "have enough money sitting around to pay every debt that will ever mature," Opp. 26, but argues that a DHC must have a "reasonable way" to pay debts "due in the near term" (as opposed to just on the day "they become due," as provided in Section 8(g)(v)). JPMorgan provides no metric for determining what is the "near term," and, of course, none is to be found in the Credit Agreement or the caselaw. We only know that it is sometime before the

debts "become due," but not so far out as the final maturity date of the debt instruments. This is simply no way to read a contract. Unless the debt has come due and the debtor is unable to pay it, parties will be embroiled in needless speculation about whether the debtor may or may not be able to pay future debts. Yet, the answer to that question may well change from day to day with the ebb and flow of the markets. Simply put, circumstances change. In particular, the DHCs made interest payments in January. *See* Compl. ¶ 69.

In any event, had the parties intended to require the DHCs to have sufficient funds on hand to pay debts as they "would" become due in the future, they could have provided for a default if a DHC "shall be unable to pay all of its debts coming due within a given 6-month period," or "12-month period," and so forth. They did not. To the contrary, the Credit Agreement only allows CCO to transfer funds to the DHCs to make debt payments 15 business days before the debt is due; and thus, as a practical matter, a DHC would never be able to pay its debts more than 15 business before they become due. Credit Agreement § 7.6(b)(iii). The Court should reject JPMorgan's invitation to inject uncertainty into the Credit Agreement and instead give 8(g)(v) its plain meaning as discussed below.

## C. JPMorgan's Construction Of Section 8(g)(v) Is Inconsistent With Basic Principles Of Contract Interpretation.

As set forth in Charter's opening brief, the proper construction of "unable to … pay its debts as they become due" means unable to pay debts on the actual day they become due. This interpretation allows for a harmonious reading of Section 8(g)(v) as a whole, is consistent with the other provisions of the Credit Agreement, and consistent with the parties' course of conduct.

### 1. JPMorgan's Construction Of Section 8(g)(v) Would Render One Clause Superfluous.

Section 8(g)(v) provides three related, but distinct, events of default: if "any Designated Holding Company, the Borrower or any of its Subsidiaries [1] shall generally not, or [2] shall be

unable to, or [3] shall admit in writing its inability to, pay its debts as they become due." Credit Agreement § 8(g)(v). JPMorgan misinterprets these provisions, asserting the first clause is restrospective and the second is prospective. And JPMorgan would effectively render the third clause superfluous. This is a gross misreading of the plain language of Section 8(g)(v). Properly interpreted, this provision provides for defaults if a DHC is (1) unreliable in paying debts generally as they become due, (2) actually unable to pay its debts when they become due, or (3) unequivocally going to be unable to pay debts and admits so in writing.

The first clause of Section 8(g)(v) creates a default if a DHC turns out to be *unreliable*, in that it "generally" fails to pay its debts when they are due. Thus, there is a default if a DHC is habitually late in making payments (failing to pay debts "as they become due"), or misses too many payments (even if it could have paid them). The second clause creates a default if a DHC is actually *unable* to pay its debts as they become due. The clause is neither forward nor backward looking. Instead, it focuses on the date on which the debts become due and, as they become due, inquires whether the DHS is able to pay them. The events of default recognized under the second clause are not a subset of the first. The second clause is not triggered merely because a DHC fails to pay a debt on the due date, but only if the debtor was actually unable to pay on that date. Thus, a DHC may conclude that it would rather default on a particular obligation than pay, even though it is able to pay. For example, a mortgagor who decides the asset is no longer worth the outstanding debt may default on the mortgage rather than pay, even though it is able. That is not a default event under the Credit Agreement. *See, e.g.*, *National Union Fire Ins. v. Cohen*, No. 92 CIV 9500, 1996 WL 476921, *4 (S.D.N.Y. Aug. 22, 1996) (denying summary judgment based on "inability to pay debts" where foreclosure had occurred because debtor claimed it was able to pay but allowed foreclosure to resolve that debt). Nor is

the second clause invoked merely because the debtor "would" be unable to pay its debts on a date other than that on which they become due (if as most debtors, it did not keep sufficient cash on hand to pay its debts in advance). Thus, there is no basis for the retrospective/prospective dichotomy urged by JPMorgan.

