**EXHIBIT B**

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

# FORM 10–K

(Mark One)

[X] ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2007
or

[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the Transition Period From     to
Commission File Number: 000–27927

**Charter Communications, Inc.**
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| Delaware | 43–1857213 |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |
| 12405 Powerscourt Drive | |
| St. Louis, Missouri 63131 | (314) 965–0555 |
| (Address of principal executive offices including zip code) | (Registrant's telephone number, including area code) |

Securities registered pursuant to section 12(b) of the Act:

| Title of each class | Name of Exchange which registered |
|---|---|
| Class A Common Stock, $.001 Par Value | NASDAQ Global Select Market |
| Preferred Share Purchase Rights | NASDAQ Global Select Market |

Securities registered pursuant to section 12(g) of the Act: None

Indicate by check mark if the registrant is a well–known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☑

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S–K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10–K or any amendment to this Form 10–K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non–accelerated filer, or a smaller reporting company. See definition of "accelerated filer," "large accelerated filer," and "smaller reporting company" in Rule 12b–2 of the Exchange Act. (Check one):

Large accelerated filer ☑     Accelerated filer ☐     Non–accelerated filer ☐     Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b–2 of the Act). Yes ☐ No ☑

The aggregate market value of the registrant of outstanding Class A Common Stock held by non–affiliates of the registrant at June 30, 2007 was approximately $1.5 billion, computed based on the closing sale price as quoted on the NASDAQ Global Select Market on that date. For purposes of this calculation only, directors, executive officers and the principal controlling shareholder or entities controlled by such controlling shareholder of the registrant are deemed to be affiliates of the registrant.

There were 398,227,512 shares of Class A Common Stock outstanding as of January 31, 2008. There were 50,000 shares of Class B Common Stock outstanding as of the same date.

Documents Incorporated By Reference
Portions of the Proxy Statement for the annual meeting of stockholders to be held on April 29, 2008 are incorporated by reference into Part III.

The breach of any covenants or obligations in the foregoing indentures or credit facilities, not otherwise waived or amended, could result in a default under the applicable debt obligations and could trigger acceleration of those obligations, which in turn could trigger cross defaults under other agreements governing our long–term indebtedness. In addition, the secured lenders under the Charter Operating credit facilities, the holders of the Charter Operating senior second–lien notes, the secured lenders under the CCO Holdings credit facility, and the holders of the CCH I notes could foreclose on their collateral, which includes equity interests in our subsidiaries, and exercise other rights of secured creditors. Any default under those credit facilities or the indentures governing our convertible notes or our subsidiaries' debt could adversely affect our growth, our financial condition, our results of operations and our ability to make payments on our convertible senior notes, our credit facilities, and other debt of our subsidiaries, and could force us to seek the protection of the bankruptcy laws.

We may not be able to access funds under the Charter Operating revolving credit facilities if we fail to satisfy the covenant restrictions, which could adversely affect our financial condition and our ability to conduct our business.

Our subsidiaries have historically relied on access to credit facilities to fund operations, capital expenditures, and to service parent company debt, and we expect such reliance to continue in the future. Our total potential borrowing availability under our revolving credit facility was approximately $1.0 billion as of December 31, 2007, none of which was limited by covenant restrictions. There can be no assurance that actual availability under our credit facility will not be limited by covenant restrictions in the future.

One of the conditions to the availability of funding under the Charter Operating revolving credit facility is the absence of a default under such facility, including as a result of any failure to comply with the covenants under the facilities. Among other covenants, the Charter Operating revolving credit facility requires us to maintain specified leverage ratios. The Charter Operating revolving credit facility also provides that Charter Operating obtain an unqualified audit opinion from its independent accountants for each fiscal year, which, among other things, requires Charter to demonstrate its ability to fund its projected liquidity needs for a reasonable period of time following the balance sheet date of the financial statements being audited. There can be no assurance that Charter Operating will be able to continue to comply with these or any other of the covenants under the credit facilities. See "—We and our subsidiaries have a significant amount of debt and may incur significant additional debt, including secured debt, in the future, which could adversely affect our financial health and our ability to react to changes in our business" for a discussion of the consequences of a default under our debt obligations.

We depend on generating sufficient cash flow and having access to additional liquidity sources to fund our debt obligations, capital expenditures, and ongoing operations.

Our ability to service our debt and to fund our planned capital expenditures and ongoing operations will depend on both our ability to generate and grow cash flow and our access to additional liquidity sources. Our ability to generate and grow cash flow is dependent on many factors, including:

- the impact of competition from other distributors, including incumbent telephone companies, direct broadcast satellite operators, wireless broadband providers and DSL providers;
- difficulties in growing, further introducing, and operating our telephone services, while adequately meeting customer expectations for the reliability of voice services;
- our ability to adequately meet demand for installations and customer service;
- our ability to sustain and grow revenues and cash flows from operating activities by offering video, high–speed Internet, telephone and other services, and to maintain and grow our customer base, particularly in the face of increasingly aggressive competition;
- our ability to obtain programming at reasonable prices or to adequately raise prices to offset the effects of higher programming costs;
- general business conditions, economic uncertainty or slowdown, including the recent significant slowdown in the new housing sector and overall economy; and
- the effects of governmental regulation on our business.

