UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 09-01132

- - - - - - - - - - - - - - - - - - - - -x

In the Matter of:


CHARTER COMMUNICATIONS INC.,


      Debtor.


- - - - - - - - - - - - - - - - - - - - -x


           U.S. Bankruptcy Court

           One Bowling Greet

           New York, New York


           May 5, 2009

           9:07 a.m.


B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

1   MOTION Filed by Defendants to Dismiss Complaint and for

2   Determination Under 157(b)(3), in JPMorgan Chase Bank N.A. v.

3   Charter Communications Operating LLC

4

5   MOTION Filed by the Official Committee of Unsecured Creditors

6   to Intervene

7

8   MOTION Filed by Rembrandt Technologies, LP and Rembrandt

9   Technologies, LLC for Entry of an Order Modifying the Automatic

10  Stay

11

12  MOTION Filed by the Debtors for Entry of an Order Directing

13  that Certain Orders in the Debtors' Chapter 11 Cases be Deemed

14  Applicable to a Certain Affiliated Debtor

15

16  DISCLOSURE Statement Hearing

17

18

19

20

21

22

23

24  Transcribed By:  Esther Accardi

25

1    A P P E A R A N C E S :

2    KIRKLAND & ELLIS, LLP

3         Attorneys for Debtors

4         163 East 53rd Street

5         New York, New  York 10022

6

7    BY:   PAUL BASTA, ESQ.

8

9

10   KIRKLAND & ELLIS, LLP

11        Attorneys for Debtors

12        655 Fifteenth Street, N.W.

13        Washington, D.C. 20005

14

15   BY:   JONATHAN D. BRIGHTBILL, ESQ.

16        JEFFREY S. POWELL, ESQ.

17

18

19   KIRKLAND & ELLIS, LLP

20        Attorneys for Debtors

21        300 North LaSalle Street

22        Chicago, Illinois 60654

23

24   BY:   RAY C. SCHROCK, ESQ.

25

```
1    A P P E A R A N C E S : (continued)

2    UNITED STATES DEPARTMENT OF JUSTICE

3    OFFICE OF THE UNITED STATES TRUSTEE

4         33 Whitehall Street

5         New York, New York 10004

6

7    BY:   PAUL SCHWARTZBERG, ESQ.

8

9

10   SKADDEN ARPS SLATE MEAGHER & FLOM, LLP

11        Attorneys for Paul Allen

12        Four Times Square

13        New York, New York 10036

14

15   BY:   JAY M. GOFFMAN, ESQ.

16

17

18   PAUL WEISS RIFKIND WHARTON & GARRISON, LLP

19        Attorneys for Crossover Committee

20        1285 Avenue of the Americas

21        New York, New York 10019

22

23   BY:   ALAN W. KORNBERG, ESQ.

24        ANDREW J. EHRLICH, ESQ.

25
```

1    A P P E A R A N C E S : (continued)

2    SIMPSON THACHER & BARTLETT, LLP

3         Attorneys for JPMorgan Chase

4         425 Lexington Avenue

5         New York, New York 10017

6

7    BY:   PETER PANTALEO, ESQ.

8         GEORGE WANG, ESQ.

9         BRYCE FRIEDMAN, ESQ.

10        MORRIS J. MASSEL, ESQ.

11

12

13   ROPES & GRAY, LLP

14        Attorneys for Creditors' Committee

15        1211 Avenue of the Americas

16        New York, New York 10036

17

18   BY:   DAVID S. ELKIND, ESQ.

19        RUSSELL LIPPMAN, ESQ.

20        KEITH H. WOFFORD, ESQ.

21        MARK R. SOMERSTEIN, ESQ.

22

23

24

25

```
1    A P P E A R A N C E S : (continued)

2    WHITE & CASE, LLP

3          Attorneys for Law Debenture

4          1155 Avenue of the Americas

5          New York, New York 10036

6

7    BY:   GERARD UZZI, ESQ.

8

9

10   TOGUT SEGAL & SEGAL, LLP

11         Attorneys for Charter Investment, Inc.

12         One Penn Plaza

13         New York, New York 10010

14

15   BY:   BRIAN F. MOORE, ESQ.

16         FRANK A. OSWALD, ESQ.

17

18

19   COVINGTON & BURLING, LLP

20         Attorneys for Wilmington Trust Company

21         620 Eighth Avenue

22         New York, New York 10018

23

24   BY:   SUSAN POWER JOHNSTON, ESQ.

25
```

1   A P P E A R A N C E S : (continued)

2   BROWN RUDNICK, LLP

3        7 Times Square

4        New York, New York 10036

5

6   BY:   DANIEL J. SAVAL, ESQ.

7        DAVID J. MOLTON, ESQ.

8

9

10  AXLEY BRYNELSON, LLP

11       Attorneys for Mark Crudell

12       2 East Mifflin Street

13       Madison, Wisconsin 53703

14

15  BY:   DAVID M. PELLETIER, ESQ.

16

17

18  KRAMER LEVIN NAFTALIS & FRANKEL, LLP

19       1177 Avenue of the Americas

20       New York, New York 10036

21

22  BY:   KENNETH H. ECKSTEIN, ESQ.

23

24

25

1    A P P E A R A N C E S : (continued)

2    KATTEN MUCHIN ROSENMAN, LLP

3         Attorneys for Rembrandt Technologies

4         575 Madison Avenue

5         New York, New York 10022

6

7    BY:   JEFF J. FRIEDMAN, ESQ.

1             P R O C E E D I N G S

2      THE COURT:  Be seated please.  Good morning.

3      I understand we're taking one thing out of order.

4      Mr. Basta, good morning.

5      MR. BASTA:  Good morning, Your Honor.  Paul Basta from

6 Kirkland & Ellis on behalf of the debtors.

7      Your Honor, we have four items on the agenda today.

8 The motion to dismiss the adversary proceeding.  The Rembrandt

9 Technologies' motion to lift the stay.  Our affiliated debtor

10 add-on motion.  And the disclosure statement motion.

11      I don't know if the Court has a preference.  We were

12 proposing to --

13      THE COURT:  I thought there was a motion to intervene?

14      MR. BASTA:  Oh, and there is a motion to intervene.

15 I'm sorry about that.

16      THE COURT:  That's the one that I thought was going to

17 be taken out of order.

18      MR. BASTA:  All right.  Let's take that one out of

19 order.

20      THE COURT:  Great.

21      MR. ELKIND:  Excuse me, Your Honor.  Thank you very

22 much, Your Honor, on the theory that it's always best to start

23 on matters in which there's no disagreement.

24      Your Honor, David Elkind for the official committee of

25 unsecured creditors.

1          We filed the motion to intervene under Section 1109

2     and Federal Rules of Civil Procedure 24 in the adversary

3     proceeding brought by JPMorgan.  Notice was given to all

4     parties.  There is no objection.  We submitted an order

5     together with our application to the Court.

6          THE COURT:  Motion's granted.

7          MR. ELKIND:  Thank you.  And I just call your

8     attention to one additional housecleaning matter.  Which is

9     that we did submit to the Court a letter modifying the

10    protective order as it relates to the official committee.  The

11    protective order was entered prior to the formation of the

12    committee.  And so there were certain relatively minor changes

13    that were needed to assure that the committee could properly do

14    its work.  The debtor has consented and worked out those issues

15    with the debtor, and the debtor consented to the order as we

16    submitted it to the Court.  We served our letter on all

17    parties, we raised the issue with the conference before the

18    Court about a week ago.  So I just call that Your Honor's

19    attention.  We also did submit an order to the Court modifying

20    the protective order as agreed.

21         THE COURT:  All right.  I'm confident it's somewhere

22    in chambers, and it will be entered.

23         MR. ELKIND:  Thank you very much.

24         MR. POWELL:  Good morning, Your Honor.  Jeff Powell

25    for the debtors on the first official item on the agenda.

1           May I approach?

2           THE COURT:  that was not official?

3           MR. POWELL:  It was meaningful, it didn't make the

4    agenda.

5           THE COURT:  Okay.

6           MR. POWELL:  May I approach, Your Honor?

7           THE COURT:  You may.

8           MR. POWELL:  I disseminated these two handups to the

9    other parties, Your Honor.  This is a summary of what we think

10   are the e-contract terms, and underneath are the provisions

11   themselves.

12          THE COURT:  All right, thank you.

13          MR. POWELL:  Your Honor, the debtors move to dismiss

14   the complaint for failure to state a claim and also we've asked

15   that the Court determine that this adversary proceeding is a

16   core proceeding.

17          There's been extensive briefing as Your Honor knows.

18   And I'll try to keep my arguments brief and to the point.

19          On the first issue the, core proceeding issue, I think

20   the law is clear.  We've cited several Second Circuit decisions

21   on the applicable law here.  The Central Vermont case, U.S.

22   Lines, and CBI Holding that say whether a proceeding like this

23   is core depends on the degree to which it is independent of the

24   reorganization.  And whether the nature of the proceeding

25   directly affects a core bankruptcy function.  I think that law

1    is clear, Your Honor, and not in dispute.

2         On the application of the law to this adversary

3    proceeding there is no genuine claim that this complaint is

4    independent of the reorganization.  Or, indeed, that it's

5    resolution will have no ramifications on the administration of

6    the estate or confirmation.  Indeed, the entire purpose of the

7    complaint is to block reinstatement.  And in their papers

8    JPMorgan has not and cannot contend that it filed this

9    adversary proceeding for any reason other than to block

10   reinstatement.

11        There is no genuine dispute that the ramifications of

12   the complaint directly impact core bankruptcy functions,

13   impairment, reinstatement, and, thus, the confirmation of the

14   plan before the Court.  If JPMorgan prevails on its adversary

15   complaint there is no reinstatement and this plan cannot be

16   confirmed.  Those are indisputably core bankruptcy functions.

17        THE COURT:  Let me ask you a question.  Assuming this

18   complaint had never been filed, and we were, instead, involved

19   in what amounted to preemptive confirmation litigation that's

20   exactly the same as the litigation you're engaged in right now.

21   In fact, everybody agreed that's a pivotal issue in the case.

22   There's no litigation that relates to the issue.  But it's a

23   foreseeable aspect of your prenegotiated and prepackaged plan.

24   That's clearly a core issue, isn't it?

25        MR. POWELL:  Yes, sir.

1        THE COURT:  So what is the distinction in your view

2   between the fact that we have what amounts to parallel

3   proceedings?  One's a litigation and one's confirmation

4   litigation.  Is there any distinction?

5        MR. POWELL:  Let me just preface it by saying -- and

6   I'll get to this.  But we don't think there should be

7   litigation under a complaint or otherwise with respect to these

8   allegations.

9        That said, the allegations in this complaint clearly

10  go to confirmation.  Clearly go to confirmation.  And I don't

11  see any room between the allegations in the complaint and what

12  Your Honor otherwise will have to address at confirmation.

13       THE COURT:  How then is the debtor advantaged if the

14  complaint is dismissed?  Because the very same issue is present

15  in the case, it's absolutely front and center.  And it seems to

16  me that as a result the principal issue here is core versus

17  non-core.  Because if its non-core and it's not dismissed it

18  may represent a procedural hurdle that's different from the

19  procedural hurdle that exists already in the confirmation

20  litigation.  Whereas, if it's not dismissed but it's core,

21  isn't it the same litigation that we have in the context of

22  confirmation?

23       MR. POWELL:  But the procedural hurdle if this

24  complaint is allowed to stand directly impacts the lockup

25  agreements in the timetable that we discussed with Your Honor

1    on several instances.  We think this is core, and Your Honor

2    can address all of this in confirmation.  If this was found to

3    be non-core than any findings of fact or questions of law would

4    have to be taken up by the Southern District.  And we're quite

5    concerned that that would impact the dates that led us to this

6    schedule.

7            THE COURT:  So is more about timing than it is about

8    substance?

9            MR. POWELL:  Well, on the substance issue I just think

10   there's no distinction between the allegations that are raised

11   and the matters that Your Honor is going to have to address in

12   confirmation.

13           THE COURT:  That's actually my point.

14           MR. POWELL:  Yes.

15           THE COURT:  I'm trying to understand why -- an awful

16   lot is being -- a lot of time is being spent, a lot of money is

17   being spent on what is really a threshold procedural issue that

18   I'm distilling down.  And maybe I'm being overly simplistic

19   here, and tell me if you think I am.  I'm distilling this down

20   to the core/non-core distinction as opposed to the substantive

21   dismissal of the adversary proceeding.  Because the very same

22   litigation issues continue unaltered regardless of what I do

23   with the complaint as long as it's core.

24           MR. POWELL:  Assuming that these allegations stated a

25   claim.  I mean, obviously our argument would be if Your Honor

1    finds this as core, our argument is that these allegations

2    should not be addressed even during confirmation because

3    there's no legitimate argument that there's been a breach to

4    the credit agreement.

5         THE COURT:  I understand that.  But if we project

6    ahead to July and we're involved in a confirmation battle,

7    there's no question that the objections will be raised and

8    you're not going to be able -- you'll have a contested matter.

9    You're not going to be able to move to dismiss the objections

10   to confirmation.  They'll have to be adjudicated and resolved.

11        MR. POWELL:  Well, one of the purposes to the second

12   part of our motion, Your Honor, is to get a ruling from Your

13   Honor that this type of allegation, that there is some

14   prospective obligation is not in default under the contract,

15   and that we would not have to litigate those allegations now,

16   in the context of a complaint, or later in the context of

17   confirmation.

18        THE COURT:  Well, regardless of what happens to the

19   complaint, I want to understand something.  Is it your position

20   that you can similarly block the ability of JPMorgan Chase as

21   agent to challenge confirmation on the basis of impermissible

22   reinstatement, both because of alleged pre-petition defaults

23   under the credit agreement and change of control issues?

24        MR. POWELL:  We cannot summarily block those arguments

25   based solely on a finding by Your Honor that this is core.

1    We're not asserting that.  We are asserting that this is core

2    and those allegations are not properly brought.  They are two

3    independent issues.  We are not saying that merely because Your

4    Honor -- if Your Honor was to find that this is core, we're not

5    saying by, itself, that there can be no further litigation on

6    these allegations.

7         THE COURT:  Let's just say that I were to agree with

8    you.  Let's just say that I agree that it was core.  And that

9    there was a failure to state a claim.  You'd still be involved

10   in the same litigation, wouldn't you?

11        MR. POWELL:  Well, I think we would clearly be

12   involved in litigation with the banks on the propriety of

13   reinstatement.  And that, clearly, will include the cross-

14   acceleration point and the change of control point that Mr.

15   Pantaleo made on the first day.  We would hope that if our

16   motion -- if both parts of our motion are granted, then it

17   would not include a dispute about whether Section 8(g)(5) is

18   perspective.

19        In other words, we will still be litigating with the

20   banks even if Your Honor grants both parts of these motions.

21   However, the scope of that litigation will be refined, will be

22   narrowed if Your Honor grants both parts of this motion.

23        THE COURT:  Okay.  Please proceed with your argument.

24        MR. POWELL:  Briefly then on core, there's no genuine

25   dispute on the law or the application of the facts.  And I want

1    to address JPMorgan's three arguments very quickly.

2          JPMorgan argues that CCO is solvent and, therefore,

3    there will be no impact on core bankruptcy functions.  But this

4    argument wholly ignores the core bankruptcy functions that I've

5    just referred to; confirmation, reinstatement, impairment.

6    There's a single unified plan before this Court and this

7    complaint goes to the very heart of that plant, that some

8    entirely hypothetical CCO only plan might be confirmed however

9    the adversary complaint is resolved is not relevant.  The issue

10   isn't whether a hypothetical plan could be approved or

11   confirmed, the issue is whether this plan can be confirmed.

12   And this plan cannot be confirmed if Your Honor finds that

13   JPMorgan prevails on the complaint.

14          The second argument is consent.  JPMorgan argues that

15   the debtors' cases are in apposite because it didn't file a

16   claim.  But the issue here is not whether JPMorgan filed a

17   proof of claim, it's whether it is consented to this Court's

18   jurisdiction.  Or, rather, whether it's been unwillingly

19   dragged into this Court.  And on this JPMorgan has clearly

20   consented to jurisdiction.  Whether it be the cash collateral

21   order, whether it be discovery on confirmation or any other

22   issue, it is actively and aggressively participating on matters

23   in Your Honor's court.

