Michael B. Hopkins
David W. Haller
Susan Power Johnston
Charles Jeanfreau
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York  10018
phone:  (212) 841-1000
fax:  (212) 841-1010

*Counsel to Wilmington Trust Company*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ————————————————— ) | | |
| In re: ) | | Chapter 11 |
| ) | | |
| CHARTER COMMUNICATIONS, INC., *et al.*, ) | | Case No. 09-11435 (JMP) |
| ) | | |
| ) | | |
| Debtors. ) | | Jointly Administered |
| ————————————————— ) | | |
| ) | | |
| JPMORGAN CHASE BANK, N.A. ) | | |
| as Administrative Agent, ) | | |
| ) | | |
| Plaintiff, ) | | Adversary Proceeding |
| ) | | No. 09-01132 (JPM) |
| -against- ) | | |
| ) | | |
| CHARTER COMMUNICATIONS OPERATING, ) | | |
| LLC and CCO HOLDINGS, LLC, ) | | |
| ) | | |
| Defendants. ) | | |
| ————————————————— ) | | |

**POST-HEARING BRIEF OF WILMINGTON TRUST COMPANY, AS
INDENTURE TRUSTEE FOR THE SECOND LIEN NOTES, OBJECTING TO
THE DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION**

This post-hearing brief objecting to confirmation of the *Debtors' First Amended Joint Plan of Reorganization* is submitted on behalf of Wilmington Trust Company, as indenture trustee under the Second Lien Indentures for the holders of the Second Lien Notes.[1]

## Preliminary Statement

A change of control will occur if the Debtors' Plan is confirmed, with Paul Allen losing control of Charter and a group of four former bondholders — Apollo Management LLP ("Apollo"), Oaktree Capital Management, LP ("Oaktree"), Crestview Partners, LP ("Crestview") and Franklin Resources, Inc. ("Franklin"; with Apollo, Oaktree and Crestview, the "Group") — gaining control. In the alternative, a subgroup comprised of Apollo, Oaktree and Crestview will gain control (the "Subgroup"). If the Plan is confirmed, both the Group *and* the Subgroup would have greater voting power, as defined in the Second Lien Indentures, than Paul Allen. The change of control provisions in the Second Lien Indentures therefore would be triggered by consummation of the Plan, which makes the Plan not feasible.

As this Court knows, members of the Group denied at trial that they will gain joint control of Charter, and denied that they are, or have acted, as a group. But these general denials were expected and are contradicted by more credible, contemporaneous documentary evidence, including numerous admissions of the Group's expected joint control and status as a group. These admissions, combined with other important circumstantial evidence, demonstrate that the Group and Subgroup will gain control of Charter, and that they have acted and will continue to act as a group.

---

[1] Defined terms have the meanings given in Wilmington Trust's Objection to Confirmation of the Debtors' First Amended Plan of Reorganization. Wilmington Trust on behalf of the Second Lien Noteholders also adopts and incorporates the arguments and supporting evidence set forth in the post-trial submissions of the First and Third Lien Creditors relating to the change of control under their documentation.

For his part, Paul Allen has demonstrated a distinct lack of interest in Charter's future, not deigning to appoint himself to Charter's board nor even to show up at trial. As far as the record shows, he has no resolve to exercise control over Charter. Indeed, as Charter headed for bankruptcy, he did not want any ongoing control position, and was prepared to walk away, but then was offered and finally agreed to accept more than $180 million and other consideration to retain voting rights and board seats that the Debtor and the Group believed were the minimum necessary to avoid tripping the change of control provisions. The reasonable inference from Paul Allen's lack of interest is that he, in fact, will not be in control of Charter; rather, the Group will be. And this Court can and should draw that inference. Neither the Debtor's management, nor the Group, would permit Charter to be controlled by such a disinterested, absent party; they do not anticipate a helmless future because they all know that in fact Paul Allen will not be in control, and that Charter will be led by Apollo and the rest of the Group.

The Debtor and the Group cannot hide the Group's joint control, and in any event they miscalculated. A big effort was made to ensure that Paul Allen would have a greater voting interest than Apollo, Oaktree and Crestview combined, but only on a fully diluted basis through both the shares *and* warrants he would receive under the Plan. The Debtor and the Group, however, did not focus on the change of control provisions in the Second Lien Indentures and the Third Lien Credit Agreement, which do not measure voting strength on a fully diluted basis. Instead, the change of control provisions in those documents specifically measure voting strength based on beneficial ownership of shares that, "at the time" the measurement is made, are "entitled to vote in the election of the board of directors." JPMX 2 § 8(k)(ii); WTCX 1, 2, Art. 1, def. of "Change of Control" clause (3), and def. of "Voting Stock"; WFX 1 § 1.1 at 7-8, 28. Paul Allen's warrants do not count under this standard because the shares that might some day be

issued if and when the warrants are exercised will not be issued as of the Effective Date and therefore would not be "entitled to vote" as of that date. Measured on this basis, Apollo, Oaktree and Crestview, even without Franklin, have a greater voting interest than Paul Allen.

Moreover, even the Debtor's own warrant-counting methodology for its beneficial ownership voting percentage calculation, if properly applied, would have shown that Apollo, Oaktree and Crestview, even without Franklin, have a higher voting percentage than Paul G. Allen. The Debtor used calculations for the Second Lien Indentures and the Third Lien Credit Agreement that erroneously credited Paul Allen's Class B Stock with as much as 37.3 percent of Charter's total voting power (rather than the fixed 35 percent actually applicable to the Class B stock), thus decisively distorting the conclusions the Debtor relied upon regarding these relative voting percentages.

The law recognizes a group-in-fact even without admissions at trial and without a written shareholders' agreement. A preponderance of the evidence weighs in favor of finding that the Group and Subgroup will gain control of Charter, and the Court should find so here.

### The Evidence

A.   **The Bondholders Admitted During the Course of the Underlying Events That They Were a Group and Jointly Would Control Charter.**

Many of the communications among Group members were veiled behind the attorney-client privilege, given the bondholders' joint retention of the Paul Weiss firm and their joint meetings and discussions with that firm.[2] Moreover, the bondholder group apparently was strongly counseled, given the certainty of ensuing litigation on the change-of-control issue, to be

---

[2] See, e.g., representation by counsel for JPMorgan Chase that in excess of 23,011 documents were withheld from production or redacted on the grounds of privilege. Tr. 09/10/09 32:18-33:21.

careful to avoid admitting in any writing their status as a group.[3] Even still, the truth came out on several occasions. For example:

- Early on, Mark Rowan of Apollo suggested a partnership with Crestview and Oaktree to "buy lots of CCH I and be prepared to put in a bunch of new money," JPMX 139, which plan others at Apollo later executed.

- Darren Glatt of Apollo communicated internally that Christine Villaluz of Franklin "understands that Apollo, Oaktree, Fidelity and Franklin will ultimately control this Company." JPMX 157.

