Michael B. Hopkins
David W. Haller
Susan Power Johnston
Charles H. Jeanfreau
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, New York  10018
phone:  (212) 841-1000
fax:  (212) 841-1010

*Counsel to Wilmington Trust Company*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ——————————————————— ) | | |
| In re: | ) | Chapter 11 |
| | ) | |
| CHARTER COMMUNICATIONS, INC., *et al.*, | ) | Case No. 09-11435 (JMP) |
| | ) | |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ——————————————————— ) | | |
| | ) | |
| JPMORGAN CHASE BANK, N.A. | ) | |
| as Administrative Agent, | ) | |
| | ) | |
| Plaintiff, | ) | Adversary Proceeding |
| | ) | No. 09-01132 (JPM) |
| -against- | ) | |
| | ) | |
| CHARTER COMMUNICATIONS OPERATING, | ) | |
| LLC and CCO HOLDINGS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| ——————————————————— ) | | |

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS**
**OF LAW SUBMITTED BY WILMINGTON TRUST COMPANY,**
**<u>AS INDENTURE TRUSTEE FOR THE SECOND LIEN NOTES</u>**

These proposed findings of fact and conclusions of law are submitted to resolve

the issues litigated at the hearing on confirmation of the Debtors' proposed First Amended Plan

of Reorganization (the "Plan"), by Wilmington Trust Company, as indenture trustee for the holders of (i) the 8% Senior Second Lien Notes due 2012 and the 8.375% Senior Second Lien Notes due 2014 (the "2004 Second Lien Notes"), issued pursuant to an Indenture (the "2004 Second Lien Indenture") by and among Charter Communications Operating, LLC ("CCO") and Charter Communications Operating Capital Corp. ("CCO Capital"), as issuers, and Wilmington Trust, as successor trustee, and (ii) the 10.875% Senior Second Lien Notes due 2014 (the "2008 Second Lien Notes" and, together with the 2004 Second Lien Notes, the "Second Lien Notes," with the holders of the Second Lien Notes being the "Second Lien Noteholders") issued pursuant to an Indenture (the "2008 Second Lien Indenture" and, together with the 2004 Second Lien Indenture, the "Second Lien Indentures") by and among CCO and CCO Capital, as issuers, and Wilmington Trust, as trustee.

The proposed findings of fact set out below are predicated on (a) the testimony of Ann Kurinskas, Paul A. Gompers, Christine Villaluz, Eric Zinterhofer, Jeff Marcus, Kenneth Liang, James Millstein, Neil Smit, Stephen Goldstein, Gregory L. Doody and Lance Conn at the confirmation hearing, both live and through deposition testimony introduced into evidence at the hearing, (b) documents introduced into evidence at the confirmation hearing, and (c) documents filed in the dockets of these proceedings of which the Court may take judicial notice.

## PROPOSED FINDINGS OF FACT

### The First Lien Credit Agreement

1.     CCO is a party to an Amended and Restated Credit Agreement, dated as of March 18, 1999, as amended and restated March 6, 2007 (the "First Lien Credit Agreement," the debt issued thereunder, the "First Lien Debt"), among CCO, as borrower, Charter Communications Operating Holding LLC ("CCOH") as guarantor, the lenders party thereto (the

"First Lien Lenders") and JPMorgan Chase Bank, N.A. as administrative agent ("JMPC"). JPMX 2.

2.      The First Lien Credit Agreement provides that it shall be an event of default if, *inter alia,* a transaction is consummated "the result of which is that any "person" or "group" (as such terms are used in Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), other than the Paul Allen Group has the power, directly or indirectly, to vote or direct the voting of Equity Interests having more than 35% (determined on a fully diluted basis) of the ordinary voting power for the management of the Borrower, unless the Paul Allen Group has the power, directly or indirectly, to vote or direct the voting of Equity Interests having a greater percentage (determined on a fully diluted basis) of the ordinary voting power for the management of the Borrower than such "person" or "group".... JPMX 2, § 8(k)(ii).

3.      JPMC typically requests change of control provisions like those in the First Lien Credit Agreement when a borrower has a financial sponsor, to enable JPMC to renegotiate the terms of the loan if the financial sponsor's role is diminished or terminated.  Tr. 8/25/09 (Kurinskas) 43:14-44:10, 45:5-47:14.[1]

**The Second Lien Indentures**

4.      As of the Petition Date, CCO was indebted to the Second Lien Noteholders in the aggregate amount of not less than $2,397,000,000 in outstanding principal amount, accrued but unpaid interest and accrued but unpaid fees and costs.  JPMX 266 (hereafter, "Amended Disclosure Statement") at 17 n.9.