The third clause of 8(g)(v), unlike the other two clauses, is forward looking because it creates a default if a DHC determines unequivocally that it is *going to be unable* to pay its debts when they become due and "admit[s] in writing its inability to" pay those debts. JPMorgan's reading of 8(g)(v) would render the third clause superfluous. Under its construction, there could never be a default based on a DHC "admit[ting] in writing" that it is unable to pay its debts as they become due, because that future inability to pay would itself be a default event under the second clause. The default would have occurred before the DHC could put pen to paper. As JPMorgan concedes, an interpretation that renders one of 8(g)(v)'s clauses meaningless is impermissible. *See* Opp. 23 (citing *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005); *PaineWebber, Inc. v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996)).

Thus, the Court should hold that, under the plain meaning of the second clause of 8(g)(v), there is a default only if a DHC is actually unable to pay its debts on the day they become due.

### 2. JPMorgan's Construction Of Section 8(g)(v) Is Inconsistent With Other Contract Provisions.

JPMorgan protests that its interpretation of Section 8(g)(v) would not create any conflict with Section 7.6(b)(ii) because the latter provision only allows the movement of funds to cure a default by a DHC as to one of its debts, and not to cure a "Default or Event of Default" under the Credit Agreement itself. Even so, JPMorgan misses the point. Under the Credit Agreement, Charter is permitted to move money so that the DHCs may make interest payments on their

debts.  Credit Agreement § 7.6.  This provision was specifically negotiated to allow Charter to move funds precisely because, as JPMorgan acknowledges, "CCO is the sole source of operational cash flow for repayment of debt by CCO's parents."  Compl. ¶ 33.  The parties to the Credit Agreement clearly contemplated that if a DHC lacked sufficient cash to pay a debt, CCO would need to be able to move money up to that DHC entity so it could make its payments.

Under JPMorgan's circular reading of Section 8(g)(v), however, DHC defaults become a self-fulfilling prophesy that Charter is helpless to avoid, Section 7.6 notwithstanding.  If, at any moment in time, a DHC did not have sufficient funds in hand to pay debts becoming due in the "near term" (whatever that means, *see* Part III.B, *supra*), there would be a default under 8(g)(v) according to JPMorgan.  Such a default would thus preclude CCO from moving funds to a DHC. *See* Credit Agreement § 7.6(b)(i).  And the DHC, in turn, would not be able to pay its debts when they actually became due.  Yet, the whole point of Section 7.6 was to permit the movement of funds to the DHCs (whether by distribution or note prepayment, *see* Credit Agreement § 7.8), to pay their debts as they became due.  If CCO is already in default under Section 8(g)(v) of the Credit Agreement whenever a DHC does not have sufficient funds n hand to meet a forthcoming debt obligation, then Section 7.6 is meaningless, because CCO will never be able to move funds to the DHC for it to pay that debt.  A court must "arrive at a construction" that gives "fair meaning to all of the language employed by the parties."  *Gerlach v. The Horn & Hardart Co.*, 683 F.Supp. 342, 344 (S.D.N.Y. 1988).  Because JPMorgan's interpretation of 8(g)(v) would essentially render Section 7.6 "superfluous or meaningless," it is untenable.  *See Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992).

JPMorgan's construction is also inconsistent with Section 4.21, because it would effectively impose additional solvency obligations on the DHCs that the parties did not

contemplate. JPMorgan has no answer to this point in its Opposition. The parties knew how to negotiate a forward-looking solvency requirement of the type that JPMorgan now seeks to bootstrap on to Section 8(g)(v), and they specifically excluded the DHCs from such a requirement. That negotiated provision is Section 4.21, which reads: "<u>Solvency</u>. The Borrower [CCO] and its Subsidiaries, taken as a whole, are, and after giving effect to the financing transactions referred to herein will be *and will continue to be*, Solvent." Section 4.21 (emphasis added). Critically, Section 4.21 applies only to CCO and its subsidiaries, not to the DHCs. Thus, there was no requirement that the DHCs remain solvent, and with good reason—the parties knew that "CCO [was] the sole source of operational cash flow for repayment of debt by CCO's parents." Compl.¶ 33. The DHCs merely needed to be able to pay their debts on the day they became due and, as discussed above, the parties negotiated extensive provisions to allow for the transfer of funds from CCO to the DHCs so they could do so. To read Section 8(g)(v) as imposing a solvency requirement on the DHCs would eviscerate Section 4.21.