Some of these factors are beyond our control. It is also difficult to assess the impact that the general economic downturn and recent turmoil in the credit markets will have on future operations and financial results. However, we believe there is risk that the economic slowdown could result in reduced spending by customers and advertisers, which could reduce our revenues and our cash flows from operating activities from those that otherwise would have been generated. If we are unable to generate sufficient cash flow or access additional liquidity sources, we may not

be able to service and repay our debt, operate our business, respond to competitive challenges, or fund our other liquidity and capital needs. We expect that cash on hand, cash flows from operating activities, and the amounts available under Charter Operating's credit facilities will be adequate to meet our projected cash needs through the second or third quarter of 2009 and thereafter will not be sufficient to fund such needs. Our projected cash needs and projected sources of liquidity depend upon, among other things, our actual results, the timing and amount of our capital expenditures, and ongoing compliance with the Charter Operating credit facilities, including Charter Operating's obtaining an unqualified audit opinion from our independent accountants. Charter will therefore need to obtain additional sources of liquidity by early 2009. Although we and our subsidiaries have been able to raise funds through issuances of debt in the past, we may not be able to access additional sources of liquidity on similar terms or pricing as those that are currently in place, or at all. An inability to access additional sources of liquidity could adversely affect our growth, our financial condition, our results of operations, and our ability to make payments on our convertible senior notes, our credit facilities, and other debt of our subsidiaries, and could force us to seek the protection of the bankruptcy laws, which could materially adversely impact our ability to operate our business and to make payments under our debt instruments, and would reduce or eliminate the value of our equity shares. See "Part II. Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations — Liquidity and Capital Resources."

Because of our holding company structure, our outstanding notes are structurally subordinated in right of payment to all liabilities of our subsidiaries. Restrictions in our subsidiaries' debt instruments and under applicable law limit their ability to provide funds to us or our various debt issuers.

Charter's primary assets are our equity interests in our subsidiaries. Our operating subsidiaries are separate and distinct legal entities and are not obligated to make funds available to us for payments on our notes or other obligations in the form of loans, distributions, or otherwise. Our subsidiaries' ability to make distributions to us or the applicable debt issuers to service debt obligations is subject to their compliance with the terms of their credit facilities and indentures, and restrictions under applicable law. See "Part II. Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations — Liquidity and Capital Resources — Limitations on Distributions" and "— Summary of Restrictive Covenants of Our High Yield Notes – Restrictions on Distributions." Under the Delaware Limited Liability Company Act, our subsidiaries may only make distributions if they have "surplus" as defined in the act. Under fraudulent transfer laws, our subsidiaries may not pay dividends if they are insolvent or are rendered insolvent thereby. The measures of insolvency for purposes of these fraudulent transfer laws vary depending upon the law applied in any proceeding to determine whether a fraudulent transfer has occurred. Generally, however, an entity would be considered insolvent if:

- the sum of its debts, including contingent liabilities, was greater than the fair saleable value of all its assets;
- the present fair saleable value of its assets was less than the amount that would be required to pay its probable liability on its existing debts, including contingent liabilities, as they become absolute and mature; or
- it could not pay its debts as they became due.

While we believe that our relevant subsidiaries currently have surplus and are not insolvent, there can be no assurance that these subsidiaries will not become insolvent or will be permitted to make distributions in the future in compliance with these restrictions in amounts needed to service our indebtedness. Our direct or indirect subsidiaries include the borrowers and guarantors under the Charter Operating and CCO Holdings credit facilities. Several of our subsidiaries are also obligors and guarantors under senior high yield notes. Our convertible senior notes are structurally subordinated in right of payment to all of the debt and other liabilities of our subsidiaries. As of December 31, 2007, our total debt was approximately $19.9 billion, of which approximately $19.5 billion was structurally senior to our convertible senior notes.

In the event of bankruptcy, liquidation, or dissolution of one or more of our subsidiaries, that subsidiary's assets would first be applied to satisfy its own obligations, and following such payments, such subsidiary may not have sufficient assets remaining to make payments to its parent company as an equity holder or otherwise. In that event:

- the lenders under Charter Operating's credit facilities, whose interests are secured by substantially all of our operating assets, and all holders of other debt of our subsidiaries, will have the right to be paid in full before us from any of our subsidiaries' assets; and
- the holders of preferred membership interests in our subsidiary, CC VIII, would have a claim on a portion of its assets that may reduce the amounts available for repayment to holders of our outstanding notes.