24          Finally, JPMorgan argues that Orion governs here.  But

25   Orion is a very narrow holding.  It's been limited to its

1    facts.  As evidenced by the numerous Second Circuit, SDNY and

2    Bankruptcy Court decisions that we've cited that came after

3    Orion.  And the facts of Orion are entirely different than the

4    ones here.  Unlike here, the debtor in Orion was the plaintiff.

5    Unlike here, the counterparty in Orion had no involvement in

6    the bankruptcy proceeding whatsoever.  And unlike here, the

7    complaint only had minimal impact on the administration of the

8    estate because a favorable decision would merely augment the

9    assets of the estate.  Here a favorable decision on the

10   complaint would blow up the plan of reorganization for the

11   Court.

12        Your Honor, that's all I want to say on core.  I'm

13   prepared to argue the second part, the failure to state a

14   claim, unless Your Honor would prefer that I sit down and we do

15   it in parts.

16        THE COURT:  Let's do it all at once.

17        MR. POWELL:  Okay.  The second part of our motion is

18   that we have moved the Court to dismiss the complaint for

19   failure to allege a breach of the credit agreement.  There's no

20   dispute that Charter made every interest payment before filing

21   for bankruptcy.  JPMorgan nevertheless contends that two, or

22   perhaps one of two designated holding companies were unable to

23   pay their debts as they would become due sometime in the

24   future.  This prospective obligation is contrary to a plain

25   reading of Section 8(g)(5).  It is contrary to other provisions

1    of the credit agreement, specifically, two subsections of 7.6

2    and 4.21.  And it has not support in the case law.  By

3    contrast, our reading of Section 8(g)(5) gives effects to all

4    three clauses in that provision.  And is consistent with

5    Section 7.6 and 4.21.

6          I briefly want to talk about our specificity argument,

7    because it's a significant one.  And not merely a pleading

8    deficiency.  The only factual allegation in the complaint

9    supporting the conclusory allegation that this these two

10   entities were unable to pay their debts is that they were

11   unable to pay dividends under Delaware law.  That's it.  All

12   three counts funneled to that single allegation.  But that's

13   not an event of default under the contract.  There's no

14   contract provision that requires that funds be moved up only

15   via dividends.  And JPMorgan doesn't cite any such contract

16   provision.  Indeed, as the contract makes clear and as the

17   complaint, itself, acknowledges, there are several different

18   ways to move money up through the corporate chain, including

19   the repayment of intercompany notes.  Thus, there are no

20   factual allegations, none, supporting a plausible claim of

21   default under the Supreme Court's decision in Twombly.  Not

22   merely a pleading defect that could be cured, but a fatal

23   defect.

24          Prospective.  JPMorgan claims that the case law makes

25   claim -- and I'm quoting:  "That an entity is unable to pay

1    debts where it is reasonably certain that it will not be able

2    to pay debts as they become due in the near future."

3    "Reasonably certain, near future."  JPMorgan doesn't cite to a

4    single case that supports that proposition.  Nor is that

5    proposition reflected in the contract itself.  In it's

6    prospective argument JPMorgan cites to only three cases, but

7    none supports its argument.

8         The Westlake and Bridgeport cases concerned the

9    propriety of municipalities seeking Chapter 9 protection.

10    Those cases rested on a very specific and very unique statutory

11    purpose.  Cities need to continue to be providing services, and

12    they cannot be allowed to default before declaring bankruptcy.

13    Those cases, Westlake and Bridgeport, have never been cited by

14    a single case as authority for contract interpretation.  Not

15    one.  Indeed, they've never been cited outside the context of

16    Chapter 9 in municipalities.

17         Indeed, they undermine JPMorgan's argument.  Even in

18    the context of Chapter 9 those cases hold that there's an

19    inability to pay debts only when the maturity of the debts is

20    imminent, and the inability to pay certain.  Imminent, certain.

21    The mere possibility is insufficient.  And here, of course, the

22    complaint doesn't allege that the designated holding companies

23    inability to pay any imminent debts was certain nor could it,

24    because Charter made every interest payment before filing for

25    Chapter 11.

1       The language of the contract, itself. JPMorgan's

2 argument also fails because it would render the third clause of

3 Section 8(g)(5) a nullity in violation of Hornbook Law. And I

4 won't belabor that, we've laid that out in our reply brief,

5 Your Honor.

6       But, critically, it's also Hornbook Law that Section

7 8(g)(5) must be read in a manner that gives fair meaning in a

8 manner consistent with other contract provisions. Our reading

9 of Section 8(g)(5) does that. JPMorgan's reading does not. In

10 fact, JPMorgan's construct conflicts with two provisions of

11 Section 7.6, which we've summarized in the hand up before Your

12 Honor. Subsection (b)(2) and subsection (b)(3). The reason

13 for Section 7.6 was that the parties understood from the outset

14 that these entities could not pay their debts without funds

15 coming up from CCO. So 7.6 addresses the movement of funds

16 from CCO up to these entities.

17       7.6(b)(2) provides that funds cannot be -- I'm sorry,

18 can be moved to cure a designated holding company default. And

19 (b)(3) provides that funds cannot be moved up more than fifteen

20 days before the interest payments are due. Both of these

21 provisions would be rendered meaningless under JPMorgan's

22 construct.

23       If the designated holding companies had insufficient

24 funds to pay debts sometime in the future, that would be a

25 default right then and there. And funds could not be moved up

1    to cure a designated holding company default, or within fifteen

2    days of an interest payment.

3         I want to particularly, Your Honor, flag subsection

4    (b)(3) which prohibits distributions more than fifteen days

5    before interest payments are due.  Everyone understood that the

6    designated holding companies could not make interest payments

7    without funds from CCO.  But under JPMorgan's construct here

8    there would be an event of default long before those fifteen

9    days arrived.  JPMorgan's argument here would render both of

10   those provisions a nullity and is improper under Hornbook Law.

11   The same argument is applied to Section 4.21 which we laid out

12   in our brief.  And we also laid out in our brief the party's

13   course of dealing over the years.

14        Your Honor, we referenced the company's extensive

15   disclosures from the very beginning of this credit agreement.

16        Last point I want to mention, very briefly.  A brief

17   word about JPMorgan's use of extrinsic evidence in its

18   response.  That's improper, of course, on a motion to dismiss.

19   More tellingly, however, none of that extrinsic evidence

20   remotely supports its argument that this section was

21   prospective.  It doesn't even come close.

22        So, Your Honor, for the reasons set forth in our

23   brief, and today, we'd ask that you find that this is a core

24   proceeding, and that you dismiss the complaint for failure to

25   state a claim.  Because it is inconsistent with the law, with

1    Section 8(g)(5), the party's course of conduct and other

2    provisions of the contract.

3         THE COURT:  Before you sit down, let me ask you this

4    question.  I'm aware that the parties have been involved for

5    some time, even predating the commencement of the bankruptcy

6    case in discovery.  Discovery relating to the reinstatement

7    question.  But more, particularly, the issues framed by

8    JPMorgan's complaint.  To what extent, if at all, is the

9    outcome of the motion to dismiss and my fair evaluation of the

10   legal arguments that you've made, dependent upon any discovery

11   which is ongoing or yet to be performed?

12        MR. POWELL:  None, whatsoever.  This is based on the

13   contract, and the law, and the complaint.

14        THE COURT:  Thank you.  I think the committee is going

15   to be supporting the debtor, so we'll take the supporters

16   before we take the others seeking to oppose the motion.

17        MR. ELKIND:  Thank you, Your Honor.  Your Honor, I

18   will be brief.

19        Your Honor, there is no doubt here as to what JPMorgan

20   is attempting to do.  They're attempting to take issues that

21   would ordinarily be part of the confirmation process, part of

22   any confirmation objection, part of any confirmation order.

23   And they're attempting to separate out of their convenience

24   certain of the issues piecemeal to litigate in a separate

25   adversary proceeding for procedural advantage.

1        The creditors' committee is in complete and full

2    support of the debtors' motion to dismiss.  We support

3    wholeheartedly their position that this is a core proceeding.

4    We support their position that any and all matters that are

5    allowed to proceed ought to proceed as part of the confirmation

6    process, and ought to be, to the extent they're allowed to

7    proceed, ought to be ruled upon as part of the confirmation

8    order.  And we fully support their position on the merits that

9    the claims that are set forth in the complaint failed to set

10   forth proper claims for relief.

11       I'm going to be short because I think Mr. Powell and

12   the voluminous submissions already made to the Court adequately

13   delineate the issues.  I think there can be no doubt that these

14   are core proceedings.  If they were litigated as I just

15   described, as part of the confirmation process, there is no

16   doubt that every single issue raised by JPMorgan would be a

17   core issue.  And I'm at a loss to understand how JPMorgan can

18   contend that you can transmute a core issue into a non-core

19   issue by separating it out piecemeal and putting it into an

20   adversary complaint.  And, indeed, if you can do that, it would

21   happen in every case before this Court.

22       THE COURT:  Well, that's not entirely true.  Because

23   their complaint, fairly read, alleges pre-petition defaults

24   under their credit agreement.  And they assert in their papers

25   that they could very well have brought that as pre-petition

1  State Court or District Court litigation.  They waited pretty

2  much at the behest of the debtor to not distract the debtor

3  during its restructuring efforts, and brought it front and

4  center reserving all rights with respect to the core/non-core

5  distinction.  So I hear what you're saying, but I'm not

6  entirely sure that I agree with it.

7        MR. ELKIND:  Well, I think in this context, Your

8  Honor, I think that, first of all, there can often be State

9  Court issues that are presented as part of issues that are

10  presented on confirmation and that are part of the core issues.

11  But I think as the Court Second Circuit stated in U.S. Lines

12  and the other cases submitted to this Court, where the issues

13  are sought to be litigated for the very purpose of directly

14  affecting core proceedings, where that's the whole import of

15  litigating the issues, I think the law is pretty clear that the

16  issues are core issues.  I think that's what the court held in

17  U.S. Lines.  I think that's what the courts held in the other

18  cases that have been submitted to this Court.  So this is not a

19  situation where there is a litigation brought by the debtor

20  seeking to enforce contract claims against a third party, as in

21  Orion.  And it's not a case in which there is a separate

22  independent breach of contract dispute that's separate and

23  apart from a reinstatement or core issue.  The whole purpose of

24  this proceeding, and the whole purpose of attempting to

25  bifurcate the issues here, is to deal with and focus, and level

a gun at the reinstatement under Section 1124, which is
entirely a core proceeding.

So there can't be any doubt, to use the words of the
court in the U.S. lines that "the proceedings here directly
affect a core bankruptcy function." Indeed, it couldn't be
more the case and couldn't be more the purpose of what's being
done here.

The second point that we would make, Your Honor, is
that we believe that however the issues are addressed, we
believe that any issues that are allowed to proceed, should be
combined with the confirmation process and should be a part of
the Court's rulings with regard to confirmation. And what we
don't want to see happen is for there to be a multiplicity of
proceedings that for some procedural reason are allowed to give
rise to separate appeals or separate procedural efforts that
would otherwise delay the confirmation process, that's our
concern.

And we agree with the position of the debtor that
there are a number of ways that this can be handled. First of
all, we believe that the Court could decline to exercise its
authority to hear this as a declaratory judgment. Which is
fully within the discretion of the Court, since any and all
issues, as Your Honor pointed out, can and undoubtedly will be
addressed in connection with an objection to confirmation.
That's one way to do it. Another way to do it is as the

1    debtors suggested in their papers.  For the Court to stay this

2    with full rights to JPMorgan to raise any and all issues in

3    connection with the confirmation process.  And a third way to

4    do is simply to consolidate the two proceedings.  However, in

5    that regard, again, it is important, we think, that any

6    proceedings in this be -- that are allowed to proceed, that do

7    continue should be consolidated with the confirmation, both in

8    terms of procedural handling, and also in terms of any ruling.

9    So that there is one ruling to the extent there's anything left

10   in this matter.  And that there is no procedural advantage and

11   no proliferation of motions, appeals, or whatever.

12           And, thirdly, Your Honor, without repeating what the

13   debtor said, we are in complete agreement -- the committee is

14   in complete agreement with the debtor that the claims set forth

15   in JPMorgan's complaint failed to set forth proper claims.

16   What we find is a little bit like a balloon covered with oil

17   where you try to pin down what it is -- with the shape of their

18   arguments, that every time you grab it you find that it's

19   transmuting itself into some other type of argument.  We think

20   that the contract here, the credit agreement is clear that the

21   debtors had the authority to upstream these monies to the

22   parent -- to the two designated holding companies.  There has

23   been no failure to make any of the payments.  And, frankly, we

24   think that the motion to dismiss on the merits could also be

25   granted by the Court.  Thank you, Your Honor.

1       THE COURT:  Thank you.

2       MR. KORNBERG:  Your Honor, Alan Kornberg from Paul

3  Weiss Rifkind Wharton & Garrison for the crossover committee.

4       THE COURT:  Mr. Pantaleo is so eager to get to the

5  podium.

6       MR. KORNBERG:  In case there's any doubt, there

7  crossover committee fully supports the debtors' position in

8  this matter.  There is no question that this is a core

9  proceeding.  This adversary proceeding has absolutely no

10  meaning or purpose except in connection with confirmation.  The

11  bank debt is in default, the bank debt has been accelerated

12  merely by the filing of these Chapter 11 cases.  So a

13  declaratory judgment as to alleged pre-petition defaults is an

14  utterly useless exercise except for reinstatement purposes.

15       What this really is, and I think why we're struggling

16  somewhat today, it's a preemptive confirmation objection.

17       Now, Your Honor, I think you have the discretion to

18  hear it if that's what you want to do, and you have the

19  discretion not to hear it, I believe, for the reasons cited by

20  the debtor.  Because there are many related issues that will be

21  raised by the banks and other parties in connection with

22  confirmation contested proceedings.  But if you're inclined to

23  hear it now, I think you should dismiss the adversary

24  proceeding.  I think it would advantage the estate.  Would take

25  some of these issues off the table.  And, frankly, avoid some

1    of the litigation expense attended to them.

2        We believe, Your Honor, that the alleged defaults are

3    based on a very tortured after the fact construction of the

4    credit agreement.  As the debtor has laid out this credit

5    agreement was designed knowing full well that the designated

6    holding companies were not self-funding.  They had to look to

7    the borrower, the operating company for their funds.  And as

8    the debtors pointed out the provisions stipulate that the funds

9    can only be upstreamed fifteen business days -- no earlier than

10   fifteen business days before the debt service payments are due.

11   If JPMorgan's view of the credit agreement was accurate the

12   designated holding companies would always be in a state of

13   default, because they say you have to read the provision with

14   future -- a prospective affect, and fifteen days is not very

15   far into the future.  They knew the designated holding

16   companies had no other source of liquidity.  But I don't

17   believe that they felt that they were always in default.  I

18   don't think that that's what the parties intended.  I don't

19   think that that's how they conducted themselves, there were no

20   notices of default given.  And the facts are that the

21   designated holding companies always made the payments they were

22   required to make.  And they made them when they were due.

23   There was never any risk that they would not, as the facts show

24   us.  And when the company faced liquidity restraints, Charter

25   took prompt and effective, and definitive action to delever the

1    designated holding companies by filing these reorganization

2    cases.

3          So, Your Honor, in some, the alleged defaults depend

4    on a very strained interpretation of the credit agreement that

5    we believe is at odds with the plain meaning of the words, the

6    context, the facts, and the party's conduct.

7          THE COURT:  Thank you, Mr. Kornberg.

8          MR. GOFFMAN:  Your Honor, Jay Goffman of Skadden Arps

9    on behalf of Paul Allen.

10          As Your Honor is aware, Mr. Allen is the majority

11   shareholder of Charter, as well as the chairman.

12          We stand to support the debtors' motion to dismiss the

13   adversary proceeding.  I'm not going to repeat all the

14   arguments you've just heard, you don't need to hear those

15   again.  What I'd like to do is just address the two questions

16   that Your Honor raised earlier in the morning.

17          The first is this core or non-core issue.  And we

18   agree, that's the key issue here, is this core or non-core.  I

19   can't imagine any matter being more core to this Chapter 11

20   case than what's alleged in the papers.  It goes directly to

21   the sole issue in this case.  Can the bank debt be reinstated

22   under the plan?  The arguments have been made, the cases have

23   been cited, Orion is in apposite.

24          The question is why are they alleging its non-core

25   versus core?  We think it's a good tactical position that

1   they've taken, many people in their shoes would take the same

2   position.  If you could get this technical argument out of --

3   in front of a judge who wasn't as experienced in Chapter 11 and

4   in bankruptcy there may be a better way of convincing a judge

5   on the issue.