- Mr. Glatt also responded to a question from PriceWaterhouseCoopers as follows: Q. "Will Apollo or the combined bondholders have enough power to control / thus the right to appoint a majority of the new BOD?" A. "yes, Paul Allen will have the right to 35% of the vote, therefore the bondholders will control the other 65% and have the right to nominate directors commensurate with their voting control." JPMX 282.

- Crestview's internal credit review memoranda stated: "We view this as an attractive investment opportunity to team up with Apollo and Oaktree to buy a controlling stake in the fourth largest US cable company . . . ." JPMX 234 at 1. Crestview recognized that, in attempting to avoid tripping the change-of-control

---

[3] Group members took pains to avoid any record of their agreement to acquire and exercise joint control of Charter. As described below, Eric Zinterhofer of Apollo sought to avoid an "email trail" concerning Charter. JPMX 181. As further described below, Crestview doctored its memoranda to remove references to the Group's joint control. Compare JPMX 234 at 4, 5, 8, 10, 12 with JPMX 243 at 4, 5, 8, 10, 12, and JPMX 193 at 1, 25, 49, 50 with JPMX 243 at 1, 25, 49, 50. See also Tr. 07/29/09 (Marcus) 157:7-22 and CX 374. Other memoranda were addressed to counsel in the apparent hope that the attorney client privilege would shield the communication. JPMX 154; Tr. 7/28/09 (Zinterhofer) 145:8-18, 234:7-21. Oaktree did not generate any memoranda whatsoever concerning Charter. Tr. 7/29/09 (Liang) 217:7-15.

provisions, the bondholders' oral agreement to share control could not be memorialized in a written shareholders' agreement, but the joint control nonetheless was clear: "Together with Apollo and Oaktree, we would control approximately 68% of Charter's equity post-restructuring and have approximately 44% voting control. However, given the change of control provisions in the Company's bank agreements, we would not be able to enter into a shareholders agreement." JPMX 234 at 25.

- Even without a formal shareholders' agreement, it was eminently clear to the Group, and also to Paul Allen and Charter management, that the Group would be in charge with Apollo in the lead. Thus, Eric Zinterhofer of Apollo wrote: "I expect we [Apollo] will control about 1/4 of the equity, and with Oaktree, Crestview and Franklin, will control about 40% of the vote . . . . In terms of influence, it is already clear in mgmt's mind that Apollo is the lead here. Also, Paul's main designee on the board, Lance Conn, understands the dynamic very well. . . . We usually do share control in these loan to own situations." JPMX 237.

- Likewise, although there was no written agreement among the members of the Group, they agreed to a board seat for Jeff Marcus of Crestview even if Crestview did not meet the 10 percent threshold. JPMX 193 at 2 (the Group "committed" to a board seat for Mr. Marcus); see also JPMX 169 ("Apollo and Oaktree agreed to put Jeff [Marcus] on the board even if we end up under 10%."); JPMX 169 (similar). The understanding among them was that Mr. Marcus would be Chairman. JPMX 234 at 1, 2.

- Apollo and Oaktree further agreed between them to be "bonded at the hip" in decision making on another transaction, the Aleris transaction, and made that

agreement in exchange for the same agreement on Charter. JPXM 176. Eric Zinterhofer of Apollo commented, "Ken Liang (from Oaktree) and I are making all the decisions together on the Charter restructuring. We don't have anything in writing, just like we didn't in Spectrasite, but we have known each other a long time." JPMX 181. Mr. Zinterhofer then confirmed that "I can give Oaktree joint control with us on Charter." JPMX 176. In response to the control proposal between Oaktree and Apollo, Josh Harris of Apollo observed, "getting a partnership dialog going like this with one of the biggest distressed guys around would be a good thing generally." JPMX 181. When Mr. Harris asked Mr. Zinterhofer for specifics about Charter, Mr. Zinterhofer said that it was "something I would not want an email trail on." JPMX 181. Subsequently, a proposed communication back to Oaktree from Apollo stated that Apollo would "agree to same [joint control] on Charter, which could even apply POST reorg." JPMX 180.

- Oaktree advised its funds just before a deal was reached with Charter that "we are working closely and smoothly with a large group of like-minded holders and have developed a well-defined strategy to achieve all that we would have achieved a year from now." JPMX 159.

- Finally, the bondholder representatives frequently referred to each other as "partners," and expressed their commitment to partnering together on Charter post-reorganization. See, e.g., JPMX 244 (Apollo expresses to Crestview, and vice versa, that it "look[s] forward to being your partner on this one."); JPMX 191.

This contemporaneous evidence, admitting joint control of Charter by the Group, should weigh much more heavily than the general denials of the Group members at trial. While

the Group members attempted at trial to explain away certain of their prior written admissions, their explanations simply were not credible.

Thus, Mr. Marcus testified that Crestview's statements about the Group's agreement to give Mr. Marcus a board seat were just "hopeful" and "aspirational." Tr. 7/29/09 (Marcus) 88:11-90:15. But mere hopes and aspirations regarding a board seat, in normal parlance, would not be referenced by statements that the Group "agreed" or "committed" to the board seat, as Crestview wrote. If mere wishful thinking were intended, that could easily have been expressed. Moreover, the contemporaneous admissions were made to Crestview's founders, and in internal memoranda prepared to obtain approval for Crestview's $225 million investment in the rights offering. JPMX 193, 234. Presumably, the language was chosen deliberately, not haphazardly, given this serious context.

Similarly, Mr. Marcus and Mr. Zinterhofer both testified that Crestview's and Apollo's references to the fact that they had "nothing in writing" with other members of the Group was merely meant to convey that there was no agreement among them, written or oral. Tr. 7/29/09 (Marcus) 54:8-15; Tr. 7/28/09 (Zinterhofer) 62:22-63:21. But in natural discourse, stating that nothing is in writing only has relevance if there is an oral understanding or agreement — i.e. "we have an understanding *but nothing is in writing*." If the intended communication was the non-existence of any understanding or agreement whatsoever, then that statement could have been made simply, without reference to the lack of any writing.[4]

---

[4] Both Mr. Zinterhofer and Mr. Liang testified that in prior transactions where they had written shareholders' agreements, they were not attempting to avoid change of control provisions. Tr. 7/28/09 (Zinterhofer) 193:7-194:2; Tr. 7/29/09 (Liang) 219:8-220:1. Thus, the reason to avoid a written agreement here was not present in those cases.

With regard to trying to avoid "an email trail," Mr. Zinterhofer testified that this statement merely expressed his preference not to convey to his boss, to whom he was writing, numbers that might be inexact and yet inadvertently relied on. Tr. 7/28/09 (Zinterhofer) 60:23-62:8. But it would have been simple to communicate the numbers to his boss with a caveat that they were inexact or estimates, and should not be relied on, if that is what he meant; or alternatively to tell his boss that Mr. Zinterhofer preferred to speak with him in person about the numbers. By contrast, the expression of a preference to avoid an email trail bespeaks a desire to hide something from third parties — such as adversaries in bankruptcy litigation that was expected to ensue — not to withhold something from the boss he was writing to.