---

[1] References to "Tr." are to the transcript of the confirmation hearing.  The date and the witnesses' names are also included for ease of reference.

5.    Under the Second Lien Indentures, one type of "Change of Control" occurs when a transaction is consummated the result of which is that "any 'person' (as defined [in section 13(d)(3) of the Exchange Act]), other than Paul G. Allen or any of the Related Parties becomes the Beneficial Owner, directly or indirectly, of more than 35% of the Voting Stock of the Company or a Parent, measured by voting power rather than the number of shares, unless Paul G. Allen or a Related Party Beneficially Owns, directly or indirectly, a greater percentage of Voting Stock of the Company or such Parent, as the case may be, measured by voting power rather than the number of shares, than such person;. . . ."  WTCX 1, 2, Art. 1, def. of "Change of Control," clause (3).

6.    Under the Second Lien Indenture, "Beneficial Owner" "has the meaning assigned to such term in Rule 13d-3 and Rule 13d-5 under the Exchange Act, except that in calculating the beneficial ownership of any particular 'person' (as such term is used in Section 13(d)(3) of the Exchange Act) such 'person' shall be deemed to have beneficial ownership of all securities that such 'person' has the right to acquire, whether such right is currently exercisable or is exercisable only upon the occurrence of a subsequent condition."  WTCX 1, 2, Art. 1, def. of "Beneficial Owner."

7.    The Second Lien Indentures provide that the "Voting Stock" "of any Person as of any date means the Capital Stock of such Person that is at the time entitled to vote in the election of the board of directors or comparable governing body of such Person."  WTCX 1, 2, Art. 1, def. of "Voting Stock."

8.    Upon a Change of Control, the Second Lien Noteholders have the right to require CCO to repay all or part of the Second Lien Notes pursuant to a "Change of Control Offer," in which CCO must offer a "Change of Control Payment" in cash equal to 101% of the

aggregate principal amount of the Second Lien Notes repurchased plus accrued and unpaid interest thereon, if any, on the date of repurchase. WTCX 1, 2 § 4.16.

**Third Lien Credit Agreement**

9.  CCOH is party to a Credit Agreement, dated as of March 6, 2007 (the "Third Lien Credit Agreement" (with the First Lien Credit Agreement and the Second Lien Indentures, the "Secured Lender Agreements"), the debt issued thereunder, the "Third Lien Debt," and together with the First Lien Debt and Second Lien Notes, the "Secured Debt"), by and among CCOH, as borrower, the banks and other financial institutions or entities from time to time parties thereto and Wells Fargo Bank, N.A., as successor administrative agent. WFX 1.

10. The Third Lien Credit Agreement has change of control provisions similar to those of the Second Lien Indentures. WFX 1 at § 6.16.

**Cross Defaults**

11. It is an event of default under the First Lien Credit Agreement if there is any change of control under the Second Lien Indentures or Third Lien Credit Agreement. JPMX 2 § 8(k)(iii).

12. It is an event of default under the Second Lien Indentures and the Third Lien Credit Agreement if there is a default under the First Lien Credit Agreement, including a change of control default, which results in the acceleration of the First Lien Debt. WTCX 1, 2 § 6.01(5); WFX 1 § 8.1(e).

**Paul G. Allen's Mutating Role at Charter**

13. Pre-petition, Mr. Allen was a financial sponsor of Charter who historically demonstrated his willingness to bridge the companies' financial needs during challenging times. JPMX 28; Tr. 8/25/09 (Kurinskas) 43:14-44:10, 45:5-47:14.

14.     Pre-petition, Mr. Allen was a member of the Board of Directors of CCI and was the Chairman of the Board.  JPMX 347 at 3.

15.     Prepetition, Mr. Allen held a 91% voting control interest in CCI. Amended Disclosure Statement at 15.

16.     If the Amended Plan is confirmed, Mr. Allen will hold 2% of the equity value and 35.1% of the undiluted voting power of reorganized CCI.   Amended Disclosure Statement at 27-28; JPMX 193 at 5; Goldstein Decl. Ex. D.

17.     If the Amended Plan is confirmed, Mr. Allen will be the Beneficial Owner of 35.1% of the Voting Stock of CCI, without the exercise of the warrants and other rights granted to him under the Amended Plan.  Goldstein Decl. Ex. D.