### 3. JPMorgan's Construction Of Section 8(g)(v) Is Inconsistent With The Parties' Actions And Course Of Conduct.

The pleadings (and documents incorporated by reference) reveal a course of conduct between the parties that demonstrates they both understood Section 8(g)(v)'s second clause to apply only when a DHC was unable to pay debts on the date they become due, and not that a DHC must be able, at all times, to pay some future debts at a future time uncertain:

- The parties understood at the outset that the DHCs would not be able to pay future debts, absent a cash infusion from CCO. *See* Compl. ¶ 33. Thus, they negotiated elaborate provisions addressing the movement of money to enable the DHCs to pay debts as they became due. *See* Credit Agreement § 7.6, 7.8.

- Charter disclosed in November 2007 that "cash flows from operating activities and amounts available under the Company's credit facilities may not be sufficient to …

satisfy its interest and principal repayment obligations in 2009, and will not be sufficient to fund such needs in 2010 and beyond." Charter Communications, Inc., Quarterly Report (Form 10-Q), at 8 (Nov. 8, 2007) (attached as Ex. A).[2]

- Charter disclosed in February 2008 that it would have insufficient funds to meet its cash needs after the second or third quarter of 2009 and that there could "be no assurance that [the DHCs] will not become insolvent or will be permitted to make distributions in the future … in amounts needed to service our indebtedness." Charter Communications, Inc., Annual Report (Form 10-K), at 22-23 (Feb. 27, 2008) (attached as Ex. B).

- Charter disclosed in May 2008 that "credit facilities will not be sufficient to fund projected cash needs in 2010 … and thereafter." Charter Communications, Inc., Quarterly Report (Form 10-Q), at 8, 24 (May 12, 2008) (attached as Ex. C). "No assurances can be given that the Company will not experience liquidity problems …" *Id.*

- Thereafter, in October and November 2008, JPMorgan lent $750 million to Charter under the Credit Agreement. *See* Compl. ¶ 41.

The parties knew from the beginning that the DHCs would never have sufficient funds to be able to pay their debts as they became due absent transfers from CCO; yet, under JPMorgan's construct, Charter would have been in default on day one of the agreement precisely because the DHCs were not able to pay debts on their own. Obviously, the parties did not negotiate default terms that would be triggered at the outset. Likewise, the very SEC disclosures relied on by JPMorgan in its Complaint, *see* Compl. ¶¶ 61-62, demonstrated long before October 2008 that the DHCs lacked sufficient funds on hand to pay debts as they would become due in the future. JPMorgan knew all along that the DHCs did not and could not satisfy the kind of solvency test that it now seeks to retroactively impose. Yet far from asserting a default, it continued to make

---

[2] The parties' course of conduct may inform the proper construction of the contract if the Court is uncertain as to the plain meaning articulated by Charter. *See Tele-Pac, Inc. v. Grainger*, 168 A.D.2d 11, 22 (N.Y. 1991) (citing *Filmvideo Releasing Corporation v. Hastings*, 446 F.Supp. 725, 728-729, *aff'd* 594 F.2d 852 (2d Cir. 1978)). The Court may rely on that course of conduct as reflected in the pleadings and documents incorporated into the Complaint by reference, as well as "public disclosure documents filed with the SEC." *Kramer v. Time Warner Inc.*, 37 F.2d 767, 774 (2d Cir. 1991); *see also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991); *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998).

additional funds available under the Credit Agreement.  In sum, the parties' course of conduct only serves to confirm the plain meaning of clause two of Section 8(g)(v):  that there was no default unless a DHC was unable to pay its debts on the day they became due.  As such, the motion to dismiss should be granted.

## CONCLUSION

Charter respectfully requests that the Court dismiss JPMorgan's adversary Complaint because (1) it is a "core" proceeding under Bankruptcy Code section 157 and raises issues that are properly resolved as an objection to confirmation; and (2) it fails to state a claim upon which relief can be granted.

Respectfully submitted,

New York, New York
Dated:  May 1, 2009

/s/ Richard M. Cieri
Richard M. Cieri
Paul M. Basta
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York  10022-4611
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

- and -

Jeffrey S. Powell
Daniel T. Donovan
John C. O'Quinn
KIRKLAND & ELLIS LLP
655 15th Street NW, Suite 1200
Washington, D.C.  20005
Telephone:     (202) 879-5000
Facsimile:     (202) 879-5200

Counsel to the Debtors and Debtors in
Possession (except Charter Investment, Inc.)