6          There's also a question on timing.  As Your Honor is

7   aware, there are lockup agreements, there are timetables built

8   into it.  And it's key that we stay on that timetable to

9   confirm this plan.  As long as all the issues remain in front

10  of Your Honor because they're core, we have confidence that

11  we'll be able to move on that timetable.  Once the issues get

12  separated into different courts there's no certainty that we'll

13  be able to stay with that timetable and confirm this plan.

14         The second question I think Your Honor raised had to

15  do with procedurally why is this better to dismiss the

16  proceeding as opposed to allow it to go forward.  Putting aside

17  the fact that it's an adversary proceeding designed to address

18  the key issues to be dealt with at confirmation, probably the

19  easiest example of why this is improper is the motion to

20  intervene that Your Honor granted this morning.  The issues

21  that are in front of the Court are key and central to

22  confirmation of the plan.  Yet, as the adversary proceeding

23  would have it set up, no one is allowed to participate in that.

24  Not the equity, not the bonds, not any other party-in-interest

25  unless they file a motion to intervene and Your Honor grants

1    it.

2         It shows why the procedure is really improper.  We

3    understand.  Mr. Pantaleo has been a friend for many years,

4    he's very smart and he's very creative.  He's come up with some

5    interesting tactical arguments to try to get a pure plan

6    confirmation issue into a different context.  We applaud his

7    efforts, they just don't stand up, Your Honor.  We would ask

8    you to dismiss the adversary proceeding.

9         THE COURT:  Okay.  Mr. Pantaleo, you've been praised.

10        MR. PANTALEO:  Your Honor, Peter Pantaleo, Simpson

11   Thacher, JPMorgan.  And my partner, George Wang, will address

12   the contract issues with respect to the motion to dismiss the

13   claims themselves.

14        Your Honor, we agree also with Your Honor's

15   observation.  I mean, we've viewed -- our view is simply this.

16   We had a contract, it's pre-petition, before bankruptcy.  That

17   occurred, we think they breached it when they made a

18   misrepresentation in connection with during the fourth quarter

19   of '08 borrowing money.  The misrepresentation went to the fact

20   that they effectively say they're DHCs, designated holding

21   companies, are able to pay their debts as they come due.  Our

22   view is that the financial conditions of certain of them

23   effectively caused them legally to shut down all distributions

24   upstairs.  Effectively choking off any monies that could be

25   used to pay debts as they come due.

1      THE COURT:  Yeah.  But there's a big so what about

2    this.  And Mr. Kornberg emphasized it in his argument in

3    support of the motion to dismiss.  Which is Charter's in

4    bankruptcy.  The question of whether or not there's a pre-

5    petition default is meaningless for purposes of your rights

6    except as it relates to reinstatement.  Except for that issue,

7    which is obviously core to the plan.  So isn't this just a

8    procedural ploy on your part?  It sure seems that way.

9      MR. PANTALEO:  Well, Your Honor, it was our desire to

10   preserve as much as our rights as possible as we go through

11   bankruptcy.  We knew, for example, that if we raised

12   objections, whether to this issue, or to change of control, or

13   to cross-acceleration, and we lost the next argument was going

14   to be we had no right to appeal.  And we disagree with that, we

15   think we do have a right to appeal.  But we felt that it was

16   important for us and for our clients to preserve as much as

17   possible an ability to have appellate review or other court

18   review of any issues that we raised in bankruptcy.  And so

19   reading Orion, we made the conclusion that if you have a pre-

20   petition contract, and a factual dispute as to whether or not a

21   default existed, that even if the relief sought in connection

22   with the contract in Orion's case, assuming the contract is

23   clearly core, the determination of the related factual dispute

24   is non-core.  That's how we read Orion.  So we don't disagree,

25   Judge, that confirmation, for example, reinstatement is a core

issue.  And we accept that.

The issue is, under Orion, as we read the Second
Circuit's decision in Orion, if in order to get to that answer
of whether you can, in Orion's case, assume a contract, or in
this case reinstate an obligation, sort of parallel in our
view, you have a factual dispute as to whether or not there was
a pre-petition breach under a pre-petition contract.  That's
got to be decided in a separate adversary proceeding, and it's
non-core.  And so that's why we did it this way.

And, you know, candidly, Judge, what we're trying to
do is preserve our rights as fully as possible.  Now, if Your
Honor determines that this is core then I agree with you.  You
know, we deal with it all at confirmation, and that's what we
would intend to do.  But, frankly, we read Orion to say that
the right procedure is what we did, basically.  Raise it as a
separate adversary.  Even though it's a prerequisite to a core
relief.  I mean, there's nothing -- I mean, assuming a
contract, Judge, is pretty core in bankruptcy.  And you can't
assume a contract unless you cure a default, and you can't cure
a default until you determine whether a default exists.
Presumably, that's why Judge Lifland thought it was moot when
he granted the relief in Orion and say okay, I'm going to
assume the contract and dismiss this action for declaratory
relief because it's irrelevant at this point.  I understand the
logic of the lower court's decision.  Nonetheless, the Second

1    Circuit said very specifically, when you have a factual dispute

2    as to whether or not a default existed pre-petition under a

3    pre-petition contract, then, you know, you've got to hear it as

4    an adversary proceeding, and it's non-core.  And the solution

5    according the Second Circuit was the one that we brought here.

6    Which is if it's a big deal -- and in Orion the Court said this

7    could be a big deal, and you hear it at the same time.  So that

8    you're not -- you know, you're not granting core relief with

9    respect to assuming the contract and running any risk that

10   you're wrong about whether, in fact, a default exists.

11           So, you know, that's why we did it.  We read Orion, we

12   thought it was the right procedure, and, you know, we signaled

13   it obviously in the way we did before bankruptcy.  We brought

14   it during bankruptcy.  Frankly, Your Honor, I think -- I

15   thought you were making the observation before, and I agree

16   with you.  You know, we're supposed to be unpaired in this

17   case, and we could have said nothing, frankly.  We could have

18   sat back and done nothing.  And then a day after they came out

19   of bankruptcy could have sued them for breach.  They're plan is

20   to leave us as if no bankruptcy had occurred.  You know, but we

21   didn't do that.  We basically raised it with them early.  We

22   raised it before Your Honor now, in order to get it resolved.

23   And we did it pursuant to a procedure we thought was in

24   compliance with the Second Circuit's decision.  If Your Honor's

25   decides it's core we'll deal with that at confirmation, that's

1    fine.  Just like we're going to deal with cross-acceleration at

2    confirmation and change of control.

3         We happen to think because of Orion, because of the

4    nature of the complaint, and the fact that there is no other

5    sort of process that, you know, would convert this from core to

6    non-core, there's no claims allowance process here, we're

7    solvent.  This is not an issue of prioritizing on creditors,

8    we're solvent.  Even the nature of what they're seeking to do

9    in bankruptcy, which is -- again, to use Judge Lifland's words,

10   treat this as if no bankruptcy had existed.  All those things

11   to us tell us that really this ought to be treated as non-core.

12   And, in particular, because of the fact that the Second Circuit

13   seemed to recognize that even if it's a predicate to a core

14   relief, if you're dealing with a factual dispute as to whether

15   or not there was a default that occurred pre-petition under a

16   pre-petition contract, adversary proceeding, non-core, and

17   that's what we've done here, Judge.

18        THE COURT:  Let me stop you for one second on your

19   Orion argument.  Orion arose out of 365 of the Bankruptcy Code

20   and contract assumption litigation.  Your current adversary

21   proceeding has nothing to do with the assumption of a contract,

22   it has to do with claimed defaults under a contract that, as

23   you point out, is intended to pass through bankruptcy and be

24   reinstated.  Given the distinction I've just drawn, in what

25   respect is Orion relevant in the present context?

1          MR. PANTALEO:  Well, in Orion, the debtor was seeking

2     to assume a contract and the counterparty was saying that you

3     breached it and you can't assume it, basically.  You know,

4     there was a key man provision, you're in default.  And the

5     debtor was saying look, you know, the debtor brought an

6     adversary proceeding to effectively, you know, compel a

7     determination of assumption.

8          Here, they're basically saying to us the reinstatement

9     is effectively like assuming a financial contract.  The only

10     difference is our commitments don't get assumed.  But

11     everything else gets assumed.  And that's why when you look at

12     1124 you see references to 365.

13          THE COURT:  Yes, but as your argument points out we're

14     talking about very different code sections.  And we're talking

15     about something which goes to the heart of the economics of

16     this case.  This is the 500 million dollar elephant in the

17     room.

18          MR. PANTALEO:  Yes.  Let's take this in pieces then.

19     You know, in Orion you had a motion to assume a contract which

20     was a core dispute.  The Court in Orion seemed to think it was

21     a significant issue of fact.  They said that if you can't

22     assume the contract it could have a significant impact on the

23     estate.  In Orion the issue was, simply, in order to assume the

24     contract you've got the predicate of curing defaults, and then

25     you've got a dispute as to whether default existed.  And that

1    bottom issue was non-core according to the Second Circuit.  And

2    so here you've got a loan agreement, they want to reinstate the

3    loan agreement.  You've got a cure defaults same as 365.  And

4    now we've got a dispute as to whether or not there's a default

5    that exists that needs to be cured.

6         THE COURT:  But it's not the only dispute that you

7    have in your quiver.  You have other disputes, change of

8    control, cross-acceleration.

9         MR. PANTALEO:  Sure.  The fact that we have other

10   disputes -- we're not saying that --

11        THE COURT:  This is the one that's convenient for you

12   procedurally because it creates added leverage during the

13   course of the bankruptcy.

14        MR. PANTALEO:  No, Your Honor.  Respectfully, that's

15   not right.

16        THE COURT:  That's not right?  You didn't do this to

17   increase the leverage of JPMorgan Chase in this case.

18        MR. PANTALEO:  Your Honor, we have defaults.  Either

19   we raise them or we don't.  I mean, you know, we have rights or

20   we're wrong.

21        THE COURT:  Yes.  But you also rather dramatically on

22   the very same day that the bankruptcy case filed, filed your

23   adversary proceeding.  Got some press.  And it included the

24   very conspicuous non-core reference, which is the procedural

25   leverage.  Otherwise, this is just as I said earlier preemptive

1    confirmation litigation.

2         MR. PANTALEO:  I misunderstood what you were saying, I

3    apologize.  I thought you were saying we were just bringing

4    this complaint to create leverage in the case.  You're focusing

5    in particular on the allegation, I apologize.

6         THE COURT:  That's what we've been discussing, Yes.

7         MR. PANTALEO:  And I said to you before, Your Honor,

8    candidly, we think it's non-core because of Orion.  And we

9    think because of the reasons we said.  You know, factual

10   dispute, whether a default exists under a pre-petition

11   agreement.  Even if it's a connection with an issue of cure.

12   Even if it's a connection with a cure issue of, in one case

13   assumption, another reinstatement.  We think it's a perfect

14   parallel basically.  And so we think the proper procedure is

15   Orion, non-core dispute.  We could have brought this as a core

16   proceeding, we could have consented to final entry by this

17   Court.  I agree with all that.  We didn't, Your Honor, because

18   we're trying to preserve our rights because we understand that

19   we may lose, although we don't think that we should.  We want

20   to preserve as much as an appellate review as we can.

21        And we happen to think, as we said on our statement on

22   disclosure, with respect to the disclosure statement, because

23   we're being reinstate we actually have all of our appeal

24   rights.  But that's a separate issue.  Okay.  That's all.

25   That's why we did it this way.  We think the procedure was

1   proper, and we agreed with them.  We basically said look, if

2   you want to hear it at the same time, that's fine.  If you want

3   to hear it earlier, that's fine.  This deadline, their

4   timetable, Judge, this is their timetable.  I mean, we've got a

5   solvent debtor here.  We've got a cable company.  You know,

6   look at Adelphia, it was in bankruptcy for six years.  Not that

7   that's a model.  Okay.

8        But I'm trying to say to you is there's a place

9   between three notes and six years where you can have a very

10  successful reorganization of a cable company, okay.  But they

11  said we've got these deadlines, which, you know, they

12  manufacture on their own.  And to be fair to me now, they

13  manufacture these deadlines with my complaint in front of them,

14  a month before they filed.  Okay.  So they understood exactly

15  what was going to go on here.

16       THE COURT:  I understand.  Everybody's leveraging

17  everybody else.

18       MR. PANTALEO:  Okay, fair enough.  Fair enough, Your

19  Honor.  As a legal matter, though, we happen to think the

20  analysis is correct.  We do think there are defaults, we do

21  think they need to be addressed.  Frankly, as I said, we could

22  have -- we didn't, but we could have taken a position of a

23  reinstated, we didn't say anything, not a word.

24       THE COURT:  Not have been a smart move.

25       MR. PANTALEO:  Well, you know --

1          THE COURT:  Because all your leverage is right now.

2          MR. PANTALEO:  Actually, no, Your Honor.  Because --

3          THE COURT:  You don't think so?

4          MR. PANTALEO:  No, I don't think so, Your Honor.

5    Because if a month after the come out of bankruptcy we tell

6    them they're in default and they say we're not.  And then we

7    litigate, not in front of a bankruptcy court because we've been

8    reinstated.

9          THE COURT:  Wouldn't you have been in risk of having

10   waived that argument if you sat through with this entire

11   bankruptcy with reinstatement right in front of me and the

12   disclosure statement went out to the world?  Wouldn't you under

13   the old Oneida case have waived claims that would have been

14   impossible to assert post-petition?  I think you have a dilemma

15   at the moment.  I don't think you can conveniently wait and

16   assume that you have the argument it wasn't waived in

17   bankruptcy.

18         MR. PANTALEO:  We didn't wait, Judge.

19         THE COURT:  Excuse me?

20         MR. PANTALEO:  We didn't wait, obviously.

21         THE COURT:  Obviously.

22         MR. PANTALEO:  I think, actually, two things.  One,

23   had they, for example, given you a confirmation order that

24   asked you to make specific findings that, in fact, there were

25   no defaults with the credit agreement.  Yes, we would have

1    gotten up here to say something.  And at that point, at

2    confirmation, we would have said you know what, you need a

3    declaratory judgment in order to decide this issue.  And then

4    people would have been yelling at us, why did you wait until

5    now to raise the issue.  Okay.  So that was choice one.  Okay.

6         Choice two is they would have said nothing, they would

7    have just had a confirmation order saying we are reinstated,

8    all of our rights are preserved, including our contractual

9    rights, including our defaults.  And at that point we could

10   have done what we wanted to do.  And I think legally it would

11   have been perfectly proper if that's all had happened, plus to

12   call a default bid.  The point is, Judge -- we didn't do it,

13   okay.  The point is, we did the -- actually, we did the extreme

14   opposite, we gave them a complaint even before they filed,

15   okay.  So that everyone saw what was going on, and then we

16   raised it front and center before Your Honor.  I appreciate the

17   observation that, you know, we're calling it non-core because

18   we want to gain some kind of leverage.  You know, honestly,

19   we're calling it non-core to preserve all of our rights, Judge,

20   including our right to appeal.  And if Your Honor decides it's

21   core, then, you know, these are issues that we'll deal with as

22   we will deal with the other issues which we clearly

23   acknowledge, Judge, are core issues because they relate to

24   confirmation, not to a pre-petition dispute as to whether or

25   not there was a pre-petition default under a pre-petition

1    contract.

2           THE COURT:  Thank you.

3           MR. PANTALEO:  Thank you, Judge.  And as to the other

4    aspect of the motion to dismiss, my partner George Wang.

5           MR. WANG:  Good morning, Your Honor.

6           THE COURT:  Good morning.

7           MR. WANG:  As Mr. Pantaleo points out, the complaint

8    pleads that TCO made misrepresentations.  During the fourth

9    quarter of 2008 and, again, in February of 2009, CCO made

10   representations that there were no defaults or events of

11   defaults under the credit agreement.  As pled in the complaint

12   those representations were false.  As pled in the complaint

13   certain designated holding companies, DHCs, were unable to pay

14   its debts as they become due.  That was an express event of

15   default under the credit agreement.

16          THE COURT:  Let me stop you a second.  Because you

17   just said as they become due.  Much has been made about your

18   use of the term as they "would" become due in the complaint.

19   Are you, in effect, modifying your theory of the case as you

20   now say as they become due, which is the classic formulation of

21   insolvency, as opposed to as they would become due.  Because

22   the future oriented aspect of your complaint is something that

23   has been challenged pretty actively by the debtors and others?