**B.**     **Crestview's Efforts to Hide Its Admissions Are Further Evidence of the Intended Joint Control By the Group.**

Crestview was not as careful at first as some of the other Group members in its written communications, and recognized somewhat later the damage that its concessions concerning control would cause in future litigation over the change of control provisions. It decided therefore to remove all references to the Group's joint control. Compare JPMX 234 at 4, 5, 8, 10, 12 with JPMX 243 at 4, 5, 8, 10, 12, and JPMX 193 at 1, 25, 49, 50 with JPMX 243 at 1, 25, 49, 50. See also Tr. 07/29/09 (Marcus) 157:7-22 and CX 374. Luckily, the original versions were not permanently destroyed and revealed what the Group actually thought, before Crestview focused more clearly on the implications of the truth for subsequent change of control litigation. See, e.g., JPMX 238, 243.

**C.**     **Franklin Sold Apollo Sufficient Rights So That Apollo Could Obtain a Second Board Seat, and Solidify the Group's Control.**

Franklin made perhaps the most significant contribution on behalf of the Group to increase and solidify the Group's control: By selling Apollo sufficient rights in the Rights Offering to lift Apollo above a 20-percent voting interest (permitting the appointment of an

additional director), and yet not selling too many rights in order to keep Franklin above the 10-percent threshold and thereby retain its board appointee. See CX Declaration 6 (hereafter "Goldstein Decl.") Ex. D; WTCX 13-15; Tr. 7/23/09 (Villaluz) 161:13-162:24. By virtue of this purchase and sale, the Group increased its initial board representation from 4 to 5 (counting Neil Smit as the Group's appointee) or from 3 to 4 (not counding Mr. Smit), which gave the Group a greater or at least equal number of initial board members as Paul Allen.

Christine Villaluz of Franklin testified at trial that the fact of the sale, and the number of rights sold — just sufficient to lift Apollo over the 20-percent threshold and yet keep Franklin over 10-percent — was merely a coincidence. Tr. 7/23/09 (Villaluz) 161:14-162:24. But that testimony was simply not credible. She claimed that a few Franklin portfolio managers did not want to exercise their rights, but most apparently did. And if barely any fewer rights had been sold Apollo would not have gained a seat, while if barely any more rights had been sold Franklin would have lost a seat. Goldstein Decl. Ex. D. The most reasonable inference from these facts is that the sale was negotiated cognizant of the thresholds and with the intent to maximize the Group's initial board representation, which inference this Court should draw.

**D. Paul Allen Has Demonstrated Little or No Interest in the Future of Charter; He Has Kept a Significant Voting Interest Only Because He Was Handsomely Paid to Do So and Will Not Actually Control Charter.**

The bondholders recognized that as part of the restructuring, "Paul Allen [would be] removed from day-to-day processes and M&A strategy." JPMX 253; see also Tr. 07/29/09 (Liang) 214:1-11. Although Paul Allen was an active director and Chairman of the Board before the restructuring, he will have little or no involvement going forward. He did not appoint himself to Charter's board, JPMX 352 Ex. 3, and did not even show up at the trial of this matter. There is no first-hand evidence from Paul Allen that he will be supervising and instructing the board

members he appointed.  Instead, he has demonstrated a complete lack of resolve to exercise control over Charter.

As Charter headed for bankruptcy, Paul Allen did not want an ongoing control position, and even threatened to damage Charter by exercising his exchange rights.  Tr. 09/02/09 (Conn) 35:7-38:11.  But then he was offered and finally agreed to accept more than $180 million and other consideration to retain voting rights and board seats that the Debtor and the Group believed were the minimum necessary to avoid tripping the change of control provisions.  See Tr. 7/23/09 (Villaluz) 31:20-32:10; Tr. 8/17/09 (Doody) 33:23-34:3, 34:22-24, 44:13-24; Tr. 9/2/09 (Conn) 145:19-146:7; and see Tr. 9/2/09 (Conn) 175-77.[5]  At the same time, the evidence demonstrates that the Group has no desire for real, effective managerial or financial control by Allen, and that their emphasis on his nominal control is nothing more than window dressing intended to support reinstatement of the debt.  In fact, the Group explicitly denied Paul Allen's requests for veto rights over strategic transactions and majority representation on the board — without which he cannot meaningfully be said to have any real control.  Tr. 7/29/09 (Liang) 210:16-214:11; JPMX 166.

The reasonable inference from Paul Allen's lack of interest is that he, in fact, will not be in control of Charter.  Neither the Debtor's management, nor the Group, would permit such disinterested, absentee control from Paul Allen.  Instead, the Group, led by Apollo, will be in control, and will chart the Company's direction.

---

[5] During negotiations, Paul Allen initially requested $1.5 billion not to trigger a change of control, JPMX 157 at 2, but ultimately settled for less.  See Amended Plan, Art. VI, para. C.

### E.    Other Circumstantial Evidence Supports a Finding of Group Status and Joint Control.

The existence of a group is further demonstrated by prior relationships among the Group members (JPMX 7, 50, 81, 91, 99, 176, 177, 181, 223, 234 at 25; Tr. 7/28/09 (Zinterhofer) 125:20-137:10; Tr. 7/29/09 (Marcus) 21:1-12, 25:13-24, 75:25; Tr. 7/29/09 (Liang) 184:24-185:23), by their common purpose in ensuring that the CCH I securities were treated as the fulcrum securities in the restructuring (Tr. 7/29/09 (Marcus) 30:12-23, 70:5-12; Tr. 7/23/09 (Villaluz) 104:22-105:5; Tr. 7/28/09 (Zinterhofer) 153:10-154:1; JPMX 152, 308, 310), by their participation in the rights offering to obtain additional equity in the restructuring, (Tr. 7/23/09 (Villaluz) 98:25-100:25; Tr. 7/28/09 (Zinterofer) 47:23-48:12, 137:1-138:1; Tr. 7/29/09 (Marcus) 70:13-71:23; JPMX 234 at 25, 263, 308), and by their shared exit strategy for their respective investments in Charter (JPMX 157, 234 at 46-50; 235 at 20-23; Tr. 8/23/09 (Villaluz) 142:23-143:5; Tr. 7/29/09 (Marcus) 79:23-81:6; Tr. 7/29/09 (Liang) 184:6-13; Tr. 8/24/09 (Gompers) 206:21-14).

## ARGUMENT

## I.  THE PLAN IS NOT FEASIBLE BECAUSE CHANGE OF CONTROL PROVISIONS IN THE SECURED LENDER AGREEMENTS WILL BE TRIGGERED ON THE EFFECTIVE DATE.