18.     If the Amended Plan is confirmed, Mr. Allen will be removed from day-to-day processes and M&A strategy.  JPMX 253; Tr. 7/28/09 (Zinterhofer) 175:5-25; Tr. 9/02/09 (Conn) 125:10-17, 126:9-12.

19.     If the Amended Plan is confirmed, Paul Allen will not serve on the new board, nor will he hold any position with the Debtors post-confirmation.  JPMX 352, Ex. 23.

**The Crossover Committee**

20.     Before commencing their Chapter 11 cases, the Debtors negotiated the terms of a restructuring plan with a bondholder committee (the "Crossover Committee"). Amended Disclosure Statement at 21.

21.     The Crossover Committee holds approximately 73% of the $4 billion 11% Senior Secured Notes due 2015 issued by CCH I, LLC and CCH I Capital Corp. (the "CCH I Notes").  Verified Statement of Paul, Weiss, Rifkind, Wharton & Garrison LLP Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure (the "2019 Statement") [Docket No. 33].

22.     The Crossover Committee holds approximately 52% of the $2.5 billion 10.25% Senior Notes due 2010 and 2013 issued by CCH II, LLC and CCH II Capital Corp. (the "CCH II Notes").  2019 Statement.

## Apollo, Oaktree, Crestview and Franklin Are A Group

23.     Apollo, Oaktree and Crestview share a common investing strategy of purchasing fulcrum securities in a company that they believe to be headed towards a restructuring for the purpose of receiving equity in the reorganized entity — i.e., the "loan to own" or "distressed to own" strategy.  Tr. 8/24/09 (Gompers) 214:15-218:3; JPMX 271 at 18-34; see  JPMX 28 at 3; 317.

24.     Members of Apollo, Oaktree and Crestview knew each other from prior business dealings before the Charter restructuring negotiations commenced.  JPMX 81, 99, 234 at 25, 50, 176, 177, 181; 7/28/09 (Zinterhofer) 125:20-137:10; Tr. 7/29/09 (Marcus) 21:1-12, 25:13-24, 75:25-77:20; Tr. 7/29/09 (Liang) 184:24-185:23.

25.     Apollo, Oaktree, Crestview and Franklin understood when they invested in CCH I securities that those securities could be the fulcrum security in a Charter restructuring.  Tr. 7/28/09 (Zinterhofer) 34:7-18, 102:10-105:3, 109:8-110:15, 153:20-154:1; Tr. 7/23/09 (Villaluz) 93:11-16; Tr. 7/29/09 (Marcus) 30:12-23; 70:5-12; Tr. 7/29/09 (Liang) 173:9-174:9; JPMX 192 at 1, 289 at 4-5.

26.     If the CCH II securities had been the fulcrum securities in a Charter restructuring, Apollo, Oaktree, Crestview and Franklin would have lost their substantial investments in the CCH I securities.  (Marcus) 30:12-23, 70:5-12; Tr. 7/23/09 (Villaluz) 104:22-105:5; Tr. 7/28/09 (Zinterhofer) 153:10-154:1; JPMX 152, 310.

27.     Apollo, Oaktree, Crestview and Franklin dominated the restructuring deliberations, negotiations with other parties and the conduct of the Crossover Committee from the outset of the proposed restructuring.  JPMX 108, 110, 117, 119, 144, 151, 153, 157, 166, 193 at 2, 196, 234 at 54, 237, 253, 308, 309, 323, 334, 339, 341; LDTX 401; Tr. 7/21/09 (Millstein) 117:1-7; see Tr. 7/28/09 (Zinterhofer) 123:19-25, 136:4-16, 137:1-142:16, 143:14-144:2, 166:2-168:12, 171:22-173:10; Tr. 7/29/02 (Marcus) 48:2-13; see Tr. 7/29/09 (Liang) 194:1-195:3, 202:9-203:16.

28.     Apollo, Crestview, Franklin and Oaktree met on two occasions with Neil Smit without any other bondholders, parties or advisors present.  JPMX 222; Tr. 7/23/09 (Villaluz) 36:5-37:20; and see Tr. 7/28/09 (Zinterhofer) 150:23-152:1; Tr. 7/29/09 (Marcus) 87:10-88:6.

29.     Mr. Conn of Vulcan met with Apollo, Crestview, Oaktree and Franklin to negotiate the terms of the Paul Allen Settlement.  Tr. 7/29/09 (Marcus) 86:19-87:9; Tr. 9/2/09 (Conn) 92:17-93:17.