24          MR. WANG:  Well, Your Honor, the contract clearly

25   provides that it's an event of default where a DHC is unable to

1    pay its debts as they become due.  That's the wording, we don't

2    deny that, we never denied it.

3            THE COURT:  The complaint does use the term would,

4    however.

5            MR. WANG:  Correct, it does.  And it's in the context

6    of speaking in the past tense.  So the credit agreement speaks

7    in the future sense.  DHC shall become unable to pay its debts

8    as they become due.  When we were talking about what happened

9    in the fourth quarter of 2008 and speaking about the DHC's

10   inability in the past to pay their debts as they become due, we

11   use the term would become in an effort to be grammatically

12   correct.  We weren't trying to modify the standards, trying to

13   change the standards.  We recognized and agreed that the

14   standard was whether the DHC shall be unable to pay its debts

15   as they become due.

16           THE COURT:  So this is just some grammatical style

17   book that put the word "would" in there, is that how this

18   happened?

19           MR. WANG:  Correct.  That was an effort to be

20   grammatically correct in using -- in discussing this default in

21   the past tense as opposed to, you know, inability to pay today

22   or in the future as it's used in the credit agreement.

23           THE COURT:  Okay.  So when you say "as they become

24   due" that's the only standard I need to look to, correct?

25           MR. WANG:  Correct.  That's the standard that's in the

1    credit agreement.  And on that issue there are several cases

2    interpreting that exact same language, "inability to pay its

3    debts as they become due."  And the Drexel case, for example,

4    is directly on point.  And it's the most factually analogous to

5    ours.  In Drexel the language at issue and the agreement was

6    the defaulting party is "unable to pay its debts, generally, as

7    they become due."  Now, that's a more restrictive phraseology

8    because it adds the words "generally" but otherwise it's the

9    same as ours, unable to pay its debts as they become due.

10            And in that case the court found as a matter of

11    summary judgment, you know, that there were no disputed issues

12    of fact that the debtor was unable to pay its debts as they

13    become due, and it employed a forward looking test.  The facts

14    of that case that the court found Emcorp unable to pay its

15    debts as they become due even though it had 200 million dollars

16    in cash as of October of 1998, and it faced only twenty million

17    dollars interest payments due through the end of the year.  Why

18    was it unable to pay its debts as they become due?  Because the

19    Court looked to the surrounding facts and circumstances.  And

20    they saw that the board of directors of Emcorp had imposed a

21    moratorium on interest payments.  Also, Emcorp had made public

22    announcements about the possibility and probability of a

23    bankruptcy filing.  And the possible need for reorganization.

24    In addition, Emcorp had issued an SEC statement saying Emcorp

25    may be unable to continue with its current capital structure

1    here.

2         We have the same fact pattern here.  And here we're

3    not dealing with an effort by us to say we're right as a matter

4    of law, there's no undisputed issues of fact, we're just at the

5    pleading stage.  Here you have Charter's SEC statements which

6    have very similar statements, we may be unable to continue with

7    the current structure.  You had Charter in the fourth quarter

8    of 2008 retaining a restructuring advisor, Lazard.  Retaining

9    legal advisors on restructuring and a reorganization.  And

10   organizing the bondholders and making public announcements

11   about the need to reorganize or restructure its obligations.

12        THE COURT:  Mr. Wang, I have a very simple question

13   for you.  The designated holding companies were funded,

14   interest payments were made, consistent with the credit

15   agreement you argue perhaps not because of the alleged illegal

16   dividend question, correct?  But here's the question I have,

17   very simple question.  If, in fact, payments were made as

18   contemplated under the credit agreement so that there are no

19   monetary defaults, in what respect is this technical reading of

20   the document even relevant?  Because these entities performed

21   as required under the document.  Your very technical reading of

22   "as they become due" seems to miss the point the payments were

23   made as they became due.  In what respect is the technical

24   reading significant in the context of the actual performance of

25   the credit agreement?

1    MR. WANG:  Your Honor, let me make it very clear.

2  We're not saying that Section 7.6 prohibits upstreaming of

3  money.  And we understood -- everyone understood all along that

4  the DHCs were holding companies that by and large didn't have a

5  lot of cash or liquid assets on hand.  They depended upon the

6  ability to upstream money through the corporate structure in

7  order to make their interest and printable payments.  That was

8  well understood, and that's undisputed.  And we're not reading

9  7.6 or 8(g)(5).

10    THE COURT:  And it happened.  There was no pre-

11  petition default in respect of monetary payments, correct?

12    MR. WANG:  Not quite, Your Honor.  Let me go over

13  what --

14    THE COURT:  Is it correct or is it not correct that

15  there were no monetary defaults pre-petition?

16    MR. WANG:  Under our credit agreement.

17    THE COURT:  You were paid everything you were due

18  under your credit agreement?

19    MR. WANG:  That's correct, under our credit agreement

20  we were paid everything that we were due.  But, nevertheless,

21  what the credit agreement provides is that there's an event of

22  default where there's an inability to pay their debts as they

23  become due.  And here --

24    THE COURT:  But there wasn't an inability because the

25  debts were paid.

1          MR. WANG:  Here's what happened, as pled in the

2     complaint.  In the fourth quarter of 2008 Charter's board

3     determined that two designated holding companies could no

4     longer, not because of the credit agreement or 7.6, or 8(g)(5),

5     or anything in the credit agreement, but because of fiduciary

6     duty obligations two designated holding companies could no

7     longer upstream monies through dividends or distributions.

8          That was the upstream of the money through dividends

9     and distributions, restricted payments, as that term is used in

10    the credit agreement.  That was the life blood for DHCs to make

11    interest payments.  That's how every single interest payment

12    prior to, and on October 1, 2008, was made.  Through restricted

13    payments up the chain.

14         THE COURT:  Let's jus say for the sake of argument,

15    however, that there was another permissible way for funds to be

16    upstreamed to the designated holding companies so that they

17    could make their interest payments which were, in fact, made.

18    In what respect are your clients harmed in any respect other

19    than in the very technical argument now being made in

20    connection with reinstatement?  Because money is money, and

21    assuming that money permissibly ended up -- permissibly in the

22    hands of the DHCs so the payments could be made, you're not

23    monetarily harmed, correct?

24         MR. WANG:  Well, Your Honor, it's correct, that you

25    need to look at the alternatives available to Charter Holdings.

1    The alternative used by Charter Holdings to make its November

2    17, 2008 interest payment was to have CCO repay an intercompany

3    obligation owed to a parent of Charter Holdings.  So Charter

4    Holdings made its interest payment on November 17, 2008 by

5    having CCO repay a parent, Charter Hotel, having the parent

6    make a capital contribution down, paying its interest.  That

7    was an alternative.  However, that November payment essentially

8    exhausted the amount of any intercompany obligation owing from

9    CCO to Charter Holdings, or any parent.  It wasn't enough to

10   cover January or February.  And look what Charter says by its

11   own words in February of 2009.  "Charter determined in

12   exercising its fiduciary duties and in compliance with

13   applicable law that it could not make two interest payments for

14   junior entities in its capital structure which were due on

15   January 15, 2009 in the amount of approximately seventy-four

16   million dollars."  It could not make those two interest

17   payments.  That was what was sent to us in a draft affidavit of

18   Greg Doody, Charter's restructuring officer on February the

19   12th, 2009, the day that Charter was telling us that they would

20   need to file for bankruptcy if they didn't finalizes in ink a

21   deal with the bondholders.  So could not on January 15, 2009

22   make that interest payment.  Yet, on February the 3rd, 2009,

23   CCO came to us again with another borrowing request, made yet

24   another representation that there were no defaults, no events

25   of defaults under the credit agreement.  And that, alone, that

1   February 3, 2009 representation, alone, compels denial of the

2   motion to dismiss.  Because that is a misrepresentation made

3   under the credit agreement.

4          So to be clear, what our allegations are that

5   fiduciary duty responsibilities prevented continued upstreaming

6   of money.  Yes, they made their November 17, 2008 interest

7   payment through this mechanism of pre-paying an intercompany

8   obligation, and having Charter HoldCo have a contribution.  But

9   that was exhausted.  And there have been issues that have been

10  raised with Charter HoldCo's intercompany loans.

11         White & Case's clients have complained about possible

12  fraudulent conveyances on account of capital contributions by

13  Charter HoldCo in other uses of funds of Charter HoldCo where

14  those monies were allegedly supposed to be used to pay CCI's

15  obligations.  So there are issues with that.

16         But leaving all that aside, that bucket was exhausted

17  and there are no other way, and the evidence we'll put on at

18  the trial, will show that.  There is no other way to get money

19  up.  And that's why they said on January 15th we could not make

20  those interest payments.

21         And let me just return to 8(g)(5).  We're not making a

22  technical reading or a very legalistic reading of this.  You

23  look at the cases that deal with this language.  Yes, we have

24  Drexel, I've discussed Drexel, that was outside the bankruptcy

25  context, a very similar language.  But the Bankruptcy Code, in

1    it's definition of insolvency for municipalities, uses the

2    exact same phrasing, "unable to pay its debts as they become

3    due."  And, for example, in Bridgeport what the Connecticut

4    Bankruptcy explained is "it's undisputed that on June the 6th

5    Bridgeport was paying its debts as they became due.  The issue

6    here is whether Bridgeport was unable to pay its debts as they

7    become due."  This quote requires a perspective analysis.  It

8    must be determined as of that date whether Bridgeport will be

9    unable to pay its debts as they become due.  And the Court

10   proceeded to look into the near term -- into the near future to

11   see if it was clear -- if it was reasonably certain that

12   Bridgeport will run out of money.

13        The same happened in Westlake.  And Westlake relies on

14   this Court's decision in Hudson & Manhattan, the Southern

15   District of New York's decision in Hudson & Manhattan where the

16   Court explained that unable to pay its debts as they become due

17   is triggered where the maturity is given and it's reasonably

18   certain that the payment can't be meet.  That was a state of

19   affairs in the fourth quarter of 2008, and it was very, very

20   clearly the state of affairs before February 3, 2009 when they

21   made the representation to us that there were no defaults or

22   events of default.

23        I would be happy to address any other questions Your

24   Honor may have.

25        THE COURT:  How do you deal with the argument made by

1   your adversary that Section 7.6(b)(iii) makes your argument

2   seem preposterous, because it was always understood that the

3   distribution could be made no earlier than fifteen business

4   days prior to the date that a payment was due?

5         MR. WANG:  Again, Your Honor, I want to emphasize,

6   we're not saying that the fact that holding companies generally

7   don't have much in terms of assets, you know, is an event of

8   default under the credit agreement.  We understood that

9   restricted payments would be the general mechanism for allowing

10  and enabling a DHC to make its payments.  7.6 doesn't prohibit

11  that in any way.

12        And, again, here, the prohibition -- the reason

13  8(g)(5) is triggered is not because of some fancy interplay or

14  catch-22 with 7.6, instead it was the director's conclusion

15  that two DHCs lacked surplus and, hence, as a fiduciary duty

16  matter, upstream money which put the DHC above it.

17        THE COURT:  I hear that argument, and I understand

18  that argument, I think.  But you also acknowledged that they

19  found a way around that problem.

20        MR. WANG:  They found a way around that problem in

21  November of 2008, which is, arguably, okay.  And which would

22  not have sufficed even through early in 2009.  And their own

23  documentation makes clear that they understood, for example, in

24  getting a clean audit opinion KPMG needed to look at the

25  ability to service debts over the next twelve to eighteen

1    months.  To get a clean audit opinion as of December 31, 2008

2    the audit window was through the middle of 2010.  That is the

3    relevant window to determine ability to pay as of December 31,

4    2008; the next twelve to eighteen months.  That's what the

5    documents that we've been receiving from Charter indicate.

6          THE COURT:  Are you saying that there's an eighteen-

7    month forward looking period for purposes of determining

8    ability to pay debts when they become due?

9          MR. WANG:  Correct.  That's what the documentation

10   that we've been receiving --

11         THE COURT:  Correct?  That's incredible to me.  That's

12   an absolutely incredible argument.  You're going to need to

13   explain yourself on that one.

14         MR. WANG:  The documentation that we received shows

15   that Charter was looking on a forward looking -- to determine

16   ability to pay as of getting a clean audit opinion at the

17   ability to service its obligations on a going forward basis.

18   And that's consistent with the interpretation offered in the

19   case law of ability to pay debts as they become due.

20         THE COURT:  That's certainly not supported by the

21   Bridgeport decision.

22         MR. WANG:  The Bridgeport decision does look into the

23   future.  And it expressly says --

24         THE COURT:  Not eighteen months?

25         MR. WANG:  Well, the Bridgeport decision looks to the

1    next fiscal year.  And that is, in part, because we're dealing

2    with a municipality which publishes a budget on an annual

3    basis.  And you need to look at the next annual budget.

4        THE COURT:  Are you equating a clean audit opinion to

5    the ability to pay debts as they become due?

6        MR. WANG:  They're not exactly synonymous.  We're not

7    suggesting that.  But one of -- it appears to us -- we haven't

8    had any depositions yet, but it appears to us from the facts

9    that we have that the ability to get a clean audit opinion

10   rested, in part, one of the considerations was the ability to

11   service debts that were due over the next -- you know, over the

12   relevant audit window.

13       THE COURT:  Okay.

14       MR. WANG:  But returning to 7.6, there's no conflicts.

15   Again, 7.6 doesn't prohibit the upstreaming of money.  Again,

16   the conclusion -- for whatever reason, their own conclusion

17   that they could no longer upstream money through the

18   restrictive payment mechanism and their exhaustion of other

19   alternatives that were available to them that made this -- that

20   created this 8(g)(5).  And, again, these are factual issues --

21   these are all factual issues that will be resolved through the

22   discovery process and presented to Your Honor.  All that's

23   required under Federal Rule of Civil Procedure 8, the notice

24   pleadings standards, which I think the debtor agrees applies,

25   is a short and plain statement of the basis for our relief.

1    And even under the Supreme Court's most recent pronouncement in

2    Twombly, what we need to show is -- what we need to plead are

3    allegations that are plausible.  Plausible on their face.  And

4    that's what we've done, Your Honor.

5        THE COURT:  Let me ask you the same question I asked

6    counsel for Charter on the issue of pending discovery.  Is

7    there anything that is going on in the discovery efforts of

8    JPMorgan or Charter, for that matter, that you deem to be

9    relevant to the determination of the pending motion?

10       MR. WANG:  In a sense, Your Honor, our motion -- the

11   complaint is sufficiently pled.

12       THE COURT:  So discovery is irrelevant.

13       MR. WANG:  But discovery will still be relevant to

14   establishing the facts that we've plead and that I've

15   described.  So the facts will show that Charter, you know,

16   recognized that it was unable to pay its debts as they become

17   due as of the fourth quarter of 2008.  So discovery is relevant

18   in that sense.  That will inform what is put on before Your

19   Honor at the trial as combined with plan confirmation as

20   currently structured under the schedule.

21       THE COURT:  Okay, thank you.

22       MR. POWELL:  Your Honor, Jeff Powell for the debtors.

23   Let me be very brief.

24       On this eighteen-month audit window clean audit

25   opinion issue, I think nothing could be more clear that

1    JPMorgan is fishing for a standard to be applied to a contract

2    that doesn't contain such a perspective obligation.  It is so

3    amorphous, is it the audit window, is it sometime in the near

4    future, is it the difference between the near future and the

5    distant future?  They are looking for a standard that does not

6    exist in the contract.

7          Second, 7.6(b)(iii).  Does JPMorgan contend that in

8    the near future, to use their phrase, exceeds fifteen days?

9    Because if so, then their construct conflicts with the

10   contract.  If on the other hand, JPMorgan contends that in the

11   near future is less than fifteen days there was no default as

12   their complaint makes clear.

13         Third, Drexel does not help JPMorgan.  Drexel says

14   that case interpreting statutory provisions, like Bridgeport

15   and Westlake, are not relevant to a matter interpreting a

16   contract.  And, indeed, Drexel says you must look to the intent

17   of the parties as reflected in other contract provisions, here,

18   7.6 and 4.21.  Drexel doesn't help JPMorgan, it helps the

19   debtors.

20         The exchange between Your Honor and JPMorgan's counsel

21   revealed the following:  Charter made every payment before it

22   filed for bankruptcy, including the February payment.  The

23   banks were not momentarily harmed, which was the answer Mr.

24   Wang gave in response to your question.  So we have a situation

25   where Charter made every payment, the banks were monetarily

1   harmed.  But they, nevertheless, allege a default at some point

2   in the future.