The Plan cannot be confirmed because the Debtors cannot satisfy section 1129(a)(11) of the Bankruptcy Code, which requires that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."  11 U.S.C. § 1129(a)(11).  The court must scrutinize the plan carefully to determine whether it offers a reasonable prospect of success and is workable.  In re One Times Square Assocs. Ltd. P'ship, 159 B.R. 695, 709 (Bankr. S.D.N.Y. 1993) ("The feasibility test requires the

court to determine whether a plan is workable and has a reasonable likelihood of success. The purpose of the feasibility test is to protect against visionary or speculative plans."); <u>In re Drexel Burnham Lambert Group, Inc.</u>, 138 B.R. 723, 762 (Bankr. S.D.N.Y. 1992) (<u>Drexel Burnham I</u>) ("The feasibility test set forth in § 1129(a)(11) requires [the court] to determine independently whether the Plan is workable and has a reasonable likelihood of success.").

This Plan is not feasible because the Group, consisting of Apollo, Oaktree, Crestview and Franklin, (a) has acted collectively to acquire a majority of the new Class A stock and a majority of the total equity value of the reorganized CCI, (b) will have named 5 initial members of the Board of Directors of CCI, which is more than Paul Allen, and even if the Group only named an equal number of the initial directors as Paul Allen, the change of control provisions still would be triggered, (c) will appoint a majority of the directors at the first shareholders meeting, (d) will hold more than 35 percent of the Voting Stock (as defined in the Second Lien Indentures) of CCI, and more of the Voting Stock than Paul Allen, and (e) will control the management of CCI and its subsidiaries through its domination of the Board, to achieve the Group's common objectives for Charter.

Confirmation of the Plan, therefore, would cause a change of control giving the Second Lien Noteholders the opportunity to demand, immediately upon Charter's emergence from bankruptcy, repayment of the amounts owed at par plus a premium, and likewise would trigger a change of control under the other Secured Lender Agreements.

**A.      Apollo, Oaktree, Crestview and Franklin Have Acted Collectively and With a Common Purpose To Acquire and Hold Their New Class A Stock.**

The evidence described and incorporated above, and which was elicited at trial, demonstrates that Apollo, Oaktree, Crestview and Franklin have acted as a group, collectively

and with a common purpose, to acquire and hold a majority of the New Class A Stock, and therefore are a "group" and thus a "person" within the meaning of Section 13(d)(3) of the Securities Exchange Act of 1934 (the "Exchange Act").

The change of control provisions incorporate the definition of "person" provided in Section 13(d)(3), which provides:

> When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a "person" for the purposes of this subsection.

Similarly, Rule 13d-5(b)(1) provides:

> When two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership, for purposes of Sections 13(d) and 13(g) of the Act, as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such person.

Reflecting the possibility that members of a group, as here, may take steps to disguise or conceal their agreement to avoid the consequences of their collective action, the cases hold that an agreement to act as a group may be formal or informal, and may be proved by direct or circumstantial evidence. Morales v. Quintel Entm't, Inc., 249 F.3d 115, 124 (2d Cir. 2001). A group for purposes of Section 13(d) need not be formally organized nor need it memorialize its intentions in writing; all that is required is that its members combine in furtherance of a common objective. See Morales, 249 F.3d at 124:

> Moreover the alleged group members need not be committed to "acquiring, holding, voting or disposing of equity securities" on certain specified terms, but rather they need only have combined to further a common objective regarding one of the just-recited activities.

More specifically, a formal writing — such as a shareholders agreement — is not necessary to find the existence of concerted group activity.  See Wellman v. Dickinson, 682 F.2d 355, 363 (2d Cir. 1982) (internal citations omitted):

> The statute [Section 13(d)] contains no requirement, however, that the members be committed to acquisition, holding, or disposition on any specific set of terms.  Instead, the touchstone of a group within the meaning of Section 13(d) is that the members combined in furtherance of a common objective. Of course, the concerted action of the group's members need not be expressly memorialized in writing.

See also Int'l Banknote Co. v. Muller, 713 F. Supp. 612, 619 (S.D.N.Y. 1989) (finding formation of group based on retention of joint counsel and informal discussions concerning proxy contest to elect proposed slate of directors at annual meeting); CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP, 562 F. Supp. 2d 511, 553 (S.D.N.Y.), aff'd, 292 Fed. Appx. 133 (2d Cir. 2008) (group exists where "two or more persons reached an understanding, explicit or tacit, to act in concert to achieve a common goal," which "may be formal or informal, and need not be expressed in writing") (internal quotations omitted).

The relationship among group members is relevant to a determination that they are acting collectively with a common purpose in acquiring, holding or divesting securities.  See MCI Communications Corp., SEC No-Action Letter, 1978 SEC No-Act. LEXIS 1764 (Aug. 21, 1978), which addressed whether five commercial banks holding warrants to purchase more than 31 percent of outstanding MCI stock in connection with amendments to a credit agreement would be a group under Section 13(d)(3) "solely by virtue of their concerted actions relating to the purchase of equity securities directly from an issuer in a transaction not involving a public offering," and thus would be exempted under Rule 13d-5(b)(2).  Although the banks had no agreements respecting the warrants or their transfer, the SEC staff could not conclude that the

banks were not a group, because their relationship with each other extended beyond the mere purchase of the warrants:

> The loan agreement and its subsequent amendments require joint action by the Banks with respect to certain types of transactions which may be proposed by the Issuer. Such joint action by the Banks may encompass matters which have a fundamental impact on MCI's corporate operations, such as its ability to invest, incur additional debt, modify pension plans and many other matters that go well beyond the ministerial matters contemplated by Rule 13d-5(b)(2) and which are probative of the existence of a group.

> Moreover, the continuing and common interest which the banks have as creditors in ensuring that their loans are repaid provides a significant incentive for a concerted disposition of the warrants, which represent the right to purchase in excess of 31% of MCI common stock now outstanding, to a new control group which could promise a greater likelihood of repayment of the loans. This potential for a rapid shift in control is, of course, precisely the type of disclosure at which Section 13(d) is aimed. This unity of interest suggests that the joint status which the Banks enjoy as lenders and security holders is not capable of separation for the purpose of finding that a group does not exist.

Id.

Applying these standards, the facts demonstrate that the Group has acted collectively to acquire the new Class A stock, to hold the stock, and to exercise its voting power by appointing directors, and will continue to act collectively to manage the reorganized CCI through its control of the new Board for at least a year. A change of control therefore will occur on the Effective Date.

The Group here, like the lending banks to MCI, has "a continuing and common interest," which it has acted to promote on behalf of its members. Apollo, Oaktree, Franklin and Crestview dominated the Crossover Committee, viewed themselves as acting in partnership in

taking control of the Debtors, and have acted collectively in other restructurings.[6]   They were

instrumental in choosing the legal and financial professionals the Crossover Committee

retained.[7]   The members of the Group executed identical lock up restructuring agreements to

effectuate their common purpose of obtaining confirmation of the Plan on the terms they agreed

to, on their timetable.   JPMX 198-206; Tr. 7/23/09 (Villaluz) 94:15-22, 119:12-121:12; Tr.