30.     When Mr. Conn of Vulcan met with Apollo, Crestview, Oaktree and Franklin to negotiate the terms of the Paul Allen Settlement no other bondholders or advisors were present.  Tr. 7/29/09 (Marcus) 86:19-87:9; Tr. 9/2/09 (Conn) 92:17-93:17.

31.     During the negotiations leading to the Amended Plan, Apollo, Oaktree and Crestview frequently referred to themselves in contemporaneous internal communications as a group that would be in control of the reorganized Charter:

(a). Mark Rowan of Apollo suggested a partnership with Crestview and or Oaktree to "buy lots of CCH I and be prepared to put in a bunch of new money."  JPMX 139.

(b). Darren Glatt communicated internally that Christine Villaluz of Franklin "understands that Apollo, Oaktree, Fidelity and Franklin will ultimately control this Company."  JPMX 157.

(c). Darren Glatt responded to a question from PriceWaterhouseCoopers as follows: Q. "Will Apollo or the combined bondholders have enough power to control / thus the right to appoint a majority of the new BOD?" A. "yes, Paul Allen will have the right to 35% of the vote, therefore the bondholders will control the other 65% and have the right to nominate directors commensurate with their voting control." JPMX 282.

(d). Crestview's internal credit review memoranda stated: "We view this as an attractive investment opportunity to team up with Apollo and Oaktree to buy a controlling stake in the fourth largest US cable company . . . ." "Together with Apollo and Oaktree, we would control approximately 68% of Charter's equity post-restructuring and have approximately 44% voting control. However, given the change of control provisions in the Company's bank agreements, we would not be able to enter into a shareholders agreement." JPMX 234 at 1, 25; and see JPMX 158 at 9.

(e). Eric Zinterhofer of Apollo wrote: "I expect we [Apollo] will control about 1/4 of the equity, and with Oaktree, Crestview and Franklin, will control about 40% of the vote . . . . In terms of influence, it is already clear in mgmt's mind that Apollo is the lead here. Also, Paul's main designee on the board, Lance Conn, understands the dynamic very well." "Also, I feel good from a relationship standpoint with the various parties." "We usually do share control in these loan to own situations." JPMX 237.

(f). Eric Zinterhofer of Apollo commented, "Ken Liang (from Oaktree) and I are making all the decisions together on the Charter restructuring. We don't have anything in writing, just like we didn't in Spectrasite, but we have known each other a long time." Mr. Zinterhofer then confirmed that "I can give Oaktree joint control with us on Charter." In response to the control proposal between Oaktree and Apollo, Josh Harris of Apollo observed, "getting a partnership dialog going like this with one of the biggest distressed guys around would be a good thing generally." JPMX 176, 181.

(g). Apollo and Oaktree agreed to be "bonded at the hip" in decision making on another transaction, the Aleris transaction, and made that agreement in exchange for the same agreement on Charter; Apollo would "agree to same [joint control] on Charter, which would even apply POST reorg." JPMX 176, 177, 180, 181.

(h). Oaktree advised its funds on February 3, 2009, that "we are working closely and smoothly with a large group of like-minded holders and have developed a well-defined strategy to achieve all that we would have achieved a year from now." JPMX 159. See also JPMX 144, 159; Tr. 7/29/09 (Liang) 204:1-205:9; and see Tr. 7/29/09 (Marcus) 71:13-72:7.

(i). The bondholder representatives frequently referred to each other as "partners", and expressed their commitment to partnering together on Charter post-reorganization. See, e.g., JPMX 244 (Apollo expresses to Crestview, and vice versa, that it "look[s] forward to being your partner on this one."), 191.

32.    The bondholders took pains to avoid records of their agreement to acquire control of Charter through the restructuring and the rights offering:

(a). When Mr. Harris asked Mr. Zinterhofer for the third time about specifics about Charter, Zinterhofer explained that he had not put "these nums" in an email because they were in flux and because they were "something I would not want an email trail on." JPMX 181.

(b). Crestview removed references to the bondholders' joint control from the final version of the internal credit review memoranda. Compare JPMX 234 at 4, 5, 8, 10, 12 with JPMX 243 at 4, 5, 8, 10, 12, and JPMX 193 at 1, 25, 49, 50 with JPMX 243 at 1, 25, 49, 50. See also Tr. 07/29/09 (Marcus) 157:7-22 and CX 374.

(c). Other memoranda were addressed to counsel in the apparent hope that the attorney client privilege would shield the communication. JPMX 154; Tr. 7/28/09 (Zinterhofer) 145:8-18. See also Tr. 7/28/09 (Zinterhofer) 234:7-21.