3         JPMorgan concluded by saying that the bar is low on a

4   motion to dismiss.  But it isn't non-existent, there is a bar.

5   And the plain language of 8(g)(5), the plain language of

6   Section 7.6 and 4.21, the case law, and the party's course of

7   conduct all demonstrate that JPMorgan has not and cannot allege

8   a cognizable claim.

9         One point on core.  Mr. Pantaleo said that Orion

10  applies because a factual dispute as to whether there was a

11  breach of a pre-petition contract.  Those are the facts in

12  every single case we cited following Orion that held that there

13  was core.  Whether from this Court or the Southern District or

14  from the Second Circuit.  That description of Orion's

15  applicability does not help the banks because all of the other

16  cases we've cited have the same fact pattern.  Thank you, Your

17  Honor.

18        THE COURT:  Thank you.  Is there anything more on

19  this?

20        I'm going to take a fifteen-minute recess.  But before

21  doing so let me just understand what the next steps are in

22  today's agenda.

23        MR. BASTA:  Your Honor, there are three remaining

24  items on the agenda.  Mr. Brightbill will argue the Rembrandt

25  motion to lift the stay.  I don't think that should take

1    terribly long.  The motion to approve the orders being entered

2    to our recently filed debtor is uncontested.  It should take

3    one minute.  And our disclosure statement motion is largely

4    resolved.  I think there's only one unresolved objection from

5    the United States Trustee's Office relating to releases.  I

6    would plan on making my way through that quickly.

7              THE COURT:  Okay.  Fine.  We'll take fifteen minutes.

8              (Recess from 10:43 a.m. until 10:52 a.m.)

9              THE COURT:  Be seated, please.  To the extent we take

10   another break or at the time that we break later, I've been

11   informed that Judge Drain has hearings in the courtroom which

12   is right down the hall and I heard a word that noise from this

13   crowd disturbed him.  And so, let's avoid that in the future.

14             I've given some thought to the issues presented in

15   this very well argued matter and here's how I am resolving the

16   issues, as of today.  On the question of core versus non-core,

17   based upon my review of the papers that have been filed and

18   applicable case authority as well as the very effective

19   arguments made by counsel, I find that this litigation is core

20   and I will prepare, in due course, a memorandum decision that

21   lays out the reasoning that supports that conclusion.  I'm not

22   telling you precisely when that opinion will be issued but it

23   will be timely relative to the confirmation hearing itself.

24             My reason for doing it in this manner is that I think

25   it's appropriate to know how I find on that issue but I think

1   it's also appropriate that this very intensely legal matter be

2   described with precision with appropriate references to case

3   authorities.  And to the extent that Mr. Pantaleo or his

4   colleagues determine that it is appropriate at some point to

5   seek appellate review in respect of that determination, I think

6   it only appropriate that the District Court, or to the extent

7   it becomes pertinent the Court of Appeals, have as complete a

8   rendition of my analysis as possible.  So I'm not going to

9   attempt today to tell you how I read the cases.  I think you

10  can just incorporate by reference what you've read in the

11  charter papers and assume that I agree with them, I'll just say

12  it a little differently.

13      On the issue of the failure to state a claim, I've

14  reviewed the papers filed by both sides and I compliment

15  counsel both for Charter and JPMorgan in having prepared

16  extremely persuasive, thorough and as far as I can tell well

17  and creatively reasoned papers on the subject.  Partly because

18  I find the arguments made by each side to be, in relative

19  terms, balanced and because the contract provisions in question

20  are complex and the language which appears to be so clear when

21  you read it on second reading begins to appear a little less

22  clear, this is a matter I'm taking under advisement.  And I,

23  today, offer no inkling as to how I might rule.

24      I would note, however, that even if were to have

25  granted the motion to dismiss outright today from the bench,

1   subject to any decision I might later right, that such

2   dismissal would appear to have little or no impact upon the

3   behavior of the litigants because the issues that are presently

4   the subject of active and intense discovery would continue

5   unabated and will continue unabated.

6        For that reason, granting the motion to dismiss today,

7   if I were to do so, is not the sort of things that would

8   produce a peaceful resolution nor, since it's interlocutory for

9   purposes of the confirmation battle, would it really affect

10  much behavior in my view.  So I'm going to take the time that I

11  think I need to give the contract issues that are imbedded in

12  the motion to dismiss some deeper thought.  And also allow the

13  parties the time that they need to continue to pursue

14  discovery.  You'll note that during the course of the argument

15  I asked both counsel for Charter and counsel for JPMorgan as

16  agent whether or not discovery was ongoing in connection with

17  the issues being presented in the motion to dismiss argument.

18  And it's apparent that discovery is ongoing, although counsel

19  appropriately indicate that it's really not germane to the

20  determination of the motion to dismiss itself.

21       While it may not be germane to the disposition of the

22  motion to dismiss it's nonetheless relevant to the issues

23  presented in the complaint.  And more particularly to the

24  issues to be unraveled and resolved at the time of

25  confirmation.  So I'm taking that under advisement with the

1   understanding that it will be decided in due course but in due

2   course may mean in the context of the confirmation hearing

3   itself.

4           Let's move on to the next matter.

5           MR. BASTA:  Your Honor, the next item on the agenda is

6   Rembrandt's motion to modify the automatic stay.  And I believe

7   it's their motion.

8       (Pause)

9           MR. FRIEDMAN:  Good morning, Your Honor.  Jeff

10  Friedman, Katten Muchin Rosenman for Rembrandt Technologies LP.

11          THE COURT:  Good morning.

12          MR. FRIEDMAN:  This is, in fact, Rembrandt's motion

13  for relief from the stay to continue litigation against the

14  debtors that is pending in a multi-district litigation in the

15  United States District Court for the District of Delaware.

16          We submit that cause exists to modify the stay to

17  allow continuation of that litigation that has been pending for

18  close to three years in the Delaware courts, particularly on

19  the facts of this case.  It is, as Your Honor knows, undisputed

20  that the debtors don't intend to use these Chapter 11 cases to

21  affect litigation such as ours and the debtor will confirm that

22  this morning in connection with the disclosure statement

23  hearing.

24          THE COURT:  Let me stop you for a second on this

25  because I found your motion to be intriguing, in part because

1    you were mostly arguing that because this is a, I hate to use

2    the term but I'll use it, a surgical bankruptcy, but it isn't

3    Chrysler, that the automatic stay maybe doesn't matter so much.

4    And since you're not going to be an impaired creditor and since

5    this litigation has been pending for a while and since you're

6    one of a number of parties in the litigation and the trial date

7    in January of 2010 that we should just make believe the

8    automatic stay doesn't apply or disregard it for cause.  The

9    cause basically being you're a pass-through creditor.

10        But I have some concern about the fact that if that

11   were the law, if that were the ruling in your case, that means

12   that every litigation that's pending against this company of

13   all sort, would simply be exposed to the full blossoming of the

14   lawyer's intensity and the bankruptcy would be disregarded and

15   the automatic stay would have no effect.  So what makes you

16   special?

17        MR. FRIEDMAN:  Well Your Honor, I think that to some

18   degree that's a bit of an exaggeration and I think it is

19   somewhat fact specific.  But fundamentally there are surgical

20   bankruptcies and there are surgical bankruptcies.  This is a

21   very narrow issue, really, the reinstatement issue that Your

22   Honor is going to be dealing with in confirmation.  And I'm not

23   so sure, Your Honor, that to the extent that you're not

24   occupying the time of the senior management and the attorneys

25   who are needed for the Chapter 11 itself, that the notion that

1   a lot of litigation that would otherwise be reinstated and is

2   at an important juncture in whatever court it's pending should

3   go forward.  I don't know that that's so offensive on the facts

4   of a case like Charter.

5        I mean, there may be instances where the very survival

6   of the company is in doubt, I don't think that's Charter.

7   Charter is solvent, from what everyone seems to say.  The

8   people, Charter argues, are somehow needed are really never

9   specified.  And we just say well the debtors are very busy.

10  But the fact of the matter is, Your Honor, this is a patent

11  case.  And the people working on this case and the people are

12  not the lawyers who are working on the Chapter 11 case; it's a

13  different set of lawyers.  The people we think are going to be

14  involved in the factual issues that would be raised in this

15  case are probably not the senior executives and the general

16  counsel working on this case, they are on a much lower level.

17  And to the extent they point out that there are people who

18  would really be inconvenienced, we're certainly prepared to

19  make accommodation.  We're not trying to slow up the Chapter 11

20  or harm the Chapter 11 process.

21       THE COURT:  How are you prejudiced by waiting till the

22  end of this bankruptcy, since it's supposed to be a quick one?

23       MR. FRIEDMAN:  Well, Your Honor, the reality is that a

24  trial in January 2010 gives you some leeway.  I mean, it's

25  eight months roughly, to move things around in discovery, to

1    make motions, dispositive motions and so forth.  But they're

2    proposing taking four months of that and arguing to the Court

3    that they can catch up four months down the road assuming that

4    their schedule sticks.  And I don't know that their schedule is

5    going to stick but in the best of all worlds, if their schedule

6    sticks, they'll have used up four of the eight months and then

7    have to, sort of, put everyone to the trouble of catching up.

8    Not only us but to some extent their burden is going to be more

9    difficult because they now have to do, in a truncated period

10   under greater time pressure then they face today, what they

11   would have to do over a longer period of time if Your Honor

12   grants the stay relief.

13          THE COURT:  What happens in this case between May 5th

14   and July 23rd?

15          MR. FRIEDMAN:  There is discovery that is ongoing and

16   there is, at the moment, a discovery cutoff date for everyone

17   else of May 26.  Presumably if Your Honor would lift the stay

18   there'd be some adjustment for Charter.

19          The Court in the case in Delaware has required, in

20   essence, briefs to be submitted on the wisdom of filing case

21   dispositive motions.  The court will allow a case dispositive

22   motion to be filed, that would occur within this time period

23   and then depending on whether or not the Court granted

24   permission for a particular party to file the case dispositive

25   motion, that schedule will be presumably fixed by the Delaware

1   Court at that time.

2        So the short answer, Your Honor, is discovery will be

3   ongoing during that time and this briefing schedule for

4   permission to file case dispositive motions would occur during

5   that time.

6        THE COURT:  Are we talking depositions?  Are we

7   talking documents?  Where are we in the discovery phase?

8        MR. FRIEDMAN:  We're talking both, Your Honor.  Right

9   now there are document requests outstanding.  There are

10   requests for admissions outstanding so discovery is at a fairly

11   intense point in terms of where this litigation has proceeded.

12   And as I said, Your Honor, discovery cutoff is currently May

13   26th.

14        THE COURT:  Who represents Charter in this litigation?

15        MR. FRIEDMAN:  I'm not sure, Your Honor.  I know it's

16   not Kirkland & Ellis because I asked that question, point

17   blank, of Mr. Brightbill.

18        THE COURT:  Okay.  Let me hear the rest of your

19   argument.

20        MR. FRIEDMAN:  Sure.  So as I said, Your Honor, the

21   debtors have generically stated that the debtors are very busy

22   but we do think that we're talking about specific individuals

23   with knowledge of this fairly specific technical patent

24   litigation and intellectual property.  They're not going to be

25   the CEO and CFO of Charter.  And we do think that this

1    shouldn't be treated as if it's some sort of mom and pop

2    restaurant where if you take the two people who are running it

3    out of the mix the bankruptcy comes to a standstill. I think

4    that's a gross exaggeration here.

5            There's argument that somehow --

6            THE COURT: Well, it's a gross exaggeration that

7    actually nobody's asserted. Nobody's asserted the bankruptcy

8    comes to a standstill. What's being asserted in opposition to

9    your requested relief is that this is going to be a major

10   distraction and that there's a floodgates argument aspect to

11   this as well. If not just you what about everybody else? And

12   if everybody else shows up we've lost the automatic stay and

13   this is an important restructuring for an important company.

14           MR. FRIEDMAN: Well Your Honor, as to the distraction

15   --

16           THE COURT: It's not a mom and pop operation.

17           MR. FRIEDMAN: As to the distraction, Your Honor, that

18   really goes to who is involved in this particular litigation

19   for Charter. As I said, they haven't described to us that, you

20   know, we'd be okay with this if only you wouldn't take so and

21   so's deposition or you would give us an extra two weeks. It

22   hasn't been that. It's just we need four months.

23           THE COURT: Where does it say, anywhere, that the

24   automatic stay only applies if it's protecting senior officers

25   who are involved in the restructuring? The automatic stay

1    applies, in large corporate restructurings, for the entire

2    enterprise.

3              MR. FRIEDMAN:  It does, Your --

4              THE COURT:  It always has and should.

5              MR. FRIEDMAN:  It does, Your Honor.  The question is

6    whether there's cause for relief from that stay based on the

7    facts here.

8              THE COURT:  Please explain why you have established

9    cause.

10             MR. FRIEDMAN:  Thank you, Your Honor.  There are

11   arguments made by the debtor that it will cost them hundreds of

12   thousands of dollars if they are forced to go.  Yet the debtors

13   say that in four months they'll begin a catch-up process which

14   will undoubtedly be more expensive, not less expensive, to the

15   extent that they are forced to catch up in a shorter time

16   period with less flexibility, assuming the January 10 trial

17   date holds up.

18             It clearly would be more efficient and will avoid

19   duplication by not only Rembrandt but by the Delaware court as

20   well to not have to deal with Charter separately in some sort

21   of catch-up proceedings.  So I think there's fundamental issues

22   of judicial efficiency and it's not as if this case isn't going

23   to go forward.  They have knowledge that this case is going to

24   go forward, they're just saying they need four months and

25   everything needs to come to a standstill, as far as they're

1    concerned, in this case for those four months or somehow the

2    bankruptcy won't proceed efficiently. And frankly, I just don't

3    buy that argument.  I think that Kirkland & Ellis is the

4    counsel for the debtor and they're functioning.  And I think

5    that the senior executives, who have to oversee this, are

6    functioning.  And there hasn't been any suggestion that the

7    people we need or the people who would be involved in this are

8    the same people needed to push the bankruptcy through.

9        And while I don't disagree that the automatic stay

10   applies to the enterprise, you know, no one's suggesting that

11   we need the guy who's going to install cable next week.

12   They're just different levels, as a practical matter, in a

13   bankruptcy with this complexity that either involves the people

14   that we need or they don't.  And they haven't advised us and

15   they haven't advised the Court that the actual people who would

16   be involved in this litigation are going to somehow really be

17   inconvenienced if this is forced to go forward.  And I think

18   that's a factor.  We're looking at a balance, Your Honor, and a

19   balance of the harm.  And they really haven't suggested that

20   harm except in very nebulous and general terms.

21       I think Your Honor has got enough experience in

22   litigation to know that when you take somebody like one of the

23   seventeen defendants out and you've got a trial date that's

24   eight months away and everybody participates in discovery

25   except them for four months of those eight months, it's going

1    to inconvenience a lot of people going forward and we're

2    balancing that harm.

3         And because they intend to reinstate everything and

4    leave this litigation in Delaware where it belongs, it's really

5    a question of whether it's more efficient to proceed now or

6    whether there are benefits that are tangible to allowing them

7    four months, at least four months assuming things go on track,

8    of leeway to not participate.  And that's the balance that the

9    Court has to reach.  So we do think that there is cause here,

10   on traditional basis of judicial economy and because they're

11   not seeking to really affect this litigation except insofar as

12   they're going to get four months -- a four-month hiatus if

13   their stay stays in effect.

14        So Your Honor, I think that's fundamentally the basis

15   for cause here.  Is that the Delaware court and Rembrandt will

16   be inconvenienced and it will cost far more money for us to

17   have to do this twice and to have Charter catch up, assuming

18   that Charter can catch up.

19        THE COURT:  I think it's really not quite what you

20   said.  I think your concern is that this is going to delay the

21   trial in some fashion.

22        MR. FRIEDMAN:  Well, Your Honor, but that would be a

23   material prejudice considering that Charter intends --

24        THE COURT:  You never said that.

25        MR. FRIEDMAN:  Because we're not --

1          THE COURT:  That's what I just interpreted but you

2     never said that.  I think that's what your real concern must

3     be.

4          MR. FRIEDMAN:  It is a concern.  I'm not sure, Your

5     Honor, that the trial will be moot because there are seventeen

6     other defendants besides Charter.  So, you know, we do think

7     the trial can go forward.  If we take Charter at its word --

8          THE COURT:  If Charter can be taken at its word that

9     it is prepared to catch up and not delay the trial how are you

10    prejudiced in any respect?