7/29/09 (Liang) 207:23-209:9.[8]   The Group also approved management for the reorganized

debtors, and negotiated and approved their post-confirmation executive compensation

arrangements.  JPMX 218 at 14-15, 234 at 44-46; WTCX 4, 6 at 4;  see Tr. 7/21/09 (Smit) 235:7-

9;  Tr.  7/23/09  (Villaluz)  47:15-48:17;  Tr.  7/22/09  (Smit)  65:8-25;  Amended  Disclosure

Statement at 22.  Members of the Group had numerous internal discussions on the subject of who

would serve on the reorganized CCI Board, and discussed in contemporaneous internal

communications the number of board seats they would be able to control.  Tr. 7/29/09 (Marcus)

43:5-45:10; JPMX 169, 170, 193 at 12, 235 at 3-4, 239; WTCX 5.  They also agreed to appoint

_____

[6] See JPMX 108, 110, 117, 119, 144, 151, 153, 157, 166, 193 at 2, 196, 234 at 54, 237, 253, 308, 309, 323, 334, 339, 341; LDTX 401; Tr. 7/21/09 (Millstein) 117:1-7; Tr. 7/28/09 (Zinterhofer) 123:19-25, 136:4-16, 137:1-142:16, 143:14-144:2, 166:2-168:12, 171:22-173:10; Tr. 7/29/02 (Marcus) 48:2-13; Tr. 7/29/09 (Liang) 194:1-195:3, 202:9-203:16.

[7] See Schaffer v. CC Invs., LDC, No. 99 Civ. 2821 (VM), 2002 WL 31869391, at *6-7 (S.D.N.Y. Dec. 20, 2002), in which the court denied a motion to dismiss a complaint alleging violations of Sections 13(d) and 16(b) of the Exchange Act, which motion was predicated on the absence of a group, when there was evidence that the investors relied on a single law firm to draft various agreements between the issuer and the investors, and where "[c]ommunications, copies and updates reflecting the preferences of various parties during the course of the negotiations were incorporated and distributed by" the law firm.  Id. at *5.  An "extensive pattern of reliance on the common legal services" was a legitimate basis for a trier of fact to conclude that the investors had an agreement with respect to the acquisition, holding and subsequent disposition of shares; indeed, "the circulation of drafts and related documents among the various investors itself constitutes a basis from which a jury could draw a fair inference of agreement." Id. at *7 (citing Gen. Aircraft Corp. v. Lampert, 556 F.2d 90, 95 (1st Cir. 1977)).

[8] Lock up agreements among the investors — like the restructuring agreements here — are evidence that investors are acting as a group for a common purpose.  See Schaffer, 2002 WL 31869391, at *8 (citing Morales, 249 F.3d at 126-27).

Mr. Marcus of Crestview to the Board, likely as Chairman.  <u>See</u> JPMX 169, 170, 193, 234; Tr. 7/29/09 (Marcus) 125:8-126:10, 149:6-18.[9]

Thus, any shares beneficially owned by one member of the Group must be deemed to be "beneficially owned" by all members of the Group.

Any suggestion that the Group will suddenly dissolve upon the Effective Date would be frivolous.  As one would expect in connection with an investment in excess of $1 billion, the Group has taken great care to ensure that the reorganized CCI will be run in a manner that is acceptable to it — including by approving management, negotiating management's executive compensation agreements, appointing a controlling block of the new Board, and, critically, ensuring that the new Board will govern without a shareholders' meeting for at least the first twelve months after the Plan is consummated.  As Eric Zinterhofer of Apollo wrote:  "I expect we [Apollo] will control about 1/4 of the equity, and with Oaktree, Crestview and Franklin, will control about 40% of the vote . . . .  In terms of influence, it is already clear in mgmt's mind that Apollo is the lead here.  Also, Paul's main designee on the board, Lance Conn, understands the dynamic very well."  JPMX 237.  Indisputably, the dynamic going forward, which all of the key players including management and Paul Allen understand, is that the Group, led by Apollo, will be in control of Charter post-confirmation and will be calling the shots.

## B. Pursuant to the Plan, the Group Would Appoint at Least an Equal Number of Directors as Paul Allen.

If the Plan is confirmed, the Group will have the effective power under the Plan and CCI's proposed Amended and Restated Certificate of Incorporation to appoint 5 of the 11

---

[9] <u>See</u> <u>SEC v. Savoy Indus., Inc.</u>, 587 F.2d 1149, 1166 (D.C. Cir. 1978) (participation in discussions on subject of who would become member of board of directors suggests group status).

initial members of CCI's Board of Directors, who will serve for at least 12 months after consummation: Apollo has appointed two directors, Oaktree has appointed one, Franklin will soon appoint one, plus together the Group agreed to give Neil Smit the fifth of their Class A Board seats.[10] For his part, Paul Allen was given four board seats, but under the change of control provisions he must have greater voting power than any "group" to avoid triggering the provisions. Thus, even if Neil Smit or Franklin's appointee, for example, were found not to be part of the Group's Board faction, the change of control provisions still would be triggered.

The change of control provisions are triggered by a "person," as such term is used in Section 13(d)(3) of the Exchange Act, becoming the "Beneficial Owner" of more than 35 percent of the "Voting Stock," "measured by voting power rather than the number of shares," so long as Paul Allen does not own a greater percentage. See Second Lien Indentures, Art. 1, def. of "Change of Control," clause (3).[11] "'Voting Stock' of any person as of any date means the Capital Stock of such Person that is *at the time entitled to vote* in the election of the board of directors or comparable governing body of such Person." Second Lien Indentures Art. I, def. of

---

[10] Under the initial plan, after Paul Allen's four appointees and the Group's appointees, all remaining board seats were to be filled by majority vote of the Class A shareholders. CX 226. The Group held a majority of the Class A shares, Amended Disclosure Statement at 57; Tr. 7/22/09 (Smit) 62:12-63:5; Tr. 7/23/09 (Villaluz) 129:17-20; Tr. 8/24/09 (Goldstein) 61:8-22, 64:24-69:12, and therefore would fill those seats. In an early change to the plan, the Group agreed to give one of the seven Class A board seats to Neil Smit, thereby making him effectively the Group's appointee. Amended Disclosure Statement at 56; Tr. 7/22/09 (Smit) 60:3-10; Tr. 7/23/09 (Villaluz) 129:21-130:12; Tr. 7/28/09 (Zinterhofer) 177:10-13.