(d). Oaktree did not generate file memoranda describing its investment strategies for Charter. Tr. 7/29/09 (Liang) 217:7-15.

33.    Franklin took an active role in the Charter restructuring negotiations to protect its investment, which was in excess of $2 billion, from a free fall bankruptcy. Tr. 7/23/09 (Villaluz) 66:20-67:20, 79:3-11, 80:27-81:8, 89:9-16. See also Tr. 7/23/09 (Villaluz) 92:18-93:10, 100:13-23.

34.    Franklin reduced its original commitment to the rights offering by approximately $70 million, and Apollo subscribed to that additional amount. Tr. 8/23/09 (Villaluz) 48:18-49:24.

35.    In June 2009 Franklin transferred to Apollo rights exercisable into 6,849,756 shares of New Class A Stock at an exercise price of $0.29198123, for an aggregate cash price of $2,000,000. JPMX 283; WTCX 13-15.

36.    Following Apollo's assumption of $70 million of Franklin's original rights offering commitment and Franklin's transfer to Apollo of its rights exerciseable into the

6,849,756 shares, Franklin retained enough rights to receive 11.2% of the voting power in reorganized CCI on an undiluted basis. Goldstein Decl. Ex. D.

37.    Following Apollo's assumption of $70 million of Franklin's original rights offering commitment and Franklin's transfer to Apollo of its rights exerciseable into the 6,849,756 shares, Apollo held rights sufficient to secure to it 20.5% of the voting power in reorganized CCI on an undiluted basis. Goldstein Decl. Ex. D.

**The Restructuring Agreements**

38.    Apollo, Crestview, Franklin and Oaktree entered into identical Restructuring Agreements pursuant to which each of them agreed to support and vote in favor of a financial restructuring of the Debtors on terms consistent with the Plan, not to support any other plan and which entitled any member to withdraw if any other bondholder signing a Restructuring Agreement breached that agreement. JPMX 198-206; Tr. 7/23/09 (Villaluz) 94:15-22, 119:12-121:12; Tr. 7/29/09 (Liang) 207:23-209:9.

39.    Agreement by holders of a majority in face amount of CCH I notes was required to give direction to UBS and Houlihan Lokey, the advisors to the Crossover Committee. 7/29/09 (Liang) 200:7-25; JPMX 100-101.

40.    Apollo, Oaktree and Crestview pledged to backstop the rights offering by purchasing any shares declined by other CCH I noteholders. Amended Disclosure Statement at 25-26; JPMX 235 at 17.

41.    As the Equity Backstop Parties, Apollo, Oaktree and Crestview obtained a right of first refusal for any rights that any CCI I Noteholder wished to transfer before the conclusion of the rights offering. JPMX 187, 193 at 3, 234 at 23, 25; Tr. 7/23/09 (Villaluz) 122:20-123:17.

42.     The Term Sheet provides that the plan must be acceptable to members of the Crossover Committee who hold a majority of the face amount of CCH I bonds held by all Crossover Committee members, defined as the "Requisite Holders." Tr. 7/23/09 (Villaluz) 120:14-121:1; Tr. 7/28/09 (Zinterhofer) 193:17-195:24; JPMX 218.

43.     Apollo, Oaktree, Crestview and Franklin hold a majority in principal amount of CCH I notes held by the Crossover Committee. Tr. 7/23/09 (Villaluz) 121:4-12; Tr. 7/28/09 (Zinterhofer) 173:17-174:21; Tr. 7/29/09 (Liang) 201:19-22.

44.     Apollo, Oaktree, Crestview and Franklin constitute the Requisite Holders whose consent to changes in the Term Sheet and Plan was required. JPMX 218.

**The Group Confirms Management and Its Compensation**

45.     Apollo, Crestview, Franklin and Oaktree agreed on the management of the reorganized Debtors and negotiated with management its Value Creation Plan. JPMX 218 at 14-15; 234 at 44-46; WTCX 4, 6 at 4; see Tr. 7/21/09 (Smit) 235:7-9; Tr. 7/23/09 (Villaluz) 47:15-48:17; Tr. 7/22/09 (Smit) 65:8-25; Amended Disclosure Statement at 22.