11         MR. FRIEDMAN:  Because, Your Honor, there will be more

12    cost and duplication of effort in the catch up process.

13         THE COURT:  You're the plaintiff.  Welcome to

14    litigation in Delaware.

15         MR. FRIEDMAN:  I understand, Your Honor, it's our risk

16    and if the stay stays in place we're going to have to confront

17    that.  But Your Honor, this is --

18         THE COURT:  Relative to what you're attempting to

19    pursue it seems marginal at best.  If you're talking about

20    incremental cost, because you're doing something in four months

21    that you're not doing now, all it is is deferral.

22         MR. FRIEDMAN:  Your Honor, it's deferral, it's

23    appearances, it's moving deadlines.  It's a number of things

24    that have two different parallel tracks having to run.

25         THE COURT:  It's amorphous.

1    MR. FRIEDMAN:  I think more amorphous, Your Honor, is

2    the sort of vague explanation as to why Charter will be

3    prejudiced.

4        THE COURT:  We'll hear that in a minute.

5        MR. FRIEDMAN:  -- by the continuation of the -- by the

6    lifting of the stay here.

7        THE COURT:  Okay.  Let's find out.

8      (Pause)

9        MR. BRIGHTBILL:  Your Honor, Jonathan Brightbill from

10   Kirkland & Ellis for the debtors.  One issue, before I begin,

11   my pro hac motion was filed yesterday afternoon.  I don't

12   believe it's technically been granted.

13       THE COURT:  I deem it granted.  Welcome to the

14   Southern District.

15       MR. BRIGHTBILL:  Thank you, Your Honor.  I'm going to

16   keep this short because Your Honor has obviously reviewed all

17   the papers and is familiar with the arguments.

18       First and foremost, you have hit on a central issue

19   that appears not only in cases that we have cited in our brief

20   but also in many other places which is that it isn't just this

21   motion that is at issue.  It is also the follow-on motions that

22   will undoubtedly come because this is not the kind of situation

23   that other courts, and frankly the courts in cases that they

24   have cited, have recognized -- justify lifting a 362 stay.

25       Just so Your Honor has them at his fingertips, In re

1    Bally Total Fitness, the Northwest Airlines case, the Comdisco

2    case, these are all cases that recognize the very argument that

3    Your Honor has touched upon which is that this is the opening

4    of the floodgates, potentially, when you grant a motion such as

5    this that can't be meaningfully distinguished from many, many

6    other cases that are pending against the debtor.

7        The cases that they cite often deal with instances

8    where the trial was five days away.  The trial may have already

9    occurred.  Instances where an insurer had stepped in and

10   assumed responsibility for defending the case.  These are not

11   the kind -- this is not what is at issue in this case, and Your

12   Honor understands that.

13       With respect to who will be distracted, if you will,

14   specifically; the case law indicates it's only a very slight

15   distraction.  I think that issue is a red herring.

16   Notwithstanding that, the controller of the company has been

17   noticed, I believe, or will be a 30(b)(6) designee.  The

18   controller of the company is obviously involved in some of the

19   financial aspects in the background of this bankruptcy.  There

20   are accounting folks that I understand will have to be involved

21   in responding because much of the discovery that remains, with

22   respect to Charter specifically, as Your Honor noted it's one

23   of seventeen groups of defendants.  Much of the discovery that

24   will go specifically to Charter will relate to damages kinds of

25   discovery and therefore some of these same individuals and

1    folks who are assisting the debtor in organizing --

2    reorganizing the company at this time, will be called upon to

3    respond to these specific discovery requests.

4         You know, at some level this idea that the catch-up

5    will necessarily be less efficient, as we noted in our brief we

6    do not agree with that.  As we've seen in this very case, what

7    often happens is you make your way through discovery is that

8    people get more reasonable over time.  Discovery requests get

9    more specific and at the end of the day when it comes time to

10   do the catch up for Charter it may actually end up being far

11   more focused in particular discovery that's ultimately less

12   burdensome both for Charter and for the plaintiff, Rembrandt,

13   in that case.

14        Finally, with respect to this issue of concern about

15   delay of the trial, there is a motion, as I understand it, now

16   pending in the Rembrandt court before the District of Delaware,

17   that the existing trial, and we assume that that trial is going

18   to hold up notwithstanding seventeen defendants, but that

19   existing trial will be limited to the manufacturing defendants

20   which does not include Charter.  And therefore this -- if that

21   motion is granted and, you know, at this time we obviously

22   don't know what will ultimately transpire there.  The trial

23   that will proceed in January won't even concern Charter.

24        So at the end of the day, when you look back at the

25   case law, we think there is a lot of case law that is relevant

1    to this particular factual situation, again the Comdisco case,

2    that establishes very clearly that this is the kind of

3    situation that justifies leaving the stay in place and quite

4    frankly Rembrandt has not cited any case law that supports

5    their position that on this kind of factual situation that a

6    stay ought to be lifted and their case ought to, uniquely, be

7    allowed to go forward.

8         THE COURT:  You referenced the Comdisco case, what's

9    the significance of that to your position?

10        MR. BRIGHTBILL:  The Comdisco case is from the

11   Northern District of Illinois.  And specifically the Comdisco

12   case considered the very kinds of arguments that we're

13   discussing here, which is that to the extent that the stay

14   stays in effect the bankruptcy court was anticipating that it

15   was going to be a relatively short bankruptcy there, six

16   months.  And that the debtors would be able to come out of

17   bankruptcy and at that point catch up.

18        And as Your Honor has already observed, in that kind

19   of factual situation the Court held that there was not any

20   cognizable prejudice to the plaintiff in that case in having

21   the stay continue in effect.  And then that was offset by the

22   fact that because it was an abbreviated bankruptcy proceeding,

23   because there was a lot of things happening on a short time

24   frame, on an aggressive schedule, that it was necessary and

25   appropriate for the debtor in that case to focus on the

1     bankruptcy proceeding at that time.

2          THE COURT:  The argument made by Rembrandt, however,

3     is that this is effectively a one-issue bankruptcy.  Now, I

4     don't know if that's true but much of what we've been arguing

5     about today suggests that that may be true.  Assuming we're

6     dealing with an almost purely legal issue in a setting in which

7     the company professes to be operationally sound, we're not

8     involved in asset disposition, we're not involved in reduction

9     in force, we're not involved in upheaval of the sort that

10    sometimes occasions corporate reorganization.  Largely, the

11    company that we have now will be the company that we have

12    tomorrow.  The only difference is that we have de-levered it.

13    I don't mean to oversimplify it.

14          MR. BRIGHTBILL:  Uh-huh.

15          THE COURT:  In that setting Comdisco seems to be not

16    entirely relevant.

17          MR. BRIGHTBILL:  Well, Your Honor, I think it really

18    depends upon, kind of, the facts of any particular proceeding,

19    as you note.  And one thing I will note about this proceeding

20    is while perhaps the restructuring itself is perhaps not as

21    complex as you may see in Comdisco, the fact remains that we

22    have this adversary proceeding that is proceeding.  We have

23    twelve depositions of Charter employees that have been noticed

24    and are scheduled to go forward.  There are numerous

25    depositions going forward on other issues.

1          We have a number of employees who perhaps aren't being

2     deposed but at any given period of time are assisting with the

3     restructuring, are assisting with the litigation.  And frankly,

4     we have an even tighter time schedule then what they were

5     facing in the Comdisco case.  And so, on the net balance while

6     the technicalities of the restructuring at issue there may have

7     been different, I don't know that the impacts on the debtor

8     would be any more or less.

9          THE COURT:  Is the prejudice that you're concerned

10    about simply that certain individuals like the controller may

11    need to spend some of their time dealing with Rembrandt?

12         MR. BRIGHTBILL:  No, and it's also the floodgates

13    issue and we cited that in our brief.  That once this motion is

14    granted, on a case that is eight months away from trial at

15    which discovery has not even closed yet, which summary judgment

16    may, to some degree, limit that trial or preclude certain

17    issues, there are many, many variables down the road and many,

18    many reasons why this case doesn't need to proceed now.  And if

19    this motion is granted and this case is allowed to proceed,

20    Charter, as Your Honor is aware, is a very large company.  At

21    any given moment has all kinds of litigation pending against

22    it.  And what's to prevent anyone else from coming in and

23    seeking a "me too" motion of our motion should proceed.  And at

24    some point you do get a cumulative impact.

25         THE COURT:  Okay.  Thank you.  Anything more?

1          (Pause)

2          THE COURT:  I think the committee wants to say a few

3    words of support for the position I've just heard the debtor

4    articulate.

5          MR. ELKIND:  Very few.  I think enough has been said

6    and enough been briefed.  The committee supports the debtors'

7    position on this, Your Honor.

8          THE COURT:  Fine.  That's brief enough.

9          (Pause)

10         MR. FRIEDMAN:  Your Honor, to the extent that the

11   debtor has personnel, the controller for an example because we

12   didn't know who their 30(b)(6) witness would be, and that

13   controller is needed to help with this case, we will be

14   flexible.  We're not trying to mess up the bankruptcy.  We

15   understand it.  We think it's in everyone's interest to not

16   waste four months.  I mean, it's much better to have the

17   controller have a two or three month window where he can show

18   up and do what he has to do for us rather than four months from

19   now trying to come out of bankruptcy.  Trying to go effective

20   and do whatever, you get to turn the company coming out of

21   bankruptcy, be forced in a very compacted time to then deal

22   with all the discovery issues.

23         So we're not trying to be difficult, Your Honor, here.

24   We think it's actually to the estate's advantage to have the

25   flexibility.

1        THE COURT:  It's very charitable of you.  Incredible.

2        MR. FRIEDMAN:  We will be flexible.  And Your Honor,

3    the floodgates argument, you know, I'm not the only one who

4    knows how to make a stay motion.  There's a pretty

5    sophisticated bar in New York.  If other people wanted to make

6    a stay motion, they'd be here.  The notion that because our

7    stay motion is granted on our facts, every stay motion has to

8    prevail I think is just an exaggeration.  No other stay motion

9    has been made.  We're a month into this case.  There are lots

10   of lawyers and lots of litigations going on.  If they wanted to

11   move forward they'd ask for stay relief, they haven't.  And I

12   just think that that's sort of a red herring that the debtors'

13   throwing up here and that there's just no real basis for it.

14       THE COURT:  You're not appealing for clients, are you?

15       MR. FRIEDMAN:  So Your Honor, we do think there is

16   cause here.  We do think it's in the interest of judicial

17   economy.  We actually think it's to the debtors' benefit to

18   have that flexibility.  And Your Honor, we're willing to be

19   flexible within whatever constraints you want to place upon us

20   in giving us stay relief if you don't want to just completely

21   open it wide open.  We're happy to work with the debtor, we're

22   not trying to be difficult here, Your Honor.

23       THE COURT:  Okay.  Understood.  Anything more?  The

24   motion is denied for the following reasons.  I reviewed the

25   papers filed by Rembrandt and by the debtor and was frankly

intrigued by the notion that because this was a prenegotiated

bankruptcy running on a very fast track that the automatic stay

really didn't have same import that it might otherwise have.

The notion really is that this is a special purpose bankruptcy

which is well planned, well coordinated and designed to achieve

a corporate purpose with the principle effort being the

litigation we've already discussed on today's record, between

the debtor and JPMorgan Chase on the issue of reinstatement.

I'll recognize, just as an observation, that

reinstatement is only one word but it is a complex issue that

in the context of this case, no doubt, will generate a

tremendous amount of legal effort on both sides and will

involve significant discovery and legal maneuvering occurring

within a relatively confined time frame.

I believe that as a result that it is somewhat

distorting to describe this bankruptcy as limited to that issue

because while it is a single issue and it's conceivable there

may be some others, for example non-debtor releases which we'll

be hearing a little bit about during the disclosure statement

discussion, let's not mistake what we're dealing with.  We're

dealing with a bankruptcy that even at 9 a.m. was sufficiently

interesting to a number of people that we filled the courtroom

and we had standing room.

The automatic stay, as I've said in other cases, is

one of the most fundamental protections that a debtor enjoys,

1    and it's not conditional.  It isn't less important simply

2    because a case is prenegotiated.  It isn't less important

3    simply because a case may have a more focused objective than

4    some other cases.  And the importance of the automatic stay is

5    recognized in our case law and in the guiding Second Circuit,

6    Sonnax case.  There are twelve iconic standards that everybody

7    refers to for purposes of determining whether or not stay

8    relief may be appropriate in a particular circumstance.

9         More often then not it's the balance of harms factor

10   which represents the most significant concern of the Court in

11   deciding whether or not to grant stay relief.  With all respect

12   to the position asserted by Rembrandt, it's remarkably an

13   unsympathetic argument.  We're talking about multi-district

14   litigation in the District of Delaware involving seventeen

15   defendants with a trial date now scheduled for 2010.

16        The issue is not real prejudice but speculative

17   inconvenience associated with some hypothetical disruption of a

18   discovery schedule.  On the debtors' side, however, we have not

19   so much that this litigation is going to be problematic as much

20   as if we have the automatic stay being opened up in this case

21   it will lead to the opening up of the automatic stay in other

22   cases and soon we will lose the protection of the automatic

23   stay for all pending litigation and it will be as if we're not

24   in bankruptcy for purposes of such litigation.  That's a

25   speculative argument as well.

1    The floodgates argument is one that gets made

2    routinely in cases large and small. I've made such arguments,

3    I've heard such arguments and generally such arguments are not

4    particularly compelling. However, in the context of this case

5    it's really the motion itself that defeats itself, as opposed

6    to the opposition. The motion fails to satisfy the Sonnax

7    standards and is denied. There's no harm shown and I'll accept

8    an order from debtors' counsel that reflects this result.

9    MR. BASTA: Thank you, Your Honor. Paul Basta from

10   Kirkland on behalf of the debtors. The next item on the agenda

11   is pretty straightforward and reflects the fact that we found

12   another legal entity after the filing called Pacific Microwave

13   that we filed on April 20th. And we have filed a motion

14   seeking to have the other orders that have been entered in the

15   court that apply to the other debtors apply to Pacific

16   Microwave. We've served it on proper notice and there has not

17   been any objections and would request that it be approved.

18   THE COURT: It's approved.

19   MR. BASTA: Thank you, Your Honor. We'll now turn to

20   the disclosure statement motion. And the way I would propose

21   to proceed is to just briefly establish the notice we provided

22   of the disclosure statement, a brief word as to why it

23   satisfies 1125. Mr. Schrock and our team have been working

24   very hard to resolve the outstanding objections by adding

25   disclosure to the disclosure statement and we have been

1     successful in accomplishing that. I think we have one U.S.

2     Trustee objection that we have to handle.

3         I'll highlight some of the changes to the plan since

4     the filing and I'll move for approval of the solicitation,

5     voting and rights offering procedures. And we're also seeking

6     approval of the commitment fees for the financing that underlie

7     the plan.

8         Your Honor, we've tried to do this in a way in which

9     we're not constantly filing revised documents on the disclosure

10     statement. These things tend to move constantly. On Friday we

11     filed a black-line disclosure statement showing changes from

12     the filing date. I have two or three pages of additional pages

13     for where it stands now, I would like to hand up if I could.

14         THE COURT: That's fine. Thank you.

15     (Pause)

16         MR. BASTA: With respect to notice, Your Honor, we

17     filed our original plan and disclosure statement and the

18     disclosure statement motion on March 27th and it was served on

19     the same date. We filed a revised plan and disclosure

20     statement last Friday and it was served by e-mail and

21     overnight. We filed our original notice of the disclosure

22     statement hearing on March 30th and an updated notice showing

23     the moved date to this date on April 18th. Affidavits of

24     service are on file and we submit that notice of these

25     proceedings is proper or has been proper.

1          Our disclosure statement contains adequate information

2    that would enable someone to vote in favor or against the plan.

3    It is long.  It has a lot of information in it.  It covers the

4    debtors' assets, their liabilities in the business, the general

5    economic conditions in which we operate.  It describes our

6    plan, the classification and treatment of interests under that

7    plan.  It describes how we're going to implement that plan and

8    it contains financial projections.

9          We received seven objections and one reservations of

10   rights which we has resolved as follows:  Three objections from

11   JPMorgan, the Kramer Levin subgroup and the third lien agent

12   all objected seeking additional disclosure regarding what their

13   view is of the objections to confirmation of the plan, mostly

14   focused on reinstatement.  We have reached agreement and have

15   included in the disclosure statement statements from the

16   parties regarding the reinstatement litigation which resolves

17   those objections.