[11] "Change of Control" is defined in the Second Lien Indentures to include, among other things:

> the consummation of any transaction, including any merger or consolidation, the result of which is that any "person" (as defined above) other than Paul G. Allen or any of the Related Parties becomes the Beneficial Owner, directly or indirectly, of more than 35% of the Voting Stock of the Company or a Parent, measured by voting power rather than the number of shares, unless Paul G. Allen or a Related Party Beneficially Owns, directly or indirectly, a greater percentage of Voting Stock of the company or such Parent, as the case may be, measured by voting power rather than the number of shares, than such person;

"Voting Stock" (emphasis added). Because the Group's holdings of Voting Stock will enable it effectively to designate more CCI directors than Paul Allen, or worst case an equal number of directors, then for all practical purposes the Group will have more Voting Stock than Paul Allen, or at least an equal amount. In any event, Paul Allen will not have more Voting Stock than the Group.

The quoted language of the change of control provisions evidences a clear purpose to measure shifts in "voting power," and thus control, based upon the power of stockholders to designate directors. If, as the Plan here will cause, a "person" acquires Voting Stock giving that "person" the effective power to designate an equal or greater number of CCI directors than Paul Allen, the purpose of the change of control provisions can be served only by honoring the right of the holders to put their Secured Debt back to the issuers.

Any narrower reading of "voting power" would favor form over substance. Courts, however, have emphatically stressed substance over form in construing indenture covenants, and have rejected "literalist" interpretations of indenture covenants if they are at odds with the "underlying purpose to be served." Sharon Steel Corp. v. Chase Manhattan Bank, N.A., 691 F.2d 1039, 1049 (2d Cir. 1982); see also In re Associated Gas & Elec. Co., 61 F. Supp. 11, 28-29 (S.D.N.Y. 1944) (unsecured subsidiary debt found to constitute in effect a "mortgage or pledge" for purposes of parent company's negative pledge covenant), aff'd, 149 F.2d 996, 1004 (2d Cir. 1944). As stated by the New York Appellate Division, First Department,

> Contracts are not to be interpreted by giving a strict and rigid meaning to general words or expressions without regard to the surrounding circumstances or the apparent purpose which the parties sought to accomplish. The court should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed. Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention

> of the parties as manifested thereby. Form should not prevail over substance and a sensible meaning of words should be sought.

In re Estate of Stravinsky, 4 App. Div. 3d 75, 81, 770 N.Y.S.2d 40, 45 (1st Dep't 2003) (internal citations omitted) (quoting William C. Atwater & Co. v. Panama R.R., 246 N.Y. 519 (1927)).

This reading of "voting power" is reinforced by the change of control provisions' incorporation of definitions from the Exchange Act and the rules thereunder, as well as by court decisions and SEC pronouncements interpreting those definitions. The definition of "Beneficial Owner" in the Second Lien Indentures expressly incorporates the definition in Rules 13d-3 and 13d-5 under the Exchange Act. Rule 13d-3 provides that "a beneficial owner of a security includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares (1) Voting power which includes the power to vote, or to direct the voting of, such security …."

The provisions of Section 13(d) and the rules thereunder have been interpreted broadly to achieve their intended purpose. The Williams Act, which includes Section 13(d) of the Exchange Act, "is aimed at those who seek control of shares in order to effectuate changes in a corporation." Calvary Holdings, Inc. v. Chandler, 948 F.2d 59, 63 (1st Cir. 1991). Section 13(d) and the related rules are aimed at "'every large, rapid aggregation or accumulation of securities, regardless of technique employed, which might represent a potential shift in corporate control.'" CSX Corp., 562 F. Supp. 2d at 538. See also id., 562 F. Supp. 2d at 540 (Rule 13d should be broadly interpreted "so as to ensure disclosure 'from all those persons who have the ability to change or influence control'") (citing SEC Exch. Act Rel. Nos. 14692 (Apr. 28, 1978), 18114 (Oct. 1, 1981)). Cf. Calvary Holdings, 948 F.2d at 63-64 (the definition of "beneficial owner" focuses on the power to vote, the ability to direct a vote and the power to dispose of stock); SEC v. First City Fin. Corp., 688 F. Supp. 705, 721-22 (D.D.C. 1988), aff'd, 890 F.2d

1215 (D.C. Cir. 1989) ("concept of beneficial ownership focuses on any relationship that *as a factual matter* confers on a person a significant ability to determine how voting power or investment power will be exercised") (emphasis in original).

Thus, under principles of indenture interpretation, as well as under the rules and interpretations applicable to Section 13(d), *de facto* power to designate more than 35 percent of the board members constitutes beneficial ownership of more than 35 percent of the voting power, whether or not this power is achieved through a formal written voting mechanism.

C.    **Pursuant to the Plan, the Group Would Appoint a Majority of the Directors at the First Shareholder Meeting.**

Within 31 days after the Effective Date the Group will have appointed 5 of Charter's initial directors, but at Charter's first shareholder meeting the Group will elect 7 of Charter's 11 directors ⎯ an outright majority. Amended Disclosure Statement at 57; Tr. 7/22/09 (Smit) 62:12-63:5; Tr. 8/24/09 (Goldstein) 64:24-69:12. The Group holds an overwhelming majority of the Class A shares, Tr. 7/23/09 (Villaluz) 121:4-12; Tr. 7/28/09 (Zinterhofer) 173:17-175:4; Tr. 7/29/09 (Liang) 201:19-22, and therefore will be able to elect all 7 Class A directors (all directors on the Board except for the 4 Allen Class B directors). Indeed, together Apollo and Oaktree hold approximately 50 percent of the Class A shares, and therefore likely will be able themselves to elect 7 of Charter's 11 directors, particularly after they exercise their warrants. Goldstein Decl. Ex. D.[12]  Even if the Debtor were found to have avoided a change of control

---

[12] As noted above, Apollo agreed to "give Oaktree joint control with us on Charter," and Apollo and Oaktree agreed to be "joined at the hip" in respect of their decision making on Charter post-reorganization. JPMX 176; see also JPMX 180, 181.

upon consummation, a prospective change of control is undeniable as of the time of the first shareholder meeting.

**D.** **Post-Confirmation, the Group Would Have a 49.8 Percent Voting Interest On an Undiluted Basis, While Paul Allen Would Have a 35.1 Percent Interest on an Undiluted Basis.**

The change of control provisions in the First Lien Credit Agreement specifically require measurement of voting strength on a fully diluted basis. JPMX 2. By contrast, the Second Lien Indentures and the Third Lien Credit Agreement require measurement based on Beneficial Ownership of Voting Stock. Voting Stock, under these documents, is stock that currently can be voted at an election of the board of directors. WTCX 1, 2; WFX 1 (definition of "Voting Stock"). Thus, Voting Stock does not include the warrants issued to Paul Allen because the shares that would be issued to Paul Allen in the event he were to exercise the warrants have not been issued yet, or in any event are held by Charter, and therefore cannot be voted currently at an election of the board of directors.