**The Group Shares a Common Exit Strategy**

46.     Apollo, Oaktree, Crestview and Franklin share a common exit strategy for their respective investments in Charter. JPMX 157, 234 at 46-50, 235 at 20-23; Tr. 8/23/09 (Villaluz) 142:23-143:5; Tr. 7/29/09 (Marcus) 79:23-81:6; Tr. 7/29/09 (Liang) 184:6-13; Tr. 8/24/09 (Gompers) 206:21-207:14.

**Appointment of Directors**

47.     The Amended Plan provides that each projected holder of 10% of the voting power of reorganized CCI attributable to the new Class A stock will have the right to

appoint one director for each 10% of the voting power so held.  JPMX 265 (hereafter, "Amended Plan"), Article VI. para. N.

48.    If the Amended Plan is confirmed, reorganized CCI will have eleven directors.  Amended Plan, Art. VI., para. N.

49.    If the Amended Plan is confirmed, Paul Allen will appoint four directors, who have been identified as W. Lance Conn, Bill McGrath, Christopher Temple and John D. Markley.  JPMX 352 Exs. 3, 23.

50.    If the Amended Plan is confirmed, Apollo will appoint two directors, who have been identified as Eric Zinterhofer and Darren Glatt.  JPMX 352 Exs. 3, 23.

51.    If the Amended Plan is confirmed, Oaktree will appoint one director, who has been identified as Bruce Karsh.  JPMX 352 Exs. 3, 23.

52.    If the Amended Plan is confirmed, Franklin will appoint one director, who has not yet been identified.  JPMX 352 Exs. 3, 23.

**The Group Consents to Neil Smit's Board Seat**

53.    If the Amended Plan is confirmed, Neil Smit, the President and CEO of reorganized CCI, will be a director.  Amended Disclosure Statement at 57; Tr. 7/22/09 (Smit) 60:3-10; JPMX 352 Ex. 3.

54.    The original Plan and Disclosure Statement did not identify Neil Smit as a member of the Board of Directors of the reorganized Charter.  CX 709 at 49; CX 707 at 54.

55.    Under the original Plan, after Paul Allen's four appointees and the Group's appointees, remaining board seats were to be filled by majority vote of the Class A shareholders.  CX 709 at 49; CX 707 at 54.  The Group was to receive a majority of the Class A

shares, Goldstein Decl. Ex. D; Tr. 7/22/09 (Smit) 63:2-4. Therefore, either by initial appointment or subsequent vote, the Group would fill all seven Class A board seats.

56. The Amended Disclosure Statement, dated May 7, 2009, stated for the first time that Neil Smit would receive one of the original Class A Board seats. Amended Disclosure Statement at 57.

57. As the Requisite Holders of a majority in principal amount of the CCH I Notes held by the members of the Crossover Committee, Apollo, Crestview, Franklin and Oaktree agreed to the change in the Amended Plan that named Neil Smit as a member of the Board of reorganized CCI. Tr. 7/22/09 (Smit) 60:3-10.; Tr. 7/23/09 (Villaluz) 129:21-130:12; Tr. 7/28/09 (Zinterhofer) 177:10-13.

**Filling Vacancies in the Board as of the Effective Date**

58. If the Amended Plan is confirmed, there will be three vacancies in the board of directors upon the Effective Date. JPMX 352 Ex. 23.

59. If the Amended Plan is confirmed, Franklin will have 31 days from the Effective Date to appoint a director. JPMX 352 Ex. 23.

60. Under the Term Sheet negotiated between Charter and the bondholder group in advance of the restructuring, "[a]ll other members of the board of directors shall be elected by holders of the majority of shares of new Class A stock then outstanding." WTCX 9; CX 226 at 14.

61. On July 17, 2009, the Plan was amended to provide that any vacancies on the Board as of the 31st day after the Effective Date would be elected by all of the directors, not just the Class A directors. JPMX 357.

62.     As the Requisite Holders of a majority in principal amount of the CCH I Notes held by the members of the Crossover Committee, Apollo, Crestview, Franklin and Oaktree agreed to the change in the Amended Plan pursuant to which all directors, not just Class A directors, will elect the directors not yet named as of the Effective Date.  Tr. 7/23/09 (Villaluz) 134:22-137:14; Tr. 7/29/09 (Marcus) 150:23-153:4.

**Mr. Marcus's Board Seat**

63.     Apollo and Oaktree have agreed with Crestview to put Mr. Marcus on the board even if Crestview did not obtain 10% of the voting power of the reorganized Charter. JPMX 169, 170, 193, 234; and see Tr. 7/29/09 (Marcus) 149:6-15.