18         We have two litigants, Goodell, the class action

19   plaintiffs, and Rembrandt who wanted some additional disclosure

20   in the disclose statement regarding the nature of their

21   litigation claims and we have resolved those objections by

22   adding disclosure in that regard.

23         The CCI noteholders filed an objection claiming that

24   the disclosure statement lacked adequate information because it

25   did not include sufficient information regarding intercompany

1    claims, the settlement with Mr. Allen, whether or not we can

2    transform tax attributes into recoveries for that class and

3    avoidance actions that may be held by that class.  They also

4    argued that the debtor should not be able to vote, essentially,

5    intercompany claims in support of the plan.

6           We have reached an agreement that I'll read on the

7    record.  And I think Mr. Uzzi from White & Case may want to

8    have a word on it.  Both parties -- I should preface this by

9    saying we did supplement disclosure regarding these items in

10   the disclosure statement.  Notwithstanding that, we have agreed

11   that both parties will sit down and in good faith exchange

12   information relevant to the CCI notes plan treatment and the

13   CCI notes confirmation issues in a manner consistent with our

14   confirmation timeline.

15          With respect to the HoldCo notes, the HoldCo notes are

16   the -- there are mirror notes between CCI and HoldCo, which is

17   one level below.  We have clarified that we will solicit that

18   class and we will vote that class.  And that the voting

19   procedures that we seek approval of today will not affect the

20   right of the CCI noteholders to later come in and argue that

21   that vote should be disregarded or designated or however they

22   want to handle that at confirmation.  And so with that, I

23   think, the agreement is a good one.  We'll sit down with these

24   folks and give them some additional information and hopefully

25   just address this at confirmation.

1    THE COURT:  All right.  Mr. Uzzi, do you have any

2    thoughts you want to add?

3    MR. UZZI:  Very briefly, Your Honor.

4    (Pause)

5    MR. UZZI:  Your Honor, Gerard Uzzi from White & Case

6    on behalf of Law Debenture who's indentured trustee to

7    convertible notes at CCI.

8    Your Honor, the agreement, as stated by counsel for

9    the debtor, does accurately reflect our agreement.  The

10   indentured trustee, Your Honor, is concerned about this

11   agreement that it not be misconstrued even prior to the start

12   of this hearing but even as a result of comments made coming up

13   to this hearing that our agreement to step aside with respect

14   to the disclosure issues and really withdraw our objection is

15   not misconstrued as satisfaction with the plan and disclosure

16   statement, particularly with respect to the plan, Your Honor.

17   We've agreed to do this because of the commitment of

18   the debtors to provide us the information that we've been

19   asking for.  And to do so on the timeline that is consistent

20   with their stated objectives.  And we're prepared to work on

21   that timeline, Your Honor, but we also don't want to be

22   prejudiced by that timeline to the extent the debtors don't

23   otherwise live up to that end of the bargain.

24   Your Honor, on the very first day of the case or the

25   first day hearing I informed the Court that we did not think

1    that this was a one-issue case and we still don't think this is

2    a one-issue case.  Our concerns remain, and in some respect

3    they're heightened by some of the changes that were made to the

4    disclosure statement that's not reflected on our objection, the

5    changes that were made and filed on Friday.

6          Your Honor, I believe that it's our obligation; at

7    least, to give this Court a little bit of notice as to what

8    some of these concerns are so that as we head down into this

9    case that Your Honor is not surprised by what our issues are.

10   And frankly that nobody comes back and claims that we're a

11   Johnny-come-lately complaining about this case because we

12   didn't raise what we think are issues with the plan today.

13         THE COURT:  You've been complaining throughout so

14   nobody's going to assert your Johnny-come-lately.

15         MR. UZZI:  Your Honor, though, I think in fairness our

16   complaints have been very discreet and limited.  We did not

17   file a sixty-page disclosure statement objection arguing that

18   this plan was patently incomfirmable.

19         THE COURT:  It's okay.  I'm simply saying that you've

20   been a presence in the case throughout so you're not a Johnny-

21   come-lately.

22         MR. UZZI:  All right.  Thank you, Your Honor.  And

23   Your Honor, I can dispense with my argument, I think it will

24   only take five minutes, if you would like.  But I think it

25   would be helpful to the Court to kind of understand some of

1    what our complaint is here.  There's been such a focus on

2    reinstatement as that being the issue of the case.  There are

3    other issues in this case.

4         THE COURT:  Is it your purpose in making this five

5    minute presentation to give me a preview of your confirmation

6    objection or is there some other purpose?

7         MR. UZZI:  It's to give you a preview of our concerns

8    about this case.  Principally related, yes, to confirmation.

9         THE COURT:  Well, to be perfectly candid, you have an

10   audience and you may want to use this opportunity to alert

11   people what it is that they can look forward to in terms of

12   pleadings and I'm prepared to listen to it up to a point.

13        MR. UZZI:  Okay.

14        THE COURT:  But it is absolutely clear that anything

15   that relates to confirmation is reserved to another appropriate

16   time, that's not now.  That anything that you say is simply a

17   preview of the coming attractions, no more, no less.  It

18   doesn't have any legal significance in the case and if you said

19   nothing all of your rights would be reserved anyway.

20        MR. UZZI:  I greatly appreciate that, Your Honor.  And

21   therefore I will be extremely brief.

22        THE COURT:  Why don't you be extremely brief, then?

23        MR. UZZI:  I will be extremely brief, Your Honor.  And

24   here, just to put our class of creditors in context, Your

25   Honor, is that we think reading the disclosure statement that

1    the CCI noteholders are the only class of creditors that are

2    taking a substantial haircut in this case that's not otherwise

3    a part of this deal.  We don't think there's another class.  If

4    there is, maybe there's on other.  But we're one of the few.

5         Everybody else in this deal, Your Honor, is either

6    part of the deal, they've signed up to it, or they're either

7    getting paid in full through reinstatement or a cash out at a

8    hundred cents on the dollar.  So we are an important

9    constituency here.  In fact, not only are we the only

10   constituency that's being asked to take -- at least creditor

11   constituency that's being asked to take a material haircut,

12   we're the only material creditor constituency at the debtor

13   CCI.

14        And what does the plan provide for us?  It provides

15   for us a fixed recovery of nineteen cents at the debtors'

16   valuation.  Now we have issues with the debtors' valuation, I

17   will reserve on that, Your Honor, but it's a substantial

18   haircut even by the debtors' measure and it's a fixed recovery.

19   There's no contingent consideration that you would expect to a

20   creditor that's receiving a substantial haircut.  There's no

21   look to avoidance actions.  There's no look to litigation or

22   some other future value that may be derived.

23        So in connection with our disclosure statement

24   objection, Your Honor, what we really ask for is tell us what

25   the basis of our recovery is.  Tell us what we're being asked

1    to walk away from, and that's really not reflected in the

2    disclosure statement.  But those questions remain and we have a

3    commitment from the debtors to answer those questions for us.

4    And in light of that we are here hoping to work constructively

5    but those are fair questions for us to ask, Your Honor.

6         Now Your Honor, we've put in our disclosure statement

7    objection and in those we did allude to some of the issues that

8    are a problem, we think, in these cases including issues

9    relating to the voting of the Hold Co notes, absolute priority,

10   the existence of avoidance actions not being pursued and

11   questions regarding the insider generally, Your Honor.  And I'm

12   not going to raise those again unless, of course, Your Honor

13   has some questions.  But there are a couple of changes to the

14   plan that I think Your Honor should be aware of that do cause

15   us concern and frankly we would have raised in our objection

16   had it been part of the plan when it was initially filed.

17        And Your Honor, I'd like to turn your attention, just

18   very briefly, to page four of the black line of the disclosure

19   statement, and I can hand up the page if it's helpful to Your

20   Honor.

21        THE COURT:  I don't think it's going to be helpful

22   because I don't mean to cut you off, you said you were going to

23   be very brief.  The disclosure statement issues have been

24   resolved.  Your objection to the disclosure statement has been

25   resolved through the matter that has been described by

1    Mr. Basta.  And you're now going into problems you have with

2    the disclosure statement.  Either your objections are resolved

3    or they're not.

4          MR. UZZI:  Fair enough, Your Honor.  I mean, Your

5    Honor, I think it's important for the Court to understand the

6    direction of the case and all I'm trying to do is provide

7    context to the Court and frankly other parties in interest.

8          THE COURT:  I understand.

9          MR. UZZI:  Others --

10         THE COURT:  I understand but I think that we have a

11   lot of people here, some of whom are standing.

12         MR. UZZI:  Sure.

13         THE COURT:  And I think we should focus on what's

14   actually before me right now.  What's before me right now is a

15   disclosure statement which has been modified to accommodate the

16   objections of a variety of parties.  And as it relates to your

17   client, Law Debenture Trust Company, my understanding is that

18   it includes a variety of, I'll call them remedies that you

19   bargained for that include some discovery and information that

20   you're seeking and the solicitation of mirror note issues in

21   the case.  And so my view is if you made a deal, that's great.

22   That means I don't have to listen to all this.

23         MR. UZZI:  Fair enough, Your Honor.  And I appreciate

24   Your Honor's recognition of our rights and that we will not be

25   prejudiced by not raising the issues.  I just hope the Court

1  understands that part of my motivation for today, and I'm

2  frankly happy to reserve on all of this, is that we've heard a

3  great deal of presentation on the very first day of this case

4  about what this Court will be hearing in July.  We heard a

5  whole presentation on the merits of reinstatement of this case

6  on the first day and that issue's not before the Court.  It

7  wasn't before the Court, at least, on the first day.  And if

8  Your Honor --

9          THE COURT:  I had a PowerPoint on the first day on the

10  issue.

11          MR. UZZI:  Yes.  Yes, Your Honor.  And I just -- I

12  don't want to be left out in the sense that having -- there is

13  a concern that we have in the continued statements in this case

14  that this is a one-issue case.  This is not a one-issue case.

15  And I take and respect and thank the Court for its recognition

16  that we will be heard at confirmation.  But we do have serious

17  issues and we will reserve for confirmation, Your Honor.

18          THE COURT:  That's fine.

19          MR. UZZI:  Thank you, Your Honor.

20          MR. PELLETIER:  Your Honor, I'd like to be heard on

21  just the objections very briefly before we move on.

22          MR. UZZI:  I'm still working through the objections.

23          MR. PELLETIER  Sorry.  We've already discussed our

24  objections.

25          MR. UZZI:  Go ahead.

1          MR. PELLETIER:  Your Honor, David Pelletier from Axley

2     Brynelson on behalf of Mark Crudell (ph.) and other class

3     plaintiffs.  We have resolved our objection.  It was stated

4     that it was resolved because of the inclusion of -- in the

5     nature of the litigation.  It was really resolved because of

6     language that was added to the third party relief section, at

7     least that's our position.  And so I just wanted to make that

8     clear for the record.

9          THE COURT:  Okay.

10          MR. PELLETIER:  Thank you.

11     (Pause)

12          MR. BASTA:  Your Honor, the next objection was filed

13     by the creditors' committee.  The creditors' committee thought

14     the disclosure statement lacked adequate information regarding

15     the rights offering and the allocations of equity and Allen's

16     settlement.  And they also requested certain modifications to

17     the rights offering procedures.  We have resolved that

18     objection by including some additional language in the

19     disclosure statement regarding the items that concerned the

20     creditors' committee.

21          We have also made modifications to the rights offering

22     procedures to make them acceptable to the creditors' committee,

23     and I'll get into them a little bit later when I describe the

24     rights offering changes.  But the most significant change is

25     that if a creditor elects to participate in the rights offering

1    and funds its commitment, then that creditor will be entitled

2    to get interest that's earned on that amount pending the

3    closing.  And with that, I think, we have addressed the

4    creditors' committee's concerns.  I think counsel also had a

5    few comments.

6            MR. WOFFORD:  Your Honor, good morning.  Keith Wofford

7    from Ropes & Gray for the official committee.  Mr. Basta's

8    comments are correct.  Our objection is resolved and I will not

9    steal his thunder as the particularized changes.  The debtors

10   and the crossover committee, together, were responsive to the

11   official committee's request with respect to both disclosure

12   statement changes as well as substantive changes to the rights

13   offering.  And again, I'll leave it for Mr. Basta to go through

14   the substance.

15           There was also one more clarification with respect to

16   the commitment fees that are being approved today and a

17   clarification that we'd agreed with Mr. Schrock and the

18   crossover would be made on the record.  I don't know if they

19   would like to handle this now or whether the commitment fee

20   approval is going to be handled as a separate item.

21       (Pause)

22           MR. WOFFARD:  It'll be a separate item, Your Honor,

23   I've been informed.  So we'll just handle that clarification at

24   the end.

25           THE COURT:  Fine.  Nice job of articulating Mr.

1    Basta's whisper.

2         MR. BASTA:  Your Honor, the last objection was the

3    objection of the Office of the United States Trustee.  And this

4    is where we are, the U.S. Trustee objected requesting that the

5    plan and disclosure statement carve out government claims from

6    the proposed releases.  And we have accommodated that objection

7    and added specific language carving out the government claims.

8    The U.S. Trustee has also argued that there isn't insufficient

9    justification for the third party releases that are in the

10   plan.  And we have added language indicating why we believe a

11   third party release is appropriate here and the standards under

12   Drexel and the substantial contribution that the parties are

13   making to justify those releases.  I think Mr. -- you'll see,

14   Your Honor, that in respect to the plan changes that we have

15   made -- that we've made some modifications in addition to

16   changing the government releases.  We have added a provision

17   that if a party's claim is treated as unimpaired under the

18   plan, that the releases will not affect that unimpaired claim.

19   And this addresses a matter that I think is indirectly raised

20   by the U.S. Trustee's office but was also raised by many of the

21   lenders claiming that the existence of that release somehow

22   prevented reinstatement and so we've addressed that issue head

23   on.

24        So with that, we just think that the release point

25   here is not a disclosure statement issue.  The release here is

1    a confirmation issue and the question is whether or not the

2    disclosure statement puts on notice to parties that are seeking

3    to vote in favor or against the plan that the debtors are

4    seeking these releases.  It's unmistakable, from the disclosure

5    statement, that we are seeking that.

6           THE COURT:  All right.  Mr. Schwartzberg?

7           MR. SCHWARTZBERG:  Yes.  Your Honor, Paul Schwartzberg

8    for the U.S. Trustee's office.  I'm here on -- actually, as Mr.

9    Basta said, he is correct.  It is a confirmation objection but

10   it's also a disclosure statement objection.

11          I'm standing here today, basically, focusing on the

12   rights of the interest holders who are being wiped out under

13   this plan, other than Mr. Allen.  As Your Honor may recall,

14   when the disclosure statement was filed it initially prevented

15   the interest holders from taking any causes of action or

16   raising any causes of action that were based on both the

17   debtors' fraud and violation of securities laws, state and

18   federal.

19          I had never seen, prior to today, a disclosure

20   statement seeking the releases of illegal activities which this

21   one did and still does.  The debtors did take away the fraud

22   part so that they are carved out or no longer part of the

23   releases.  But violations of securities laws are still

24   something being sought to be released.  And at this point,

25   although the debtors have indicated why they believe these are

1    justified, they only use boilerplate language.  They don't

2    specifically say why the equity holders, who are receiving

3    nothing under this case, should be subject to this non-debtor

4    release.

5        In regards to the officers, directors, financial

6    advisors, lawyers they basically say they made a substantial

7    contribution and therefore should get these releases.  What

8    that substantial contribution is, above and beyond what happens

9    in every other case that's filed, I'm not aware of it and it

10   was not disclosed in the disclosure statement.  And similarly,

11   regarding the release afforded Mr. Allen, they speak of the

12   settlement and the substantial contribution but they don't

13   explain how or why that should affect equity holders who are

14   not getting anything under this plan and are not benefiting in

15   any iota from any of the numerous allegations that they're

16   saying Mr. Allen is giving up or providing to the plan.  And

17   nothing flows down to them so it is unclear why the releases

18   should -- they should be subject to the releases unless they're

19   provided an opportunity to object and consent.

20       THE COURT:  Well, they're deemed to reject because

21   they're getting nothing out of the plan, right?

22       MR. SCHWARTZBERG:  That's correct, Your Honor.

23       THE COURT:  So the disclosure statement, as to them,

24   is a meaningless iteration.  It doesn't affect their voting

25   because their voting doesn't matter.  And the legal issue that

1    you've identified, which is entirely legitimate and one that I

2    expect I'll be hearing more about at confirmation, seems to be

3    a confirmation objection.