As a result, the correct comparative measurement of voting strength for purposes of the change of control provisions in the Second Lien Indentures and the Third Lien Credit Agreement is the undiluted voting strength of the relevant parties. Using this measure, the Group upon consummation would have beneficial ownership of 49.8 percent of the Voting Stock while Paul Allen would have beneficial ownership of 35.1 percent of the Voting Stock. Goldstein Decl. Ex. D.

The Debtor, and its advisor Lazard to date have completely ignored the Voting Stock definitions in the Second Lien Indentures and the Third Lien Credit Agreement, focusing instead solely on the Beneficial Ownership language. See, e.g., Goldstein Decl. ¶ 39:

> Based on discussions with the Debtors' counsel, I understand that the Second Lien Indentures, the Third Lien Credit Agreement and the Indenture for the unsecured Notes at CCOH have a change of control test

that is based on "beneficial ownership," defining "beneficial ownership" substantially consistent with Rule 13d-3 and Rule 13d-5 under the Exchange Act. We have also calculated the voting percentages of the Debtors pro forma for the transaction on a beneficial ownership basis.

But the Voting Stock definition is critical, and cannot be ignored or read out of the Second Lien Indentures and Third Lien Credit Agreement. Indeed, consistent with well known canons of construction, the change of control provisions must be read so as to give meaning to all of the terms recited there. See In re Metromedia Fiber Network, Inc., 335 B.R. 41, 52 (Bankr. S.D.N.Y. 2005) ("Basic principles of contract interpretation dictate the preference for an interpretation that gives effect and meaning to all terms of an agreement over an interpretation that does not.") (citing 11 Richard A. Lord, Williston on Contracts § 32:9 (4th ed. updated July 2003)); Restatement (Second) of Contracts § 203(a) (1981) (updated August 2003) ("[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect."); see also Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (U.K.) Ltd., 230 F.3d 549, 558 (2d Cir. 2000) ("[A]n interpretation that gives reasonable and effective meaning to all terms of a contract is preferable to one that leaves a portion of the writing useless or inexplicable.").

Read in tandem, the Beneficial Ownership and Voting Stock terms are plainly intended to pick up structures by which stock is owned indirectly or beneficially, but only when the stock itself can be voted currently in an election of the board of directors. It is not meant to pick up stock that currently is not yet issued, might never be issued, and therefore cannot be voted currently.

**E. Post-Confirmation, the Subgroup Would Have a 38.6 Percent Voting Interest On an Undiluted Basis, While Paul Allen Would Have a 35.1 Percent Interest on an Undiluted Basis.**

Even without Franklin, on an undiluted basis measured as required under the Second Lien Indentures and Third Lien Credit Agreement, the Subgroup comprised of Apollo, Oaktree and Crestview would have a greater percentage of Voting Stock than Paul Allen: 38.6 percent for the Subgroup and 35.1 percent for Paul Allen. Goldstein Decl. Ex. D.

The Debtor took exceeding care to ensure that the Subgroup had less voting power than Paul Allen on a fully diluted basis, recognizing that the evidence was strong that the Subgroup at a minimum was a group, even if Franklin's participation was easier to defend. But the Debtor failed to comprehend, until trial, that an undiluted measurement was required under the Second Lien Indentures and the Third Lien Credit Agreement. Under the measures required by the change of control provisions in those documents, even the Subgroup, on its own, has more Voting Stock than Paul Allen. These change of control provisions would be tripped even if Franklin is not in the group.

**F. Even Counting Warrants and Other Rights, the Subgroup Would Have Beneficial Ownership of 39.0 Percent of the Voting Power While Paul Allen Would Have Only 38.6 Percent.**

The Debtor and Lazard have argued that Paul Allen will "beneficially own" a higher voting percentage than the Subgroup under SEC standards, but have crucially distorted their purported SEC-based calculations by crediting Paul Allen's Class B stock with over 36 percent of Charter's voting power instead of the fixed 35 percent which the Class B stock will always have. See Goldstein Decl. ¶¶ 39-42. The Debtor's and Lazard's distorted calculations show Paul Allen holding a voting percentage of 39.8 percent and the Subgroup holding only 37.6 percent. Once this mistake is corrected, however, even the Debtor/Lazard approach would show the Subgroup holding more than Paul Allen — 39.0 percent to 38.6 percent.

The problem with the Lazard calculations is that Lazard has assigned the Class B shares a <u>fully diluted</u> "voting power" equal to 66,120,600 Class A shares, and has then improperly used this number in its <u>non-fully diluted</u> Second Lien and Third Lien calculations. Lazard acknowledges that this number represents "the number of votes represented by Mr. Allen's Class B shares on a fully diluted basis," used for the purposes of calculations under the First Lien Credit Agreement. In those fully diluted First Lien calculations, Lazard applies a denominator equal to an equivalent total of 188,915,999 shares, so that 66,120,600 shares would indeed constitute 35 percent. Goldstein Decl. ¶ 36.

In Lazard's purported "beneficial ownership" calculation for Paul Allen, however, Lazard continues to assign the same fully diluted 66,120,600 number to the Class B shares even though Lazard's denominator has been reduced to 182,177,005 (72,571,021 plus 109,605,984) — thus giving the Class B stock credit for 36.3 percent of the total vote, which of course is more than it will ever have under the Amended Certificate of Incorporation, which fixes the Class B voting stock at 35 percent regardless of how many Class A shares are outstanding. <u>See</u> Goldstein Decl. ¶ 40; JPMX 352, Ex. 3 (Amended Certificate of Incorporation) Art. FOURTH (b)(i)(A)(2).

The distortion becomes even more pronounced in Lazard's purported "beneficial ownership" calculation for the Subgroup. There Lazard's denominator has been reduced even further, to 177,233,870 (66,620,689 plus 110,613,181). Lazard's continued use of the fully diluted 66,120,600 number for Paul Allen's Class B shares in this calculation (in addition to Mr. Allen's 249,610 initial Class A shares) gives the Class B stock credit for 37.3 percent of the total vote — substantially higher than Class B's real fixed 35 percent of the vote. <u>See</u> Goldstein Decl. ¶ 41.

Correcting this error in the Paul Allen "beneficial ownership" calculation, Goldstein Decl. ¶ 40, would require using a voting power equivalent of 62,491,910 shares for the Class B stock, representing 35 percent of a denominator equal to 178,548,315 (62,491,910 plus the 116,056,405 Class A shares counted in Lazard's table). Paul Allen's total would become 68,942,331, for a voting percentage of 38.6 percent of the denominator.