**The First Shareholders' Meeting**

64.     Subject to the Amended and Restated Bylaws relating to the filling of vacancies, if any, on the Board of Directors, the members of the Board of Directors as constituted on the Effective Date will continue to serve at least until the first annual meeting of stockholders after the Effective Date, which meeting shall not take place until at least 12 months after the Effective Date.  Amended Plan, Art. VI., para. N.

65.     At the first meeting of shareholders, the Class A shareholders have voting power to elect 7 of the 11 directors.  Tr. 7/22/09 (Smit) 57: 21-58:12.

66.     If the Amended Plan is confirmed, as majority holders of the new Class A stock, Apollo, Oaktree, Crestview and Franklin will have sufficient voting power to elect seven of the eleven directors at the first shareholders meeting.  Amended Disclosure Statement at 57; Tr. 7/22/09 (Smit) 62:12-63:5; Tr. 7/23/09 (Villaluz) 129:17-20; Tr. 8/24/09 (Goldstein) 61:8-22, 64:24-69:12.

**Change of Control**

67.     If the Amended Plan is confirmed, Apollo, Oaktree, Franklin and Crestview will hold in the aggregate a majority of the equity and of the voting power of reorganized CCI's Class A common stock.  CX Declaration 6 (hereafter "Goldstein Decl."), Ex. D; Tr. 7/22/09 (Smit) 63:2-5.

68.     Apollo, Oaktree, Crestview and Franklin rejected Paul Allen's request to appoint a majority of the board because the bondholders would be the majority owners of the reorganized Charter, and the owners of a company get to nominate the board.  Tr. 7/29/09 (Liang) 211:8-214:11.

69.     Apollo, Oaktree, Crestview and Franklin rejected Paul Allen's request for veto rights over major corporate transactions.  Tr. 7/29/09 (Liang) 210:16-211:7.

70.     Charter, Apollo, Oaktree, Crestview and Franklin negotiated with Paul Allen's representatives to achieve  for Allen a 35% voting stake in the reorganized Charter to attempt to avoid the change of control provisions in the Secured Loan Agreements.  See Tr. 7/23/09 (Villaluz) 31:20-32:10; Tr. 8/17/09 (Doody) 33:23-34:3, 34:22-24, 44:13-24; Tr. 9/2/09 (Conn) 145:19-146:7.

71.     Charter, Apollo, Oaktree, Crestview and Franklin do not want Paul Allen to have managerial control of the reorganized Charter, because that is in the purview of the board and the shareholders with a majority interest  See Tr. 07/29/09 (Liang) 210:18-212:17.

72.     Paul Allen agreed to retain a nominal economic interest and a 35% voting power in Charter in exchange for consideration in the approximate value of $180 million.  Tr. 9/2/09 (Conn) 175-77.

73.     If the Amended Plan is confirmed, Apollo, Oaktree, Crestview and Franklin will collectively hold 67.5% of the common equity in reorganized CCI.  Goldstein Decl. Ex. D.

74.     If the Amended Plan is confirmed, Apollo, Oaktree and Crestview will collectively hold 52.3% of the total common equity in reorganized CCI.  Goldstein Decl. Ex. D.

75.     If the Amended Plan is confirmed, Apollo, Oaktree, Crestview and Franklin will collectively Beneficially Own 49.8% of the Voting Stock of reorganized CCI.  Goldstein Decl. Ex. D.

76.     If the Amended Plan is confirmed, Apollo, Oaktree and Crestview will collectively Beneficially Own 38.6% of the Voting Stock of reorganized CCI.  Goldstein Decl. Ex. D.

77.     If the Amended Plan is confirmed, Paul Allen will Beneficially Own 35.1% of the Voting Stock of reorganized CCI.  Goldstein Decl. Ex. D.

78.     The Class B shares, as a class, are assigned by the Amended Certificate of Incorporation a fixed 35% of the combined voting power of all reorganized CCI capital stock, so Paul Allen's Class B shares will never constitute more than 35% of the total Voting Stock measured by voting power.   JPMX 352, Ex. 3 (Amended Certificate of Incorporation) Art. FOURTH (b)(i)(A)(2).

79.     Even using the Debtor's warrant-counting methodology, but correcting Lazard's calculations to avoiding crediting the Class B shares with more than 35% of the voting power, Apollo, Oaktree and Crestview will collectively beneficially own 39.0% of the voting power of reorganized CCI.  See Goldstein Decl. ¶ 41.