4         MR. SCHWARTZBERG:  Your Honor, in terms of laying out

5    why they're doing this so that equity holders -- interest

6    holders who reviewed the disclosure statement can see the

7    justification would help, perhaps, form well, A, their

8    objections and, B, give them an understanding about why are

9    they not only getting nothing under the plan but why are they

10   also being prevented from taking other causes of action against

11   non-debtors.

12        THE COURT:  I take it, then, that you continue to

13   object and that the language which I see in the black line that

14   Mr. Basta handed up to me is not satisfactory to you?

15        MR. SCHWARTZBERG:  That's correct, Your Honor.  I'm

16   trying to ascertain from the disclosure statement why the

17   releases should flow down or what the debtors' argument is why

18   the releases should flow down to the interest holders.

19        THE COURT:  Mr. Basta, do you want to comment on this?

20        MR. BASTA:  Your Honor, the standard under Drexel for

21   getting a third party release is a substantial contribution to

22   the estate.  It is not dependent on whether or not somebody is

23   in the money or out of the money on the plan.  If the company

24   itself has received a substantial contribution, we believe that

25   satisfies Drexel.  We think anybody who picks up this

1    disclosure statement understands that Mr. Allen is making very

2    substantial contributions to this company, is facilitating

3    reinstatement and is funding the plan.  And we think it's

4    unmistakable that anyone who reads the disclosure statement is

5    going to see that Mr. Kornberg's clients are making substantial

6    contributions in the form of new money and otherwise in the

7    plan.

8           And we believe it's a confirmation issue.  We

9    understand Mr. Schwartzberg's concern.  We've added language in

10   the disclosure statement.  If Mr. Schwartzberg would like us to

11   expand this language and have it contain a sentence that says

12   that it's the position of the Office of the United States

13   Trustee that irrespective of contributions made to a company in

14   bankruptcy, a third party release is inappropriate as to a

15   constituency that is not receiving a recovery, I'd be happy to

16   add that additional disclosure if that would resolve Mr.

17   Schwartzberg's concern.

18          THE COURT:  Mr. Schwartzberg, does that satisfy your

19   concerns?  Is that helpful?

20          MR. SCHWARTZBERG:  Your Honor, I'm still trying to

21   figure out what the logic is as to why the non-debtor releases

22   should apply to interest holders who are not getting anything

23   under -- if Mr. Basta's saying all you need to do is put in

24   money to the plan and then you get a release and that affects

25   people who don't receive any of that benefit, then I think that

1    should be said --

2        THE COURT:  Well, the language that I'm looking at,

3    which is quite general, and if I'm not looking at the right

4    language somebody should tell me, is black lined on page 97 and

5    reads "The Office of the United States Trustee has raised

6    concerns regarding the scope of the releases by holders and

7    their applicability to certain nonconsenting holders.  Absent a

8    resolution of this matter, the debtors anticipate that the

9    Court will decide any dispute on this matter at the hearing to

10   confirm the plan."

11       So I think that's the language that the debtor has

12   proposed to deal with this issue.  It doesn't specifically

13   reference shareholders but it does reference nonconsenting

14   holders.  And it clearly points out that you've raised

15   concerns, which you have and you're continuing to do, about the

16   scope of the releases and their applicability to those who

17   haven't consented.

18       This is a matter of language.  I think the world is on

19   notice that the U.S. Trustee's Office takes issue with this as

20   to those who haven't consented.  Is there more language that we

21   can add that will make you happy?

22       MR. SCHWARTZBERG:  Your Honor, Mr. Schrock just

23   provided me language -- I'm looking at my black line, it

24   doesn't appear in my black line.  I think -- he indicated he

25   had shown this to me earlier, although I don't recall it.  But

1     was this in the -- and he may well have.

2           THE COURT:  This was handed up to me by Mr. Basta at

3     the beginning of the disclosure statement hearing.

4           MR. SCHWARTZBERG:  I don't think I had seen this

5     but --

6           THE COURT:  Why don't you take a look at it?

7           MR. BASTA:  Your Honor, may I suggest that we proceed

8     and maybe Mr. Schwartzberg and Mr. Schrock can get together on

9     the language while we're going through the rest of the hearing

10    and see if that works.

11          THE COURT:  That's fine.

12          MR. SCHWARTZBERG:  Your Honor, I don't want to hold up

13    the hearing.  This language appears to be -- I had not seen

14    this.  This language appears to be, at this point and based on

15    Your Honor's comments, adequate.

16          THE COURT:  Fine.  Great.  That settles it.

17          MR. BASTA:  Turning to the solicitation, voting rights

18    and rights offering --

19          MR. FRIEDMAN:  One moment, Your Honor.  Can I just

20    clarify one point, please?

21     (Pause)

22          MR. FRIEDMAN:  Jeff Friedman, Katten Muchin Rosenman

23    for Rembrandt.  Your Honor, we did file a limited objection to

24    the disclosure statement in connection with the third party

25    release language.  Our client was concerned that there is a

1    potential ambiguity because in addition to being a general

2    unsecured creditor who's -- theoretically whose rights are

3    going to be left unimpaired, we are also holders of a CA cause

4    of action.  And we are concerned that there is specific

5    language that says only causes of action -- the only causes of

6    action not released by the third party releases are those

7    specifically mentioned in the plan or plan supplement.  And our

8    cause of action isn't mentioned in any of those.  And it then

9    goes on to say, also, general unsecured claims were being

10   reinstated or left unimpaired or also not effected.  So we're

11   concerned that there's a bit of an ambiguity and that no one

12   say, well the more specific cause of action language should

13   really apply to you even though you're also a general unsecured

14   creditor.

15          I think Kirkland & Ellis is prepared to clarify that

16   on the record, Your Honor.

17          THE COURT:  Mr. Basta, will you clarify that?

18          MR. BASTA:  Yes, Your Honor.  It would be really great

19   if through the third party release we could extinguish all

20   existing litigation.

21          THE COURT:  And get rid of Rembrandt Technologies.

22          MR. BASTA:  Yeah, and get rid of it all in one fell

23   swoop but that's not our intention.  It's the -- the third

24   party release language is obviously not intended to cover that

25   pending litigation.

1          THE COURT:  Okay.  Is that clarification satisfactory,

2    Mr. Friedman?

3          MR. FRIEDMAN:  Yes, Your Honor.  Thank you.

4          MR. BASTA:  So turning to the solicitation, voting and

5    rights offering procedures.  Your Honor, I'm not going to go

6    into this stuff into detail.  It's very detailed and it's very

7    well thought out and it has been commented on by counsel who

8    represents the constituents in this case.  The solicitation

9    procedures contain all the critical dates, record dates,

10   objection dates for the plan.  It discusses the form of

11   solicitation packages and who gets what and when people are

12   entitled to vote.  They are standard and we have followed the

13   standard procedures.

14         The rights offering procedures were heavily negotiated

15   with the various parties and set forth a process where people

16   can indicate whether or not they want to invest under the plan.

17   It is a topic that the creditors committee quite appropriately

18   spent a fair amount of their time focusing on, wanting to make

19   sure that the creditors who were not at the table as part of

20   the deal had an opportunity to invest as contemplated.

21         As a result of the discussions with the creditors'

22   committee we've made the following changes to the rights

23   offering procedures.  We added a provision that holders wishing

24   to transfer their right to invest must disclose the identity of

25   the transferee in the notice of intention.  We've changed

1    language so that the excess backstop parties right of first

2    refusal would allow them to purchase all or none of the offered

3    securities.  The previous draft had allowed them to purchase a

4    portion.

5          We have, as I mentioned earlier, if a party wants to

6    invest we're going to hold the money in an interest bearing

7    account and give the parties the interest on that -- that's

8    earned in that account.  And we've also added language that

9    eligible holders who elect to exercise the right and

10   participate but fail to fund will not be liable for indirect or

11   punitive damages.

12         And with those changes, I believe we have satisfied

13   the concerns of the creditors' committee and we would request

14   that all of these procedures be approved as part of our motion.

15         I was going to turn to the commitment fees, should I

16   do that and maybe counsel for creditors' committee could come

17   up at the end.

18         The motion approves the commitment fees that are

19   provided for under the documents.  What's important to

20   understand about these commitment fees is that they're not

21   earned until confirmation.  So if the plan is never confirmed,

22   the fees are never earned and they're not payable until the

23   effective date.  And that was an important negotiation when we

24   were negotiating with the crossover committee.

25         The fees are a rollover fee, that is a fee for the

1  amount of the old CCH-2 notes that continue into New CCH-2

2  notes.  And that's 1.5 percent of the principal amount plus

3  interest, which we're expecting the fee to be about twenty

4  million dollars.

5       And then there's a new CCH-2 commitment fee, meaning

6  not the notes that are rolling but the amount of new notes that

7  are being provided.  And that fee is the greater of three

8  percent of the portion of the new CCH-2 notes commitment and

9  .83 percent of the respective portion of the new CCH-2

10 commitment for each month beginning April 1, 2009.  We're

11 expecting that if it goes six months, that fee would be eight

12 million dollars.  It could be more if we get off track here.

13      And then there's an equity backstop fee equal to three

14 percent of the equity backstop commitment of 1.6 billion, which

15 translates into a forty-nine million dollar fee.  These fees

16 are large but the dollars at stake are very large.  And in

17 support of the commitment fees, Your Honor, I'd like to just

18 proffer, because we believe the business judgment governs our

19 seeking approval of these fees.  I'd like to just read a short

20 proffer from Steven Goldstein, who's a managing director at

21 Lazard, in support of our determination on approval of the

22 commitment fees.

23      THE COURT:  All right.  Let me first ask if there's

24 any objection to proceeding by means of a proffer.  I hear no

25 objection.  You can do that.

1          MR. BASTA:  Mr. Goldstein would testify that he

2     believes the debtors exercised sound business judgment in

3     agreeing to the commitment fees.  That the commitment fees were

4     negotiated in good faith and at arms length.  That the

5     commitment fees were reasonable when comparing fees agreed to

6     in similarly sized cases and under similar circumstances.  That

7     the commitment fees are a critical component of the prearranged

8     plan and are vital to the reorganization.  And that the lockup

9     agreement provides that it's an event of default if the

10    commitment fees are not approved within fifty days of the

11    petition date.  And that based upon these facts the commitment

12    fees should be approved.

13         THE COURT:  Is there anyone who wishes to cross

14    examine with respect to the proffer?  Apparently not.  I accept

15    the proffer.

16         MR. BASTA:  Thank you, Your Honor.

17      (Pause)

18         MR. WOFFARD:  Your Honor, again, Keith Woffard from

19    Ropes & Gray for the committee.

20         Two brief notes, as Mr. Basta remarked the committee

21    expressed some concerns about the rights procedures and in

22    particular the structure of the right of first refusal.

23    Through the combination of disclosure of the commercial impact

24    of that right of refusal and acknowledging the commercial deal

25    that had been formulated as a whole with the crossover

1    committee, based upon the changes that have been made the

2    committee is comfortable with the procedures as modified.

3            With respect to the commitment fees, there is, as we

4    were noting, one ambiguity that we wanted to have clarified on

5    the record.

6            As Mr. Basta noted, the fee is three percent for the

7    equity backstop of the 1.6 billion dollar equity commitment.

8    The ambiguity had been, Your Honor, that on page 10 of the plan

9    there had been a reference in the definition of equity backstop

10   fee to the aggregate backstop, including what is referred to as

11   the excess backstop.  And the excess backstop on the exhibit to

12   the plan supplement had been noted as an additional 741 million

13   beyond the 1.6 billion in the base equity backstop.

14           So the ambiguity had been someone could have thought

15   that the three percent was, based on the plan definition,

16   payable on roughly 2.3 billion dollars instead of 1.6.  But

17   what the concurrence of the crossover committee's

18   representatives and the debtors that in fact the fee is payable

19   on the 1.6 billion dollars, the committee is comfortable with

20   the fee as presented.  But we wanted to make sure that that was

21   clarified on the record given the aggregate dollars involved.

22           THE COURT:  I consider your statement to be sufficient

23   clarification but is there a need for anyone to say I agree or

24   yes that's true?

25           MR. WOFFARD:  We agree, Your Honor.  That's correct.

1          THE COURT:  That works.  Okay.

2          MR. BASTA:  And Your Honor, we agree as well, for the

3    debtors and we have nothing further and would request that the

4    disclosure statement be approved.  Mr. Schrock advised me that

5    there's some technical nits and gnats that need to be added to

6    the document and we would propose to submit that document

7    together with a revised order today.

8          THE COURT:  That's fine.  Does anyone else wish to be

9    heard with respect to the disclosure statement?  It's approved.

10         MR. BASTA:  Thank you, Your Honor.

11         THE COURT:  Now I have a timing problem, just so

12   you're aware of it.  I'm sure we'll find a way to deal with it.

13   One of the reasons that this hearing was scheduled for 9 a.m.

14   as opposed to a more comfortable 10 a.m. is that I'm leaving

15   this afternoon to attend a conference out of the city and will

16   be there through tomorrow evening.  I'll be back in chambers

17   Thursday morning.  Is it critical that this be entered today,

18   with nits and gnats such that I can review it in formal form or

19   can it await Thursday morning.  If it can't await till Thursday

20   morning then we're going to have to figure out a means to

21   deliver it to me.

22         MR. BASTA:  One second, Your Honor.

23    (Pause)

24         MR. BASTA:  Your Honor, the answer depends upon a

25   logistical aspect that I just don't know the answer to.

1    Generally what we would do is we would take the documents and

2    they would go to the printer and then the printer would print

3    them and we would mail.  And we were planning on mailing on

4    Thursday afternoon.  If the documents that I need to get to the

5    printer need to get there in sufficient amount of time that the

6    form of the order with Your Honor's signature on it gets

7    included into the book, then I might need to get that in

8    advance of Thursday, but I might not.  What I would ask, if

9    possible Your Honor, is that if our folks could coordinate with

10   chambers to address that logistical.  We won't utilize that if

11   we don't have to but if we do have to we would request

12   authority to do so.

13        THE COURT:  That's fine and they know how to reach me.

14        MR. BASTA:  Great.  Thank you, Your Honor.  Thank you

15   for your time today, Your Honor.

16        THE COURT:  Is there anything more for today?  Well,

17   as long as we're all here let me talk to you about scheduling

18   in July.

19      (Telephonic Interference)

20        THE COURT:  I don't know who that is but you just made

21   the courtroom smile.  Why don't you mute your phone?

22        Here's the scheduling issue.  I have a need to be away

23   the weekend of July 25.  It requires me to fly out and fly

24   back.  As a result, it would be desirable for me, assuming this

25   trial goes beyond the 23rd, for you to consider starting the

1    trial on the 21st, which is a Monday, which would give you

2    Monday, Tuesday, Wednesday and Thursday.  Why the order

3    provided for Thursday as the start of the trial notwithstanding

4    my having suggested that was not necessarily the most logical

5    thing to do, I don't know.  But I'd like you to at least

6    consider starting on Monday instead of on a Thursday because

7    that will probably mean that we'll finish or come pretty close

8    to finishing that week without interruption.

9         If that works for everybody else, I think it makes for

10    a more logical way to conduct the trial and allows me to make

11    my travel arrangements.

12         MR. POWELL:  Your Honor, Jeff Powell for the debtors.

13    That works for the debtors.  Starting on the 21st works for us.

14         THE COURT:  Any problem for the banks or anybody else?

15    It just means you have two fewer days to prepare for -- three

16    fewer days to prepare for trial, I think that's great.

17         THE COURT:  Mr. Pantaleo, what do you think?

18         MR. PANTALEO:  I think it's perfect.

19         THE COURT:  I thought you would.  Anything else?

20    Okay.  We're adjourned.  Thank you.

21         (Proceedings concluded at 12:06 p.m.)

22

23

24

25

1

2                         I N D E X

3

4                       R U L I N G S

5                                              PAGE LINE

6    Motion to Intervene Granted              10    6

7

8    Motion for Stay Relief Denied            78   24

9

10   Motion Seeking to have The Other         81   18

11   Orders That Have been entered in the

12   Court that apply to the Other debtors

13   apply to Pacific Microwave Approved

14

15   Disclosure Statement Approved           107   9

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T I O N

3

4      I, Esther Accardi, certify that the foregoing transcript is a

5      true and accurate record of the proceedings.

6

7      _____

8      ESTHER ACCARDI

9

10     Veritext LLC

11     200 Old Country Road

12     Suite 580

13     Mineola, New York 11501

14

15     Date: May 7, 2009

16

17

18

19

20

21

22

23

24

25