Correcting the same error in the Subgroup "beneficial ownership" calculation, Goldstein Decl. ¶ 41, would require using a voting power equivalent of 59,830,222 shares for the Class B stock, representing 35 percent of a denominator equal to 170,943,492 (59,830,222 plus the 111,113,270 Class A shares counted in Lazard's table). The Subgroup's total would remain 66,620,689, for a voting percentage of 39.0 percent of the denominator.[13]

## II. THERE IS NO EVIDENCE THAT THE SAVINGS CLAUSE WILL BE TRIGGERED OR EFFECTIVE TO AVOID A CHANGE OF CONTROL.

CCI's proposed Amended and Restated Certificate of Incorporation contains a "savings clause," which purports to ratchet down the voting power of any person or group that holds directly or indirectly more than 34.9 percent of the combined voting power of the capital stock of CCI. It provides:

> [T]he votes attributable to each share of Class A Common Stock held by any holder (other than an Authorized Class B Holder, as defined in Clause (b)(viii)(B) of this Article FOURTH) shall be automatically reduced *pro rata* amongst all shares of Class A Common Stock held by such holder and (if applicable) shares of Class A Common Stock held by any other holder (other than an Authorized Class B Holder) included in any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended) with such holder, so that no "person" or "group" (other than an Authorized Class B Holder) is

---

[13] Adding Franklin's 19,003,362 shares to the Subgroup's total would yield a voting percentage of 50.1 percent for the full Group on this basis.

or becomes the holder, directly or indirectly, of more than 34.9% of the combined voting power of the capital stock of the Corporation.

JPMX 352, Ex. 3, Art. FOURTH (b)(i)(A)(1). However, there is no mechanism in the Certificate of Incorporation or elsewhere that would actually effectuate the ratcheting down. Moreover, the savings clause will not prevent the Group and its designees from selecting an equal or greater number of directors than Paul Allen at the outset of the Plan, as described above. Nor will it affect the composition of the Board for the year following effectiveness of the Plan, because there will be no shareholder vote for at least twelve months after the Effective Date:

> Subject to the Amended and Restated Bylaws relating to the filling of vacancies, if any, on the Board of Directors, the members of the Board of Directors as constituted on the Effective Date will continue to serve at least until the first annual meeting of stockholders after the Effective Date, which meeting shall not take place until at least 12 months after the Effective Date.

Plan, Art. VI., para. N. In any event, there is no evidence that the savings clause would, or could, or will be triggered, particularly when the Group, and Paul Allen, and presumably all of their director designees, have and will take the position that the bondholders are not a group.

## III. UPON A CHANGE OF CONTROL, THE SECURED LENDERS MAY REQUIRE CCO AND CCOH TO REPAY THE SECURED DEBT, RENDERING THE PLAN NOT FEASIBLE.

Upon a Change of Control, the Second Lien Noteholders have the right to require CCO to repay all or part of the Second Lien Notes pursuant to a "Change of Control Offer," in which CCO must offer a "Change of Control Payment" in cash equal to 101 percent of the aggregate principal amount of the Second Lien Notes repurchased plus accrued and unpaid interest thereon, if any, on the date of repurchase. Second Lien Indentures § 4.16. Moreover, the change of control will trigger a default under the First Lien Credit Agreement, and will trigger a repayment obligation under the Third Lien Credit Agreement as well. CCO and CCOH

apparently will not have the ability to repay or refinance the Secured Debt upon the Effective Date. The Plan, therefore, is not feasible and cannot be confirmed.

The Debtors appear to contend that a "change of control" is at most a technical default with no bearing on the Secured Lenders' rights to receive their contracted-for interest and principal. See Disclosure Statement at 70. The Debtors have offered only one case, In re Orlando Tennis World Dev., 34 B.R. 558 (Bankr. M.D. Fla. 1983), in support of this contention. In that case, the debtor sought to cure and reinstate a mortgage subject to pre-petition foreclosure proceedings. Wells Fargo, the mortgagee, argued that it was impaired (i) by the debtor's plan to cure and reinstate the mortgage, (ii) through a change in the shareholders of the corporate debtor, and (iii) through a change in the partners of the partnership debtor. The mortgage agreement provided that any change in shareholders required prior written consent. It appeared that the debtor had breached the change of control provisions *before* proposing its plan for confirmation. The court held that the debtors' pre-confirmation breach of the change of control provisions did not prevent reinstatement of Wells Fargo's mortgage under section 1124: "In the absence of any evidence or suggestion that Wells Fargo's security is impaired, we will not hold that what appears to be a technical default equals impairment." 34 B.R. at 561. The court provided no explanation for its reasoning and the case has not subsequently been cited for this proposition.

Orlando Tennis is not relevant here for a number of reasons. First, the facts are completely inapposite. The collateral in Orlando Tennis was real property whose value was presumably unaffected by any change in the equity composition of the entity owning it. Here, the strength of the Secured Lenders' credit — a multi-billion dollar media enterprise operating as a going concern — is largely dependent upon the quality of the Debtors' ownership and management. The Secured Lenders believed that Paul Allen's continued dominance of the

corporate enterprise was necessary to assure that sufficient cash would be generated to service their debt. It is, therefore, of paramount importance to the Secured Lenders in this case to prevent the enterprise from passing into the control of a different ownership/management team without their consent. It is for this precise reason that corporate debt instruments contain change of control provisions similar to those at issue here. See In re Barrington Oaks Gen. P'ship, 15 B.R. 952, 966 (Bankr. D. Utah 1981); see also Bustop Shelters of Louisville, Inc. v. Classic Homes, Inc., 914 F.2d 810, 814 (6th Cir. 1990).

Moreover, the change of control in Orlando Tennis occurred pre-confirmation, and the bank argued that it was an incurable breach that prevented reinstatement of its loan. In this case, in contrast, the change of control will occur immediately upon consummation of the Plan. In addition, the Second Lien Noteholders do not contend that the change of control prevents reinstatement of the Secured Debt — it could not prevent reinstatement because it has not yet occurred. The Second Lien Noteholders contend, instead, that even assuming the Debtors are able to reinstate the Secured Debt, the Plan is not feasible because of the change of control that will occur upon consummation.

The Debtors may mean to suggest that Orlando Tennis requires this Court to give an advisory opinion that once the Plan is confirmed and consummated, the resulting change of control is a mere technical default that the Secured Lenders cannot enforce under the terms of the Secured Lender Agreements. This argument must also fail. If a change of control will occur upon consummation of the Plan, as Wilmington Trust contends, to rule in advance that it is a mere technical default would deny the Secured Lenders the full benefit of the contracts, and would mean that the Debtors had not, in fact, reinstated the Secured Debt.

## Conclusion

For the reasons stated above, the Plan is not feasible. The Court should deny confirmation of the Plan and grant such other relief as justice requires.

Dated: New York, New York
September 18, 2009

COVINGTON & BURLING LLP

By:   /s/ David W. Haller
      Michael B. Hopkins
      David W. Haller
      Susan Power Johnston
      Charles H. Jeanfreau
The New York Times Building
620 Eighth Avenue
New York, New York 10018
phone: (212) 841-1000
fax: (212) 841-1010
email: mhopkins@cov.com
     dhaller@cov.com
     sjohnston@cov.com
     cjeanfreau@cov.com

*Counsel for Wilmington Trust Company, as Indenture Trustee for the Second Lien Indentures*