80.     Even using the Debtor's warrant-counting methodology, but correcting Lazard's calculations to avoiding crediting the Class B shares with more than 35% of the voting power, Paul Allen will beneficially own only 38.6% of the voting power of reorganized CCI. <u>See</u> Goldstein Decl. ¶ 40.

<u><strong>PROPOSED CONCLUSIONS OF LAW</strong></u>

1.     Section 13(d)(3) of the Securities Exchange Act of 1934 (the "Exchange Act") defines "person" to include a "group" acting together for the purpose of acquiring, holding, or disposing of securities.

2.     Under Rule 13d-5(b), promulgated under the Exchange Act, "a beneficial owner of a security includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares (1) Voting power which includes the power to vote, or to direct the voting of, such security. . . ."

3.     Under Rule 13d-5(b), the shares held by all members of a group must be aggregated to determine the total shares Beneficially Owned by the group.

4.     Apollo, Oaktree, Crestview and Franklin have worked together to acquire and hold their securities in reorganized CCI in a manner that establishes that they are a "group" within the meaning of section 13(d) of the Exchange Act.

5.     Any shares beneficially owned by any of Apollo, Oaktree, Crestview or Franklin must be deemed to be "beneficially owned" by all of them within the meaning of the change of control provisions of the Second Lien Indentures.

6.     A change of control will occur if the Amended Plan is confirmed because Apollo, Oaktree, Crestview and Franklin will have appoint five (including Neil Smit) of the initial 11 directors, and Paul Allen will not have the power to appoint more than five directors.

7.      A change of control will occur if the Amended Plan is confirmed because Apollo, Oaktree, Crestview and Franklin will have the power to appoint four (not including Neil Smit) of the initial 11 directors, and Paul Allen will not have the power to appoint more than four directors.

8.      A change of control under the change of control provisions of the Second Lien Indentures will occur if the Amended Plan is confirmed because Apollo, Oaktree, Crestview and Franklin will have the power to elect 7 of the 11 directors at the first meeting of shareholders.

9.      A change of control under the change of control provisions of the Second Lien Indentures will occur if the Amended Plan is confirmed because Apollo and Oaktree (even without Crestview and Franklin) will have the power to elect 7 of the 11 directors at the first meeting of shareholders.

10.     A change of control under the change of control provisions of the Second Lien Indentures will occur if the Amended Plan is confirmed because Apollo, Oaktree and Crestview (even without Franklin) will have the power to elect 7 of the 11 directors at the first meeting of shareholders.

11.     A change of control under the change of control provisions of the Second Lien Indentures will occur if the Amended Plan is confirmed because the Group, comprised of Apollo, Crestview, Oaktree and Franklin, will Beneficially Own 49.8% of the Voting Stock of reorganized CCI, and this will exceed Paul Allen's 35.1% on that basis.

12.     A change of control under the change of control provisions of the Second Lien Indentures will occur if the Amended Plan is confirmed because the Subgroup, comprised

of Apollo, Crestview and Oaktree, will Beneficially Own 38.6% of the Voting Stock of reorganized CCI, and this will exceed Paul Allen's 35.1% on that basis.

13. A change of control under the change of control provisions of the Second Lien Indentures will occur if the Amended Plan is confirmed because the Subgroup, comprised of Apollo, Crestview and Oaktree, will beneficially own 39.0% of the voting power of reorganized CCI even using the Debtors' own warrant-counting methodology, if properly applied, and this will exceed Paul Allen's 38.6% on that basis.

14. Confirmation of the Amended Plan would cause a change of control under the Second Lien Indentures, giving the Second Lien Noteholders the opportunity to demand, immediately upon Charter's emergence from bankruptcy, repayment of the amounts owed at par plus a premium, and likewise would trigger a change of control under the other senior secured instruments.

15.     The Amended Plan is not feasible because its confirmation will trigger a change of control under the Second Lien Indentures.

Dated:  New York, New York
          September 18, 2009

                                        COVINGTON & BURLING LLP


                                        By:   /s/ David W. Haller
                                              Michael B. Hopkins
                                              David W. Haller
                                              Susan Power Johnston
                                              Charles H. Jeanfreau
                                        The New York Times Building
                                        620 Eighth Avenue
                                        New York, New York  10018
                                        phone:  (212) 841-1000
                                        fax:  (212) 841-1010
                                        email:  mhopkins@cov.com
                                                dhaller@cov.com
                                                sjohnston@cov.com
                                                cjeanfreau@cov.com

                                        *Counsel for Wilmington Trust Company, as Indenture Trustee for the Second Lien Indentures*