**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CHARTER COMMUNICATIONS, INC., | ) 09-11435 (JMP) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| JPMORGAN CHASE BANK, N.A., | ) |
| as Administrative Agent, | ) |
| | ) |
| Plaintiff, | ) Adversary Proceeding |
| | ) No. 09-01132 (JMP) |
| -against- | ) |
| | ) |
| CHARTER COMMUNICATIONS OPERATING, | ) |
| LLC and CCO HOLDINGS, LLC, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW OF
JPMORGAN CHASE BANK, N.A., AS ADMINISTRATIVE AGENT, IN
SUPPORT OF OBJECTIONS TO CONFIRMATION OF DEBTORS'
JOINT PLAN OF REORGANIZATION AND IN SUPPORT OF ENTRY
OF JUDGMENT IN THE ADVERSARY PROCEEDING**

JPMorgan Chase Bank, N.A. ("JPMorgan"), as Administrative Agent for prepetition secured lenders (the "Lenders") to Debtor Charter Communications Operating, LLC ("CCO" or the "Borrower") under the Amended and Restated Credit Agreement, dated as of March 18, 1999, as amended and restated as of March 6, 2007 (the "Credit Agreement"), among CCO, CCO Holdings, LLC ("CCO Holdings" or "CCOH"), JPMorgan, the several lenders from time to time party thereto, and certain other parties, hereby submits these Proposed Findings of Fact and Conclusions of Law in support of its objections to confirmation of the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code (the "Plan") and in support of entry of Judgement in the adversary proceeding, No. 09-01132.

## PRELIMINARY STATEMENT

Charter asks this Court to reinstate the Credit Agreement pursuant to which senior Lenders have advanced over $8.3 billion to the Borrower, CCO, Charter's solvent operating company. Reinstatement would violate well-established bankruptcy law, however, because the Credit Agreement has been breached and the Plan not only fails to cure the breaches, but itself creates further contract breaches, depriving the Lenders of the benefit of their bargain.

The Lenders have identified four separate breaches. If the answer to any one of the four questions listed below is "yes," the Court should deny Charter's motion for confirmation of the Plan.

**I.     Did Apollo, Oaktree, Crestview and Franklin act as a group for the purposes of acquiring or holding equity securities with voting power equal to or greater than Paul Allen's?  Yes.  ¶¶ 19-57, 213-231.[1]**

> 1.   It is an Event of Default under Section 8(k)(ii) if any "group," as defined
>
> under Section 13(d) of the Exchange Act, has more than 35% of the voting

---

[1]   All references to "¶ __" are to Paragraphs within the Proposed Findings of Fact and Conclusions of Law of JPMorgan Chase Bank, N.A., as Administrative Agent.

power for the management of the Borrower and Allen does not have greater voting power.  ¶¶ 9-13, 200-208.

2. Apollo, Oaktree, Crestview and Franklin act as a group in furtherance of their common objective of using the restructuring to convert their holdings of fulcrum debt securities into a controlling stake in Charter's equity and then managing the Charter until the arrival of an opportune time to exit their investments at very substantial rates of return, thus constituting a "group for the purpose of acquiring [or] holding securities . . . ." ¶¶ 19-48.

3. Even under Charter's interpretation of "voting power for the management" of the Borrower as referring to voting interest in combined new Class A and new Class B shares (without consideration of the classified board structure), confirmation of the Plan would result in a violation of Section 8(k)(ii).  It would result in the Takeover Group acquiring or holding 45% of voting interest (as measured by Charter), whereas Allen would hold only 38% of such voting interest.  ¶¶ 50, 215.

4. Confirmation would also result in an Event of Default under Section 8(k)(ii) because it would result in the Takeover Group having the power to appoint and elect a majority of the 11-member classified CCI Board.  The Takeover Group will, through its ownership of a majority of new Class A shares, have the power to appoint or elect 7 directors, whereas Allen will appoint and elect only 4 directors.  ¶¶ 51-54, 216-219.

5. Apollo, Oaktree and Crestview will, even without Franklin, together have greater voting power than Allen.  Apollo, Oaktree and Crestview will, even

without Franklin, own a majority of the new Class A equity and thus will be able to appoint and elect all 7 Class A directors.  ¶ 55.

6. Charter's Plan of Reorganization breaches Section 8(k)(ii) of the Credit Agreement, and the Plan does not cure the breach.

**II.     If the Plan is confirmed, will Paul Allen cease to be able to direct at least 35% of the voting power for the management of the Borrower?  Yes.  ¶¶ 58-59, 232-236.**

1. It is an Event of Default under Section 8(k)(i) of the Credit Agreement if Allen ceases to have the power "directly or indirectly, to vote or direct the voting of Equity Interests having at least 35% . . . of the ordinary voting power for the management of the Borrower."  ¶ 4(iv).

2. Allen currently holds 91% of the voting power over CCI and controls its Board, giving him the ability to control every company in the chain of ownership between CCI and the Borrower, including CCOH.  ¶¶ 17(a), 235.

3. CCOH, the sole member of the Borrower, has 100% of the voting power for management of the Borrower, including the power to remove CCI as the "Manager" of the Borrower pursuant to a management contract.  ¶¶ 16, 233.

4. Under the Plan, Allen will cease to have either voting power over CCI or control of its Board.  As a result, he will not be able to control any company below CCI, including CCOH, or to exercise any of CCOH's Votes in the Borrower.  ¶¶ 58-59, 232-236.

5. The Plan breaches Section 8(k)(i) of the Credit Agreement, and the Plan does not cure the breach.  ¶¶ 58-59, 232-236.

**III.** **On November 5, 2008, when CCO borrowed $250 million, was CCH or CIH unable to pay its debts as they become due?  Yes.  ¶¶ 60-167.**

1. It is an Event of Default under Section 8(b) if any representation of the Borrower "shall prove to have been inaccurate . . . on or as of the date made."  ¶ 4(i).

2. It is an Event of Default under Section 8(g)(v) if any DHC "shall be unable to . . . pay its debts as they become due."  ¶ 4(iii).

3. The Borrower borrowed $250 million from the Lenders on November 5, 2008, at which time it represented that the DHCs were able to pay their debts as they become due (and the Borrower submitted a request to borrow additional sums on February 5, 2009, making the same representation).  ¶¶ 89, 128-133, 258-259.

4. The representation was inaccurate because, as of November 5, 2008, CCH and CIH were unable to pay their debts as they become due.  As of that date, CCH I lacked surplus, making it a violation of Delaware law for that entity to make distributions and thus impossible for CCO's cash to be upstreamed to CCH or CIH through distributions.  In addition, CCH and CIH had no other means of paying their debts due in January and April 2009 due to insufficient cash at those entities, as well as insufficient intercompany receivables and a lack of capital market alternatives for raising the necessary cash.  ¶¶ 77-167, 260-262.

5. There have been breaches of Section 8(b) of the Credit Agreement, and the Plan does not cure such breaches.  ¶¶ 263-265.

**IV. Was CCO's default under the Credit Agreement as a result of the acceleration of CCH, CIH, CCH I or CCH II indebtedness unrelated to the financial condition and bankruptcy of CCO, a solvent entity? Yes. ¶¶ 168-171, 267-271.**

1. It is an Event of Default under Section 8(f) if indebtedness of any DHC (other than CCOH) in excess of $200 million is accelerated. ¶¶ 168-171.

2. Under the terms of the bond Indentures issued by CCH, CIH, CCH I and CCH II, each of those DHCs had in excess of $200 million in indebtedness accelerate upon its filing for bankruptcy in accordance with the Plan support agreements, thus triggering a default by CCO under a separate contract, the Credit Agreement. ¶¶ 170, 268.

3. The CCO default that was triggered by the acceleration of DHC debt was not in any way tied to either CCO's financial condition or its bankruptcy filing. ¶ 171.

4. CCO is solvent. ¶ 171.

5. There have been breaches of Section 8(f) of the Credit Agreement, and the Plan does not cure such breaches. ¶¶ 168-171, 267-271.

For these reasons, JPMorgan respectfully submits, the Court must answer each of the above four questions in the affirmative and deny confirmation of the Plan.

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ........................................................................ i

TABLE OF CONTENTS ..............................................................................vi

FINDINGS OF FACT ....................................................................................1

    I.      The Credit Agreement ............................................................1

    II.    The Plan Impairs The Lenders' Legal, Equitable And Contractual Rights For The Benefit Of Junior Creditors And Equity Holder Paul Allen .........................................................................3

    III.   The Plan Will Cause Change Of Control Defaults ....................5

        A.    The Lenders Bargained For An Acceleration Right Upon A Change Of Control .................................................5

            1.    Section 8(k)(ii) ...................................................6

            2.    Section 8(k)(i) ....................................................8

        B.    The Plan Will Cause A Change Of Control Default Under Section 8(k)(ii) ......................................................9

            1.    Apollo, Oaktree, Crestview And Franklin Act Together As A Group For The Purpose Of Acquiring And Holding Equity Of CCI ........................................9

                (a)    Private Equity Firms Seek To Gain Control Of Acquisition Targets ........................................11

                (b)    Apollo, Oaktree and Crestview Have A History Of Working With Each Other And With Other Private Equity Firms In Loan-To-Own Transactions ...................................................13

                (c)    Apollo, Oaktree And Crestview Targeted Charter For Takeover ......................................15

                (d)    Apollo, Oaktree And Crestview Formed A Group For A Loan-To-Own Transaction Following Charter's December Announcement .................20

(e)     Apollo, Oaktree And Crestview Recruited Franklin To Execute The Loan-To-Own Strategy ................................................22

(f)     Apollo, Oaktree, Crestview And Franklin Negotiated, Agreed To And Implemented A Reorganization Plan With The Shared Objective Of Acquiring Charter Equity Securities ............................25

(g)     The Takeover Group's Members Admit (At Least Privately) They Are Partners And Part Of A Group To Acquire And Hold Charter Equity Securities That Will Jointly Control Charter Post-Bankruptcy ................................................34

(h)     The Takeover Group Attempted To Cover Its Tracks ................................................38

2.     The Takeover Group Will Have The Power To Vote Equity Interests Having The Same Or Greater Voting Power For The Management Of The Borrower Than Paul Allen ................................................41

(a)     The Takeover Group Will Have A Greater Voting Interest In CCI Than Paul Allen ............................42

(b)     Because The Reorganized CCI Will Have A Classified Board Of Directors, The Takeover Group Will Have The Voting Power To Elect A Majority Of The Board, Independent Of Voting Percentages ................................................43

(c)     Apollo, Oaktree And Crestview, Even Without Franklin, Will Have Greater Voting Power Than Paul Allen ................................................48

3.     The So-Called "Savings" Clause Does Not Avoid A Change Of Control ................................................49

C.     The Plan Will Cause A Change Of Control Default Under Section 8(k)(i) ................................................50

IV.     The Borrower Misrepresented On November 5, 2008 And Again On February 3, 2009 That CCH And CIH Were Each Able To Pay Its Debts As They Become Due ................................................52

A.      There Has Been A Complete Failure Of Proof By Charter On The Issue Of CCH's And CIH's Ability To Pay Debts As They Become Due ................................................................. 52

B.      The Credit Agreement ........................................................... 53

      1.      Section 8(b) ................................................................. 53

      2.      Section 8(g)(v) ........................................................... 54

C.      By November 5, 2008, CCH And CIH Were Unable To Pay Their Debts As They Become Due ........................................... 59

      1.      Historically, CCH And CIH Were Able to Pay Their Debts With Funds Upstreamed From CCO Through Distributions ................................................................ 59

      2.      Charter's Efforts Throughout 2007 And 2008 To Find Investors Were Unsuccessful ....................................... 61

      3.      Charter Prepared For A Restructuring In The Wake Of A Decline In Its Valuation And The Collapse Of The Credit Markets .......................................................... 62

      4.      Charter Began Contingency Bankruptcy Planning in October 2008 ............................................................. 63

      5.      On November 5, 2008, CCO Falsely Represented That CCH And CIH Were Able To Pay Their Debts As They Become Due ...................................................... 66

            (a)      CCH And CIH Had Essentially No Cash Or Liquid Assets With Which To Pay Their Debts ................. 67

            (b)      Intercompany Loans And Receivables Were Insufficient To Cover CCH's And CIH's January And April 2009 Interest Payments ........................ 67

            (c)      There Were No Viable Capital Market Transactions ....................................................... 69

            (d)      For CCH And CIH To Be Able To Pay Their Debts As They Become Due, CCH I Needed To Have Surplus ............................................................... 71

      6.      As Of November 5, 2008, CCH I Had No Surplus ......................... 71

(a) On November 5, 2008, The Public Trading Markets Indicated A Value Well Below The $18.7 Billion Breakeven Point For Surplus ........................71

(b) As Of November 5, 2008, Charter Did Not Know Whether CCH I Had Surplus ....................75

(c) Charter Improperly Used A Draft Duff & Phelps DCF Analysis In Lieu Of A Proper Surplus Analysis ........................................................78

(d) Corrected Draft Duff & Phelps DCF Shows No Surplus ...............................................81

(e) Management's "Sensitivities" Were Improper Because They Ignored Market Values ................82

7. On November 14, 2008, The Board Shut Down Distributions From CIH To CCH ....................83

8. Lazard Did Not Perform A Valuation Of Charter In November 2008 ........................................85

9. Vulcan's Analysis Confirms That There Was No Surplus..................................................86

10. Shortly After the $250 Million Borrowing Charter Admits To The Lenders And The Bondholders That CCH I Did Not Have Surplus ........................89

11. Charter Was Unable To Pay Interest Due On January 15, 2009....................................................95

12. KPMG Determined That It Could Not Give An Unqualified Audit Opinion Because Of The Lack Of Surplus And Lack Of Available Alternatives..................98

13. In February 2009, CCO Submitted A Borrowing Request For $35 Million And Charter Declared It Intended To File For Bankruptcy ................................101

14. Charter's Bankruptcy Filings ......................................104

15. Lazard's March 27, 2009 Valuation Showed No Surplus..................................................104

(a) Lazard's DCF Analysis ................................106

           (b)      Lazard's Comparable Companies Analysis ..................... 106

           (c)      Lazard's Precedent Transactions Analysis ...................... 106

      16.      Charter Has Continued To Underperform
                Management Projections On Revenues ....................................... 109

  D.    Taylor Credibly Testified That, As Of November 5, 2008, CCH
       And CIH Were Unable To Pay Their Debts As They Become
       Due .................................................................................................... 110

  E.    Den Uyl's Analysis Did Not Address The Relevant Questions,
       Was Flawed And Was Contradicted By Lazard And Taylor ................... 113

      1.      Den Uyl Offered No Opinion On Ability To Pay ......................... 113

      2.      Den Uyl Likewise Offered No Opinion On Whether
              There Was Enough Surplus To Make The January
              2009 Or April 2009 Interest Payments ......................................... 113

      3.      Den Uyl's Comparable Companies Analysis Indicated
              No Surplus At CCH I ................................................................... 113

      4.      Den Uyl's Precedent Transactions Analysis Was
              Flawed ....................................................................................... 114

      5.      Den Uyl's DCF Analysis Was Flawed ........................................ 116

      6.      Den Uyl's Analysis Of NOLs Was Flawed ................................. 118

      7.      Den Uyl's Reliance On Equity Analyst Reports Was
              Improper .................................................................................... 120

V.    The Plan Denies JPMorgan Its Specifically Bargained-for
     Acceleration Cross-Default Rights ...................................................... 122

VI.   Charter Can Afford To Pay Lenders A Market Rate Of Interest ............... 125

CONCLUSIONS OF LAW .............................................................................. 129

I.    Charter Has The Burden Of Proving Compliance With Each
     Requirement Of 11 U.S.C. § 1129(a), including Lack Of
     Impairment under 11 U.S.C. § 1124 .................................................... 129

  A.    11 U.S.C. § 1129(a) ........................................................................... 129

  B.    11 U.S.C. § 1124 ............................................................................... 131

  C.    Burden Of Proof On Surplus And Change Of Control ............................ 133

D.     This Court Has Already Decided That The Issues Raised In The Adversary Proceeding Are Objections To Plan Confirmation ...................................................................................134

II.     The Plan Results In Change of Control Defaults Under Sections 8(k)(ii) and 8(k)(i) of the Credit Agreement, Thereby Impairing the Lenders' Contractual Rights .........................................................136

A.     The Plan Will Cause A Change Of Control Default Under Section 8(k)(ii) ..................................................................136

1.     "Group" Under Section 8(k)(ii) Of The Credit Agreement ...............................................................136

2.     The Plan Will Result In The Takeover Group Having The Power To Vote Equity Interests Having The Same Or Greater Voting Power For The Management Of The Borrower Than Paul Allen ...............................138

3.     The So-Called Savings/Dilution Clause Is Irrelevant ...................142

B.     The Plan Leaves Allen With Zero Votes For CCO's Management In Breach Of Section 8(k)(i) Of The Credit Agreement ...............................................................................143

III.    CCO's False Representations In Connection With Its November 5, 2008 And February 3, 2009 Borrowing Requests Are Events Of Default That Are Not Cured By The Plan And Cannot Be Cured ........................144

A.     Section 8(b) Of The Credit Agreement ....................................144

B.     Section 8(g)(v) Of The Credit Agreement ................................144

1.     Section 8(g)(v) Sets Forth A Prospective Test .............................145

2.     Charter's Attempt To Read The "Unable To Pay Debts As They Become Due" Language Out Of The Contract Should Be Rejected ........................................147

C.     CCO's Misrepresentations ........................................................148

D.     The Plan Does Not Cure CCO's Misrepresentations ...............149

IV.    The Credit Agreement Cannot Be Reinstated Because The Plan Does Not Cure Defaults Under Section 8(f) Of The Credit Agreement As Required By Section 1124(2)(A) .................................150

A.    The Non-Obligor DHCs' Debt Accelerated And Thus CCO Is In Breach Under Section 8(f) Of The Credit Agreement .......................... 150

B.    These Cross-Acceleration Defaults Are Not *Ipso Facto* Defaults ................................................................................................... 151

C.    The Plan Does Not Cure CCO's Section 8(f) Defaults ........................... 154

V.    The Plan Cannot Be Confirmed ........................................................................ 155

**FINDINGS OF FACT**

**I.     THE CREDIT AGREEMENT**

1.      Under the Credit Agreement, CCO is the Borrower and JPMorgan is the

Administrative Agent.[2]

2.      CCO currently owes approximately $8.2 billion under the Credit Agreement, along

with approximately $140 million in issued, undrawn letters of credit.[3]

3.      The Credit Agreement gives the Lenders the right to accelerate all amounts

outstanding under the Credit Agreement upon the occurrence of an Events of Default specified in

Section 8 of the Credit Agreement.[4]

4.      Events of Default, as defined in the Credit Agreement, include:

> (i)      Section 8(b):  "any representation or warranty made or deemed made by any Loan Party herein . . . shall prove to have been inaccurate in any material respect on or as of the date made or deemed made."[5]

> (ii)     Section 8(f):  "any Designated Holding Company other than Holdings shall (i) default in making any payment of any principal of any Indebtedness (including, without duplication, any Guarantee Obligation in respect of Indebtedness) on the scheduled or original due date with respect thereto or (ii) default in making any payment of any interest on any such Indebtedness or default in the observance or performance of any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, if such default or other event or condition, in each case with respect to this clause (ii), results in the acceleration of such Indebtedness prior to its stated maturity or (in the case of any such Indebtedness constituting a Guarantee Obligation) causes such Indebtedness to become payable; provided, that a default, event or condition described in clause (i) or (ii) of this paragraph (f) shall not at any time constitute an Event of Default unless, at such time, one or more defaults, events or conditions of the type described in clause (i) or (ii) of this

---

[2]     JPX 2 at JPM-CH 5934.

[3]     JPX 266 at 16-17, 19.

[4]     JPX 2 § 8.

[5]     JPX 2 § 8(b).

1

paragraph (f) shall have occurred and be continuing with respect to such Indebtedness the outstanding aggregate principal amount of which exceeds $200,000,000."[6]

(iii)     Section 8(g)(v):  "any Designated Holding Company . . . shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due."[7]

(iv)     Section 8(k)(i):  "the Paul Allen Group shall cease to have the power, directly or indirectly, to vote or direct the voting of Equity Interests having at least 35% (determined on a fully diluted basis) of the ordinary voting power for the management of the Borrower."[8]

(v)     Section 8(k)(ii):  "the consummation of any transaction (including, without limitation, any merger or consolidation) the result of which is that any 'person' or 'group' (as such terms are used in Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended) other than the Paul Allen Group has the power, directly or indirectly, to vote or direct the voting of Equity Interests having more than 35% (determined on a fully diluted basis) of the ordinary voting power for the management of the Borrower, unless the Paul Allen Group has the power, directly or indirectly, to vote or direct the voting of Equity Interests having a greater percentage (determined on a fully diluted basis) of the ordinary voting power for the management of the Borrower than such 'person' or 'group.'"[9]

5.     The term Designated Holding Companies ("DHCs") is defined to include:  (i) CCOH, (ii) CCH II, LLC ("CCH II"), (iii) CCH I, LLC ("CCH I"), (iv) CCH I Holdings, LLC ("CIH") and (v) Charter Communications Holdings, LLC ("CCH").  The chart below is a true and correct depiction of Charter's[10] corporate structure[11]:

---

[6]   JPX 2 § 8(f).

[7]   JPX 2 § 8(g)(v).

[8]   JPX 2 § 8(k)(i).

[9]   JPX 2 § 8(k)(ii).

[10]   The term "Charter" as it is used throughout this document refers collectively to CCI and all of its subsidiaries.

[11]   JPX 247; JDX 1.



## II. THE PLAN IMPAIRS THE LENDERS' LEGAL, EQUITABLE AND CONTRACTUAL RIGHTS FOR THE BENEFIT OF JUNIOR CREDITORS AND EQUITY HOLDER PAUL ALLEN

6. The Plan fails to recognize the occurrence of any Event of Default. Thus, the Plan fails to cure such Events of Default and deprives the Lenders of their right to accelerate under the Credit Agreement.

(a) The Lenders specifically obtained the right, in the event of a change of control or other Event of Default, to accelerate all amounts outstanding or, if they desired, renegotiate the interest rate, covenants and other terms of the Credit Agreement.[12]

(b) The Plan deprives the Lenders of those bargained-for rights.

7. The Plan seeks to reinstate the below-market bank debt to subsidize the expected returns of a group of bondholders that is acquiring a majority equity stake in Charter Communications, Inc. ("CCI"). That group of bondholders consists of Apollo Management, L.P.

---

[12] ¶¶ 9-10.

("Apollo"), Crestview Partners, L.P. ("Crestview"), Oaktree Capital Management, L.P. ("Oaktree"), and Franklin Resources, Inc. ("Franklin") (collectively, the "Takeover Group").[13]

      (a)    Apollo and Crestview anticipate 40.3% and 52.4% internal rates of return ("IRRs") on their new money investments, respectively, if the bank debt is reinstated.[14]

      (b)    Charter could pay the Lenders a market rate of interest and maintain liquidity, with little impact other than to reduce somewhat the Takeover Group's IRRs.[15]

      (c)    In order to try to reinstate the bank debt and keep the senior creditor banks away from the negotiating table, Apollo, Oaktree, Crestview and Franklin are causing Charter to make a $375 million payoff to Paul Allen, $209 million of which Paul Allen's representatives attribute to his cooperation in avoiding the appearance of a "change in control" for purposes of the Credit Agreement.[16]

      (d)    The Plan forces the Lenders to provide below-market financing for Charter's takeover by structurally junior creditors.

---

[13]  ¶ 19.

[14]  JPX 154 at Charter-e 00093864 ("A 400 million new money investment by Apollo would garner 18.6% of the post restructuring ownership (17.7% after dilution from 5% management options) and generate $1,840 million of proceeds or $1,440 million of profit dollars, which implies a 40.3% IRR and 4.60x MOIC."); JPX 158 at Charter-e 00133069 ("[T]he rights offering investment is projected to generate very attractive returns assuming positive EBITDA growth and at least a 5.0x exit multiple. Assuming a 5.5% EBITDA CAGT and 7.0x LTM exit multiple, the projected IRR and ROI are 52.4% and 7.4x.").

[15]  ¶ 173.

[16]  9/2/2009 Hr. Tr. at 85:10-86:3 (Conn) ("Q. All right. And getting back to the final deal here, if we go back to Exhibit 215, under CC VIII Mr. Allen receives 150 million dollars, right? A. Yes. Q. And under total change of control Mr. Allen receives 209 million dollars, right? A. Yes. Q. And that's not all Mr. Allen receives, right? A. What do you mean? Q. Well, Mr. Allen also gets twenty-five million dollars for the management fee receivable that we talked about earlier, right? A. No. Q. And he also gets twenty million dollars in compensation for reimbursement of legal fees and expenses, right? A. That's also part of the plan, yeah. Q. Right. So now it's up to about 404 million dollars, right? A. Yeah.").

(e)     Indeed, the Plan is premised on allowing the Takeover Group to pick the Lenders' pockets through reinstatement of a Credit Agreement that has been materially breached. As Mr. Millstein testified, "it's not like the value is being conferred upon widows and orphans. It's being conferred upon, you know, Oaktree and Apollo and Franklin and Fidelity and, you know, hedge fund managers and fund managers and professional investors and sophisticated third parties."[17]

8.     The Credit Agreement does not permit the Takeover Group to use the existing below-market bank debt as a source of financing for its acquisition of Charter. If the Takeover Group wants to buy a controlling equity interest in Charter, its four members should use their own money to do so and pay the Lenders a market rate of interest.

## III.    THE PLAN WILL CAUSE CHANGE OF CONTROL DEFAULTS

### A.     The Lenders Bargained For An Acceleration Right Upon A Change Of Control

9.     The Lenders based their credit decision to lend to CCO in part on the fact that Paul Allen was the controlling shareholder of CCI, the public holding company at the top of Charter's corporate structure.[18]

(a)     Paul Allen has been the controlling shareholder of CCI since its initial public offering in 1999.[19]

(b)     Through his control of CCI, Paul Allen controlled and controls each of CCI's subsidiaries, including CCO.

---

[17]   9/10/2009 Hr. Tr. at 22:24-23:3 (Millstein).

[18]   8/25/2009 Hr. Tr. at 46:18-21 (Kurinskas) ("[T]he credit decision that was made here was based partly on Paul Allen being the control party and the lenders have known for many years that Paul Allen has controlled this company.").

[19]   JPX 354.

(c)     When making a loan to a company that has a significant financial sponsor, lenders typically require assurance that the sponsor will remain involved, including retaining some level of voting influence and control over the corporate borrower.[20]

(d)     It is standard for JPMorgan to include a change of control provision in credit agreements so that if there is a transfer of control from the original sponsor to other parties, the lenders will have the right to come back to the table to revisit the terms of the credit agreement.[21]

10.     JPMorgan, on behalf of the Lenders, specifically negotiated for the change of control provisions in Section 8(k) of the Credit Agreement.[22]

**1.     Section 8(k)(ii)**

11.     JPMorgan included Section 8(k)(ii) to ensure that, if Paul Allen did not retain voting control greater than that of any other person or "group," the Lenders would have the right to, at their choosing, come back and determine whether the terms of the Credit Agreement were still appropriate or to accelerate the outstanding indebtedness.[23]

---

[20]   8/25/2009 Hr. Tr. at 43:24-44:3 (Kurinskas) ("It's quite typical when we're making a loan to a company for which there's a significant financial sponsor for the lenders to want some assurance that that sponsor is going to remain involved, retain some level of voting influence and control over the company.").

[21]   8/25/2009 Hr. Tr. at 44:3-44:10 (Kurinskas) ("And so it's pretty standard to incorporate a change of control provision so that if there is going to be a transfer from the original sponsor to other parties, that the lenders would have the opportunity to come back to the table and relook at the contract and decide whether there were other provisions that needed to be changed in order to provide more protection, given that the original sponsor was going to be reducing its voting interest.").

[22]   JPX 2 § 8(k); 8/25/2009 Hr. Tr. at 43:23-44:10, 46:17-47:2 (Kurinskas).

[23]   8/25/2009 Hr. Tr. at 46:21-47:2 (Kurinskas) ("And the point of putting in this other provision is that if another group was going to come into possession of a greater ability to vote at the level of the bank borrower than Paul Allen had, the lenders had a right to come back and revisit the situation and take a look at the contract and decide whether the provisions that are in the contract are appropriate.").

12.   Section 8(k)(ii) of the Credit Agreement provides that there is an Event of Default upon:

> the consummation of any transaction (including, without limitation, any merger or consolidation) the result of which is that any "person" or "group" (as such terms are used in Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended) other than the Paul Allen Group has the power, directly or indirectly, to vote or direct the voting of Equity Interests having more than 35% (determined on a fully diluted basis) of the ordinary voting power for the management of the Borrower, unless the Paul Allen Group has the power, directly or indirectly, to vote or direct the voting of Equity Interests having a greater percentage (determined on a fully diluted basis) of the ordinary voting power for the management of the Borrower than such "person" or "group."[24]

(a)   The Credit Agreement defines "Equity Interest" as "any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all classes of membership interests in a limited liability company, any and all classes of partnership interests in a partnership and any and all other equivalent ownership interests in a Person, and any and all warrants, rights or options to purchase any of the foregoing."[25]

(b)   Section 8(k)(ii) focuses on "voting power for the management of the Borrower."  By contrast, the change of control provision in Charter's other agreements, such as its Indentures, focuses on "Voting Stock of [CCO] *or a Parent*."[26]

13.   Section 13(d)(3) of the Securities Exchange Act of 1934 (the "Exchange Act") defines "group" as "two or more persons [that] act as a partnership, limited partnership, syndicate,

---

[24]   JPX 2 § 8(k)(ii).

[25]   JPX 2 § 1.1 ("Defined Terms").

[26]   *E.g.*, WTC 2 (Second Lien Notes), Art. 1, def. of "Change of Control," at 7 (defining "Change of Control" as including "the consummation of any transaction including any merger or consolidation, the result of which is that any 'person' (as defined above) other than Paul G. Allen or any of the Related Parties becomes the Beneficial Owner, directly or indirectly, of more than 35% of the Voting Stock *of the Company or a Parent*, measured by voting power rather than the number of shares . . . .") (emphasis added); WF 1 (Third Lien Indenture).

or other group for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer."[27]

### 2. Section 8(k)(i)

14. Section 8(k)(i) of Credit Agreement provides that there is an Event of Default if:

> the Paul Allen group shall cease to have the power, directly or indirectly, to vote or direct the voting of Equity Interests having at least 35% (determined on a fully diluted basis) of the ordinary voting power for the management of the Borrower.[28]

15. The "management of the Borrower" in Section 8(k)(i) of the Credit Agreement refers to the management of CCO, which is the Borrower under the Credit Agreement.

16. As the sole member and equity owner of CCO, CCOH has 100% of the voting power for the management of CCO.[29]

17. Currently, because he controls CCI, Paul Allen has the power, indirectly, to direct how CCOH votes its voting power for the management of the Borrower—*i.e.* its equity interests in CCO.[30]

(a) Allen now holds a 91% voting interest in CCI and thus controls the CCI Board.[31]

(b) Through his voting control of CCI, Allen controls how each of CCI's direct and indirect subsidiaries votes. Allen controls each of Charter Communications Holding Company, LLC ("Holdco"), CCH, CIH, CCH I, CCH II, CCOH and CCO. Most importantly with

---

[27] 15 U.S.C. § 78m(d)(3).

[28] JPX 2 § 8(k)(i).

[29] JPX 7 at CTR-00007238-00007240.

[30] ¶ 59.

[31] JPX 266 at 15 ("Allen owns 100% of Charter Investment, Inc. ('CII') and controls CCI through a voting control interest of approximately 91.1% as of February 28, 2009.").

respect to Section 8(k)(i), he has the power to vote all of CCOH's equity interests in CCO and thus controls 100% of the ordinary voting power for the "management of the Borrower," CCO.[32]

**B.    The Plan Will Cause A Change Of Control Default Under Section 8(k)(ii)**

18.    The Plan will result in the Takeover Group having the power to vote equity interests having the same or greater voting power for the management of the Borrower than Paul Allen. Specifically:

(a)    The Takeover Group will have a greater voting interest in the combined new Class A and new Class B equity securities of CCI than Paul Allen.

(b)    The Takeover Group will have the voting power to elect a majority of the CCI Board.

(c)    Whether or not Franklin is excluded from the Takeover Group does not change anything.  Apollo, Oaktree and Crestview will still have the power to elect 7 members of CCI's 11-member Board.  This is still more than the 4 members Paul Allen will have the power to elect.

**1.    Apollo, Oaktree, Crestview And Franklin Act Together As A Group For The Purpose Of Acquiring And Holding Equity Of CCI**

19.    As private equity firms commonly do in implementing a loan-to-own strategy, Apollo, Oaktree and Crestview agreed, commencing in December 2008, to work together as a group for the purposes of acquiring and holding equity securities of CCI through the restructuring. Because Apollo, Oaktree and Crestview needed Franklin, and Franklin needed them, Franklin joined the others and formed the Takeover Group.

---

[32]    ¶ 59.

(a)     Apollo is a private equity firm founded in 1990 by Leon Black to invest in buy-out deals and debt of troubled companies.[33]  Since its inception, Apollo has exploited distressed debt as a means of investing in companies.[34]  During the current financial crisis, Black told investors that one of Apollo's funds had close to $4 billion earmarked to pursue distressed buyouts of mid- and large-capitalized companies with a goal of controlling those companies.[35]

(b)     Oaktree is a private equity firm founded in April 1995 by a group of partners that had been investing in distressed debt since the 1980s.[36]  The firm focuses largely on investing in distressed debt and the firm is one of the oldest investors in distressed debt.[37]  As of March 31, 2009, Oaktree had $51.12 billion under management.[38]  It is currently in the market with its fifth "loan-to-own" fund, which has $5 billion in capital.[39]  Ken Liang is the managing director of Oaktree's distressed debt opportunities group.[40]

(c)     Crestview is a private equity firm established in 2004 by former employees of Goldman Sachs and Morgan Stanley and now claims $4 billion in assets under management.[41]  Crestview, which boasts cable as a "core competency," embraces a strategy of installing Crestview

---

[33]   JPX 271 at 18.

[34]   *Id.* at 19.

[35]   *Id.* at 19-20.

[36]   *Id.* at 21.

[37]   *Id.*

[38]   *Id.*

[39]   *Id.*

[40]   *Id.*; 7/29/2009 Hr. Tr. at 161:25-162:3 (Liang)  ("Q. And did your position at that time change? A. Yes, it did.  I moved into the distressed debt opportunities group on a permanent basis as a managing director.").

[41]   JPX 271 at 22.

partners or chosen managers on its portfolio companies' boards of directors.[42]  Jeff Marcus, a 42-year veteran of the cable television business, is a partner of Crestview.[43]

(d)     Franklin is a holding company for various investment management subsidiaries that offer a wide range of investment options.  Franklin Advisors, Inc. is a subsidiary of Franklin that provides management and other services for the Franklin series of mutual funds.[44]  Like Apollo, Oaktree and Crestview, Franklin is experienced with distressed debt investing; it has been investing in distressed securities since 1950.[45]  Christine Villaluz is a fixed income analyst at Franklin Advisors, Inc., responsible for monitoring the Franklin funds' investments in the cable sector and providing buy/sell recommendations to fund portfolio managers.[46]

(a)     **Private Equity Firms Seek To Gain Control Of Acquisition Targets**

20.     Apollo, Oaktree and Crestview are all private equity firms that generally seek to gain control of the companies they target for investment.[47]

---

[42]  *Id.* at 23.

[43]  *Id.*; 7/29/2009 Hr. Tr. at 14:5-11, 14:5-25 (Marcus) ("Q. And when was Crestview founded?  A. Middle of 2004.  Q. Shortly before you joined?  A. Yes.  Q. And what is your position there?  A. Well, my title is managing director, but I am one of six partners of the firm. . . . Q. And can you tell the Court, at a high level, your professional experience since college?  A. Since college -- actually, while I was still in college, I started in the cable television business selling cable door to door.  And I've worked in that -- in and around that business for the past forty-two years.").

[44]  JPX 271 at 24; 7/23/2009 Hr. Tr. at 63:9-11 (Villaluz).

[45]  JPX 271 at 24.

[46]  7/23/2009 Hr. Tr. at 10:7-17 (Villaluz) ("Q. And can you tell the Court your responsibilities at Franklin?  A. I'm a fixed income analyst. I support around ten portfolio managers.  I make buy, sell, hold recommendations in the companies that I follow.  Q. And do you have a particular sector or industry in which you focus?  A. Yes.  I focus on the cable, satellite and wireline telecom sectors.  I also follow home building, building products, building materials in high grade and high yield.  And I also have European and U.S. coverage.").

[47]  JPX 271 at 18; 8/24/2009 Hr. Tr. at 200:24-201:7 (Gompers); 7/28/2009 Hr. Tr. at 77:2-6 (Zinterhofer).

(a) The institutional and other sophisticated investors in private equity funds do not invest with those firms to clip coupons.[48] These investors can buy bonds on their own. They invest with private equity firms because such firms take control of companies that need restructuring and/or better management.[49] Investors in private equity firms hope for and expect significantly higher than "clipping coupon"—type returns upon exit.[50]

(b) Private equity firms earn higher compensation because they are offering higher expected returns for their investors. Private equity firms are compensated through management fees of approximately 2-2.5% of capital under management and 20-30% of the profits of their investments.[51]

---

[48] 8/24/2009 Hr. Tr. at 200:13-201:7 (Gompers) ("And let's start at the beginning. Would you please describe, generally, what private equity investments are? A. Private equity investments are professionally managed pools of capital that invest in controlled situations that seek to gain and generate very high returns for their investors. Q. Who makes private equity investments? A. By who makes if you mean who invests in private equity funds, that's typically pension funds, endowments, other institutions, sometimes wealthy individuals. But the vast majority of capital and private equity comes from pensions and institutional investors. Q. In a general sense, how do private equity firms make their money? A. There's a -- private equity investors seek to gain control of a particular company; whether it be growth company, whether it be a company in need of restructuring. Then they undertake to become actively involved in that company through board representation, through monitoring and then seek to opportunistically exit when the time is right by selling their equity holdings at a high valuation.").

[49] *Id.*

[50] *Id.*; 8/24/2009 Hr. Tr. at 203:4-17 (Gompers) ("Okay. Let me ask you, do private equity firms in your experience typically clip coupons as an investment strategy? A. By clipping coupons I understand from testimony here is that it's buying a security to collect the dividends or the interest. And in all of my experience that's just not the strategy that private equity investment funds pursue. While they may buy a security and take the interest to enhance their returns, private equity managers are compensated as richly as they are because they seek to gain control of particular companies to become actively involved and then to exit at very high valuations, it's nothing like, say, a public mutual fund that may be compensated at a much lower level, who actually does clip coupons, who does buy securities for the interest only.").

[51] 8/24/2009 Hr. Tr. at 201:8-21 (Gompers) ("Q. And based upon your professional experience in studying private equity firms over the last eighteen years, can you describe, generally, how they're compensated as managers of these pools of investment capital? A. So having written several articles on the compensation of private equity managers, if you look at the private

(c)     Given this compensation structure, private equity firms generally do not "clip coupons" as an investment strategy.  Private equity managers are compensated as richly as they are because they gain control of particular companies to become actively involved and then to exit at very high valuations to generate substantial IRRs.[52]

> **(b)     Apollo, Oaktree and Crestview Have A History Of Working With Each Other And With Other Private Equity Firms In Loan-To-Own Transactions**

21.     Apollo, Oaktree and Crestview have a history of working with each other and with other private equity firms in syndicated private equity transactions.

(a)     A syndicated private equity transaction is one in which a number of private equity firms come together to execute a particular investment.[53]

(b)     The three principal benefits of syndication are (i) an increase in the amount of capital available; (ii) synergies from diversity of experience such as, for example, the benefit Apollo and Oaktree receive from partnering with someone with extensive cable industry experience like Crestview's Jeff Marcus; and (iii) greater confidence that the investment is a good one as a result of the "second opinion" effect of having two or more firms perform due diligence and evaluate the transaction.[54]

---

equity compensation structure it's sort of fairly standard in instruction which they receive something like a two to two and a half percent for capital under-management.  And then they receive something like twenty to thirty percent of the profits from their investments.  And this compares to say a typical mutual fund manager where mutual fund managers receive perhaps percent, but usually substantially less than a percent of assets under management.").

[52]  *See supra*, n.49.

[53]  8/24/2009 Hr. Tr. at 195:16-20 (Gompers).

[54]  8/24/2009 Hr. Tr. at 207:25-209:4 (Gompers).

22.     In syndicated transactions, private equity firms often enter into agreements with respect to their joint acquisition of a company or a controlling equity stake in a company. Those agreements may often include provisions with respect to board representation.[55]

23.     However, private equity firms do not typically enter into post-transaction shareholders agreements, voting agreements or other governance agreements. Private equity firms' interests are generally aligned with respect to post-transaction governance. To ensure cooperation with one another, private equity firms rely on stable relationships formed over time and the reputational incentives of repeat players within a small industry.[56]

24.     Many of the syndicated private equity deals that Apollo, Oaktree, Crestview and Franklin have previously worked on together were loan-to-own transactions.[57]

    (a)     A "loan-to-own" strategy is a particular investment strategy that private equity firms employ to gain control of a company by purchasing its debt. As part of this strategy, private equity firms purchase the debt security that they anticipate will convert to equity in a restructuring, which is known as the "fulcrum" security.[58]

    (b)     Barry Volpert, the founding partner of Crestview, wrote a chapter on distressed investing in a finance textbook that describes the loan-to-own strategy.[59]

    (c)     Prior to their current attempt to acquire control of Charter, Apollo, Oaktree and Crestview have pursued a loan-to-own strategy to take control of companies. Although the

---

[55]   8/24/2009 Hr. Tr. at 209:5-22 (Gompers).

[56]   8/24/2009 Hr. Tr. at 209:5-22, 211:2-25 (Gompers).

[57]   8/24/2009 Hr. Tr. at 216:24-218:3 (Gompers); JPX 271, Ex. 1.

[58]   8/24/2009 Hr. Tr. at 196:2-8 (Gompers).

[59]   WORKOUTS AND TURNAROUNDS: THE HANDBOOK OF RESTRUCTURING AND INVESTING IN DISTRESSED COMPANIES (1991), Chapter 18, "Opportunities for Investing in Troubled Companies" by Barry S. Volpert.

Franklin funds that invested in Charter debt typically do not seek control, Franklin has been willing to engage in loan-to-own strategies in the past, as well.[60]

(d)     In 2003, for example, Apollo and Oaktree implemented a loan-to-own strategy to acquire control of a company called Spectrasite through a restructuring. As a result of the restructuring, Apollo and Oaktree acquired a controlling stake in the equity of Spectrasite, seats on the board and the ability to exert significant influence over the management and policies of Spectrasite.[61]

(e)     In Spectrasite, Apollo and Oaktree did not "have anything in writing" in connection with their loan-to-own strategy to gain control of Spectrasite through the restructuring in an effort to leave no written evidence of their coordinated activity and goal.[62]

### (c)     Apollo, Oaktree And Crestview Targeted Charter For Takeover

25.     Apollo, Oaktree and Crestview actively targeted Charter for takeover.

(a)     Crestview partner Jeff Marcus is a 42-year veteran of the cable television business. Marcus previously started and owned a company called Marcus Cable and sold it to Paul Allen in 1998. Allen merged Marcus Cable into Charter, and the heritage Marcus Cable systems currently comprise approximately 20% of the Charter cable system. Allen initially asked Marcus to be the Chief Executive Officer (CEO) of CCI, but Marcus declined.[63]

---

[60]   8/24/2009 Hr. Tr. at 216:16-23 (Gompers).

[61]   7/28/2009 Hr. Tr. at 62:18-63:6 (Zinterhofer), 126:5-127:11 ("I think we owned more than a majority of the stock together."); JPX 360 at 11 ("Apollo and Oaktree are able to exert significant influence over the management and policies of SpectraSite.").

[62]   JPX 181 ("Ken Liang (from Oaktree) and I are making all of the decisions together on the Charter restructuring. We don't have anything in writing, just like we didn't in Spectrasite, but we have known each other a long time."); 8/24/2009 Hr. Tr. at 209:5-22 (Gompers) ("it is very rare, for there to be post-transaction governance agreements so voting agreements, shareholder agreements, those sorts of things are just not typical in these kinds of transactions").

[63]   7/29/2009 Hr. Tr. at 15:10-15:17 (Marcus); JPX 234 at Charter-e 00114533.

(b)      For years, Marcus has sought to get back into the cable business and has had his eye on Charter. Since he sold Marcus Cable to Allen, Marcus has been frustrated "that [Charter] was having so many difficulties."[64] Marcus believes that if he had accepted Allen's offer to be the CEO, Charter would not be in bankruptcy: "look, this is a company that has been battered for many years and shouldn't be. And I've watched it. I've – it's been a sense of frustration for me, because had I – I can honestly say this to the representatives of Paul Allen – had I agreed to remain CEO, this wouldn't have happened."[65]

(c)      Crestview first acquired $100 million face amount of CCH I Notes in 2006 as "currency" for a potential acquisition of cable assets from Charter and because "the deal team believed that, in a potential restructuring scenario, the Notes would be deemed the fulcrum security, giving Crestview an equity stake in Charter."[66]

(d)      In the fall of 2007, Charter recognized looming problems with its capital structure and initiated a process to try to sell itself. The sale process attracted the interest of a number of private equity firms.[67]

(e)      Marcus had met and developed a relationship with Eric Zinterhofer and other senior people at Apollo in connection with a potential transaction in 2005 that never came to fruition, and, at that time, the two firms began discussing Charter.[68] In 2007, Apollo and

---

[64]   7/29/2009 Hr. Tr. at 22:2-16 (Marcus).

[65]   7/29/2009 Hr. Tr. at 22:2-16, 55:11-21 (Marcus).

[66]   JPX 234 at Charter-e 00114533 ("We initially invested $48 million of equity and $43 million of debt to buy $100 million face of the CCH I 11% Notes due 2015. . . . In addition, the deal team believed that in a potential restructuring scenarios, the Notes would be deemed the fulcrum security, giving Crestview an equity stake in the Company.").

[67]   ¶ 81.

[68]   7/29/2009 Hr. Tr. at 20:19-21:12 (Marcus) ("I had met the senior people at Apollo in 2005 as a part of our firm trying to raise additional equity for the purchase of a cable company separate and apart from Charter. And although that transaction never came to fruition, I established a

Crestview evaluated a potential take-private transaction for Charter in which Crestview would invest $200 million alongside an $800 million investment by Apollo to acquire 51% of Charter equity.[69] As part of the contemplated transaction, Marcus was to join the Board, "ideally as Chairman."[70]

(f) In the fall of 2007, Apollo and Crestview met with Paul Allen's representatives at Vulcan Capital ("Vulcan"), to discuss a potential take-private transaction for Charter.[71]

(g) In connection with that potential take-private transaction, Apollo recognized that "any investment by Apollo required achieving sufficient control over Charter."[72]

relationship with Mr. Zinterhofer and some of the other principals. And at some point during conversations, we discovered that we both had a -- an interest in Charter. And with that, the discussions began in terms of is there something to do with respect to Charter.").

[69] JPX 22 at Charter-e 00779580.

[70] *Id.* ("The team is evaluating the going private transaction in conjunction with Jeff Marcus, who is a well respected cable entrepreneur and is currently a partner at Crestview Capital (Barry Volpert's private equity firm). . . . To the extent we pursue a transaction, Crestview would likely invest $200 million of equity alongside Apollo (assuming a $1.0 billion total equity account and Jeff Marcus will join the board, ideally as Chairman.")); 7/29/2009 Hr. Tr. at 60:19-61:3, 62:17-63:7 (Marcus) ("Q. . . . And I'm sure you did not get a copy of this memo [JPX 22] when it was prepared internally at Apollo at the time, but that's an accurate reporting to the investment committee at Apollo as to what you and Zinterhofer had been discussing in December of 2007, is that not correct? A. That is correct.").

[71] 7/28/2009 Hr. Tr. at 89:21-93:1, 86:20-24 (Zinterhofer) ("Q. And in the fall of '07, if I understand you, you met with representatives of Vulcan about doing a partnership deal with Marcus' firm to do a take-private transaction of Charter, is that correct? A. Yes.").

[72] 7/28/2009 Hr. Tr. at 92:22-93:1 (Zinterhofer) ("Q. And you recognized that any investment by Apollo required achieving sufficient control over Charter, is that not correct? A. Yeah, in the case of this take-private scenario, I think we were looking to try to achieve that, because we thought that could be possible in a negotiated take-private transaction.").

(h)     Apollo's Investment Committee did not approve the take-private transaction at that time.  Instead, it authorized Zinterhofer's team to invest in certain Charter notes that would be key in any restructuring.[73]

(i)     Apollo's March 2008 Investment Committee memo states that, "[a]s reflected in our current investment position, our initial focus has been the CIH class of securities" and "we have based our investment thesis on the premise that CIH would be the fulcrum security in a potential 2010 restructuring."  By March 2008, Apollo was accumulating positions in both CIH *and* CCH I Notes, because it expected one of those notes to be the fulcrum security, so that Apollo could "influence any outcome in a restructuring."[74]

(j)     By September 2008, Apollo had acquired a total of $351 million of face value in CCH I debt, and $365 million in CIH debt.[75]  It was considering consummating a loan-to-own acquisition in 2010 with a potential exit through a sale of Charter to Comcast or Time Warner:

> [B]y September 2010, to the extent the current credit environment persists and Charter's unable to refinance the maturities perpetuating a restructuring scenario, our securities would finance down to a reasonable level in the context of cable valuations.  This instills confidence that, should such a scenario materialize, we would be positioned in the fulcrum securities or to generate a cash recovery through a Comcast/Time Warner cable purchase.[76]

---

[73]   7/28/2009 Hr. Tr. at 93:2-6 (Zinterhofer).

[74]   JPX 28 at Charter-e 00779700; 7/28/2009 Hr. Tr. at 103:18-104:9 (Zinterhofer) ("Q. Did you use the words, in the memo you sent to your investment committee, to the three founding partners of the firm, that 'Given the uncertainty around the fulcrum security, we believe accumulating positions in both CCH I and CIH entities will provide Apollo with the requisite level of control to influence any outcome in a restructuring'?  A. Yes, that's –.  Q. Is that what you told him?  A. Those are the words we used here. . . . Q.  . . . [T]hat was part of your analysis of the Charter investment at the time?  A. It was part of our analysis.").

[75]   JPX 289 at Charter-e 00458449.

[76]   *Id.*

(k)     Apollo was so confident that either their CIH or their CCH I Notes would be the fulcrum security in any restructuring that Apollo increased its holdings in CCH I Notes and CIH Notes after Charter's December 12, 2008 announcement that it intended to discuss a restructuring with bondholders. Apollo acquired an additional 2% of the outstanding CCH I Notes, and by March 2009, it held $886.1 million in Charter debt.[77] Apollo's investment in CCH I Notes totaled $477.9 million and its investment in CIH Notes totaled $368.1 million.[78]

(l)     Zinterhofer admitted that in the fall of 2008, Apollo considered a 2010 restructuring of Charter increasingly likely and began to analyze a loan-to-own-strategy. However, until Charter made its December 2008 announcement, Apollo was not aware that the timeframe of the restructuring was being accelerated.[79]

(m)     Crestview also purchased an additional $38 million face amount of CCH I Notes in September 2008 as the economy collapsed and a potential restructuring of Charter in 2010 became increasingly likely.[80] Crestview's investment in CCH I Notes totaled $138 million by March 2009.[81]

---

[77]    JPX 235 at Charter-e 87668.

[78]    *Id.*

[79]    7/28/2009 Hr. Tr. at 110:22-111:9 (Zinterhofer) ("Q. And whether it's the end of September or October or some point in the fall, you moved from your clipping coupons/passive-investor strategy to what has been characterized or called by yourself, by Mr. Glatt, by others, as a distressed-to-own strategy. A. Well, we didn't really know that we were in that scenario until the call from -- you know, basically from Jim Millstein that I talked about where we saw that the company was going to be potentially imminently going through a restructuring. But I think what we thought, as I stated earlier, is that a restructuring in that 2010 time frame could have been increasingly likely, and we were seeking to analyze, you know, what would happen in that scenario.").

[80]    JPX 234 at Charter-e 001144533; 7/28/2009 Hr. Tr. at 111:5-9 (Zinterhofer) ("we thought [in Fall of 2008] . . . that a restructuring in that 2010 time frame could have been increasingly likely, and we were seeking to analyze, you know, what would happen in that scenario").

[81]    JPX 234 at Charter-e 001144533.

(n)     Oaktree also invested in Charter debt securities anticipating a restructuring in 2010.  During the negotiations of the Plan, Oaktree informed its investors that it had considered Charter to be "2010's business," but that in conjunction with a "like-minded group of holders" it had "developed a well-defined strategy to accomplish all that we could have accomplished" in 2010.[82]  By the end of December 2008, Oaktree had accumulated a total of $981 million face value in Charter notes, with $577 million in the CCH I Notes.[83]  In February 2009, Oaktree sent an update letter to its investors telling its investors that it had long anticipated a potential Charter restructuring in 2010.[84]

> **(d)     Apollo, Oaktree And Crestview Formed A Group For A Loan-To-Own Transaction Following Charter's December Announcement**

26.     Upon Charter's announcement on December 12, 2008 that it had engaged Lazard Frères & Co. LLC ("Lazard") to advise on a possible restructuring and begin discussions with Charters' bondholders, Apollo, Oaktree and Crestview quickly formed a group to act together to acquire equity securities in a restructured CCI to ensure sure that their CCH I Notes would be the fulcrum security and converted into equity.

(a)     On December 12, 2008, Charter issued a press release announcing that it had retained Lazard to initiate discussions about financial alternatives with the company's bondholders.[85]  The Takeover Group recognized that there was a risk either of a free fall

---

[82]   JPX 159 ("We knew Charter was overleveraged and would eventually go through a reorganization to extinguish debt and right-size its balance sheet.  However, like the market as a whole, we expected that to take place no earlier than the end of 2010. . . . Simply put, we assumed Charter was 2010's business.").

[83]   JPX 367.

[84]   JPX 159.

[85]   JPX 92.

bankruptcy or a restructuring in which the CCH II Notes were deemed to be the fulcrum security and both of those scenarios would result in their CCH I debt being wiped out.[86]

(b)     Apollo immediately recognized the restructuring as a golden opportunity to accelerate the timetable for the loan-to-own strategy that it had been analyzing.[87]

(c)     Initially upon learning of this development, Oaktree and Crestview, believed that a restructuring was premature and sought to convince Lazard to push it back to 2010.[88]

(d)     On December 14, 2008—two days after the December 12 announcement— Marc Rowan, a founding partner of Apollo, laid out for his subordinate, Zinterhofer, how to execute the loan-to-own strategy through a $2.54 billion rights offering, underwritten by Apollo, Oaktree and Crestview, to pay off the CCH II Notes and buy Charter at "6-ish times" EBITDA.[89] Rowan told Zinterhofer that the "[k]ey is to get Oak Tree and Crest on board."[90]

(e)     Apollo did get Oaktree and Crestview on board to execute the loan-to-own strategy.  Rowan sent an email to Bruce Karsh of Oaktree on December 15, saying:  "It seems that every few years we get back together . . . 2009 seems like that time.  Eric Zinterhofer is on point

---

[86]   7/28/2009 Hr. Tr. at 110:4-15 (Zinterhofer) ("Q.  . . . [Y]ou wanted to make sure that the fulcrum security was going to either be CCH I or CIH, and definitely you didn't want CCH II to be the fulcrum security?  A. That's correct, because we would have been wiped out on our investment had that been in the case, and that was our concern."); 7/29/2009 Hr. Tr. at 30:12-23 (Marcus) ("[I]f the CCH IIs were the fulcrum security, we would almost be assured of having our investment wiped out."); 7/29/2009 Hr. Tr. at 173:9-174:9 (Liang) ("Q.  And did Oaktree have a preference as between the two?  A.  You know, we held more of the CCH I eleven percent notes.  So there was a desire to have the equity put there.  . . .").

[87]   7/28/2009 Hr. Tr. at 110:22-111:9 (Zinterhofer).

[88]   JPX 95.

[89]   JPX 308.

[90]   *Id.*

on Charter but I am hovering in the background. I have urged him to get aligned with you as this may be a great opportunity notwithstanding that it is coming a year too soon."[91]

(f)     James Zelter of Apollo then set up a call with Zinterhofer and Karsh.[92] On December 16, 2008, Barry Volpert, Crestview's founder, sent an email to Rowan saying that he "[s]poke with Eric [Zinterhofer]. We agree on an approach for now."[93] Rowan subsequently instructed Zinterhofer to "[p]artner with Crestview and or Oaktree and buy lots of CCH I and be prepared to put in a bunch of new money."[94]

(g)     The Crestview deal team ultimately described the Plan to its Investment Committee as "an attractive investment opportunity to team up with Apollo and Oaktree to buy a controlling stake in the fourth largest U.S. cable company."[95]

**(e)     Apollo, Oaktree And Crestview Recruited Franklin To Execute The Loan-To-Own Strategy**

27.     Apollo, Oaktree and Crestview needed, solicited and obtained Franklin's agreement to execute the loan-to-own strategy.

(a)     Apollo immediately recognized that it "certainly" was necessary to get Franklin on board with the loan-to-own strategy because of the size of Franklin's CCH I holdings and because Franklin held "close to a blocking position in CCH II Notes."[96]

---

[91]     JPX 99 at Charter-e 00819783.

[92]     7/28/2009 Hr. Tr. at 125:19-22 (Zinterhofer).

[93]     JPX 309.

[94]     JPX 139.

[95]     JPX 234 at Charter-e 00114533.

[96]     JPX 91 at Charter-e 00818378 ("With the press release out we need to reach to other key holders but certainly Franklin who owns over $750mm face of the 11s."); JPX 157 at Charter-e 93995; 7/28/2009 Hr. Tr. at 143:22-144:2 (Zinterhofer) ("Q. Right. And at the time, you understood that Franklin had close to a blocking position in the CCH II bonds, is that not

(b)     Crestview and Oaktree similarly recognized the importance of Franklin and each separately reached out to Franklin.[97]

(c)     Apollo, Oaktree and Crestview needed Franklin, with its deep pockets, to "step up" and commit to the rights offering "in order to consummate the restructuring plan" because they either could not or did not want to invest the full amount necessary to gain control of Charter themselves.[98]

28.     Franklin agreed to support the Plan to protect its $2.5 billion investment in Charter debt securities that could be at great risk in a restructuring.[99]

(a)     Franklin is the largest holder of Charter debt securities.[100]  At the time Charter issued the December 12, 2008 press release, Franklin held $2.2 billion face amount of Charter debt.  It currently holds $925 million face amount of CCH I Notes (23% of outstanding CCH I Notes); $1.028 billion face amount in CIH Notes; $497 million in CCH II Notes; and about $110.5 million in CCOH Notes.[101]

(b)     Franklin quickly recognized that it needed the CCH I Notes to be the fulcrum security in order to protect as much of its Charter investments as possible.  Almost $2 billion of Franklin's holdings are at the CCH I level or more junior.  If the fulcrum were senior to

---

correct?  A. Yes. And therefore, we would need them to be on board for the restructuring plan which we ultimately signed or else we probably would not have been able to achieve it.").

[97]  JPX 95.

[98]  7/28/2009 Hr. Tr. at 155:16-156:15, 157:8-158:1 (Zinterhofer) ("So, again, what we're trying to do is, you know, basically try to find people collectively who can step up and do this rights offering in order to consummate the restructuring plan."); 7/29/2009 Hr. Tr. at 180:9-16 (Liang) (testifying that Oaktree had already invested a lot of capital in the bonds and preferred to invest less in the rights offering).

[99]  7/23/2009 Hr. Tr. at 79:5-8 (Villaluz).

[100]  7/23/2009 Hr Tr. at 71:11-13 (Villaluz).

[101]  7/23/2009 Hr Tr. at 71:23-72:6 (Villaluz).

CCH I, most of Franklin's investment could be wiped out.[102]  Christine Villaluz, a cable industry analyst at Franklin who represented Franklin's interests during Charter's restructuring and reported back to Franklin's portfolio managers, recognized that this was a "big problem" for Franklin.[103]

        (c)     Villaluz had "very limited" experience with restructurings and was "nervous and apprehensive" about working with Apollo and Oaktree.[104]

        (d)     Ultimately, however, she "got comfortable" with Apollo and the other private equity firms.  Villaluz even at one point considered giving Apollo "her proxy" in negotiations with Charter, but in the end decided that, because "we are a 23% of the group," the direction of the process should include Franklin and not be "just them."[105]

        (e)     Villaluz  recognized that Apollo was executing a loan-to-own strategy and she ultimately agreed to support it.  Villaluz agreed that "[w]hen there was no alternative but a free-fall bankruptcy and the possibility that [Franklin's $2.2 billion] debt holdings would be wiped

---

[102] 7/23/2009 Hr. Tr. at 65:16-66:4, 140:17-21 (Villaluz) ("Q. . . . By your observation over the last several months where you've been involved in the restructuring and you've been the person in charge at Franklin in that regard, you've observed Apollo executing on its loan-to-own strategy, is that not correct?  A. I don't know what Apollo's specific strategy -- I don't know when they bought their securities and what their intent.  Q. So you don't have a view one way or the other on that?  A. I could make an assumption that Apollo views this as a longer-term holding.  Q. A longer-term holding that involves converting their debt holdings into equity, a loan-to-own strategy, is that not correct?  A. Yes.").

[103] 7/23/2009 Hr Tr. at 80:10-81:5 (Villaluz) ("Q. Okay.  Now, you realized there was some risk that it might not be the CCH I bonds that would be the fulcrum security, correct?  A. Yes.  Q. And it was a concern to you because Franklin had significant holdings at the CCH I level and below? And I think you were just alluding to that earlier, were you not?  A. Yes.  Q. And CIH bonds are junior to CCH I bonds in the capital structure, is that correct?  A. Yes.  Q. And together, between the CCH I and the CIH bonds, you held about two billion face?  A. Yes.  Q. And you were concerned that in a potential restructuring, if the fulcrum was senior to the CCH I bonds, your CCH I bonds and your CIH bonds could be wiped out?  A. Yes.  And this 2.2 billion dollar issue was more than an issue; it was a problem, a big problem, wasn't it?  A. Yes.").

[104] 7/23/2009 Hr Tr. at 11:7-9, 77:24-78:5 (Villaluz).

[105] JPX 182 at Charter-e 00503935; 7/23/2009 Hr Tr. at 103:2-4 (Villaluz).

out, [Franklin] agreed and supported a plan of reorganization that would cause [its] debt holdings

in Charter to be converted to acquire in the post-reorganized Charter an equity position."[106]

> **(f)** **Apollo, Oaktree, Crestview And Franklin Negotiated, Agreed To And Implemented A Reorganization Plan With The Shared Objective Of Acquiring Charter Equity Securities**

29.     Apollo, Oaktree, Crestview and Franklin negotiated, agreed to and implemented a

restructuring plan with the common objective of acquiring Charter equity securities.

(a)     Apollo, Oaktree, Crestview and Franklin retained common financial

advisors and common counsel to negotiate and draft the Term Sheet, Restructuring Agreement and

Commitment Letter on their behalf.[107]

(b)     Representatives of Apollo, Oaktree, Crestview and Franklin met as a group

with Charter CEO Neil Smit in a dinner meeting organized by Marcus, and also had a breakfast

meeting with Charter senior management.  The Takeover Group's financial and legal advisors and

other members of the bondholder committee were *not* present at the meetings.[108]  The Takeover

Group also communicated amongst themselves on other issues as well.[109]

---

[106] 7/23/2009 Hr. Tr. at 65:16-66:4, 141:2-8 (Villaluz) ("Q. By your observation over the last several months where you've been involved in the restructuring and you've been the person in charge at Franklin in that regard, you've observed Apollo executing on its loan-to-own strategy, is that not correct?  A. I don't know what Apollo's specific strategy -- I don't know when they bought their securities and what their intent.  Q. So you don't have a view one way or the other on that?  A. I could make an assumption that Apollo views this as a longer-term holding.  Q. A longer-term holding that involves converting their debt holdings into equity, a loan-to-own strategy, is that not correct?  A. Yes.").

[107] 7/23/2009 Hr. Tr. at 119:18-120:3 (Villaluz).

[108] 7/28/2009 Hr. Tr. at 150:23-151:1; 151:18-152:1 (Zinterhofer); 7/23/2009 Hr. Tr. at 36:7-37:22 (Villaluz); 7/29/2009 Hr. Tr. at 87:10-22 (Marcus).

[109] *See, e.g.*, JPX 196 at Charter-e 00546383 ("In thinking through next steps, I thought it would make sense to convene a call tomorrow, Thursday, at 11am ET with the big backstop parties to talk through a diligence plan, including major areas to cover, advisers to engage, and timeline to completion.  Note that I have included only Apollo, Oaktree, Crestview and Franklin at this

(c)      Representatives of Apollo, Oaktree, Crestview and Franklin also negotiated as a group with Lance Conn of Vulcan during in-person meetings on February 4, 2009.  No other bondholder attended these meetings.[110]  According to Lazard's Millstein, who was Charter's chief restructuring advisor, he was just "the passenger" in the negotiations with Allen's representatives, which Apollo's Zinterhofer was "driving."[111]  In those negotiations, the Takeover Group denied Allen the right to nominate a majority of the CCI Board of Directors because the bondholders "would be the new owners of the company."[112]

(d)      Apollo, Oaktree, Crestview and Franklin collectively agreed to invest almost $1 billion of new money in the rights offering.[113]  And, the Takeover Group structured the Restructuring Agreement and relating agreements such that the breach by any one member would release all other members of the Takeover Group from their obligations under their respective agreements.[114]

(e)      If the Plan is confirmed, the Takeover Group (and, indeed, Apollo in combination with any two of the other group members) will own a majority of the Class A equity.[115]

(f)      None of the representatives of the Takeover Group denied the existence of an agreement among the members of the Takeover Group to acquire equity securities of Charter.

---

point since the major holders should reach consensus on a diligence plan before reaching out to the rest of the group.").

[110]  9/2/2009 Hr. Tr. at 92:19-93:19 (Conn).

[111]  7/21/2009 Hr. Tr. at 177:11-178:3, 182:2-13 (Millstein); 7/28/2009 Hr. Tr. at 167:4-168:1 (Zinterhofer).

[112]  7/29/2009 Hr. Tr. at 214:3-8 (Liang).

[113]  ¶¶ 33-35; 8/24/2009 Hr. Tr. at 199:11-22 (Gompers).

[114]  JPX 198 §§ 4(a), 8(a)(xii), (xiv).

[115]  8/24/2009 Hr. Tr. at 65:4-7 (Goldstein); 7/28/2009 Hr. Tr. at 185:25-186:15 (Zinterhofer).

(g)     Based on his 15 years of research on and practical experience with private equity firms, Professor Gompers testified that: "[w]hat's clear here is that there is an agreement and that agreement is the acquisition of equity, acquisition of a control[] position in equity through the process of restructuring, through the debt-for-equity swap and, in particular, the agreement of all four parties to participate in the rights offering."[116]

30.     Paul Weiss, on behalf of the Takeover Group, negotiated and drafted a single form of Restructuring Agreement and Commitment Letter for all members of the Takeover Group to sign.[117] Paul Weiss defined its clients as the "Group" in the retention letter it sent to Charter on behalf of the Takeover Group.[118]

(a)     Apollo, Oaktree, Crestview and Franklin signed identical Restructuring Agreements incorporating the same Term Sheet.[119]

(b)     Villaluz admitted on cross-examination that the Takeover Group signed "the same agreement."[120]

---

[116] 8/24/2009 Hr. Tr. at 223:22-224:2 (Gompers).

[117] 7/23/2009 Hr. Tr. at 119:18-120:5 (Villaluz) ("Q. Okay. Now, in the restructuring agreements that were put together for this proposed plan of reorganization, your lawyers at Paul Weiss drafted one form of restructuring agreement for each bondholder to sign, is that correct? The same one. A. The same one. I think so. Yes. Q. All right. And Paul Weiss negotiated on your behalf one term sheet? A. Yeah. Q. And one form of commitment letter? A. I'm sorry; I'm trying to recall if I made any changes to that. I think we ultimately -- yes. Q. The same one? A. I think so. I think so.").

[118] JPX 110 at CHARTER 55455.

[119] *See, e.g.*, JPX 218 at 1; JPX 198 § 8(a)(xiv); JPX 200; JPX 202; JPX 205; 7/29/2009 Hr. Tr. at 208:8-11 (Liang) ("Q. And you understood that if Apollo or Crestview or Franklin were to back out of the plan, Oaktree could back out of its agreement as well, correct? A. That is my understanding, yes."); 7/28/2009 Hr. Tr. at 173:18-174:13 (Zinterhofer); 7/23/2009 Hr. Tr. at 120:20-120:25 (Villaluz) ("Q. So when you said earlier today there are no express, implied, written, unwritten agreements there's at least one agreement that you all signed; is that not correct? A. The plan support agreement and restructuring agreement. Q. You all signed the same agreement, is that not correct? A. Yeah."); 7/28/2009 Hr. Tr. at 78:15-24 (Zinterhofer); 7/29/2009 Hr. Tr. at 208:3-7 (Liang).

31.     In addition to signing identical Restructuring Agreements incorporating the same Term Sheet, Apollo, Oaktree, Crestview and Franklin bound themselves to one another through such agreements.

(a)     Everyone in the Takeover Group agreed to vote in favor of the Plan, support confirmation of the Plan, and refrain from assigning its Charter Notes (other than to an assignee who agrees to join the group).[121]

(b)     In each Restructuring Agreement with the members of the Takeover Group, Charter represented that it was entering into the same agreement with the same terms with the other members of the Takeover Group.[122]

(c)     Each Restructuring Agreement provides that a breach by one member of the Takeover Group would release all other members of the Takeover Group from their obligations under their respective Agreements.[123]

(d)     The Term Sheet provided that Apollo, Oaktree, Crestview and Franklin would exchange their CCH I Notes for equity securities of CCI and acquire additional equity securities of CCI through an investment of new money in the rights offering.[124]

---

[120]  7/23/2009 Hr. Tr. at 120:13-19 (Villaluz).

[121]  JPX 198 § 3(a)-(c).

[122]  *See, e.g.*, JPX 198 § 4(a); 7/23/2009 Hr. Tr. at 121:1-4 (Villaluz) ("Q. Indeed the restructuring agreement says that they're consistent in all material terms with the terms and provisions of each other's agreements, is that correct?  A. Yes.").

[123]  *See, e.g.*, JPX 218 at 1; JPX 198 § 8(a)(xiv); 7/29/2009 Hr. Tr. at 208:8-11 (Liang) ("Q. And you understood that if Apollo or Crestview or Franklin were to back out of the plan, Oaktree could back out of its agreement as well, correct?  A. That is my understanding, yes."); 7/28/2009 Hr. Tr. at 173:18-174:12 (Zinterhofer).

[124]  JPX 218 at Charter-e 00542842.

32.     Each Restructuring Agreement specifically requires Charter to obtain the Requisite

Holders' consent to any amendment of the Plan.[125]

(a)     Apollo, Oaktree, Crestview and Franklin hold a majority face amount of

CCH I Notes and constitute the "Requisite Holders" with the power to approve the terms of the

Plan and Charter's Disclosure Statement on behalf of the other bondholders.

33.     Apollo, Oaktree, Crestview and Franklin agreed to act as equity backstop parties by

committing to invest collectively almost $1.6 billion in the rights offering, and signed identical

Commitment Letters setting forth the amount of their respective commitments to the rights

offering.[126]

34.     By agreeing to the Term Sheet and signing their respective Commitment Letters, (i)

Apollo agreed to commit $701.9 million to the rights offering; (ii) Oaktree agreed to commit $300

million to the rights offering; (iii) Crestview agreed to commit $225 million to the rights offering;

and (iv) Franklin agreed to commit $336.4 million to the rights offering.[127]  Franklin subsequently

negotiated with Apollo to reduce its commitment by $88 million to $248 million with Apollo

agreeing to increase its commitment by the corresponding amount.[128]

---

[125]   *See, e.g.*, JPX 198 § 9(f)(iii); 7/23/2009 Hr. Tr. at 121:5-16 (Villaluz); 7/28/2009 Hr. Tr. at 173:18-174:13 (Zinterhofer); JPX 218 at 1.

[126]   JPX 218, Annex E (Two other firms, WAMCO and MFC Global, committed a combined $60 million to the rights offering.  The amount of their commitment is *de minimis* in the context of the $1.6 billion offering and neither WAMCO nor MFC have any rights to Board representation or other mechanisms of control of Charter); JPX 207; JPX 209; JPX 211; JPX 214.

[127]   JPX 218, Annex E; JPX 207 at Charter-e 00097968; JPX 209 at Charter-e 00003465; JPX 211 at Charter-e 00052681; JPX 214 at Charter-e 00053031; 7/28/2009 Hr. Tr. 79:8-22 (Zinterhofer); 7/29/2009 Hr. Tr. at 207:9-14 (Liang) ("Q. And ultimately Oaktree and Apollo and Crestview and Franklin agreed to backstop almost the entire equity rights offering, correct? A. Yes, that was the end result. But, again, the opportunity to backstop, or provide the backstop, was given to everyone that was on the committee.").

[128]   JPX 340 at Charter-e 00559186-559187.

35. Apollo, Oaktree, Crestview and Franklin negotiated and agreed on the amount of their respective commitments to the rights offering.[129]

(a) By investing new money in a rights offering, Apollo, Oaktree, Crestview and Franklin would enhance the equity ownership in Charter that they would obtain through the Plan, pursuant to which their CCH I Notes are converted into equity.

(b) Franklin, Apollo, Oaktree and Crestview discussed and understood that the proceeds of the rights offering would be used to pay off a portion of the CCH II Notes to ensure that the CCH I Notes would be the fulcrum security.[130]

(c) Villaluz was initially opposed to the rights offering, but Apollo and Oaktree were "pushing hard" for it.[131] Villaluz realized that Franklin had to "work together" with the private equity firms because, if it did not, there was a risk that the CCH I Notes would not be the fulcrum security and most of Franklin's investment in Charter debt would be wiped out.[132]

---

[129] JPX 218, Annex E; 7/28/2009 Hr. Tr. 163:12-20 (Zinterhofer) ("Q. . . . Now you and Oaktree and Crestview and Franklin all negotiated together about the size of your commitment to the rights offering. A. Excuse me? I'm sorry. You said we negotiated together -- can you repeat the question. Q. Right. You discussed among yourselves what your respective commitments were going to be. A. I believe we had to work that through at one point in time, yes."); 7/29/2009 Hr. Tr. at 206:25-207:8 (Liang); 7/29/2009 Hr. Tr. at 42:10-23 (Marcus) ("Q. . . .What are you referring to here as to your agreement with Apollo and Oaktree? A. Well, this refers to the excess -- well, this refers to -- the 215 million agrees -- refers to what we had agreed to commit at that point in terms of our overall investment. And as I mentioned before, it moved around quite a bit.").

[130] 7/29/2009 Hr. Tr. at 173:9-18, 204:1-6 (Liang); 7/23/2009 Hr. Tr. at 105:1-5 (Villaluz).

[131] JPX 146 at Charter-e 235031 ("[O]aktree and [A]pollo obviously are pushing hard for a rights offering").

[132] 7/23/2009 Hr. Tr. at 97:24-98:17, 100:15-25 (Villaluz) ("Q. You were in the middle of a big learning process at this point. This was your first restructuring. You find yourselves, you, you find yourself working with sophisticated distressed debt traders in private equity firms. They're pushing hard for a rights offering. And you're trying to figure out what's in Franklin's best interest, but you also realize that you have to work together with them because if you don't you're going to end up with the risk that you're going to be totally wiped out of your now 2.5 billion dollars of investment. Is that not correct? A. Yes.").

(d)     Villaluz eventually concluded that cooperating in the rights offering with Apollo and Oaktree was necessary and desirable to ensure that the CCH I Notes would convert to equity and the Takeover Group would acquire control of Charter.

(e)     Franklin agreed to act together with Apollo, Oaktree and Crestview to invest new money in the rights offering to allow Franklin's CCH I investment to convert to equity. [133]

36.     In addition, Apollo, Oaktree and Crestview agreed to be "excess backstop parties" who committed to invest additional amounts and acquire more equity in Charter through the rights offering to the extent other CCH I holders did not exercise their full pro rata share of rights.[134]

(a)     Apollo, Oaktree, Crestview and Franklin agreed in the Term Sheet that Apollo, Oaktree and Crestview, as excess backstop parties, would have a right of first refusal with respect to the transfer of any rights in the rights offering.[135]  They also agreed to give the excess backstop parties an "overallotment option" that would allow them to invest in additional equity above their pro rata share to the extent the rights agreement was fully subscribed.[136]

---

[133]  JPX 182; 7/23/2009 Hr. Tr. at 105:1-16; 105:20-106:3; 108:16-19 (Villaluz) ("Q. Okay.  And by committing your 336 million dollars to this rights offering you're making this current reorganization practical or possible.  Is that not correct?  A. Yes.").

[134]  JPX 218 at Charter-e 00542842-43; 7/28/2009 Hr. Tr. at 164:16-23 (Zinterhofer).

[135]  JPX 218 at Charter-e 00542842.

[136]  JPX 218 at Charter-e 00542842; 7/28/2009 Hr. Tr. at 164:12-23 (Zinterhofer) ("Q. Okay.  And you and Oaktree and Crestview agree on top of that that you would commit to even more than your pro rata share of the rights offering, is that correct?…A. Yeah.  I think we were so-called excess backstop parties.  Q. Okay.  And you and Oaktree and Crestview entered identical agreements with Charter regarding that excess backstop commitment?  A. We – all three of us separately signed agreements with the company along those lines."); JPX 170 ("The over allotment is a way to solve for a minimum $400mm investment by the backstop group.  It is at our option.  We are fortunate that Franklin agreed to this."); 7/29/2009 Hr. Tr. at 181:11-183:7 (Liang).

37.     Although Crestview's equity ownership will fall below the threshold for an automatic Board seat,[137] the other members of the Takeover Group agreed to put Jeff Marcus on the Board anyway.[138]

(a)     On February 6, 2009, the Takeover Group met to negotiate issues related to the rights offering, including "board seats and the ten percent threshold."[139]  Crestview was especially interested in obtaining Board representation.  During the course of the meeting, Marcus realized  "that Crestview would not have ten percent and therefore, under the formula, would not be entitled to a board seat."[140]  Nevertheless, Marcus was determined to get a Board seat.

(b)     Marcus immediately approached Liang and O'Leary from Oaktree and Zinterhofer from Apollo to discuss his concerns about Crestview's right to Board representation.[141]  Marcus's discussion with Liang, O'Leary and Zinterhofer went very well.  The discussions went so well that Marcus's colleague Brian Cassidy, sent an email to Volpert, Crestview's founding partner, and Delaney before the meeting was over.  Cassidy's email was straight to the point: "Apollo and Oaktree *agreed to put Jeff on the board* even if [Crestview] end[s] up under 10%.").[142]

---

[137] 7/29/2009 Hr. Tr. at 41:24-42:3 (Marcus) ("Q.  Now, Mr. Marcus, do you have any expectations to whether Crestview -- I take this as implicit your last answer, but let the record be clear -- whether Crestview will achieve the ten percent threshold that will permit it to nominate a director?  A.  I'm afraid we won't.").

[138] JPX 169 ("Apollo and Oaktree agreed to put Jeff on the board even if we end up under 10%."); JPX 193.

[139]  7/29/2009 Hr. Tr. at 43:12-45:10 (Marcus).

[140]  *Id*.

[141]  *Id*.

[142]  JPX 170 at Charter-e 00144028,

(c)     Shortly after the meeting ended, Marcus sent a follow-up email to Volpert and Delaney confirming that Apollo and Oaktree had promised him a board seat "even though [Crestview would] own less than 10%."[143]

(d)     On February 10th, four days after the meeting with the ad hoc committee, Marcus, Delaney and Cassidy sent a detailed 29-page memorandum to Crestview's Investment Committee "recommending that it invest up to $225 million" in the rights offering.[144]  The memo explained, at least twice, that Crestview would get a board seat.[145]

(e)     At trial, Zinterhofer and Villaluz admitted they would support Marcus's candidacy for the Board, if asked.[146]

(f)     Marcus clearly believed he had a firm agreement to put him on the Board— his March 9 memorandum to the Crestview Investment Committee says four different times that he would "most likely" be the Chairman of the Board.[147]

38.     Through the Term Sheet, Apollo, Oaktree, Crestview and Franklin selected the restructured Charter's senior management.  They agreed that:  (a) Neil Smit will be the Chief Executive Officer of the reorganized CCI; (b) Michael Lovett will be the Chief Operating Officer of the reorganized CCI; and (c) the new Board will select other members of senior management in

---

[143]  *Id.*

[144]  JPX 193 at CHARTER 00050300.

[145]  JPX 193 at CHARTER 00050301 ("They have committed to a board seat for Jeff as part of the transaction"), CHARTER 00050311.

[146]  7/28/2009 Hr. Tr. at 51:2-52:12 (Zinterhofer); 7/23/2009 Hr. Tr. at 54:21-56:3 (Villaluz).

[147]  JPX 238 at Charter-e 00375570, Charter-e 00375571, Charter-e 00375574, Charter-e 00375608.

consultation with Smit.[148] The Takeover Group agreed on the so-called Restructuring Value Plan that would provide management incentives going forward.[149]

39. Apollo, Oaktree, Crestview and Franklin also decided the manner in which the new CCI Board will be selected if the Plan is confirmed. The procedure is set forth in the Disclosure Statement and accompanying Amended and Restated Certificate of Incorporation. The new Board will have 11 directors. Four of the 11 directors will be Class B directors. Allen will appoint these 4 Class B directors.[150] Seven of the 11 directors will be Class A directors, each of whom will be elected by majority vote of the Class A equity.[151]

> **(g)** **The Takeover Group's Members Admit (At Least Privately) They Are Partners And Part Of A Group To Acquire And Hold Charter Equity Securities That Will Jointly Control Charter Post-Bankruptcy**

40. The members of the Takeover Group admit that they will jointly control Charter as a group post-emergence from bankruptcy:

(a) At a meeting of the Apollo Investment Committee on April 14, 2009, Marc Rowan and James Zelter explained that "[c]ontrol of the company was given to investors who invested new money in the company via a rights offering."[152] The investors that invested new

---

[148] JPX 218 at Charter-e 00542853.

[149] 7/22/2009 Hr. Tr. at 106:7-11 (Smit).

[150] *Id.*; JPX 352, Amended and Restated Ex. 3, art. IV, § (b)(i)(B)(1) ("In all elections of directors, the holders of Class B Common Stock voting together as a separate class shall be entitled to elect thirty-five percent (35%) of the members of the Board of Directors (rounded up to the next whole number).").

[151] JPX 352, Amended and Restated Ex. 3, art. IV, § (b)(i)(B)(2) ("The holders of Class A Common Stock voting together as a separate class . . . shall be entitled to elect each other member of the Board of Directors not elected by holders of Class B Common Stock . . . ."); JPX 218 at Charter-e 00542853.

[152] JPX 263 at Charter-e 00823112.

money in Charter via the rights offering that they were referring to are Apollo, Oaktree, Crestview and Franklin.[153] Paul Allen did not invest new money in Charter via the rights offering.[154]

(b)     Before Zinterhofer obtained internal approval at Apollo to execute the loan-to-own strategy, Apollo senior partner Josh Harris sought reassurance that the Takeover Group would achieve control. He wanted Zinterhofer to confirm that the deal was not a like a "PIPE"—private investment in public equity—in which an investor has a minority investment stake with no ability to control the company. Zinterhofer gave Harris that reassurance, explaining that Apollo usually "shares control in these loan to own situations" and that Apollo "expect[s] to control ¼ of the equity and, with Crestview, Oaktree and Franklin, control about 40% of the vote."[155]

(c)     Similarly, Zinterhofer's lieutenant, Darren Glatt, told Apollo's tax advisors at Pricewaterhouse Coopers in response to their inquiry about who would control the company post-bankruptcy that "[A]llen will have the right to 35% of the vote [of CCI], therefore the bondholders will control the other 65% and have the right to nominate directors commensurate with their voting control."[156]

(d)     Marcus and the Crestview deal team understood that Crestview was "team[ing] up with Apollo and Oaktree to buy a controlling interest in the fourth largest cable company." Marcus and the Crestview deal team stated in their March 9 memorandum to the

---

[153]   JPX 263; 7/28/2009 Hr. Tr. 82:6-82:10 (Zinterhofer) ("Q. . . .The question was were you and Franklin and Crestview and Oaktree the investors who invested 1.6 billion dollars, thereabouts, of new money in the company via the rights offering? A. Yeah, as we discussed earlier, that's about right.").

[154]   Id.; 7/28/2009 Hr. Tr. at 84:3-9 (Zinterhofer) ("Q. All right. Now, if we could go back to the page of this document we were looking at earlier, and I take it Mr. Allen did not invest any, quote, 'new money in the company via a rights offering', did he? A. Paul Allen? Of Vulcan? Q. That's right. A. Not that I'm aware of, no.").

[155]   JPX 237 at Charter-e 00098448; 7/28/2009 Hr. Tr. at 187:22-189:15 (Zinterhofer).

[156]   JPX 282 at Charter-e 644444.

Investment Committee that the restructuring was "an attractive opportunity to team up with Apollo and Oaktree to buy a controlling interest in the fourth largest cable company" and that "together with Apollo and Oaktree (with whom we have very good relationships) we will control approximately 68% of Charter's equity post-restructuring and have approximately 44% voting control."[157]

(e)     Marcus admitted that Crestview is "part of a group that together has seventy-two percent holders of this CCH I bond, as the plan anticipates, will own a majority control of the equity . . . . By teaming up, what we meant was that we would be part of a group."[158]

(f)     Apollo correspondence similarly shows that the Takeover Group was teaming up to take control of CCI by acquiring a controlling equity position in connection with Charter's restructuring.[159]

41.     Members of the Takeover Group also view each other as "partners" who will work together as a group post-emergence from bankruptcy:

(a)     Zinterhofer admitted that he views Oaktree, Crestview and Franklin as his "partners" and "co-investors in the transaction" who are "in the same boat" and will "work well together going forward."[160]

---

[157]  JPX 234 at Charter-e 00114533, Charter-e 00114557.

[158]  7/29/2009 Hr. Tr. at 72:21-74:4, 51:15-18 (Marcus) ("Look, we're a small firm, we're a new firm.  Apollo and Oaktree are iconic firms that have been around for a long time.  It's very credentializing for Crestview to be a part of a group that includes Apollo and Oaktree.").

[159]  JPX 139; JPX 237.

[160]  7/28/2009 Hr. Tr. at 73:5-11 (Zinterhofer) ("Q. Okay. Okay, finally, and we're getting to the end now, do you consider Oaktree, Crestwood -- Crestview and Franklin to be your partners in the Charter investment?  A. In the sense that I think about the word "partners", yeah.  I mean, we're co-investors in the transaction, and we're in the same boat. And I hope that we work well together going forward should this plan be consummated.").

(b)     In an e-mail at the conclusion of the Plan negotiations, Marcus

acknowledged that Zinterhofer was more than just his "partner" during the restructuring process.

Marcus was already focused on how, post-emergence from bankruptcy, he and Zinterhofer will be

"working together to make this company the best it can be":

> I am proud to be your friend and partner.  At this moment another
> Churchill quote comes to mind, this from a speech to Parliament
> following the Battle of Britain.  He said (something like):  "This is
> not the end, it is not even the beginning of the end, it is perhaps the
> end of the beginning."  So here's to a new beginning for Charter and
> to working together to make this company/investment all that it can
> be.[161]

(c)     Zinterhofer responded to Marcus that he also "look[ed] forward to being

your partner on this one."[162]

42.     The members of the Takeover Group also share a common objective with respect to

exiting their respective equity positions in CCI.  The Takeover Group has discussed exiting

through a sale to a strategic acquirer such as Comcast or Time Warner.[163]  Both Apollo's and

Crestview's Investment Committee memoranda identify sale to a strategic acquirer as the most

likely exit.[164]  And Villaluz of Franklin acknowledged that sale to a strategic acquirer would be

Franklin's "ideal" exit strategy.[165]  Marcus admitted that a possible acquisition by Comcast or

Time Warner would be an "an attractive exit alternative."[166]

---

[161]  JPX 244.

[162]  *Id*.

[163]  7/29/2009 Hr. Tr. at 80:19-81:6 (Marcus); 7/28/2009 Hr. Tr. at 41:20-42:6 (Zinterhofer).

[164]  JPX 234 at Charter-e 00114578; JPX 235 at Charter-e 0087655-56; JPX 289 at Charter-e 00458449.

[165]  7/23/2009 Hr. Tr. at 143:9-16 (Villaluz).

[166]  7/29/2009 Hr. Tr. at 80:19-81:6 (Marcus).

**(h)      The Takeover Group Attempted To Cover Its Tracks**

43.      The members of the Takeover Group have taken steps to cover their tracks to hide what they have been doing and their plans for the future.

44.      Crestview removed all references to taking joint control of Charter with its fellow Takeover Group members from the external versions of its Investment Committee memoranda that it made available outside the firm to its limited partners.  Crestview scrubbed three memoranda, dated February 4, 2009, February 20, 2009 and March 9, 2009, and altered or deleted nine different references to Crestview taking joint control of Charter with Apollo and Oaktree.  The following chart lists the material changes made in three Investment Committee memoranda comparing the internal and external versions:[167]

| **INTERNAL VERSION** | **EXTERNAL VERSION** |
|---|---|
| **February 4, 2009 Memorandum** | |
| We believe that there might be a real opportunity for Crestview to invest $150 million to $250 million of capital over and above our pro rata share *and together with Apollo and Oaktree control over 50% of the Company.  Both Apollo and Oaktree recognize the value of the deep cable experience and Charter knowledge that Jeff Marcus brings to the table and have indicated that they would let Crestview take more than its pro rata share of the equity backstop.*"  JPX 158 at Charter-e 00133067 (emphasis added). | We believe that there might be a real opportunity for Crestview to invest $150 million to $250 million of capital over and above our pro rata share.  JPX 243 at Charter-e at 00713420. |
| **Risks and Mitigants**<br>**Risk:  Minority Ownership Position**<br>**Mitigants**: *Together with Apollo and Oaktree (who we have very good* | **Risks and Mitigants**<br>**Risk:  Minority Ownership Position**<br>**Mitigants:**  [Bullet is deleted] |

---

[167] 7/29/2009 Hr. Tr. at 97:1-108:20 (Marcus).

| | |
|---|---|
| *relationships with), we would control more than 50% of the Company.*<br><br>JPX 158 at Charter-e 00133072 (emphasis added). | JPX 243 at Charter-e 00713424-25. |

| **February 10, 2009 Memorandum** ||
|---|---|
| Crestview has developed a close working relationship with both Apollo and Oaktree, and they recognize the value that Jeff Marcus brings to this transaction. *Together with Apollo and Oaktree, we would control approximately 60% of Charter's equity post-restructuring. However, given the change of control provisions in the Company bank loan agreement, we would not be able to enter into a shareholder agreement.*<br><br>JPX 193 at CHARTER 00050304 (emphasis added). | Crestview has developed a close working relationship with both Apollo and Oaktree, and they recognize the value that Jeff Marcus brings to this transaction.<br><br>JPX 243 at Charter-e 00713306. |
| **Greater control:** Crestview will own approximately 12% of the total Company and have one board seat. *Together with Apollo and Oaktree, we will control more than 60% of the Company.*<br><br>JPX 193 at Charter-e 00050309 (emphasis added). | **Greater control:** Crestview will own approximately 12% of the total Company and have one board seat.<br><br>JPX 243 at Charter-e 00713311. |
| **Risks and Mitigants**<br>**Risk: Minority Ownership Position**<br>**Mitigants:** *"Together with Apollo and Oaktree (whom we have very good relationships with), we would control more than 60% of the Company."*<br><br>JPX 193 at CHARTER 0050311 (emphasis added). | **Risks and Mitigants**<br>**Risk: Minority Ownership Position**<br>**Mitigants:** [Bullet is deleted]<br><br>JPX 243 at Charter-e 00713313. |
| **March 9, 2009 Memo** ||
| We view this as an attractive investment opportunity to *team up with Apollo and Crestview to buy a controlling stake in the fourth largest US cable company* . . . . | We view this as an attractive investment opportunity to buy a significant stake in the fourth largest US cable company . . . . |

| | |
|---|---|
| JPX 234 at Charter-e 00114533 (emphasis added). | JPX 243 at Charter-e 00713335. |
| Crestview has a very good relationship with the senior leadership of both Apollo and Oaktree and the firms also recognize the value that Jeff Marcus brings to this transaction. *Together with Apollo and Oaktree, we would control approximately 68% of Charter's equity post-restructuring and have approximately 44% voting control. However, given the change of control provisions in the Company's bank agreements, we would not be able to enter into a shareholder agreement.*<br><br>JPX 234 at Charter-e 00114557 (emphasis added). | Crestview has a very good relationship with the senior leadership of both Apollo and Oaktree and the firms also recognize the value that Jeff Marcus brings to this transaction. Apollo, Oaktree, Franklin and Crestview would be the four largest shareholders of the Company with a combined 85% ownership stake.<br><br>JPX 243 at Charter-e 00713359. |
| **Greater control:** Crestview would own approximately 12% of the total Company, and Jeff Marcus would most likely be Chairman of the Board. *Together with Apollo and Oaktree, we would have economic control of more than 65% of the Company.*<br><br>JPX 234 at Charter-e 00114581 (emphasis added). | **Greater control:** Crestview would own approximately 12% of the total Company and Jeff Marcus would most likely be Chairman of the Board.<br><br>JPX 243 at Charter-e 000713383. |
| **Risks and Mitigants**<br>**Risk**: **Minority Ownership Position**<br>**Mitigants**: *Together with Apollo and Oaktree (whom we have very good relationships with), we would have economic control of more than 65% of the Company.*<br><br>JPX 234 at Charter-e 00114582 (emphasis added). | **Risks and Mitigants**<br>**Risk: Minority Ownership Position**<br>**Mitigants:** Crestview has very good relationships with Apollo and Oaktree, who would be the two largest shareholders of the Company.<br><br>JPX 243 at Charter-e 00713384. |

45. Apollo admitted that it sought to avoid leaving "an email trail: Fyi, the reason I have not put these nums in a email is b/c they are 1) in flux, and 2) something we would not want an email trail on."[168]

46. Marcus of Crestview similarly noted that "together with Apollo and Oaktree (with whom we have control of approximately 68% of Charter's equity post-restructuring and have approximately 44% voting control. *However, given the change of control provisions in the Company's bank agreements, we would not be able to enter into a shareholders agreement.*"[169]

47. Oaktree created no internal memoranda or other document memorializing or reflecting its analysis of the transaction or its reasons for entering into the transaction.[170] Ken Liang explained: "[w]e spend a lot of time talking about issues."[171]

48. In the midst of a discussion about a potential relationship with Oaktree in connection with another transaction, Zinterhofer informed his bosses that "Ken Liang (from Oaktree) and I are making all the decisions together on the Charter restructuring. We don't have anything is [sic] writing, just like we didn't in Spectrasite, but we have known each other a long time."[172]

**2. The Takeover Group Will Have The Power To Vote Equity Interests Having The Same Or Greater Voting Power For The Management Of The Borrower Than Paul Allen**

49. The Plan will result in a change of control under Section 8(k)(ii) of the Credit Agreement in 3 ways:

---

[168] JPX 181 at Charter-e 00096991.

[169] JPX 234 at Charter-e 00114557 (emphasis added).

[170] 7/29/2009 Hr. Tr. at 215:20-25, 217:9-17 (Liang).

[171] 7/29/2009 Hr. Tr. at 217:13-14 (Liang).

[172] JPX 181 at Charter-e 96991.

(a)     The Plan will result in the Takeover Group having a greater voting interest in the combined new Class A and new Class B equity than Paul Allen;

(b)     The Plan will give the Takeover Group the voting power to elect a majority of the Board;

(c)     Apollo, Oaktree and Crestview will own a majority of the new Class A equity and thus have the voting power to elect a majority of the Board, even without Franklin.

### (a)     The Takeover Group Will Have A Greater Voting Interest In CCI Than Paul Allen

50.     Based on Charter's own calculations, the Plan will result in the Takeover Group having a greater voting interest in the combined new Class A and new Class B equity than Paul Allen.

(a)     Charter contends that "voting power for the management of the Borrower" in Section 8(k)(ii) refers to voting interests in the new Class A and Class B equity of CCI.

(b)     The Takeover Group will have approximately 45% of the voting interest in the combined new Class A and Class B equity, on a fully diluted basis including all warrants, upon the consummation of the Plan.[173]

(c)     Allen will have approximately 38% of the voting interest in the combined new Class A and Class B equity, on a fully diluted basis including all warrants, upon the consummation of the Plan.[174]

(i)      Allen will receive 35% of the voting interest from his Class B equity.[175]

---

[173]   JPX 354; JPX 218 at Charter-e 542853.

[174]   JPX 354.

[175]   *Id.*

       (ii)     He also will receive a small amount of Class A equity upon the consummation of the Plan, raising his nominal voting percentage to 38%.[176]

      **(b)**     **Because The Reorganized CCI Will Have A Classified Board Of Directors, The Takeover Group Will Have The Voting Power To Elect A Majority Of The Board, Independent Of Voting Percentages**

51.     The Plan will give the Takeover Group the voting power to elect a majority of the Board. Based on such voting control of the Board alone, Allen will not have greater "voting power for the management of the Borrower" than the Takeover Group. This is an Event of Default under Section 8(k)(ii).

      (a)     Under the Plan, the restructured CCI will have a classified Board with 7 Class A directors and 4 Class B directors, and two classes of equity. The Class A equity holders will have the power to elect the 7 Class A directors. Allen, as 100% owner of the Class B equity, will have the power to appoint the 4 Class B directors.[177]

      (b)     The Takeover Group will own a majority of the new Class A equity of CCI upon consummation of the Plan.

       (i)     Apollo will own over 28% of the new Class A equity.[178]

       (ii)     Oaktree will own over 16% of the new Class A equity.[179]

       (iii)     Crestview will own over 8% of the new Class A equity.[180]

       (iv)     Franklin will own over 15% of the new Class A equity.[181]

---

[176] *Id*.

[177] *Id*.

[178] *Id*.

[179] *Id*.

[180] *Id*.

[181] *Id*.

(c)     Even excluding Franklin, the Takeover Group will own a majority (52% combined) of the new Class A equity in CCI.

(d)     With a majority of the Class A equity, the Takeover Group will have the power to elect all 7 of the Class A directors at the first annual meeting.  Consequently, the Takeover Group will control a majority of the CCI Board.[182]

(e)     Allen will be able to elect only his 4 Class B directors.[183]

(f)     Even if Allen secures the support of every single holder of Class A equity other than the members of the Takeover Group, he still will only be able to appoint his 4 Class B directors.  The Takeover Group can outvote him and everyone else as to the 7 Class A directors.

(g)     In the context of a classified Board, control of the company is based on the fraction of the Board that class of shareholders has the power to elect.[184]  At trial, Stephen Goldstein of Lazard, who performed the Debtors' voting power calculations, testified that voting power for the management of a company is properly measured as a percentage of all directors a shareholder has the power to elect.  He also acknowledged that the members of the Apollo Group will receive more than 50% of the new Class A Stock to be issued by CCI, giving them the power to elect 7 members of Charter's 11-member board in a hypothetical vote of shareholders.[185]

---

[182]  8/24/2009 Hr. Tr. at 61:8-22, 62:11-69:12 (Goldstein); JPX 352, Amended and Restated Ex. 3, art. IV, § (b)(i)(B)(1)-(2) (Amended and Restated Certificate of Incorporation) ("(1) In all elections, the holders of Class B common stock voting as a separate class shall be entitled to elect up to thirty-five percent (35%) of the members of the Board of Directors (rounded up to the next whole number); (2) The holders of Class A common stock voting together as a separate class . . . shall be entitled to elect each member of the Board of Directors not elected by holders of Class B common stock.").

[183]  JPX 218 at 542853.

[184]  8/24/2009 Hr. Tr. at 204:4-21 (Gompers).

[185]  8/24/2009 Hr. Tr. at 64:1-67:11, 68:5-69:12 (Goldstein).

52.     Even prior to the first annual meeting, the Takeover Group will have the voting power, independent of voting percentages, to elect an equal or greater number of the CCI Board than Allen.  This, too, is an Event of Default under Section 8(k)(ii).

(a)     The Plan will immediately give the Takeover Group the right to directly appoint 4 of the Class A directors.

(i)     Apollo has the power to appoint 2 members of CCI's initial Board.

(ii)     Oaktree has the power to appoint 1 member of CCI's initial Board.

(iii)     Franklin has the power to appoint 1 member of CCI's initial Board.

(b)     As Requisite Holders, the Takeover Group—with whom Smit negotiated his compensation—also agreed to appoint Smit, Charter's CEO, to serve as a member of the initial board of directors as a Class A director.  As a Class A director, Smit will be subject to re-election at the first annual meeting by the Takeover Group, as holders of a majority of Class A equity.[186]

(c)     Thus, collectively, the Takeover Group will have 5 or, at a minimum, 4 representatives on the Board immediately after the Plan is confirmed.  And this is not counting Jeff Marcus, whom the Takeover Group agreed to put on the Board notwithstanding the fact that Crestview's equity ownership will fall below the threshold for an automatic Board seat.[187]

(d)     Allen will have the power to appoint the 4 Class B members of the Board immediately after the Plan is confirmed.

(e)     Whether the Takeover Group is viewed as having 4 or 5 (or 6) directors, that number is more than 35% of the Board's directors.  It is an Event of Default under Section 8(k)(ii) for another person or "group" to have 35% or more voting power unless Allen has *greater* voting power.  Equal voting power does not suffice.  Because Allen can appoint only 4 directors, he will

---

[186]  JPX 352; JPX 218.

[187]  ¶ 37; JPX 169; JPX 193.

not have greater voting power for the management of the Borrower than the Takeover Group upon the consummation of the Plan.

53.     Under the original Plan filed with the Court in May 2009, the sitting Class A directors—*i.e.*, the Takeover Group appointees and Smit—had the power to fill any vacancies on the Board after the Effective Date of the Plan.[188]  This gave the Takeover Group de facto control over all 7 Class A seats on the initial Board.  On the eve of the confirmation hearing, after the Lenders pointed this out, the Takeover Group and Charter amended the Plan so that any vacancies on the Board "on the 31st day after the Effective Date would be filled by majority vote of the entire Board, rather than of just the sitting Class A directors."[189]

(a)     Whether the Takeover Group will control 4, 6 or 7 of the initial Class A Board seats, the Takeover Group will control at least 4 Board seats.

(b)     Allen will control only 4 Board seats.

(c)     Thus, Allen will not have ***greater*** voting power than the Takeover Group, thereby triggering a change of control.

54.     Despite the 11th hour Plan amendment, it appears that the sitting Class A directors will still have the power to fill the vacant seats immediately after the Effective Date.

(a)     Upon the Effective Date of the Plan, a majority of the sitting Class A directors will have the power to fill the 2 Board vacancies pursuant Section (b)(i)(B)(3) of the Amended and Restated Certificate of Incorporation:  "Any vacancies on the Board of Directors . . . of a member of the Board of Directors elected by the holders of Class A Common Stock voting separately as a class . . . or, if prior to the Company's first annual meeting of stockholders after the Effective Date, appointed by a holder of Class A Common Stock pursuant to the Joint Plan, shall

---

[188]  JPX 267 § Proposed COI § IV(b)(i)(B)(3).

[189]  JPX 352, Ex. 23, fn. 1 (List of Directors).

46

be filled by majority vote of the remaining director or directors so elected or so appointed by the holders of Class A Common Stock, even if less than a quorum." (the "Vacancy Provision").[190] Thus, the Takeover Group will directly appoint 4 Class A directors, and will have the power to directly or indirectly appoint an additional 2 members of the initial Board of Directors.

(b)    The Vacancy Provision was included in the original Amended and Restated Certificate of Incorporation filed with the Plan on May 7, 2009.[191]

(c)    Three business days prior to the start of the Plan confirmation hearing, Charter and the Takeover Group agreed to amend the Plan and the Amended and Restated Certificate of Incorporation to add a provision stating that vacancies on the Board will be filled "on the 31st day after the Effective Date" by majority vote of the entire Board. However, the new provision does not take effect until the 31st day after the Effective Date and, by its terms, only applies to vacancies existing on the 31st day following the Effective Date.[192]

---

[190] JPX 352, Amended and Restated Ex. 3 § (b)(i)(B)(3); 9/1/2009 Hr. Tr. at 36:4-37:25 (Doody) ("Q. And according to section (b)(3) one of the ways in which those vacancies may be filled by a majority vote of the remaining directors elected by the holders of Class A common stock, is that correct? A. That is correct . . . Q. Right. *Upon the effective date*, if there are less than eleven directors appointed pursuant to the plan, the remaining board seats are to be filled pursuant to the provisions of (b)(3), right? A. Correct.") (emphasis added).

[191] JPX 267, Ex. 3, Amended and Restated Certificate of Incorporation, Art. IV § b(i)(B)(3) at 4-5 ("(3)    *Any vacancies on the board of directors . . . elected by the holders of Class A Common Stock voting separately as a class* (or if any holders of Preferred Stock are entitled to vote thereon together with the holders of Class A Common Stock, as one class with such holders of Preferred Stock) *shall be filled by majority vote of the remaining director or directors elected by the holders of Class A Common Stock*, even if less than a quorum, or if there are not such directors or such directors fail to fill such vacancies within thirty (30) days, by the vote of the holders of Class A Common Stock, separately as a class (or if any holders of Preferred Stock are entitled to vote thereon together with the holders of Class A Common Stock, as one class with such holders of Preferred Stock") (emphasis added).

[192] JPX 352, Amended and Restated Ex. 3 § (b)(i)(B)(4); 7/23/2009 Hr. Tr. at 50:2-19 (Villaluz) ("Q. Now, do you have an understanding -- I'd like to switch gears now, Ms. Villaluz. Do you have an understanding of how the board of the reorganized Charter will be constituted upon emergence if the plan is confirmed? A. Yes. My understanding is that Vulcan will have four seats; Neil Smit, to the extent he remains with the company as CEO, will have a board seat;

(d)     Under the Vacancy Provision, which remains in the new Amended and Restated Certificate of Incorporation and applies "upon the Effective Date," the Class A directors as of the Effective Date have the power to fill the 2 Board vacancies any time between the Effective Date and up to the 31st day following the Effective Date.[193]

### (c)     Apollo, Oaktree And Crestview, Even Without Franklin, Will Have Greater Voting Power Than Paul Allen

55.     Apollo, Oaktree and Crestview—even without Franklin—will own a majority of the new Class A equity.  Accordingly, even if Franklin were deemed not to be part of the Takeover Group, the Plan will result in a change of control under Section 8(k)(ii).

(a)     In the context of a classified Board of Directors, control is based on the fraction of the Board of Directors that class of shareholders has the power to elect.[194]

---

and that each Class A shareholder with a voting percentage of ten percent or more will have the ability to nominate one other member to the board. Q. And do you understand that procedure to have changed slightly recently?  A. Yes.  Q. And how do you understand that change to have come about?  A. Well, the remaining two board seats will be selected by the total board.  My understanding is that the company requested this change via their advisors to our advisors.  I recall that every member of the committee approved the change, and that was that."); 7/29/2009, Hr. Tr. at 150:23-152:3 (Marcus) ("Q. What is your understanding of how those vacancies will be filled?  A. My understanding is that the directors from Apollo and from Oaktree and the designee of Franklin -- and that's why I hesitated is because I understand that Franklin itself is not going to occupy the seat -- but they'll designate someone outside of Franklin, and Mr. Smit will, along with the four Paul Allen directors, will select the two independent seats. Q. Do you know how that mechanism came to be?  A. How the selection process came to be?  I have an understanding of it.  Q. Were you asked to agree to that mechanism?  A. Was I asked to agree to it? Q. Yes.  A. Yes. . .  Q. And you were asked to agree to this provision and you so agreed to it?  A. I'm sorry? Q. You, Crestview, agreed to this mechanic for appointed -- appointing vacancies.  A. We initially objected to it, and after considering we agreed.").

[193]  JPX 352, Amended and Restated Ex. 3 § (b)(i)(B)(3); 9/1/2009 Hr. Tr. at 36:3-37:25 (Doody) ("Q. And according to section (b)(3) one of the ways in which those vacancies may be filled by a majority vote of the remaining directors elected by the holders of Class A common stock, is that correct?  A. That is correct . . . Q. Right. *Upon the effective date*, if there are less than eleven directors appointed pursuant to the plan, the remaining board seats are to be filled pursuant to the provisions of (b)(3), right?  A. Correct.") (emphasis added).

[194]  8/24/2009 Hr. Tr. at 204:4-21 (Gompers).

(b)     Excluding Franklin from the Takeover Group does not change anything because Apollo, Oaktree and Crestview will own a majority of new Class A equity of CCI upon consummation of the Plan.[195]  Apollo, Oaktree and Crestview will thus still have power to elect 7 members of the Board and Paul Allen will only appoint 4 members.

(c)     As a result of their majority ownership of new Class A equity, Apollo, Oaktree and Crestview will have the power to elect all 7 Class A directors at the first annual meeting and, consequently, will control a majority of the Board.[196]

### 3.     The So-Called "Savings" Clause Does Not Avoid A Change Of Control

56.     The Takeover Group and Charter have inserted a so-called "savings" or "dilution" clause into the proposed Amended and Restated Certificate of Incorporation that would go into effect at the first shareholders' meeting, which will not be held until at least a year after consummation.[197]  The dilution clause states that if any person or group owns stock with more than a 35% voting power, that person or group's voting interest will be reduced to 34.9%.[198]

57.     The so-called dilution or savings clause in the Amended and Restated Certificate of Incorporation, which Charter contends will prevent a change of control by reducing the Takeover Group's voting interest in combined new Class A and Class B equity to 34.9%, is irrelevant because:

---

[195]  JPX 354.

[196]  8/24/2009 Hr. Tr. at 61:8-22, 62:11-69:12 (Goldstein); JPX 352, Amended and Restated Ex. 3 § (b)(i)(B) (1), (2) (Amended and Restated Certificate of Incorporation) ("(1) In all elections, the holders of Class B common stock voting as a separate class shall be entitled to elect up to thirty-five percent (35%) of the members of the Board of Directors (rounded up to the next whole number); (2) The holders of Class A common stock voting together as a separate class . . . shall be entitled to elect each member of the Board of Directors not elected by holders of Class B common stock.").

[197]  JPX 352, Amended and Restated Ex. 3, art. IV, § (b)(i)(B)(3).

[198]  *Id.*

(a)     The dilution clause will have no effect on the makeup of the initial Board of CCI post-emergence from bankruptcy.

(b)     The Takeover Group's voting interest in combined new Class A and Class B equity is irrelevant to its "voting power for the management of the Borrower" because the Takeover Group will own a majority of the Class A equity and have the power to elect all 7 Class A directors.  ¶¶ 51-55.

(c)     The dilution clause can be waived by the new CCI Board, the majority of which will be appointed by the Takeover Group.[199]

## C.     The Plan Will Cause A Change Of Control Default Under Section 8(k)(i)

58.     If the Plan is confirmed, Paul Allen will no longer control CCI or its Board.  As a result, he will no longer have the power, either directly or indirectly, to vote or direct the voting of CCOH's equity interests in CCO for the management of CCO.[200]  He will retain Class B equity that represents less than a 2% economic interest in CCI and, in total, he will hold a mere 3% of the equity of CCI. [201]

59.     Paul Allen currently has the power *indirectly* to vote or direct the voting of CCOH's equity interests in CCO for the management of CCO through his control of the Board of Directors of CCI.[202]

(a)     CCOH is the sole member of CCO and will remain the sole member of CCO upon consummation of the Plan.[203]

---

[199] JPX 352, Amended and Restated Ex. 3, art. IV, § (b)(i)(B)(3).

[200] JDX 1; 7/22/2009 Hr. Tr. at 58:11-60:6 (Smit).

[201] JPX 354.

[202] JDX 1; 7/22/2009 Hr. Tr. at 14:3-17 (Smit).

[203] JPX 7 § 4(a)(i) at CTR 7241.

(b)    CCOH currently has the power to vote all 100 of the Votes for the approval, consent or ratification of any CCO action.[204]

(c)    CCOH has 100% of the ordinary voting power for the management of CCO.[205]

(d)    Given Paul Allen's control in CCI, Paul Allen has control over CCOH. Hence, he controls how CCOH votes its equity interests in CCO, including for the determination of the management of CCO.

(e)    Currently under the CCO Limited Liability Company Agreement ("LLC Agreement"), CCOH has exercised its 100% voting power for the management of the Borrower to appoint CCI as the "Manager."[206]

(f)    Nevertheless, under CCO's LLC Agreement, CCOH retains unilateral discretion to replace CCI as CCO's Manager as it sees fit. CCI can be removed as Manager at any time upon a vote of the majority of member "Votes." As the sole member of CCO, CCOH has

---

[204] JPX 7 § 7 at CTR 7248 ("So long as CCO Parent is the sole member of the Company, CCO Parent's Percentage Interest shall be 100 percent."); *id.* ("For the purposes of this Agreement, 'Percentage Interest' shall mean with respect to any Member as of any date the proportion (expressed as a percentage) of the respective capital account balance of such Member to the capital account balances of all Members. So long as CCO Parent is the sole member of the Company, CCO Parent's Percentage Interest shall be 100 percent.").

[205] JPX 7 § 1(h) ("Each member of the Company . . . shall have one vote in respect of any vote, approval, consent or ratification of any action (a 'Vote') for each one percentage point of Percentage Interest . . . held by such Member (totaling 100 Votes for all Members"), § 4(a)(i) ("CCI shall be the Manager until a simple majority of the Votes elects otherwise.").

[206] JPX 7 § 4(a)(i) at CTR 7241 ("CCO Parent [CCOH], as the sole member of the Company, hereby confirms the election of Charter Communications, Inc., a Delaware corporation ('CCI'), or its successor-in-interest that acquires directly or indirectly substantially all of the assets or business of CCI, as the Company's manager (the 'Manager'). CCI Shall be the Manager until a simple majority of the Votes elects otherwise.").

100% of the member Votes and, therefore, 100% of the ordinary voting power for the management of CCO.[207]  Thus, CCOH retains all voting power for the "management of the Borrower."

## IV.    THE BORROWER MISREPRESENTED ON NOVEMBER 5, 2008 AND AGAIN ON FEBRUARY 3, 2009 THAT CCH AND CIH WERE EACH ABLE TO PAY ITS DEBTS AS THEY BECOME DUE

### A.    There Has Been A Complete Failure Of Proof By Charter On The Issue Of CCH's And CIH's Ability To Pay Debts As They Become Due

60.    Bruce Den Uyl, an expert testifying on behalf of Charter, expressly admitted that he was ***not*** offering any opinion on ability to pay debts as they become due.[208]

61.    Den Uyl's opinion was limited to there being $63 million in surplus at CCH I as of November 2008.[209]

62.    Den Uyl's own analysis still shows a lack of either surplus or intercompany receivables needed for CCH or CIH to make their April 2009 debt payments.[210]  Den Uyl conceded that CCI and Holdco's intercompany receivable was insufficient to pay CIH and CCH's debts through April 2009.[211]

63.    Even if Den Uyl were correct in his opinion, no expert or fact witness testified that, as of November 5, 2008, either CCH or CIH was able to make its debt payments due in April 2009.

---

[207]  *Id.*

[208]  8/3/2009 Hr. Tr. at 131:17-132:12, 132:20-133:6, 134:6-22 (Den Uyl) (admitting that he had no opinion as to the ability of CIH or CCH to pay their debts as they become due as of November 5, 2008).

[209]  8/3/2009 Hr. Tr. at 130:22-24 (Den Uyl) ("Q. And so your opinion is that CCH I had adequate surplus to make a 63 million dollar distribution, is that correct?  A. Yes.").

[210]  8/31/2009 Hr. Tr. at 26:15-17 (Taylor) ("He explicitly did not give any opinion after January and said he didn't do any analysis after that.  His own chart actually shows that they can't make April."); 8/3/2009 Hr. Tr. at 239:1-8 (Den Uyl) ("Q. But you didn't think there was enough for April, right? . . .  A. No.  I think in April they would have had to have a distribution or raise money in other ways to raise money to pay the interest.").

[211]  *Id.*

64.     Carlyn Taylor, an expert with cable industry expertise[212] testifying on behalf of JPMorgan, testified that, as of November 5, 2008, CCH and CIH were both unable to pay their debts as they become due.  Taylor specifically testified that CCH and CIH were unable to make debt payments due in January or April 2009.[213]

65.     No expert or fact witness testified that CCH or CIH could make their April 2009 debt payments.

**B.     The Credit Agreement**

**1.     Section 8(b)**

66.     Section 8(b) of the Credit Agreement provides for an Event of Default where "any representation or warranty made or deemed made by any Loan Party herein . . . *shall prove to have been inaccurate* in any material respect *on or as of the date made or deemed made*."[214]

67.     An inaccurate representation is an Event of Default under Section 8(b) whether or not the Borrower knew or should have known its representation was false.[215]  Eloise Schmitz, Charter's Chief Financial Officer ("CFO"), admitted at trial that a false representation results in a

---

[212]  JPX 272, Ex. A; 8/31/2009 Hr. Tr. at 16:12-17:5 (Taylor).

[213]  8/31/2009 Hr. Tr. at 18:21-24 (Taylor) ("Q.  Let's return to your opinion, Ms. Taylor.  What is your opinion?  A.  As of November 5th, 2008, CIH and CCH were not able to pay their debts as they become due.").

[214]  JPX 2 § 8(b) (emphasis added).

[215]  JPX 2 §8(b) (providing for an Event of Default where "any representation or warranty made or deemed made by any Loan Party herein . . . *shall prove to have been inaccurate* in any material respect on or as of the date made or deemed made") (emphasis added); 7/31/2009 Hr. Tr. at 184:15-18 (Schmitz) ("Q. And you understand that a false representation results in an event of default regardless of whether or not CCO knew or should have known the representation was false, correct?  A. Yes."); 8/25/2009 Hr. Tr. at 12:11-15 (Kurinskas) ("My understanding of the default provision is that if the misrepresentation exists, it creates a default under the credit agreement regardless of whether the company knowingly or without knowledge made the rep or was deemed to have made the rep.").

default "regardless of whether or not CCO knew or should have known the representation was false."[216]

68.     Section 5.2 of the Credit Agreement provides that CCO is deemed to have made all representations and warranties each time it borrows, including CCO's representation that no Event of Default under § 8(g)(v) has occurred or is ongoing.[217]

69.     In representing that no Event of Default has occurred and is continuing, CCO necessarily represents that there is no Event of Default under Section 8(g)(v), among other Sections of the Credit Agreement.[218]

### 2.     Section 8(g)(v)

70.     Section 8(g)(v) of the Credit Agreement makes it an Event of Default where "any Designated Holding Company . . . shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due."[219]

71.     By its plain language, Section 8(g)(v) contains both a backward-looking test and a forward-looking test.

72.     The first clause of Section 8(g)(v) provides that it is an Event of Default when "any Designated Holding Company . . . shall generally not . . . pay its debts as they become due."[220] This test is backward looking.

---

[216] 7/31/2009 Hr. Tr. at 184:15-18 (Schmitz) ("Q. And you understand that a false representation results in an event of default regardless of whether or not CCO knew or should have known the representation was false, correct? A. Yes.").

[217] JPX 2 § 5.2 (requiring CCO to represent in connection with a borrowing request that certain "conditions precedent," including that no Default or Event of Default has occurred and is continuing, "have been satisfied").

[218] *Id.*

[219] JPX 2 § 8(g)(v).

[220] *Id.*

73. The second clause of Section 8(g)(v) provides that it is an Event of Default when "any Designated Holding Company . . . shall be unable to . . . pay its debts as they become due." By its plain language, which is clear and unambiguous, this is a prospective test.[221]

(a) The first clause of Section 8(g)(v) already makes it an Event of Default if "any Designated Holding Company . . . shall generally not . . . pay its debts as they become due."[222] Interpreting the inability to pay debts as they become due language to be backward looking as well would render that provision superfluous.

(b) All the Lenders who testified in this matter confirm that ability to pay under Section 8(g)(v) is a prospective test.[223]

(c) Ann Kurinskas, Managing Director of JPMorgan, testified that under Section 8(g)(v), ability to pay debts as they become due is a forward-looking test: "My understanding is that the language 'shall be unable to' is a prospective look at whether the designated holding companies or the borrower or any of its subs won't be able to, at some point in the future, pay their debts as they are coming due." [224] This clause provided the Lenders an early warning signal of financial distress at Charter and any change of risk at CCO.

(d) Schmitz testified that all of Section 8(g)(v), including the inability-to-pay clause, is backward looking. However, she admitted that the phrase used in Section 8(g)(v)—

---

[221] *Id.*

[222] *Id.*

[223] 8/18/2009 Hr. Tr. at 16:20-25, 17:8-14 (Zagar); 8/18/2009 Hr. Tr. at 33:16-34:7 (Federman); 8/18/2009 Hr. Tr. at 50:5-16 (Quintana); 8/18/2009 Hr. Tr. at 183:2-11 (Morris).

[224] 8/25/2009 Hr. Tr. at 28:3-10 (Kurinskas) ("Q. Let's pull up 8(g)(5), Exhibit 2. Can you explain to the Court your understanding of how section 8(g)(5) differs from that position advanced by the debtors? A. My understanding is that the language 'shall be unable to' is a prospective look at whether the designated holding companies or the borrower or any of its subs won't be able to, at some point in the future, pay their debts as they are coming due.").

"shall be unable to . . . pay debts as they become due"—is the same language as that of the cash flow test of solvency, which she agrees is forward looking.[225]

(e)　　Schmitz also admitted that similar inability-to-pay language in Charter's Second Lien Note Purchase Agreement that required "various designated holding companies" to "meet our payments as they come due . . . with no indication of time," is prospective.[226]

74.　　Section 7.6 of the Credit Agreement is consistent with the cash flow insolvency test of Section 8(g)(v).

(a)　　Section 7.6 provides that "the Borrower may make distributions (directly or indirectly) to any Qualified Parent Company . . . for the purpose of enabling such Person to make interest payments in respect of its Qualified Indebtedness . . . provided that (i) no Default or Event of Default shall have occurred and be continuing or would result therefrom, (ii) no DHC Default shall have occurred and be continuing or would result therefrom (unless the use of proceeds of

---

[225] 7/31/2009 Hr. Tr. at 149:9-19 (Schmitz) ("Q. Okay. Now, let's look at item number 2. It says -- Duff & Phelps says, "Charter will be able to pay its obligations as such obligations become due," do you see that? A. Yes. Q. And that's the second prong of the solvency analysis, right? A. Yes. Q. And, again, you say that the credit agreement doesn't require the DHC's to meet this prong in order to borrow 250 million dollars, right? A. This is similar to the language in 8(g)(5)."); 7/31/2009 Hr. Tr. at 150:5-14 (Schmitz) ("Q. Okay, So let's go back to the second test which you said was similar to the language in the credit agreement. It says, "'Charter will be able to pay its obligations as such obligations become due in the ordinary course,'" do you see that? A. Yes. Q. And by these words Duff & Phelps is, in fact, opining that Charter will in the future be able to pay its obligations in the ordinary course, correct? A. Yes."); JPX 19 at CTR-00058109.

[226] 7/31/2009 Hr. Tr. at 68:16-25 (Schmitz) ("Q. Okay. And in negotiating the purchase agreement for the second lien notes, did any draft contain a proposed forward-looking representation regarding designating holding companies? A. Yes. The purchase agreement in March of 2008 had a rep in it that we -- that was asking us to make a rep that we will be able to -- that we can and that we will be able to make our payment -- meet our payments as they come due for the various designated holding companies, with no indication of time. It just said that we will be able to meet our debt obligations as they come due."); CX 109 ¶ 1(mm)(iii) ("will be able to pay its debts, on a consolidated basis with its subsidiaries, as such debts respectively mature or otherwise become absolute or due").

such distribution cures all such DHC Defaults) and (iii) each such distribution shall be made no earlier than 15 Business Days prior to the date the relevant interest payment is due . . . ."[227]

(b)     This section allows CCO to make a distribution to a DHC that the DHC uses within 15 days to pay interest when due.[228]

(c)     Section 8(g)(v) does *not* require the DHCs to have cash on hand.  It requires only that the DHCs have access to sources of liquidity so they have the ability to pay debts as they become due.[229]

75.     Under Section 4.21, CCO is not required to represent that each of the DHCs is Solvent, as that term is defined in the Credit Agreement.[230]  The words of Section 8(g)(v) track the cash flow test for insolvency.  Section 5.2 requires CCO to represent at each borrowing that each DHC meets the Section 8(g)(v) test.  CCO need not represent that each DHC is, in fact solvent, but must represent that each DHC meets the cash flow test for solvency.

76.     Under the Credit Agreement, as in the solvency and auditing contexts, ability to pay debts as they become due is not defined by a fixed period of time.

(a)     Under the Credit Agreement, the forward-looking time period for Section 8(g)(v) was "intentionally" left open in order to allow the Lenders to "evaluate the facts and circumstances at the time and use judgment in determining whether or not either the borrower or the designated holding companies have become unable to pay their debts."[231]

---

[227]   JPX 2 § 7.6(b).

[228]   JPX 2 § 7.6(b).

[229]   JPX 2 § 8(g)(v).

[230]   JPX 2 § 4.21.

[231]   8/25/2009 Hr. Tr. at 30:9-13 (Kurinskas).

(b)     While there is no exact time period specified, auditors and valuation professionals often look forward one year or more when determining ability to pay debts as they become due.[232]

(c)     Under the cash flow test for solvency, valuation professionals typically look forward at least one year to determine whether an entity is able to pay its debts as they become due.[233] As Charter's expert explained, "It's a simple test for liquidity. It's basically does the entity have liquidity in the future for a reasonable period of time to pay their debts. So you look at what are the sources of liquidity and cash and then you look at the upcoming debt service payments and see whether, for a reasonable period of time, the companies can actually have enough liquidity to pay its debts."[234]

(d)     In order to receive an audit opinion that does not have a going concern qualification, auditing standards similarly require that an entity be able to pay its debts as they become due for a reasonable period of time going forward. Auditors often look forward one year.[235]

(e)     Schmitz admitted that KPMG made clear that it required Charter to demonstrate its ability to pay debts as they become due for a period of 18 months going forward.[236]

---

[232] 8/31/2009 Hr. Tr. at 19:25-20:1 (Taylor) ("Under a solvency test for liquidity, it's typical to use a year at least."); 8/31/2009 Hr. Tr. at 19:20-22 (Taylor) ("The auditing standard specifically says 'reasonable period of time'. And then it references a period of one year.").

[233] 8/31/2009 Hr. Tr. at 19:25-20:1 (Taylor) ("Under a solvency test for liquidity, it's typical to use a year at least.").

[234] 8/31/2009 Hr. Tr. at 19:11-17 (Taylor).

[235] 8/31/2009 Hr. Tr. at 19:20-22 (Taylor) ("The auditing standard specifically says 'reasonable period of time'. And then it references a period of one year.").

[236] 7/31/2009 Hr. Tr. at 166:16-22 (Schmitz) ("[I]t was clear to us from discussions with KPMG that in order to satisfy the opinion requirements we would have to be able to demonstrate that we had under our control the ability to move cash throughout the system, through the entire audit window. And the correct statement is we had not satisfied that through September of

(f)     Five months is well within the time frame suggested by all the guideposts for determining whether, under the facts and circumstances, there is an inability to pay debts as they become due.

**C.     By November 5, 2008, CCH And CIH Were Unable To Pay Their Debts As They Become Due**

**1.     Historically, CCH And CIH Were Able to Pay Their Debts With Funds Upstreamed From CCO Through Distributions**

77.     Historically, CCH and CIH made interest payments through funds upstreamed to them from CCO through distributions.[237]

(a)     Like all DHCs, CCH and CIH were and are shell companies that lack cash or liquid assets sufficient to service their debt payments themselves.[238]

(b)     As of October 31, 2008, CCH had no cash on its balance sheet.  CIH had only $2 million in cash on its balance sheet.[239]

(c)     CCH and CIH thus relied on the ability to receive funds from affiliates in order to make their debt payments.

(d)     Generally, all DHCs, including CCH and CIH, made interest payments through funds upstreamed to them through equity distributions up the corporate chain.[240]

(e)     In order to make distributions upwards to CCH and CIH legally, CCH I needs to have surplus.  Smit agreed that fair market value in excess of liabilities is the appropriate

---

2010, and we had not completed that work. But that to us was the standard that we had to satisfy.")

[237]  7/22/2009 Hr. Tr. at 18:1-19 (Smit).

[238]  8/31/2009 Hr. Tr. at 21:9-11, 84:4-11 (Taylor).

[239]  JPX 59; JPX 272 at 23 (Graphic 6); JDX 8.

[240]  7/22/2009 Hr. Tr. at 18:1-19 (Smit).

measurement for measuring surplus.[241]  Charter acknowledged in its board materials that "Delaware law requires that [the DHCs] have a financial surplus (fair market value of its assets in excess of its liabilities) equal to or exceeding the amount of the proposed distribution."[242]

78.     Prior to November 2008, including as recently as August 5, 2008, CCI consistently represented in its Form 10-K and Form 10-Q filings that:  "we believe that our relevant subsidiaries currently have surplus and are not insolvent."[243]

        (a)     This was stated in CCI's Form 10-Q filed November 8, 2007.[244]

        (b)     This was stated in CCI's Form 10-K filed February 27, 2008.[245]

        (c)     This was stated in CCI's Form 10-Q filed May 12, 2008.[246]

        (d)     This was stated in CCI's Form 10-Q filed August 5, 2008.[247]

79.     The relevant subsidiaries that CCI referred to in these public disclosures included the DHCs.[248]

80.     When CCI included this language in its SEC filings, it intended to communicate to the Lenders and the investing public that, as of the date of the filing, CCI believed that its relevant subsidiaries, including the DHCs, had surplus and were solvent.[249]

---

[241]  7/22/2009 Hr. Tr. at 229:1-3 (Smit) ("Q.  Okay.  Now, surplus means fair market value of assets in excess of liabilities, correct?  A. Yes.").

[242]  JPX 21 at 35; *see also* 7/22/2009 Hr. Tr. at 18:18-19 (Smit).

[243]  7/22/2009 Hr. Tr. at 217:21-222:13 (Merritt); JPX 17 at 24; JPX 27 at 23; JPX 30 at 32; JPX 35 at 35.

[244]  JPX 21 at 35.

[245]  JPX 27 at 23.

[246]  JPX 30 at 32.

[247]  JPX 35 at 35.

[248]  JPX 21; JPX 27; JPX 30; JPX 35; 7/22/2009 Hr. Tr. at 221:12-22 (Merritt).

[249]  7/22/2009 Hr. Tr. at 220:11-20 (Merritt) ("Q.  Okay.  And, again, in 2008, when Charter was making this statement to the investors and the Lenders, it wanted them to  understand that

### 2. Charter's Efforts Throughout 2007 And 2008 To Find Investors Were Unsuccessful

81.     Throughout 2007 and 2008, Charter tried unsuccessfully to find investors.

(a)     In the third quarter of 2007, Paul Allen, through Vulcan, ran a process in an effort to secure private equity investors for Charter. That process failed because Charter was over-leveraged.[250]

(b)     In the first quarter of 2008, Vulcan reopened the private equity process to seek a capital infusion. Again, that process was unsuccessful. No one wanted to or was able to buy Charter.[251]

---

Charter believed that its subsidiaries had surplus, correct? A. As of the date this was published, that's correct. Q. And when Charter made this statement in 2008 that it believed its subsidiaries are not insolvent, it wanted the investors and Lenders to understand that its subsidiaries were in fact solvent, correct? A. It wanted the readers to understand what it says, correct.").

[250] 7/21/2009 Hr. Tr. at 138:24-139:9 (Millstein) (Q. Okay. So the PE process that Vulcan ran in 2007 was unsuccessful, correct? A. It was. . . . Q. Nobody wanted to buy the company. A. The result of that process was unsuccessful. I didn't run it. I didn't participate in it. I was informed of the results but not the reasons for the results."), 141:1-2 (Millstein) ("Vulcan ran a process in the summer of 2007 which was unsuccessful."); JPX 57 at CTR-40012 ("Discussions with strategic as well as PE buyers over the last 12-18 months have indicated that strategic as well as PE buyers are unwilling or unable to take on Charter's leverage."), CTR 40018 ("STRATEGIC INITIATIVES . . . Q3 2007 Vulcan run process to seek PE investors; terminated due to turn in capital markets").

[251] 7/21/2009 Hr. Tr. at 141:1-4 (Millstein) ("Vulcan ran a process in the summer of 2007 which was unsuccessful. This chart indicates that they may have reopened the process to a limited number of PE firms in the first quarter of 2008. And that was unsuccessful."); JPX 57 at CTR-40018 ("STRATEGIC INITIATIVES . . . . Q4 2007-Q1 2008 Vulcan reopened process to seek PE investors; limited discussions with strategic buyers").

(c)     In the summer of 2008, Charter attempted to monetize its tax assets in a strategic transaction it called "Project Cosmos."[252]  Project Cosmos was unsuccessful.[253]

(d)     None of the strategic initiatives Charter sought in 2007 and 2008 was successful.[254]

### 3.     Charter Prepared For A Restructuring In The Wake Of A Decline In Its Valuation And The Collapse Of The Credit Markets

82.     In September 2008, the nation suffered several shocks to its financial system that resulted in a severe economic downturn.[255]

83.     These adverse economic conditions caused "cable valuations [to] drop[] to new lows."[256]

84.     In October 2008, Charter's public market valuation was 5.3x projected 2009 EBITDA.

---

[252] 8/24/2009 Hr. Tr. at 34:5-15 (Goldstein) ("Q. And you don't have any -- well, okay.  And there were also strategic discussions in the August to September 2008 time period, those discussions you've heard refer to as Project Cosmos, correct?  A. Again, this all predates my time with Charter.  I think those were, at Project Cosmos, was a tax structured driven transaction but I have no reason to doubt that this board book is inaccurate. Q. Right.  And those discussions were called off as well, to the best of your knowledge, correct?  A. That's correct.").

[253] 7/21/2009 Hr. Tr. at 141:1-7 (Millstein) ("In summer of 2008, we tried something entirely different. Not a sale of the company as a whole but rather the monetization of its tax assets. And that was unsuccessful."); JPX 57 (Oct 28, 2008 Board deck) at CTR 00040018 ("STRATEGIC INITIATIVES; August-September 2008 Strategic Partnership Discussions"); 8/3/2009 Hr. Tr. at 191:8-11 (Den Uyl) ("Q. Now, this Project Cosmos was a strategic transaction that there has been testimony about that actually never happened, correct?  A. Yes.").

[254] 7/21/2009 Hr. Tr. at 141:8-11 (Millstein) ("Q. So the three strategic initiatives that are listed on the page with the Bates number 40018 that took place in 2007 and 2008, none of those were successful, correct?  A. Correct."); JPX 57 (Oct 28, 2008 Board deck) at CTR 00040012 ("The economic conditions, ongoing credit crunch and the decline in cable valuations have limited the strategic as well as the financial options for the Company at this time.").

[255] 7/21/2009 Hr. Tr. at 118:20-119:7 (Millstein) (describing events impacting the economy in the late summer and fall 2008).

[256] ¶ 95(a).

85.     Charter's peers were trading at similarly low levels.[257]

86.     Charter also knew something others did not know:  that CCH and CIH could no longer pay their debts as they become due because there was no way to move to them the $224 million they needed to make upcoming debt payments between November 2008 and April 2009.[258]

### 4.    Charter Began Contingency Bankruptcy Planning in October 2008

87.     At an October 28, 2008 Board meeting, the CCI Board responded to the severe economic downturn by instructing management to undertake contingency bankruptcy planning.

(a)     During the October 28 Board meeting, Charter management advised the Board that the adverse economic environment had resulted in a continued decline in cable valuations.[259]

(b)     Management advised the Board that the decline in cable valuations could restrict Charter's ability to move funds within its capital structure and inhibit Charter's subsidiaries' ability "to pay principal and interest when due."[260]

---

[257] ¶ 95(a).

[258] ¶ 145.

[259]  JPX 56 at CTR 00040004-A ("Mr. Smit first provided an executive summary of the presentation, discussing with the Board the adverse economic conditions, restrictions in the credit markets, and resulting decline in cable valuations that had recently occurred.").

[260]  JPX 56 at CTR 00040005-A ("Mr. Smit reminded the Board that one of the challenges facing the Company was to maintain the ability to move funds within the capital structure, either via capital contributions, distributions or inter-company loans, in order to allow the Company's respective subsidiaries to pay principal and interest when due. He reminded the Board that each of these actions had to comply with debt covenants and applicable law, such as the requirement for a Company to have a financial surplus in order to pay a dividend to a parent entity, and noted that the recent market deterioration had decreased valuation multiples and increased discount rates, and therefore increased the barriers to the Company's ability to move funds within its corporate structure and to pay debt when due.").

(c)     As discussed above, no one was interested in investing in Charter.[261]

(d)     Refinancing or new debt issuances were also out of the question.  As Millstein confirmed, the credit markets were "absolutely frozen" in the Fall 2008.[262]  Schmitz also admitted during trial that by October 2008 Charter was aware it could not rely on capital markets transactions improving and, in fact, did not bother to pursue any transactions to address CIH and CCH's upcoming $224 million of debt payments.[263]

(e)     Charter's CEO, Neil Smit, reported on this state of affairs during an October 28, 2008 meeting of the Board.  Smit warned that the decrease in Charter's valuation restricted Charter's ability to move funds within its capital structure to allow its subsidiaries to pay their debts as they become due.[264]  Smit "reminded" the Board that in order to make a distribution a company needs to "have a financial surplus."[265]

(f)     Millstein told the Board that his analysis showed that "it did not appear that credit markets would improve significantly in the near future" and that Charter should consider contingency plans for a potential restructuring.[266]

---

[261]  ¶ 81.

[262]  7/21/2009 Hr. Tr. at 139:14-17 (Millstein) ("Q.  And in November when you advised the board that you could sell for eight times, the credit markets were absolutely frozen, right?  A.  At that time, they were.").

[263]  7/31/2009 Hr. Tr. at 169:13-16 (Schmitz) ("Q. Okay.  And on October 28th the board was advised, and you heard that it did not appear that credit markets would improve significantly in the future, correct?  A.  It was difficult to rely on the credit markets improving."), 167:21-168:4, 167:7-12.

[264]  JPX 56 at CTR-40005-A.

[265]  *Id.*

[266]  *Id.*

(g)     Recognizing that CIH and CCH would soon default on $224 million of debts due from November 2008 through April 2009, the Board discussed and authorized contingency planning, including a potential bankruptcy filing.[267]

(h)     The Board directed management to undertake contingency planning at this meeting.[268]  It did so because the Board, as well as management, considered contingency planning prudent and thought management should assess the requirements and actions that would be necessary in a bankruptcy filing, including the hiring of restructuring advisers.[269]

(i)     The Board also instructed management to revise the July Long Range Plan to "appropriately account for the worsening economy."[270]

---

[267] 7/22/2009 Hr. Tr. at 23:6-12 (Smit) ("If you could pull out what I believe has been marked as Exhibit 2, the October 28, 2008 board minute -- minute meetings again -- board meeting minutes -- Q. And did the contingency planning discussed at this -- at this meeting as referenced here include potential bankruptcy filing?  A. Yes, it did.").

[268] 7/22/2009 Hr. Tr. at 23:17-22 (Smit).

[269] 7/22/2009 Hr. Tr. at 23:23-24:10 (Smit) (Q. And what was your view as a director on the wisdom of undertaking contingency planning?  A. As a director, I thought it was prudent. Q. When you say you thought it was prudent to undertake contingency planning, what do you mean by that?  A. That management should assess different requirements and -- and actions that would be necessary in -- in -- in a bankruptcy filing.  So, you know, things like advisors, we should, you know, interview advisors, we should get information and how -- how bankruptcies -- you know, just general information about bankruptcies.  So, you know, we were planning as we would any business plan, what are the potential actions and how should we prepare for them.").

[270] 8/31/2009 Hr. Tr. at 212:9-14 (Johri) ("Q. And -- but you just said in October 2008, the board, consistent with your testimony, asked management to revise its long-range projections to appropriately account for the worsening economy. That was the question, and your answer was yes.  A. That is also correct."); id. at 210:3-9 ("Q. Now, at the time of the October 27th audit committee meeting, were you aware that management intended to revise its long-term projections to appropriately account for the worsening economy?  A. Around that time the audit committee, we had asked the management to prepare their revision based on the economic conditions of that time, yes.").

88.     Charter began contingency planning for a restructuring including a potential bankruptcy filing by, among other things, formally retaining Kirkland & Ellis and Lazard as restructuring advisors.[271]

### 5.     On November 5, 2008, CCO Falsely Represented That CCH And CIH Were Able To Pay Their Debts As They Become Due

89.     CCO represented on November 5, 2008 that CCH and CIH were able to pay their debts as they become due, but that representation was false when made:

(a)     CCO borrowed $250 million on November 5, 2008.[272]

(b)     In doing so, it represented that there was no Default or Event of Default, including under Section 8(g)(v).[273]

(c)     As of November 5, 2008, Charter management and Board had not made a determination as to whether CCH I had surplus.[274]

(d)     CCO's November 5, 2008 representation was false because, as of November 5, 2008, CCH and CIH were unable to pay their debts as they become due.

---

[271] 7/22/2009 Hr. Tr. at 26:6-13 (Smit) ("You retained Kirkland & Ellis for bankruptcy planning by November 14th, correct?  A. We retained Kirkland & Ellis to understand implications of a restructuring.").

[272] 8/25/2009 Hr. Tr. at 12:16-21 (Kurinskas).

[273] 7/31/2009 Hr. Tr. at 212:11-21 (Schmitz) ("Q. And you approved that borrowing request, right?  A. Yes. Q. And you didn't consider surplus and you didn't consider solvency; you just made the request, right?  A. I considered the terms of the credit agreement and I felt that we were in compliance -- Q. Okay.  A. -- with the credit agreement. Q. And you knew that approving it was a [rep], that there were no defaults, right?  A. Yes."); JPX 2 § 5.2 (requiring the borrower to make a representation and warranty as of the borrowing date that the conditions precedent to each extension of credit "have been satisfied," including a representation and warranty that no Defaults or Events of Default have occurred and are continuing).

[274] ¶¶ 101-105.

### (a) CCH And CIH Had Essentially No Cash Or Liquid Assets With Which To Pay Their Debts

90.    As of November 5, 2008, CCH and CIH did not have cash with which to pay their debts as they become due.

(a)    CCH and CIH, like all DHCs, have essentially no assets and do not generate any revenues.  As of October 31, 2008, CCH and CIH collectively had only $2 million in cash.[275]

(b)    That was well short of the funds needed to make $224 million in debt payments due in November 2008, January 2009, and April 2009.  The chart below shows upcoming debt payments in November, January and April for CCH and CIH:[276]

| Interest and Principal Payments Due ($ millions) | | | |
|---|---|---|---|
|  | November | January | April |
| CCH | 8 | 11 | 58 |
| CIH | 63 | 61 | 23 |

### (b) Intercompany Loans And Receivables Were Insufficient To Cover CCH's And CIH's January And April 2009 Interest Payments

91.    As of November 5, 2008, there were limited intercompany receivables, which were insufficient to allow CCH and CIH to pay debts due through April 2009.

(a)    In November 2008, Holdco had a $133 million receivable on its books.[277]

---

[275]  JPX 59; JPX 272 at 23 (Graphic 6); JDX 8.

[276]  JPX 75 at CTR-00040040 (Nov. 14, 2008 Board presentation reflecting interest payments and maturities through April 2009); *see also* JPX 272 at 23 (Graphic 6).

[277]  JPX 272 at 23 (Graphic 6); 8/17/2009 Hr. Tr. at 16:8-13 (Doody) ("Holdco has a intercompany receivable due from CCO.  And that if the arrow going from CCO up to Holdco indicates that

(b)     Even assuming Holdco could use the $133 million intercompany receivable to fund debt service at the CIH and CCH level, these funds were insufficient to pay the $143 million CIH and CCH had due through January 2009.[278]

(c)     The ability to use these Holdco intercompany receivables to service the debt of CCH and CIH is at best questionable because, as Charter concedes, Holdco entered into the zone of insolvency in the latter half of 2008.[279]  Charter was aware that any contributions from Holdco to an affiliate could therefore be challenged.[280]

---

CCO could repay that receivable and then Holdco could then, in turn, downstream money to holdings listed there but CCH and CIH so that they could make the interest payments due.").

[278]  JPX 272 at 23 (Graphic 6) (showing $9 million shortfall in January); 8/31/2009 Hr. Tr. at 25:8-18 (Taylor) ("So what I did was roll that forward and say if they had used the 133 million, they could have made in November the seventy-one million of payments.  Then you roll forward to January.  And they're nine million dollars short of making the January payment.  Now, if you roll forward to April and May, you can see the shortfall as of very, very quickly.  So what this essentially shows is there's a shortfall in January but there's very large shortfalls coming up thereafter.  All the intercompany accounts are exhausted fairly quickly and there's an inability to pay debts as they become due as of October of 2008.").

[279]  JPX 75 at CTR 40041 (noting negative surplus at CCI and Holdco); 8/31/2009 Hr. Tr. at 157:7-11 (Johri) ("Q. And that's because Charter entered the zone of insolvency at some point in time in 2008, right?  A. Well, at some point of time.  Q. And that was in 2008, right?  A. Towards the end of 2008.").

[280]  JPX 183 at KPMG 743 (noting that management indicated that the use of intercompany receivables was "not without legal risk for the Company").

(d)     Den Uyl makes unsupported adjustments to Taylor's intercompany receivables analysis based on a conversation he had with a Charter employee about non-cash charges relating to stock options assertedly using small monthly increases in intercompany receivables.[281]  Even with Den Uyl's adjustments, CCH and CIH still clearly were unable to use receivables to pay their debts in April 2009.[282]  Den Uyl admitted this.[283]

### (c)     There Were No Viable Capital Market Transactions

92.     As of November 2008, there were no viable capital market transactions to allow CCH and CIH to pay their debts even in January and April 2009.

(a)     Millstein confirmed that in November 2008, the credit markets were "absolutely frozen."[284]

(b)     Schmitz admitted that the fall 2008 dislocation in the credit market was not a temporary condition.[285]

---

[281] 8/31/2009 Hr. Tr. at 53:12-18 (Taylor) ("A. So based on some verbal discussions he had with some accounting person at the company he's adjusted my intercompany receivables by 3 to 4 million a month.  The reason he gave for this is saying that there are some noncash charges that caused the receivable number to go up, and that's primarily actually stock options given to CCI management employees, which Mr. Doody testified are worthless.").

[282] 8/31/2009 Hr. Tr. at 53:21-54:2 (Taylor) ("[Den Uyl's] 3 to 4 million dollar adjustment [to intercompany receivables] per month, as we saw earlier, doesn't make any difference to my opinion.  You still have an inability to pay debts as they come due because you still have a massive shortfall as of April that you can see coming up, and so his adjustments put at issue whether they can pay January, but he had no opinion about April on -- you can't pay April.  Or May or July.").

[283] 8/3/2009 Hr. Tr. at 238:19-21, 239:1-8 (Den Uyl) ("Q. But you didn't think there was enough for April, right? . . . .  A. No.  I think in April they would have had to have a distribution or raise money in other ways to raise money to pay the interest.").

[284] 7/21/2009 Hr. Tr. at 139:14-17 (Millstein).

[285] 7/31/2009 Hr. Tr. at 169:13-16 (Schmitz) ("Q. Okay. And on October 28th the board was advised, and you heard that it did not appear that credit markets would improve significantly in the future, correct?  A. It was difficult to rely on the credit markets improving.").

(c)     Schmitz also admitted that Charter decided not to pursue any capital market alternatives once it retained Lazard as a restructuring advisor and, as a result, she does not know whether or not Charter had a viable capital markets solution.[286]

(d)     Greg Doody, Charter's Chief Restructuring Officer, admitted that the financial engineering Charter previously relied on was not available as of November 2008.[287]

(e)     Not a single witness testified that, in November 2008, Charter had access to an alternative capital market transaction that it could have pursued to address its upcoming debt payments.

(f)     Debt exchanges (and indeed any other alternative to raise funds at CCH I or its subsidiaries) were not a solution because, even if Charter could have somehow managed to effect an exchange of debt issued by a solvent subsidiary for CCH or CIH debt, without surplus there still would not have been any way to upstream money to CCH or CIH as needed in order to retire or service the debt payments owed by CCH and CIH.[288]

---

[286] 7/31/2009 Hr. Tr. at 168:1-11 (Schmitz) ("Q. The only thing that was available to the company is this, correct? Bankruptcy. A. No, I can't say decisively that those options were not available to the company, we just didn't pursue them. Q. Okay. And, in fact, once you announced to the world that you were filing -- or excuse me, that you were engaging bondholders on December 12, 2008, you stopped pursuing any other option altogether, isn't that correct? A. We started pursuing a much more holistic solution. Q. So -- and the holistic solution is the bankruptcy, right? A. The restructuring, yes."), 167:15-168:4, 169:6-12 (admitting Charter never pursued the banks' pitches for debt exchanges in the fall of 2008).

[287] 8/17/2009 Hr. Tr. at 88:5-8 (Doody) ("Q. And under those market conditions that strategies that Charter had previously employed to extend maturity and maintain liquidity were no longer available to it, correct? A. I'd say that's correct."); *see also* JPX 255 ¶ 34 ("Under current market conditions, strategies that Charter has previously employed to extend maturities and maintain liquidity are no longer available."); JPX 266 at 20 (Debtors' Disclosure Statement listing prepetition debt refinancings).

[288] 8/31/2009 Hr. Tr. at 147:21-148:7 (Taylor) ("Those discussions and the various pitch documents and so forth were down at the lower levels. . . . Whether you get cash or whether you issue a new bond out of that lower level, you can't upstream value unless there's surplus. So this whole thing about whether there could be exchanges and so forth -- and nobody suggested that somebody was going to take an exchange except with being given value out of

70

       **(d)**      **For CCH And CIH To Be Able To Pay Their Debts As They Become Due, CCH I Needed To Have Surplus**

      93.     As of November 5, 2008, in order for CCH and CIH to be able to pay their debts as they become due, there needed to be surplus at CCH I so that CCH I could make equity distributions.[289]  CCH and CIH had no cash and there were no sufficient alternative ways to get money to them.  CCH I lacked surplus.  Thus, CCH and CIH were cut off from distributions and were unable to pay their debts as they become due.

      **6.**     **As Of November 5, 2008, CCH I Had No Surplus**

      **(a)**      **On November 5, 2008, The Public Trading Markets Indicated A Value Well Below The $18.7 Billion Breakeven Point For Surplus**

      94.     In order for CCH I to have surplus in November 2008, the fair value of CCH I's assets (exclusive of adjustments for working capital assets and liabilities) needed to be at least $18.7 billion, or 7.41x the 2009 EBITDA that Charter was projecting at the time (which projection was lowered by Charter at the end of 2008[290]) (the "surplus breakeven point").[291]

---

an entity that actually had market value.  All right?  So even if you could do that, you couldn't upstream it to the entities that needed it."), 149:16-150:8 (Taylor) ("Q. Now, one method that CCH and CIH -- Charter could have done in exchange for CCH and CIH is by exchanging for bonds at CCH I, correct?  A. Yes, but you can't do that.  That doesn't solve your problem.  If you issue value out of CCH I, you can't gift that value to that higher level.  That's no different than upstreaming cash.  From an accounting standpoint, you can't transfer value between entities.").

[289] ¶ 77.

[290] JPX 33 at CTR-55589; JPX 87 at CTR-1353, CTR 1364.

[291] 8/31/2009 Hr. Tr. at 27:22-25 (Taylor) ("Q. What did the fair value of assets have to be for there to be surplus at CCH I as of November the 5th, 2008?  A. It needed to be 18.7 billion for the assets up through the CCH I level."); 8/3/2009 Hr. Tr. at 145:19-22 (Den Uyl) ("Q. Okay. So as of November 17, 2008, for there to be surplus at CCH I, the entirety of Charter had to have an enterprise value of at least 18.7, correct?  A. Approximately, yes."); 8/31/2009 Hr. Tr. at 28:10-13 (Taylor) ("Q. And there's been a lot of talk about earnings multiple.  What's the surplus threshold as a multiple of 2009 earnings?  A. That that 18.74 represents 7.41 times the

(a)     Taylor and Den Uyl agreed that $18.7 billion and 7.41x projected 2009 EBITDA was the surplus breakeven point.[292]

95.     On November 5, 2008, the public trading markets indicated a value well below the 7.41x surplus breakeven point.  Valuations based on the trading prices of Charter's own securities consistently indicated a value in the range of 5-6x EBITDA from October 2008 through present.[293] The public trading market valuations of Charter's comparable companies—Mediacom, Time Warner Cable, Cablevision, and Comcast ("comparable companies")—were similarly in the 5-6x EBITDA range from October 2008 through present.[294]

(a)     At the October 28 Board meeting, the Board was told "cable valuations have dropped to new lows."[295]  Comparable companies were trading at 5-6x projected 2009 EBITDA.[296] Charter's public market valuation was 5.3x management's EBITDA projections for 2009.[297]

(b)     In November 2008, Lazard provided an update to Charter management regarding the trading multiples of Charter's comparable companies.  Those companies were

---

2009 EBITDA that was in the company's July LRP."); 8/3/2009 Hr. Tr. at 163:25 (Den Uyl) ("7.4 would be the multiple").

[292] *Id.*

[293] JPX 57 at CTR-40016.

[294] *Id.*

[295] *Id.*; *see also* 7/21/2009 Hr. Tr. at 120:15-17 (Millstein) ("Q. And the board was told cable valuations have dropped to new lows, correct?  A. Correct."); JPX 56 at CTR 40004-A ("Smit first provided an executive summary of the presentation, discussing with the Board the adverse economic conditions, restrictions in the credit markets, and resulting decline in cable valuations that had recently occurred."), CTR 40005-A ("Millstein next described and the Board discussed the market condition confronting the Company, including the depressed market valuations of cable properties and the Company's debt securities."); 7/21/2009 Hr. Tr. at 120:1-17 (Millstein).

[296] JPX 57 at CTR-40016; 7/21/2009 Hr. Tr. at 122:20-23 (Millstein) (confirming that Charter and its peers were trading within a range of approximately 5-6 times projected 2009 EBITDA).

[297] JPX 56 at CTR-40005-A.

trading within a range of approximately 5-6x projected 2009 EBITDA. Charter's valuation based

on the trading prices of its securities was around 4.9x projected 2009 EBITDA.[298]

      (c)     Nothing had changed when management and Lazard provided another

update to the Board on December 9, 2008.[299] Charter's peers were trading within a range of 5-6x

projected 2009 EBITDA.[300] Charter was still trading at a multiple of 4.2x projected 2009 EBITDA.

[301]

     96.     The public trading markets are a reliable and unbiased indicator of value.

      (a)     Lazard and Taylor expressly agreed with this.[302]

     97.     The fact that Charter and each of its comparable companies were trading in the

same range supports the conclusion that the market was acting efficiently and valuing Charter and

its peers in a reasonable range.[303]

---

[298]  JPX 60 at LAZ/CH 217; JDX 13; 8/31/2009 Hr. Tr. at 49:9-22 (Taylor).

[299]  JPX 85 at CTR-40051.

[300]  JPX 85 at CTR-40051; JDX 13; 8/31/2009 Hr. Tr. at 49:23-50:10 (Taylor).

[301]  JPX 85 at CTR 40051; JDX 13; 8/31/2009 Hr. Tr. at 49:23-50:10 (Taylor).

[302]  JPX 266, Ex. D at 3 (noting that Lazard gave weight to its comparable companies analysis in determining the fair market value of Charter); 8/24/2009 Hr. Tr. at 33:3-5 (Goldstein) ("Q. And a market's a pretty good indication of what the value is, in fact, of Charter, right? A. Oh, I think so."); 8/31/2009 Hr. Tr. at 30:8-10 (Taylor) ("You simply can't come up with a DCF that's wildly different than market numbers and then say that you're going to just rely on that and ignore the market.").

[303]  8/31/2009 Hr. Tr. at 48:9-13 (Taylor) ("The comparables all trade in a very tight reasonable range. Charter trades right in that range. So to say that somehow, you know, the dislocation in the market is somehow making Charter trade in an abnormal range, it just doesn't -- it doesn't fly."), 135:19-136:2 (Taylor) ("Q. And you'd agree that in October or November of 2008 the market in pricing cable companies was really not a great example of the market efficiency? A. No, I disagree with that. I mean, you've got large trading volumes, these are very large cap companies, and you have a significant amount of time at which those valuations remained in place. And in fact it's still basically true to this day that those valuations are not much different than they were last fall.").

98.     Schmitz admitted that Charter management did not give weight to market values in determining the value of Charter in the fall of 2008.[304]

99.     Under standard valuation methodology, it is inappropriate to give no weight to market values in calculating surplus.[305]

(a)     Taylor explained, "Basically, you can't look at this market data and come to the conclusion that there is surplus. It just defies logic. You basically have to set this aside for some reason and just say that you're not going to look at the market to decide whether there is surplus or not.  And that's just entirely inappropriate."[306]

(b)     Lazard agrees with Taylor that, in order to conduct a proper valuation, the appraiser must reconcile the values obtained through the income and market approaches,[307] something Charter failed to do at the time, and something Den Uyl also failed to do.

100.     If Charter had considered the market data available to it at the time, it could not have concluded that CCH I had surplus in November 2008.[308]

---

[304] 7/31/2009 Hr. Tr. at 97:22-98:1 (Schmitz) ("Q. And as part of your analysis, did you consider public market multiples?  A. Yes. Q. And what weight did you give those multiples?  A. Similar to Duff & Phelps, we did not give them weight.").

[305] 8/31/2009 Hr. Tr. at 30:8-10 (Taylor) ("You simply can't come up with a DCF that's wildly different than market numbers and then say that you're going to just rely on that and ignore the market.").

[306] 8/31/2009 Hr. Tr. at 50:23-51:3 (Taylor).

[307] 8/31/2009 Hr. Tr. at 30:7-8 (Taylor) ("[U]nder valuation standards, you're required to reconcile your approaches."), 134:20-22 (Taylor) ("[Y]ou're required under uniform standards of practice -- appraisal practice to reconcile the results and consider all those methods."); JPX 266, Ex. D at 3 ("Lazard's valuation analysis must be considered as a whole . . . Reliance on only one of the methodologies used or portions of the analysis performed could create a misleading or incomplete conclusion as to Enterprise Value.").

[308] 8/31/2009 Hr. Tr. at 50:23-24 (Taylor) ("[Y]ou can't look at this market data and come to the conclusion that there is surplus.").

**(b)    As Of November 5, 2008, Charter Did Not Know Whether CCH I Had Surplus**

101.    By late October and early November 2008, it was plainly apparent to management that Charter could no longer represent that its subsidiaries had surplus and were solvent, as it had done in its prior 10-Ks and 10-Qs.[309]  On November 5, 2008, Charter management and audit committee approved the Form 10-Q for the third quarter of 2008 (filed November 6, 2008), deleting the representation that "we believe that our relevant subsidiaries currently have surplus and are not insolvent."[310]

(a)    Management and the Board deleted this representation from CCI's Form 10-Q because they didn't know whether the DHCs had surplus on November 5, 2008.

(b)    As of that time, Charter was "not . . . even close" to having determined whether or not the DHCs had surplus,[311] and was "uncertain" whether it would have surplus in the future.[312]

(c)    Changing what it had repeatedly stated in past SEC filings, CCI indicated that, "Primarily in light of the economic environment, it is uncertain whether we will have, at the relevant times, sufficient surplus . . . to make distributions, including for payments of interest and principal on the debts of the parents of such entities."[313]

---

[309]    ¶ 78.

[310]    JPX 69 at 38 (CCI 10-Q for third quarter 2008 filed November 6, 2008); 7/22/2009 Hr. Tr. at 223:9-15 (Merritt).

[311]    7/31/2009 Hr. Tr. at 183:21-184:5 (Schmitz) ("Q. Okay.  Would it have been a false statement to say 'we believe that we are solvent'?  A. Would it have been a false statement?  We did not make a determination.  We were comfortable with the expanded risk factors, but we certainly did not make any determinations that there was insolvency. Q. Okay, let's go with uncertain. You were at least uncertain that you had surplus, right?  A. We had not finished any of that -- any of that work, even close."); 7/22/2009 Hr. Tr. at 225:17-25 (Merritt).

[312]    7/31/2009 Hr. Tr. at 109:23-110:4, 184:1-13 (Schmitz).

[313]    JPX 69 at 38 (CCI 10-Q for third quarter 2008 filed November 6, 2008).

102.     Even though the Board and management did not know and were "uncertain" about whether there was sufficient surplus on November 5, 2008, CCO proceeded to borrow $250 million from the Lenders on that date, thereby representing that CCH and CIH were able to pay their debts as they become due, without obtaining a valuation or solvency opinion to determine whether surplus existed at CCH I.[314]

(a)     Charter knew that CCH I needed surplus for CIH and CCH to be able to pay their debts as they become due and that it was "uncertain" as to whether CCH I had surplus.[315]

(b)     In the past, when it was uncertain as to whether there was sufficient surplus to make a distribution, Charter obtained solvency opinions from Duff & Phelps to make such determination.[316]

103.     Neither Charter management nor the Board requested a solvency or surplus opinion from Duff & Phelps or any other third party in November 2008.[317]

---

[314] 7/31/2009 Hr. Tr. at 183:21-184:5 (Schmitz); 7/22/2009 Hr. Tr. at 225:17-25 (Merritt); JPX 66 (November 5, 2008 borrowing request); 7/31/2009 Hr. Tr. at 146:2-9 (Schmitz) ("Q. And you've obtained those solvency opinions in order to support distributions up the corporate chain, correct? A. For very specific circumstances. I think there's only probably three circumstances in the past we've gotten solvency opinions. Q. And at least one of them has been to support distributions up the chain, correct? A. That's been typically the only reason.").

[315] ¶ 101(b).

[316] 7/31/2009 Hr. Tr. at 146:2-9 (Schmitz) ("Q. And you've obtained those solvency opinions in order to support distributions up the corporate chain, correct? A. For very specific circumstances. I think there's only probably three circumstances in the past we've gotten solvency opinions. Q. And at least one of them has been to support distributions up the chain, correct? A. That's been typically the only reason.").

[317] 7/31/2009 Hr. Tr. at 146:19-21 (Schmitz) ("Q. Okay. So you didn't obtain a solvency opinion from Duff & Phelps for the November 17th interest payment, right? A. No."), 188:15-17 (Schmitz) ("We were not in the position to ask Duff & Phelps for a different opinion. We did not have an updated five-year plan or an updated budget to do that.").

(a)    Neither Charter management nor the Board asked Lazard to prepare a solvency opinion, surplus opinion, or a valuation of Charter in November 2008.[318]

(b)    They did not do so even though Lazard had served as Charter's financial advisor since 2002,[319] Lazard had "unparalleled knowledge" of Charter,[320] and Lazard was a valuation expert.[321]

(c)    Lazard did not provide any opinion on valuation, solvency or surplus to Charter in November 2008 (or at any point between then and Charter's filing for bankruptcy).[322]

104.    Schmitz conceded that Charter could not have gotten any type of solvency opinion in November 2008 because "[w]e did not have an updated five-year plan or an updated budget to do that."[323]

105.    If Charter had obtained a valuation opinion or solvency opinion in November 2008, Charter would not have been "uncertain" as to whether or not CCH I had surplus. When Lazard was finally asked to value Charter in connection with this bankruptcy case, Lazard concluded that Charter's fair market value is $15.4 billion—well below the $18.7 billion breakeven point for

---

[318]  7/31/2009 Hr. Tr. at 188:9-11 (Schmitz) ("Q. Okay, but you didn't ask Mr. Millstein for a formal valuation, did you?  A. No, and the board did not ask us for one either.").

[319]  7/21/2009 Hr. Tr. at 30:22-24 (Millstein).

[320]  JPX 60 at LAZ/CH 206 ("Unparalleled knowledge of complex legal, structural and tax issues").

[321]  7/21/2009 Hr. Tr. at 102:20-22 (Millstein) ("Q. Okay.  Now, Lazard considers itself a valuation expert, correct?  A. Yes.").

[322]  7/21/2009 Hr. Tr. at 131:10-11 (Millstein) ("A. I did not render a surplus opinion, did not render a solvency opinion and I didn't render a valuation opinion.").

[323]  7/31/2009 Hr. Tr. at 188:12-19 (Schmitz) ("Q. Okay, and you could have asked Duff & Phelps for a solvency opinion like you'd done those other times in the past in connection with distributions, but you didn't, right?  A. We were not in the position to ask Duff & Phelps for a different opinion.  We did not have an updated five-year plan or an updated budget to do that.  So that is why we were very comfortable taking the information that we did have but doing sensitivities around it.").

surplus at CCH I.[324]  Charter has not introduced evidence of any event occurring between November 5, 2008 and March 27, 2009 that could materially impact the value of Charter—much less explain how Charter could be worth over $18.7 billion in November but only $15.4 billion four months later.  Indeed, Schmitz confirmed that there was no material change in the financial condition of Charter during this period.[325]  The evidence shows that, if anything, Charter's financial condition and the markets in March 2009 were better than they were in November 2008.[326]

<blockquote>

**(c)    Charter Improperly Used A Draft Duff & Phelps DCF Analysis In Lieu Of A Proper Surplus Analysis**

</blockquote>

106.    Instead of getting a formal valuation or a solvency or surplus opinion from a valuation professional, Charter management improperly used a draft Duff & Phelps Discounted Cash Flow ("DCF") analysis to come up with a valuation of Charter wildly at odds with market valuations, on which Charter based its analysis "that CCH I had a financial surplus in excess of $2.8 billion."[327]

(a)    Duff & Phelps prepared its draft DCF exclusively for SFAS 142 impairment analysis purposes.  It was not a surplus analysis.  Duff & Phelps' engagement letter expressly prohibited Charter from using the firm's SFAS 142 work as a solvency opinion.[328]

---

[324]  ¶ 135(a).

[325]  JPX 187 at JPM-CH 35576; 7/31/2009 Hr. Tr. at 127:13-128:13 (Schmitz) (confirming no material change since November 2008 noting "[t]he companies, in general, continue to operate well and are performing well").

[326]  7/21/2009 Hr. Tr. at 133:9-16 (Millstein) (agreeing that Lazard's comparable company analysis performed in connection with Charter's restructuring "showed a result of five to six times 2009 projected EBITDA," whereas in October 2008, comparable companies "were trading at sort of 4.8 to 5.3").

[327]  JPX 76 at CTR-40044.

[328]  JPX 43 at D&P-CTR 256 ("The Report or any results of our Services shall not constitute a Solvency Opinion . . . and may not be relied upon . . . as such."); 9/1/2009 Hr. Tr. at 15:7-14

(b)     Charter's engagement letter with Duff & Phelps also prohibits use of draft work product.[329]

(c)     The draft Duff & Phelps DCF was prepared using projections that management knew were based on the July 2008 Long Range Plan, which, by November 2008, management knew needed material downward revision.[330]

(d)     In fact, Charter told Duff & Phelps to stop working on its October 1, 2008 SFAS 142 appraisal because management intended to revise the July Long Range Plan.[331]

(e)     Indeed, Schmitz stopped using the July Long Range Plan for internal financing purposes in early November 2008.[332]

---

(Bliss) ("Q. Was it your opinion that that was an impermissible use of a 142 analysis? A. Yes. Q. Do you know whether Duff & Phelps has an opinion as to whether an SFAS 142 analysis can be used as a solvency opinion? A. This is standard language and again appraisals are for a specific purpose and they're not to be used for purposes other than the purpose I stated in the appraisal."); 8/31/2009 Hr. Tr. at 31:16-19 (Taylor) ("The second issue is it was done for a different purpose. It actually explicitly says you can't use it for another purpose. And it explicitly says you can't use it for solvency of which surplus would be one of the subsets of solvency.").

[329] JPX 43 at D&P-CTR 00255 ("You acknowledge that no reliance shall be placed on draft Reports, conclusions or advice. . . ."); 8/31/2009 Hr. Tr. at 31:23-32:2 (Taylor) ("And finally, the engagement letter, and partly to prevent things like this, valuation and engagement letters say you can't use unfinished drafts and, in particular, if you don't tell your valuation professional that you're planning to use it, that's a problem.").

[330] 8/31/2009 Hr. Tr. at 31:10-15 (Taylor) ("First of all, it was done off the July LRP which the company was in the process of updating. Ms. Schmitz explicitly testified that the reason she couldn't go get a formal valuation done or surplus opinion done was because she didn't have a final set of numbers she could give a professional outside.").

[331] 9/1/2009 Hr. Tr. at 20:24-21:1 (Bliss) ("Q. But you were told sometime in October that there would be a new long-range plan so not to issue a final report? A. Correct.").

[332] JPX 61 (Schmitz email forwarding more conservative projections to bank officials and noting that this is what Charter is using for "financing purposes"); JPX 62 (same).

(f)     Duff & Phelps required a signed management representation letter affirming the reasonableness of the projections before finalizing a valuation.[333]  Charter management never provided Duff & Phelps with a representation that the July Long Range Plan was reliable.

(g)     Duff & Phelps' corporate representative testified that Charter management violated the terms of its engagement letter with Charter by using the draft Duff & Phelps DCF to analyze surplus.[334]

(h)     Duff & Phelps' corporate representative expressly denied providing Charter with any analysis indicating that "that CCH I had a financial surplus in excess of $2.8 billion."[335]

(i)     Contrary to Charter's KPMG did not opine that it was appropriate to rely on the July Long Range plan in November 2008.  KPMG's workpapers expressly acknowledge that management was revising the July Long Range Plan to reflect the unprecedented economic events of the fall 2008.  KPMG noted "The budget and reforecast will take into consideration recent economic events such as the recent foreclosure rates, recent events surrounding the lending and banking markets, and the overall downturn in the economy."[336]

---

[333]  9/1/2009 Hr. Tr. at 29:11-16 (Bliss) ("[P]ursuant to Duff & Phelps procedures could a final report be issued before management signs a REP (ph.) letter confirming the reasonableness of the management projections provided in connection with the appraisal?  A.  No.  Duff & Phelps procedures is they require a signed REP letter before issuing the report.").

[334]  9/1/2009 Hr. Tr. at 23:4-7 (Bliss) ("Q. But you would agree that it appears that the draft valuation was used in a manner that was not contemplated under Duff & Phelps engagement letter with Charter?  A. I would agree, yes.").

[335]  *Compare* 9/1/2009 Hr. Tr. at 22:16-19 (Bliss) ("Q. And did your draft valuation or Duff & Phelps draft valuation indicate that CCH1 had a financial surplus in excess of 2.8 billion dollars?  A. No."), *with* JPX 76 at CTR 40044 (Board meeting minutes stating: "This information included a draft valuation the Company had recently received from Duff & Phelps ("D&P") . . . which indicated that CCH I had a financial surplus in excess of $2.8 billion dollars.").  *See also* CX 114 at CTR-40044.

[336]  CX 143 at 0000115.

### (d)    Corrected Draft Duff & Phelps DCF Shows No Surplus

107.    The draft Duff & Phelps DCF prepared for SFAS 142 purposes confirms that there

was no surplus as of November 5, 2008 if two of its assumptions that are inappropriate in a

solvency or surplus analysis are corrected:

(a)    The first inappropriate assumption of the draft Duff & Phelps DCF was that

it assumed an asset sale.[337]  This results in favorable tax treatment based on a step-up in the tax

basis of tangible and intangible assets.[338]

(i)    Such an assumption is inappropriate in a solvency or surplus
analysis.

(ii)    Lazard did not make this assumption in its DCF.[339]

(iii)    Taylor did not make this assumption in her analysis.[340]

(iv)    Den Uyl also did not make this assumption in his analysis, nor did he
contend that it is permissible to apply a step up in a solvency or surplus
analysis.[341]

---

[337]  JPX 124 at D&P-CTR 43 ("Consequently, the appraisers have used the assumption that a sale
of the Reporting Units and their underlying assets would be transacted as an asset sale.").

[338]  JPX 272 at 56 ("accelerated depreciation of a step-up basis in tangible assets (primarily the
network equipment assets) and amortization of newly created intangible asset values (e.g.
franchise licenses or goodwill) that can only be created for tax purposes with an asset sale
transaction.").

[339]  JPX 84; 9/1/2009 Hr. Tr. at 23:8-13 (Bliss) ("Q. And do you know whether Lazard's DCF
assumed an asset sale?  A. It did not. Q. So it didn't get the step up we discussed earlier with
respect to depreciation and amortization?  A. Correct."); 8/31/2009 Hr. Tr. at 33:12-18
(Taylor).

[340]  8/31/2009 Hr. Tr. at 32:12-18 (Taylor) ("So the first problem is that it uses a very aggressive
treatment of tax basis and assumes a particular type of transaction.  It assumes an asset sale
transaction and a step-up in tax basis for that.  Duff & Phelps explains that they do that
specifically because it's related to valuation of the individual assets which they do in their FAS
142.  But Lazard didn't use this.  I would never use this.").

[341]  8/3/2009 Hr. Tr. at 103:10-14 (Den Uyl) ("So what I did was I took the existing long-range
plan at the time the July LRP and then assumed -- instead of stepping up the assets I assumed
that the existing depreciation amortization that the company had would be, you know, the
amount going forward.").

(b)     Duff & Phelps' second inappropriate assumption was to use outdated and overly optimistic projections on capital expenditures.[342]

        (i)     When Duff & Phelps was asked to issue a final report for its 2008 appraisal, it increased its capital expenditure assumptions and projections considerably.[343]

(c)     When corrected by taking out the step-up in tax basis and substituting the capital expenditure percentages in Duff & Phelps' final 2008 report, the draft DCF indicates a value of $18.1 billion, below the threshold for surplus.[344]

(d)     Making these two corrections, Duff & Phelps' draft October DCF shows that CCH I did not have surplus.[345]

        (e)     **Management's "Sensitivities" Were Improper Because They Ignored Market Values**

108.     Charter management ran and presented to the Board sensitivities that totally ignored current market conditions.[346]

(a)     In these so-called sensitivities, management used multiples ranging from 7.75x to 8.5x EBITDA.[347]

(b)     However, this multiples range of 7.75x - 8.5x totally ignored the valuations placed by the public trading markets on Charter and its comparable companies,

---

[342]  9/1/2009 Hr. Tr. at 19:7-9 (Bliss) ("Q. And again, the 2009 to 2012 [capital expenditure] projections are management's projections?  A. Correct.").

[343]  8/31/2009 Hr. Tr. at 33:7-9 (Taylor) ("Eventually, when they updated and finished their work, they moderated that assumption fairly significantly.").

[344]  JPX 272 at 60 (Graphic 29).

[345]  8/31/2009 Hr. Tr. at 34:16-19 (Taylor) ("So Duff & Phelps' numbers when you just make these first two corrections [for tax step-up and capex], it reduces the valuation by billions and it brings it down to where there's clearly no surplus to CCH I.  It's below the 18.7 billion.").

[346]  JPX 75 at CTR-40042.

[347]  JPX 75 at CTR-40042.

(c)     Charter's own securities were trading in the 5-6x range.

(d)     Each of the four companies comparable to Charter was likewise trading in the 5-6x range.[348]

(e)     Sensitivities done with reasonable and appropriate earnings multiples in the actual market range of 5-6x earnings indicate a value of CCH I several billion dollars below the surplus breakeven point.[349]

### 7.     On November 14, 2008, The Board Shut Down Distributions From CIH To CCH

109.     Charter convened a special telephonic meeting of the Board on November 14, 2008 to discuss upcoming interest payments owed by CCH and CIH.[350]  Management did not typically call upon the Board to approve distributions needed for DHCs to pay interest.[351]  CCH and CIH had interest payments of $8 million and $63 million due on November 17, 2008, respectively.[352] At this meeting, the Board shut down any distribution from CIH to CCH, evidencing recognition of CIH's insolvency and lack of surplus.[353]

---

[348] 8/31/2009 Hr. Tr. at 36:12-15 (Taylor) ("Q. And can you remind us, where were market multiples at the time?  A. Again, we'll get into that but there's been a lot of testimony that it's five to six times range."); JPX 57 at CTR-40016 (showing comparables were trading in a range of 4.8-5.5x forward-looking EBITDA while Charter itself was trading at 5.6x 2009E EBITDA based on market values); JPX 60 at LAZ/CH-217 (showing Charter was trading in range of comparables); JPX 85 at CTR-40051 (same); JDX 13.

[349] JDX 11; 8/31/2009 Hr. Tr. at 36:18-21 (Taylor) ("[JDX 11] shows that if you look at a proper sensitivity, you would see very quickly that there isn't surplus.  Even at levels well above where the market was, there's no surplus.  These numbers fall off very, very fast.").

[350] JPX 75; JPX 76.

[351] 7/22/2009 Hr. Tr. at 229:8-11 (Merritt) ("Q. Okay.  And the board was not normally asked to approve distributions to allow affiliates to pay interest on that indebtedness, correct?  A. That's correct.").

[352] JPX 75 at CTR 40040.

[353] *Id.*

110. Management told the Board during the special meeting that the only way to make CIH's $63 million interest payment due on November 17, 2008 was through a distribution from CCH I.[354] Management warned the Board that failure to approve a distribution from CCH I to CIH could trigger a "free fall" bankruptcy.[355] Thus, the Board approved the distribution from CCH I to CIH.[356] Management told the board that "[a]dverse parties may nevertheless claim peer and Charter debt market valuations indicate lack of surplus at CCH I."[357] But, according to management, the "consequences of not making [the] distribution and interest[] payment would likely far exceed amount of distribution and payment."[358]

---

[354] 7/22/2009 Hr. Tr. at 31:11-21 (Smit) ("Q. Okay. On November 14th, 2008 management communicated to the board that the CIH interest payment requires -- requires distribution from CCH I to CIH, correct? A. That's what we stated, yes. . . . Q. Okay. And you used the term requires because there was no alternative. CCH I had to have surplus in order to make these interest payments, correct? A. That's correct."); JPX 75 at CTR 40039 ("CIH interest payment requires distribution from CCH I to CIH, which requires CCH I to have a financial surplus > distribution.").

[355] JPX 76 at CTR 40044 ("Mr. Smit finally noted that the Board should consider the adverse effect on the enterprise, and all the Company's stakeholders, if it failed to make the proposed distribution and interest payment. He noted the failure to pay interest would trigger "'cross defaults'" in all the Company's debt securities, which would likely require the Company to seek protection under the federal bankruptcy laws without any time to prepare for the adverse consequences of such a step.").

[356] JPX 76 at CTR 40045.

[357] JPX 75 at CTR 40039.

[358] *Id.*

111.    The Board did *not* approve a distribution from CIH to pay CCH's $8 million interest payment due on November 17, 2008.[359]  Instead, Charter funded CCH's interest payment by having CCO prepay an intercompany loan owed to Holdco.[360]  Holdco then made a capital contribution down to CCH to enable it to make the $8 million interest payment it owed.[361]

### 8.    Lazard Did Not Perform A Valuation Of Charter In November 2008

112.    At this November 14, 2008 Board meeting, Millstein did *not* give any opinion on surplus or even on valuation, and did *not* advise the Board on any price at which Charter could be sold in that market.

(a)    Millstein testified that the November 14, 2008 Board minutes, which state that he advised the Board that CCH I had adequate surplus, are inaccurate.[362]

(b)    Millstein testified that he never provided any opinion with respect to surplus.[363]

(c)    Millstein also testified that he did not opine that it would be reasonable to estimate the value of Charter in a current transaction by referring to precedent transactions.

---

[359]  JPX 76 at CTR 40045.

[360]  8/3/2009 Hr. Tr. at 47:19-48:8 (Schmitz) ("Q. Okay.  And right after that management used Holdco's assets to fund an interest payment that was owed by CCH, right?  A. Yes.  I think it's eight million dollars at this rate. Q. Yeah, it was an 8.4 million dollar payment, right?  A. Yes. Q. Okay.  And that was made around November the 17th.  Does that sound right?  A. Yes. Q. And again, management had CCO repay a valid intercompany loan due from CCO to Holdco, right?  A. Right. Q. Okay.  And then management took that repayment and some cash and had Holdco make a capital contribution down to fund the interest payment, right?  A. Right.").

[361]  JPX 76 at CTR 40045.

[362]  7/21/2009 Hr. Tr. at 150:1-2 (Millstein) ("[W]e didn't render a surplus opinion. The minutes are just wrong in that regard"); 7/21/2009 Hr. Tr. at 131:10-11 (Millstein) ("A. I did not render a surplus opinion, did not render a solvency opinion and I didn't render a valuation opinion.").

[363]  *Id.*

(d)     Millstein testified that any discussion he had about what he could sell Charter for *assumed* an economic recovery and the availability of the billions of dollars of financing needed to do the deal.[364]

(e)     The Board was aware that Millstein was discussing a hypothetical transaction contingent upon financing that was not available at that time.[365]

(f)     As of November 2008, the credit markets were absolutely frozen.[366]

(g)     When Charter finally asked Lazard to perform a valuation of Charter, Lazard gave "virtually no weight" to precedent transactions in reaching its opinion, and arrived at a value billions of dollars below the threshold required for surplus at CCH I.[367]   ¶ 15(c).

## 9.     Vulcan's Analysis Confirms That There Was No Surplus

113.    Vulcan, Paul Allen's investment firm that manages his investment in Charter, prepared two contemporaneous DCFs of its own, both of which indicated a value well short of the surplus breakeven point.

---

[364]  7/21/2009 Hr. Tr. at 141:18-142:5 (Millstein) ("Q. But I thought you just said that you could sell the company for somewhere around eight times. That's what you told the board in November.  A. It would -- look, in a change of control transaction, all of the bank debt, all of the bond debt is critical to the company. It has to be repaid. ***You can't, therefore, buy Charter without leverage, without the ability to refinance the capital structure. The board of directors understood that.*** I understood it. And in talking to them about it, the multiple at which I thought it would trade, by definition, by implication, a change of control transaction implies a refinancing of the entire capital structure. ***So it clearly depends on financing which was not available at that time.***") (emphasis added).

[365]  7/21/2009 Hr. Tr. at 141:18-142:5 (Millstein).

[366]  7/21/2009 Hr. Tr. at 139:14-17 (Millstein) ("Q. And in November when you advised the board that you could sell for eight times, the credit markets were absolutely frozen, right?  A. At that time, they were."); JPX 56 at CTR 40005-A ("Millstein . . . not[ed] that the current conditions made financing 'prohibitively' difficult and expensive at this time.").

[367]  7/21/2009 Hr. Tr. at 112:2-6 (Millstein) ("Q. Okay.  Now, based on your twenty-five years' experience and unparalleled knowledge of Charter's structure, you gave virtually no weight to the precedent transactions in valuing Charter for this Court, correct?  A. Correct."); JPX 266, Ex. D at 3 ("[W]hile a precedent transaction analysis was performed, Lazard's reliance on such methodology for purposes of determining the Enterprise Value was minimal.").

114.    After the November 14, 2008 special meeting, Vulcan representatives prepared a DCF analysis to assess the information management had provided to the Board.  This was "an analysis that Vulcan needed to have on its own." [368]  This DCF produced a valuation estimate well below the surplus breakeven point.[369]

(a)    Conn spoke to Paul Allen after the November 14 meeting, informed him about the issue of surplus, and reported that Vulcan was going "to try to better understand the work that the company is doing around a number of issues," including the issue of surplus.[370]

(b)    Temple directed a Vulcan staff member, Anchi Chern, to work on the DCF analysis.

(c)    Recognizing that the only available company-formed projections was the outdated July Long Range Plan, Vulcan Vice President (and current President), Chris Temple, instructed his subordinate, Chern, to use projections other than those contained in Long Range Plan.  Specifically, he instructed the use of current Wall Street analyst projections at the high end and low end of the range.[371]

---

[368]  9/2/2009 Hr. Tr. at 98:22-99:5 (Conn) (Q. It was prudent for Vulcan to look at that issue, that's what you determined?  A. Yes.  Q. And you directed Chris Temple to have someone at Vulcan perform a discounted cash flow analysis of Charter, at some point after the November 14th meeting?  A. Yeah. I asked him and his team to pull together basically new -- our own version of an operating plan, you know, with our own forecasts based on our understanding of the business."); 9/1/2009 Hr. Tr. at 46:2-4 (Temple).

[369]  JPX 84 at VUL 3076-77 (results of DCF showing midpoint of valuation range to be $16.1 billion).

[370]  9/2/2009 Hr. Tr. at 97:17-22, 98:5-13 (Conn) ("Did I ask you those questions and did you give those answers?  A. Yes.  Q. That was truthful testimony, right?  A. Yes.  Q. And you determined that it would be prudent for Vulcan to take a look at matters and to work in connection with the surplus issues, right?  A. Yes.").

[371]  9/1/2009 Hr. Tr. at 48:20-24 (Temple) ("Q. Did you -- in your instructions did you also include instructions about what inputs to use for projections?  A. I don't recall the specific conversation but in the interest of providing a broader sensitivity analysis, I think I suggest use one on the higher side and one on the lower side.").

(d)     Under Temple's guidance, Chern used in his DCF two sets of analyst projections—one from a Bank of America report dated November 13, 2008 and one from a Morgan Stanley presentation dated November 25, 2008.[372]

(e)     Vulcan's internal DCF resulted in a range of values from $14 to $18.2 billion with a midpoint value of $16.1 billion, consistent with Lazard's valuation that was part of Charter's first day filings, and well below the $18.7 billion surplus breakeven point.[373]

(f)     Chern reported to Temple and Conn that even using the Morgan Stanley projections that represented the high end of Wall Street's EBITDA projections for Charter, Vulcan's internal valuation was $3.4 billion lower than Duff & Phelps' October draft DCF.[374]

(g)     Chern also reported that Duff & Phelps' draft DCF was $2.4 billion more aggressive than Vulcan's because Vulcan removed stepped-up depreciation and amortization.[375]

115.    After Vulcan received Charter management's revised projections in December, Vulcan performed the identical surplus analysis employed by Charter in November 2008, which used the Duff & Phelps model, but replaced the projected EBITDA number from the July Long Range Plan with the projected EBIDTA number in the December Long Range Plan.[376]

---

[372] JPX 84 at VUL 3078; 9/1/2009 Hr. Tr. at 47:17-24 (Temple) ("Q. And he used, as you said, inputs in the form of projections from Morgan Stanley and B of A, correct? A. Publicly available research reports, yes. Q. Where were the Morgan Stanley and B of A research reports published? A. I can't say with certainty but the DCF pages would suggest that Morgan Stanley was published November 25th and Bank of America was published November 13th, 2008."), 48:21-24 (Temple).

[373] JPX 84 at VUL 3076-77.

[374] JPX 84 at VUL 3073, 3078.

[375] JPX 84 at VUL 3073, 3078.

[376] JPX 111 at VUL 3539; 9/2/2009 Tr. at 112:18-113:4 (Conn).

(a) This second Vulcan DCF analysis showed negative surplus at CCH I of $316 million.[377]

116. Consistent with its DCFs and also with current market valuations, in December 2008, Vulcan advised Lazard that it was valuing Charter at a multiple of approximately 5-6x projected EBITDA.[378] This is billions of dollars below the surplus breakeven point.

### 10. Shortly After the $250 Million Borrowing Charter Admits To The Lenders And The Bondholders That CCH I Did Not Have Surplus

117. Charter admitted to both the Lenders and the Takeover Group that CCH I had no surplus and could not make upcoming debt payments.

118. Contemporaneous to the public announcement that Charter retained Lazard as its restructuring advisor, Schmitz told Eric Federman of Credit Suisse on December 11, 2008 that all of the entities above CCH II, including the relevant DHCs, were insolvent, and that they could not make their interest payments under Delaware law.[379] Federman memorialized that discussion contemporaneously in an email as follows: "Based on current valuations, they are not really solvent from cch2 on up. Since they have interest payments and maturities at those levels, they

---

[377] JPX 111 at VUL 3539; 9/2/2009 Tr. at 112:18-113:4 (Conn).

[378] 8/24/2009 Hr. Tr. at 51:13-18 (Goldstein) ("Q. Okay. And at the same time, beginning of December 2008, Vulcan, you know the inside guys who own the big piece of Charter, was valuing Charter at five to six times in this same time frame, isn't that right? A. I believe it's somewhere in that range. I can't recall specifically.").

[379] JPX 89 ("Based on current valuations, they are not really solvent from cch2 on up. Since they have interest payments and maturities at those levels, they need to deal with it now. They have the liquidity to make these payments but cannot make them under [D]elawere [sic] law due to multiples in the sector."); 7/31/2009 Hr. Tr. at 208:8-13 (Federman) ("Q. Do you recall specifically, sir, on December 11th that Eloise told you that CCH II on up was not solvent -- or were not solvent? A. I don't remember the exact words that she used. Everything that's in this email is from what she told me probably ten minutes earlier.").

need to deal with it now. They have the liquidity to make these payments but cannot make them under [D]elawere [sic] law due to multiples in the sector."[380]

119.  On December 12, 2008, Charter announced publicly that it had retained Lazard to "initiate discussions with the Company's bondholders."[381]

120.  All the bondholder representatives who testified before this Court stated that they were shocked and surprised by this announcement.

(a)  Villaluz was "surprised" because prior to the announcement she had been led to believe by Charter management and its advisors that Charter had enough liquidity to get through its 2010 maturities.[382] She agreed that the announcement was "inconsistent with what the company had been communicating to the market and to Franklin."[383]

(b)  Marcus agreed that "every investor" he spoke with had the same reaction to Charter's announcement, which was they were "shocked, they were incredulous, they had no idea this was coming."[384]

---

[380]  JPX 89.

[381]  7/21/2009 Hr. Tr. at 49:15-50:22 (Millstein) ("[A]fter the December meeting, we put out a press release announcing that we were prepared to engage in -- I mean, they announced that Lazard had been retained specifically for the purpose of commencing recapitalization conversations that had the predicted effect of making my phone ring off the hook.").

[382]  7/23/2009 Hr. Tr. at 148:19-149:13 (Villaluz) ("Q. All right.  Now, you testified and I think this is your exact word that you were surprised by the December 12th press release, correct?  A. Yes.  Q. Because prior to that time as an analyst you had believed that the company had enough liquidity to get them through to the 2010 maturities, right?  A. Yes.  Q. And that was the I think CCH II maturity, correct?  A. Yes.  Q. And that matured around, I think September 15th of 2010, right?  A. 2010, yes.  Q. And that understanding was based on your review of the company's public filings, correct?  A. Yes.  Q. And it was based on your discussions with management that you said you had regularly, in late September or early October, right?  A. Yes.").

[383]  7/23/2009 Hr. Tr. at 149:14-150:7 (Villaluz).

[384]  7/29/2009 Hr. Tr. at 66:8-13 (Marcus).

(c)     Zinterhofer described his reaction to the announcement as "sho[cked], blindsided" because, he too, "thought the company had enough liquidity to get through at least another year and a half.  Everything we had talked about had been in terms of a possible restructuring in 2010 should 1.9 billion of debt not be refinanced.  But something that soon was pretty shocking to us."[385]  Zinterhofer also testified that it would be reasonable for other outsiders, including the Lenders, to be surprised by Charter's announcement.[386]

(d)     Kurinskas testified that JPMorgan, like the Takeover Group, was surprised by Charter's announcement.[387]

121.    Negotiations regarding the fulcrum security demonstrate that Charter and its advisors knew that CCH I had no surplus.

(a)     Beginning December 12, 2008, Lazard approached CCH I and CCH II bondholders to commence restructuring negotiations.  From the beginning, Charter recognized that the fulcrum security would be that of either CCH I or CCH II, and hence approached those bondholders in particular.  Lazard contacted major holders of CCH I and CCH II debt in December 2008 because Charter knew that, given the decline in the value of Charter, either CCH I or CCH II debt would be the fulcrum security in a Chapter 11 restructuring.[388]

---

[385]  7/28/2009 Hr. Tr. at 44:9-19 (Zinterhofer).

[386]  7/28/2009 Hr. Tr. at 108:23-109:7 (Zinterhofer).

[387]  8/25/2009 Hr. Tr. at 18:25-19:7 (Kurinskas) ("Q. What was JPMorgan's reaction to the information that Mr. Millstein provided to you? A. I was surprised as well. It was news to us that the company was -- had discovered an impediment in their ability to move money around their system to get it to where it needed to be, but it made sense when he explained it and explained why the company had chosen to start this dialogue with their bondholders in December of '08.").

[388]  8/17/2009 Hr. Tr. at 25:13-21 (Doody) ("Q. And in addition to that, did Charter have Lazard attempt to marshal or organize the bondholders?  A. Yes, we did. Q. And what steps did Lazard take to do that?  A. I don't know exactly how they did it but they identified CCH I and CCH II

(b)     That Charter recognized from the very beginning that the fulcrum security would be either CCH I or CCH II belies any assertion by Charter that it had an actual good faith belief of surplus at CCH I.  The debate over whether CCH I or CCH II was the fulcrum evidences the fact that they thought the value was at a range around or slightly over $14.8 billion, the approximate surplus breakeven point for CCH II.  This is compelling evidence of Charter's recognition that its valuation was far below the $18.7 billion needed for surplus at CCH I.[389]

(c)     The Takeover Group committed to invest an additional $1.6 billion under the Plan to ensure that CCH I, not CCH II, is the fulcrum security.[390]

122.     Thereafter, Charter proceeded to tell the Takeover Group and JPMorgan that CIH and CCH were unable to pay their debts coming due in January and April 2009 and, consistent with those admissions, did not make CIH's and CCH's interest payments on January 15, 2009 because of lack of surplus:

---

as the likely fulcrum security.  So they were trying to -- I don't know exactly how they did it but they tried to organize a critical mass of creditors in those tranches.").

[389]  8/31/2009 Hr. Tr. at 44:13-45:2 (Taylor) ("So CCH I had 3.9 billion of debt.  The plan value is 600 million, rounding or so, 5, 600 million into that CCH I debt.  And as Your Honor heard a lot of discussion about fulcrum securities, okay, when the bondholders were first contacted in the first presentation by Lazard it's clear that the bondholder committee was assembled because it was a crossover committee between CCH II and CCH I, and the discussion was all about which one of those would be the fulcrum security.  All right?  So they were looking at a value over and above 14.8 billion.  We're nowhere near the 18.7.  The 14.8 billion is the value at the breakeven for CCH II.  So the bondholders are investing 1.6 billion to ensure that the fulcrum is, in fact, 600 million into CCH I.  So we're well over 3 billion dollars away from the amount that would be required for CCH I to have surplus.  That fulcrum discussion started very quickly, you know, in December.").

[390]  8/31/2009 Hr. Tr. at 44:22-25 (Taylor) ("The 14.8 billion is the value at the breakeven for CCH II.  So the bondholders are investing 1.6 billion to ensure that the fulcrum is, in fact, 600 million into CCH I."); 7/28/2009 Hr. Tr. 149:17-150:7 (Zinterhofer) ("[Y]ou and Crestview and Oaktree and Franklin all committed about a 1.6 billion dollars in a rights offering so that you could acquire equity in Charter, is that not correct? . . .  A. The rights offering was a necessity in order to protect the value of the CCH I bonds.  As I described earlier, it was the only feasible way to achieve that result.  That's the reason we did it.").

(a)     During discussions in December 2008, Charter and its advisors told Franklin that the directors were concerned about their personal liability if the Board agreed to make the January 15, 2009 interest payment.[391]

(b)     Lazard also told Apollo that Charter would not be making the January 15 interest payment because of a lack of surplus.[392]  Lazard told Apollo in mid-December 2008, and Apollo became convinced in the following weeks, that Charter was committed to not making the January 15 interest payments.[393]

---

[391] 7/23/2009 Hr. Tr. at 151:3-151:25 (Villaluz) ("Q. Of course.  Its [sic] correct, isn't it, that after discussion commenced with Charter and it's [sic] advisors, after the December 12th press release, that the board of directors had a concern about their liability if the board agreed to make the January 15th interest payment?  A. There was some concern, yes. Q. And you were told about that concern by Charter and its [sic] advisors, right?  A. After the press release, yes. Q. And it was a concern that the board of directors could be held liable if they agreed to make the January 15th interest payment, correct?  A. Yes."), 116:8-12 (Villaluz) ("Q. And you understood that the board members remain concerned about their personal liability?  Personal liability, if that January interest payment got made.  That's what your advisors told you?  A. Yes.").

[392] 7/28/2009 Hr. Tr. at 227:11-228:8 (Zinterhofer) ("Q. In fact, the representatives of debtors told you that they were not making the January 15 interest payment because of the lack of adequate surplus at CIH and CCH, correct?  A. I think that was one of the reasons but my recollection's not going to be perfect on this but that sounds right."); JPX 154 at Charter-e 93855 ("[T]he company, which has solicited valuation advice from Duff & Phelps, believes that based on the fair value  of assets, . . . there is not adequate surplus to allow a subsidiary to dividend up cash to CIH and Charter Holdings in order for it to make the necessary January 15, 2009 interest payments.  Charter's board is concerned that payment of interest to entities that are deemed insolvent could subject its members to personal liability.").

[393] 7/28/2009 Hr. Tr. at 43:4-43:16 (Zinterhofer) ("He told us, me, that the company was unwilling to make its January interest payment and basically said you're going to need to get an ad hoc committee organized to start putting forth a restructuring plan as quickly as possible."), 122:15-123:7 (Zinterhofer) ("Q. And you knew, as of that first call [with Jim Millstein] on December 12, that the company was irrevocably committed not to make the January 15 interest payment because it was going to restructure, is that not correct?  A. Well, we became convinced of that in the -- you know, in the weeks following that first conversation that the company was not going to make its interest payment.").

(c)     Lazard told Oaktree that there was concern about making the January interest payment that would potentially require an "illegal dividend" due to the fact that there was no surplus at the relevant Charter entities.[394]

(d)     Lazard similarly told Ann Kurinskas of JPMorgan in December 2008 that "in the course of preparing the company's year-end audit, there had been some valuation work done and that valuation work had suggested that the company was going to have a problem with surplus at certain of its holding companies."[395]

(e)     Millstein indicated to Kurinskas in December 2008 that it was "doubtful" that Charter would be able to meet its interest and principal obligations in April of 2009.[396]

(f)     These statements by Charter and its advisors, which were based on the same facts available to Charter on November 5, establish that CCH I did not have surplus, and Charter was fully aware of that fact when it borrowed $250 million from the Lenders on November 5, 2008.

---

[394] 7/29/2009 Hr. Tr. at 196:24-197:24 (Liang) ("He just said that there was a concern, you know, there was a potential illegal dividend, is the word he used, issue in getting money up into the Charter capital corporate structure in order to make the payments."); JPX 368 (hand-written notes of K. Liang summarizing call with Millstein on December 15, 2008 during which Millstein indicated "no surplus.").

[395] 8/25/2009 Hr. Tr. at 16:12-21 (Kurinskas).

[396] 8/25/2009 Hr. Tr. at 16:25-7 (Kurinskas); 7/21/2009 Hr. Tr. at 59:4-17 (Millstein) ("Q. And in your discussions with JPMorgan and members of the committee, did the issue of surplus come up?  A. Yeah. Look, when you tell people that you're taking the grace period and potentially defaulting on debt that could trigger the collapse of the entirety of the capital structure, people sort of want to know, and particularly when they're thinking this is not -- the first possible time this could occur is in 2010, because based on their own homework they had concluded that we had the runway and liquidity to get well into 2010.  . . . I told them that there were risks that we could not find legal means to move the money to the relevant payor/obligor on the interest payments due down the road.").

### 11.    Charter Was Unable To Pay Interest Due On January 15, 2009

123.    CCH and CIH did not make their interest payments due on January 15, 2009 because they were unable to make those interest payments.

(a)    On January 15, 2009, CCH had an interest payment of $11 million due, and CIH had an interest payment of $61 million due.[397]

(b)    On January 14, the day before CCH's and CIH's interest payments were due, Schmitz spoke with JPMorgan representatives, Peter Hooker and Mark Van Lith, and told them that Charter "will not be making their scheduled interest payment tomorrow."[398]  Schmitz "cited a combination of reasons" for why Charter would not be making its interest payments, including that "it can't."[399]

(c)    On January 15, 2009, Charter announced publicly that CCH and CIH did not make their January 15 interest payments.[400]

---

[397]  ¶ 90.

[398]  JPX 138; 7/31/2009 Hr. Tr. at 205:17-206:5 (Schmitz) ("Q. Okay. Let's look at JPX-138, which I think you already looked at today. . . .  It says, "Peter Hooker and I spoke with Eloise Schmitz of Charter this evening. Eloise informed us that they will not be making their scheduled interest payment tomorrow. Eloise requested we keep this information confidential until tomorrow morning, at which time Charter intends to issue a press release." Do you see that?  A. Yes. Q. And that's an accurate recounting of the sum and substance of what you told them?  A. Yes.").

[399]  JPX 138; 7/31/2009 Hr. Tr. at 206:14-207:1 (Schmitz) ("So is it your testimony that in sum or substance you did not tell Mr. Van Lith that you couldn't make the interest payments because you can't or won't?  A. I don't remember specifically what I said. I'm quite sure that they're right, that I had indicated that we had not made significant progress with the noteholders. I'm quite sure also that I did not provide an indication one way or another of what we would do otherwise. And I don't remember if he asked me if we can't or we won't. It was clear that we were not making the interest payment. It was clear that we were not making the interest payment and that I had indicated that we had not made significant progress with the noteholders.").

[400]  JPX 318.

(d)     Temple admitted that Charter filed for bankruptcy because it was unable to make the January 15 interest payments:

> Q.  Do you have an understanding as to why Charter filed for bankruptcy?
> A.  Yes.
> Q.  And why did Charter file for bankruptcy?
> A.  An inability to make an interest payment.[401]

(e)     Charter's CEO, Smit, admitted during this trial that "the company did not make its January 15th interest payment due to CCH and CIH based on considerations of moving funds within the capital structure."[402]

(f)     In a presentation to Charter's audit committee, management stated "the company did not make its January 15th interest payment due to CCH and CIH based on considerations of moving funds within the capital structure."[403]

(g)     After conducting its audit and based on its discussions about Charter's financial affairs with management, KPMG reported that, "Certain interest payments at CIH and CCH were not made on their stated due date, of January 15, 2009, due to lack of surplus . . . . When the Company finalized their estimation of surplus for CCH I, they determined that there was

---

[401]  9/1/2009 Hr. Tr. at 43:7-16 (Temple) ("Q. Do you have an understanding as to why Charter filed for bankruptcy? A. Yes. Q. And why did Charter file for bankruptcy? A. An inability to make an interest payment. Q. And which interest payment was that? A. I don't recall the specific entity or amount but I believe it was -- I don't recall the specific entity. Q. Well, when was the payment due, if you recall? A. January 15th.").

[402]  7/22/2009 Hr. Tr. at 52:17-24 (Smit) ("Q. Okay, let's turn to the page with 40218 on it. It says the company did not make it's January 15th interest payment due to CCH and CIH based on considerations of moving funds within the capital structure. Do you see that? A. That's correct. Q. And that's a true statement that management made to the audit committee, correct? A. That's correct.").

[403]  JPX 224 at CTR-40218; 7/22/2009 Hr. Tr. at 52:17-24 (Smit) (Q. Okay, let's turn to the page with 40218 on it. It says the company did not make its January 15th interest payment due to CCH and CIH based on considerations of moving funds within the capital structure. Do you see that? A. That's correct. Q. And that's a true statement that management made to the audit committee, correct? A. That's correct.").

not sufficient definitive information such that an equity distribution could be made without being subject to legal challenge."[404]

(h)     As part of these same going concern work papers, KPMG reported that: "[T]he Company does not project to have adequate surplus under Delaware corporate law such that funds can be moved between entities when needed for interest and principal payments during 2009."[405]

(i)     In another portion of its workpapers, KPMG summarized the timeline of events that had taken place at Charter in late 2008 and early 2009 and stated: "January 14th 2009 – Management and the Board decided not to make the interest payments on January 15, 2009 at CCH and CIH due to the estimated lack of surplus at CCH I that would not permit the distribution of money up to CIH and CCH."[406]

(j)     In this same timeline in its workpapers, KPMG reported that "The Company concluded that . . . there would not be sufficient surplus on a prospective basis during 2009, which would not allow them to make certain principal and interest payments when due . . . ."[407]

(k)     On February 11, 2009, Charter's counsel sent JPMorgan's counsel draft first-day papers that included a proposed draft declaration of Charter's Chief Restructuring Officer, Gregory Doody.  The draft declaration acknowledged:  "Charter determined, in exercising its fiduciary duties and in compliance with applicable law, that it could not make two interest

---

[404] JPX 183 at KPMG 743-44.

[405]  JPX 183 at KPMG 749.

[406]  JPX 186 at KPMG 761 (emphasis omitted).

[407]  JPX 186 at KPMG 761.

payments for junior entities in its capital structure which were due on January 15, 2009 in the amount of approximately $74 million."[408]

        (l)     Apollo recognized that even if CIH and CCH could make the January 15 interest payments, April 1 was "the inevitable default date."[409]

        **12.**     **KPMG Determined That It Could Not Give An Unqualified Audit Opinion Because Of The Lack Of Surplus And Lack Of Available Alternatives**

124.     As part of its annual audit process, KPMG performed a going concern analysis of Charter[410] and prepared a final going concern memorandum, dated February 8, 2009 (the "Final Going Concern Memorandum"), summarizing its analysis and conclusions on the going concern qualification.

        (a)     Because of its importance, the Final Going Concern Memorandum was signed and approved by at least six KPMG auditors, including members of KPMG's national and regional offices.[411]

        (b)     As the Court recognized, this Final Going Concern Memorandum and other KPMG work papers admitted in evidence bear the indicia of reliability because they "were prepared by professionals . . . with a view toward getting the information contained in these documents right."[412]

---

[408]  JPX 194 (Declaration of Gregory Doody (Draft)) at ¶ 8.

[409]  JPX 154 at Charter-e 93856.

[410]  JPX 183 at KPMG 737 ("Final Going Concern Analysis").

[411]  JPX 183 at KPMG 737 (Final Going Concern Analysis, R1-1, reflecting handwritten initialed signatures approving the memorandum); JPX 123 at KPMG 752-54 (internal KPMG emails requesting and receiving formal approval of Final Going Concern Analysis, R1-1).

[412]  7/22/2009 Hr. Tr. at 160:16-20.

125.    As stated in the Final Going Concern Memorandum, KPMG decided that it needed to include a going concern qualification in its audit letter because of the estimated lack of surplus at key levels in the Charter corporate structure.[413]

(a)    KPMG explained:

> This conclusion is based on the projected lack of adequate surplus at certain Charter subsidiaries during 2009.  This lack of adequate surplus limits the Company's ability to distribute cash to certain entities within the structure such that those entities will not be able to meet their principal and interest obligations when due.[414]

(b)    KPMG also included in its Final Going Concern Memorandum the results of its own analysis of surplus based on Duff & Phelps' finalized FAS 142 test, measured as of December 31, 2008.[415]

(c)    The Final Going Concern Memorandum reported that KPMG's surplus analysis "indicate[d] a substantial lack of surplus at CCI, CCH, and CIH."[416]

(d)    KPMG further reported that:  "Management does not project the surplus estimate to improve during the course of 2009 such that CCH or CIH would have adequate surplus to make distributions during the course of 2009."[417]

126.    As reported in Final Going Concern Memorandum, KPMG's analysis confirmed that Charter had no viable alternatives.

---

[413]  JPX 183 at KPMG 738 ("[A]n explanatory paragraph in our 2008 auditors' report (including the auditors' reports issued at each wholly-owned subsidiary) addressing a going concern uncertainty is considered necessary.").

[414]  JPX 183 at KPMG 738.

[415]  JPX 183 at KPMG 742-743.

[416]  JPX 183 at KPMG 743.

[417]  JPX 183 at KPMG 743.

(a)     KPMG's Final Going Concern Memorandum stated that, based on regular meetings with Charter management, it was informed that Charter had no viable alternatives for moving funds as needed to permit debt payments to be made when due in 2009.[418]

(b)     KPMG's Final Going Concern Memorandum also reported that management had evaluated options relating to "1) the repayment of certain intercompany payables, 2) the placement of an intercompany note, and 3) the transfer or sale of certain corporate assets," but that "these options were not deemed to be a solution to address the magnitude of the issue."[419]

(c)     As stated in the Final Going Concern Memorandum, KPMG evaluated whether Charter had a viable option of using an intercompany payable to make interest payments, but found that the "intercompany payable" would not "solve the lack of surplus."[420]

(d)     KPMG's Final Going Concern Memorandum reported that Charter management did not have any other alternatives sufficient to make future distributions for interest and principal when due in 2009."[421]

127.    In its final audit opinion attached to CCI's Form 10-K for 2008, KPMG provided the following qualification:  "[A]s a result of the following matters:  (i) the Company's significant indebtedness; (ii) the Company's ability to raise additional capital given its current leverage; and (iii) the potential inability of the Company's subsidiaries to make distributions for payments of interest and principal on the debts of the parents of such subsidiaries due in 2009 based on the

---

[418]  JPX 183 at KPMG 743 ("In response to this projection for 2009, management evaluated whether there are other alternatives to move money to the insolvent entities at such times that interest or principal payments are due during 2009. . . . In the process, including review with internal and external legal counsel, these alternatives were not deemed to be a solution to address the magnitude of the issue, and the alternatives were not without legal risk for the Company.").

[419]  JPX 183 at KPMG 743.

[420]  JPX 183 at KPMG 744.

[421]  JPX 183 at KPMG 744.

availability of funds and restrictions under the Company's applicable debt instruments and under applicable law. These matters raise substantial doubt about the Company's ability to continue as a going concern."[422]

> **13.** **In February 2009, CCO Submitted A Borrowing Request For $35 Million And Charter Declared It Intended To File For Bankruptcy**

128. On February 3, 2009, CCO submitted a request to borrow $35 million and, in doing so, represented that no Default or Event of Default under Section 8(g)(v) had occurred or was ongoing.[423] That representation was untrue.

129. On February 4, 2009, JPMorgan sent a letter to Schmitz stating JPMorgan did not believe the conditions to an extension of credit could be satisfied under Section 5.2 of the Credit Agreement, and invited Schmitz to contact JPMorgan to discuss. Neither Schmitz nor anyone else from Charter responded to JPMorgan to explain how the representations deemed made by a borrowing request, including that the DHCs were able to pay their debts as they become due, were accurate.[424]

130. By February 5, 2009, JPMorgan knew that Charter intended to file for bankruptcy as early as the following week.[425]

---

[422] JPX 247 at F-2-F-3 ("Report of Independent Registered Public Accounting Firm").

[423] JPX 160; *see also* JPX 66.

[424] JPX 161 at CTR-43627; 8/25/2009 Hr. Tr. at 22:21-23:11 (Kurinskas).

[425] 8/25/2009 Hr. Tr. at 21:21-22:6 (Kurinskas) ("A. By early February Charter's counsel had had conversations with Simpson Thacher and had indicated that the company would be in a position to file prior to the expiration of the thirty-day grace period in the middle of February. Q. Do you know if that was before or after February 5th? A. It would have been before February 5th. Q. After you learned about Charter's bankruptcy filing, did there come a time when CCO made another borrowing request? A. Yes, it did. Q. When was that? A. We received a borrowing notice late on February 3rd.").

131.    On February 5, 2009, JPMorgan sent a letter to CCO declaring a default under the Credit Agreement.[426]

132.    On February 9, 2009, one day after KPMG determined that it could not issue an unqualified audit opinion, Schmitz wrote JPMorgan a letter asserting that the financial condition of the DHCs had not materially changed since November 5, 2008, when CCO borrowed $250 million.[427]  Schmitz claimed in this letter that CCO had not defaulted under the Credit Agreement and all of the DHCs were able to pay their debts as they become due.[428]  Schmitz also noted that one Lender funded $354,236.56 of the $35 million request on February 5, 2009.[429]

133.    Three days later, on February 12, 2009, Charter announced that it had reached an agreement in principle with the Takeover Group and that Charter intended to file for bankruptcy.[430]

(a)    As part of this agreement, the Takeover Group agreed to place its $47 million of the $74 million of January 15 interest payments into escrow.[431]  Under the terms of the

---

[426]    JPX 168.

[427]    JPX 187 at JPM-CH 35576 ("It is worth noting that on November 4, 2008, the Lenders funded the Borrower's request for Loans totaling approximately $250,000,000.  At such time, neither the Administrative Agent nor any Lender contended that an Event of Default under Section 8(g)(v) (or otherwise) had occurred and was continuing.  Since that date, when the Administrative Agent and the Lenders agreed with the Borrower that the conditions to borrowing contained in Section 5.2 of the Credit Agreement were satisfied, there has been no material change to the financial position of the Designated Holding Companies, and certainly none to warrant the determination that an Event of Default under Section 8(g)(v) has occurred and is continuing."); 7/31/2009 Hr. Tr. at 127:13-128:13 (Schmitz) (confirming no material event impacting the financial condition of the DHCs had occurred since November 2008 noting "[t]he companies, in general, continue to operate well and are performing well.").

[428]    JPX 187 at JPM-CH 35577.

[429]    JPX 187 at JPM-CH35576.

[430]    JPX 336; JPX 221 (Form 8-K, filed Feb. 13, 2009) at Item 1.01 ("Escrow Agreement").

[431]    JPX 221 at Item 1.01 (Form 8-K filed February 13, 2009) ("As part of the agreement in principle, Charter and certain of its subsidiaries entered into an Escrow Agreement, dated as of February 11, 2009, with members of the ad-hoc committee of holders of the Overdue Payment Notes (the 'Ad-Hoc Holders')"); 7/22/2009 Hr. Tr. at 98:17-99:14 (Smit) ("The purpose of the

escrow agreement with the Takeover Group, if the Board does not receive releases for the "illegal dividend" through confirmation of the Plan, Charter gets the $47 million back.[432]  The Takeover Group will receive the $47 million only if the Plan is confirmed and the directors are released.

(b)  Franklin's internal accounting department would not recognize the escrowed interest payment.  Placing the interest payment into escrow meant it had not been paid.[433]  Franklin's Christine Villaluz concluded that it was a "BS escrow agreement."[434]

(c)  The purpose of the escrow arrangement was to protect the Board against personal liability for fraudulent transfer if the Plan is not confirmed and the Board does not receive a release of liability.[435]

---

escrow was to -- if the transaction didn't go through, the forty-seven million dollars of escrow would stay within the enterprise. I'm not sure of the mechanics of it; I'm sorry.").

[432]  JPX 216 at 3.2; JPX 221 at Item 1.01 (Form 8-K filed February 13, 2009) ("Under the Escrow Agreement, the Ad-Hoc Holders have agreed to deposit into an escrow account the amounts they receive in respect of the Scheduled Payments and Wells Fargo will hold such amounts until (1) Charter and a majority of the Ad-Hoc Holders agree to the release thereof, (ii) the restructuring transactions . . . are consummated . . . or are not consummated . . . or (3) the transactions contemplated by the Restructuring agreements are not consummated by December 15, 2009 for any other reason. . . . The amounts to be deposited in escrow are approximately $47 million.").

[433]  7/23/2009 Hr. Tr. at 118:21-119:6 (Villaluz) ("Q. Well let me put it this way, your internal accounting department absolutely refused to recognize the interest payment that was put into escrow, correct?  A. Well, we didn't actually receive it because it was sent into escrow.  So they needed to categorize it as an unpaid interest payment.  Q. Right.  The interest payment was never received by Franklin, is that correct?  A. Well, the way it was categorized was an asset liability to show that it was never made.  But we physically received the money and then we sent it as soon as we got it.").

[434]  JPX 333 at Charter-e 711606 ("I don't know where your interest applies but that's much more palatable than this bs escrow agreement.").

[435]  7/22/2009 Hr. Tr. at 54:2-8 (Smit) ("Q. But you do know that if the plan is not confirmed, Charter's going to get the money back, right?  A. It would come back into the enterprise. That's right.  Q. And if this Court doesn't grant the releases that are being sought in the plan for the board of directors, the money is going to come back to the enterprise, correct?  A. That's my understanding, yes.").

### 14. Charter's Bankruptcy Filings

134.    CCI and all of its subsidiaries, including all of the DHCs—CCH, CIH, CCH I, CCH II, and CCOH—filed for bankruptcy on March 27, 2009.[436]

### 15. Lazard's March 27, 2009 Valuation Showed No Surplus

135.    As part of its first-day filings, Charter submitted a valuation of Charter prepared by Lazard (the "Lazard Valuation"). The Lazard Valuation is a fair market valuation on a going concern basis.[437] The Lazard Valuation reconfirms the lack of surplus at CCH I.

(a)    Lazard estimated the total enterprise value of Charter to be within a range of $14.1 to $16.6 billion, with a mid-point value of $15.4 billion.[438]

(b)    This is about 6.25x projected 2009 EBITDA.[439]

(c)    This value is well below the level required for CCH I to have surplus.[440]

136.    The Lazard Valuation was "as of the date of this Disclosure Statement, March 27, 2009.[441] There is no evidence that anything occurred between November 5, 2008 and March 27, 2009 that could materially have impacted the value of Charter, let alone by over $3 billion.

---

[436] JPX 266.

[437] 8/24/2009 Hr. Tr. at 73:6-7 (Goldstein) ("It's a fair market value valuation on a going concern basis.").

[438] JPX 266, Ex. D at 1; 7/21/2009 Hr. Tr. at 83:24-84:3 (Millstein) ("The valuation states a range from 14.1 billion to 16.6 billion for the enterprise as a whole with a midpoint estimate of 15.4 billion.").

[439] JPX 261 at LAZ/CH 3471 (indicating a range of multiples from 5.75x 2009 projected EBITDA to 6.75x 2009 projected EBITDA); 7/21/2009 Hr. Tr. at 112:19-113:1 (Millstein) (confirming that Lazard's midpoint valuation of $15.4 billion was "a little north" of 6 times projected 2009 EBITDA or "6ish").

[440] 8/31/2009 Hr. Tr. at 44:11-45:2 (Taylor).

[441] JPX 266, Ex. D at 1 ("Lazard has estimated that value of the Reorganized Debtors . . . as of the date of this Disclosure Statement."); 7/21/2009 Hr. Tr. at 82:21-83:3 (Millstein) (confirming that Lazard prepared the valuation of Charter attached as Exhibit D to the Debtors' disclosure statement).

(a)     If anything, the market improved between the fall of 2008 and March of 2009. Millstein agreed that in March 2009, Lazard's comparable company analysis "showed a result of five to six times 2009 projected EBITDA," whereas in October 2008, comparable companies "were trading at sort of 4.8 to 5.3."[442]

(b)     As Schmitz confirmed in her February 9, 2009 letter, there were no material changes in the financial condition of Charter during the period between November 5, 2008 and February 9, 2009.[443]

(c)     Schmitz also admitted that Charter's financial condition in February 2009 was not materially different than it was in November 2008.[444]

137.     The Lazard Valuation was not a distressed sale valuation.[445] Lazard assumed that Charter will remain a going concern.[446]

138.     Lazard followed standard valuation techniques in preparing its valuation.[447]

---

[442] 7/21/2009 Hr. Tr. at 133:9-16 (Millstein).

[443] JPX 187 at JPM-CH 35577; 7/31/2009 Hr. Tr. at 128:3-9 (Schmitz) (confirming no material change since November 2008 noting "[t]he companies, in general, continue to operate well and are performing well.").

[444] 7/31/2009 Hr. Tr. at 160:22-161:1 (Schmitz) ("I think I am comfortable saying that the balance sheet, meaning the level of liabilities was not materially different from February -- from November to February. The cash flows of the company were better, but not materially different than they were before.").

[445] 8/24/2009 Hr. Tr. at 50:11-12 (Goldstein) ("Q. Okay. And it's not a distressed sale valuation, correct? A. Correct.").

[446] 8/24/2009 Hr. Tr. at 73:6-7 (Goldstein) ("It's a fair market value valuation on a going concern basis.").

[447] 8/24/2009 Hr. Tr. at 50:2-7 (Goldstein) (confirming that Lazard's valuation "followed standard valuation techniques").

(a)     Lazard considered (i) a discounted cash flow analysis; (ii) values of comparable companies; and (iii) precedent transactions.[448]

### (a)     Lazard's DCF Analysis

(a)     Lazard's DCF analysis indicated a value of $14.4 to $18.2 billion.[449]  This entire range is below the $18.7 billion breakeven point for surplus at CCH I.

### (b)     Lazard's Comparable Companies Analysis

(a)     Lazard's comparable companies analysis indicated a value of $12.3 to $14.7 billion.[450]  This entire range is below the $18.7 billion needed for surplus at CCH I.

(b)     Even after adding a control premium of 40% to Charter's equity, the comparable companies analysis would still indicate a control valuation below the $18.7 billion needed for surplus at CCH I.[451]

### (c)     Lazard's Precedent Transactions Analysis

139.    Lazard appropriately placed only minimal reliance upon precedent transactions because they were stale and occurred in a drastically different world.[452]

---

[448]   JPX 261 at LAZ/CH 3470; 7/21/2009 Hr. Tr. at 84:6-8 (Millstein) ("We did what is pretty standard in the trade.  We did -- relied on three primary methodologies:  discounted cash flow, a comparable company approach, and precedent transactions.").

[449]   JPX 261 at LAZ/CH 3471.

[450]   JPX 261 at LAZ/CH 3471.

[451]   8/31/2009 Hr. Tr. at 51:10-21 (Taylor) ("So the trading values don't have a control premium in them. You've heard Mr. Den Uyl testify that he came to forty percent. I did analyses and came to a range of fifteen to thirty percent with large companies in the twenties, and looking at the SIC code that Charter's in, and, again, just looking at over billion dollar transactions I again came to something in the twenties, in the low twenties, so what I did is put on the high of my range of thirty percent. But it's proportional, Your Honor. I mean, if you use forty you'd get a little sliver higher. But, again, what this shows is even with control premiums you're nowhere near the amount needed for surplus. You'll still billions of dollars short."); JDX 14.

[452]   7/21/2009 Hr. Tr. at 111:5-9 (Millstein) ("Q. Even though you normalized the transactions for current market conditions, Lazard's reliance on precedent transactions for purposes of determining enterprise value was, quote, "minimal", correct?  A. Correct."); JPX 261 at

(a) Lazard explained that: "Many of the transactions that have occurred over the past six years have been executed under drastically different fundamental, credit and other market conditions from those prevailing in the current marketplace. These considerations greatly reduce the relevance of the precedent transaction analysis."[453]

(b) Lazard made an effort to factor in the overall declines in equity markets by adjusting the transaction equity values of prior deals by the overall drop in equity markets since the announcement of each transaction.[454] Specifically, Lazard recalculated transaction multiples by adjusting the implied transaction equity values by the drop in the S&P 500 since the announcement date of each transaction in an effort to yield multiples that were more comparable in the current market.[455]

(c) Even after adjusting for the overall declines in equity markets, Lazard placed minimal reliance on the precedent transactions analysis.[456]

---

LAZ/CH 3488 ("As a result of the significant limitations as to the usefulness of this methodology, Lazard's reliance on the precedent transactions analysis in determining the TEV was minimal.").

[453] JPX 266, Ex. D at 6; 7/21/2009 Hr. Tr. at 111:22-112:1 (Millstein) ("Q. Okay. So then we agree that the unprecedented volatility and declines in asset values over the last eighteen months have reduced the relevance of historical M&A multiples as a reference to value companies in the current environment, right? A. Right.").

[454] JPX 261 at LAZ/CH 3487 ("To factor in the overall declines in equity markets, our analysis adjusts the transaction equity values of prior deals by the overall drop in equity markets since the announcement of each transaction.").

[455] JPX 266, Ex. D at 6 ("To normalize the multiples paid in prior transaction, Lazard recalculated the transaction multiples by adjusting the implied transaction equity values by the drop in the S&P 500 since the announcement date of each transaction."); JPX 261 at LAZ/CH 3487 ("Using S&P index as proxy for the market, we believe this method yields multiples that are more comparable in the current environment.").

[456] JPX 261 at LAZ/CH 3488 ("As a result of the significant limitations as to the usefulness of this methodology, Lazard's reliance on the precedent transactions analysis in determining the TEV was minimal.").

(d)     Lazard also concluded that: "There have been no transactions of significant scale (i.e., greater than ~1 million subscribers) in the cable MSO industry over the past two years."[457]

(e)     Lazard properly excluded all transactions with fewer than a million subscribers from its precedent transaction analysis because they were not comparable.[458]

(f)     Charter's expert, Den Uyl, *disagreed* with Charter's financial advisor, Lazard, regarding its approach to precedent transactions, including transactions from 2000 or 2002 of any size, without adjusting for market condition changes, treating all such transactions equally to determine their mean and median multiples, and giving his precedent transaction analysis more than minimal weight.[459]

(g)     By contrast, Taylor agreed with Lazard's approach to precedent transactions here.[460]

140.     The Plan value of Charter at $15.4 billion is effectively the only current precedent transaction for Charter.

(a)     Under the Plan, Charter is being purchased for $15.4 billion, a 6.25x multiple of projected 2009 EBITDA.[461]

---

[457]  JPX 261 at LAZ/CH 3487.

[458]  JPX 261 at LAZ/CH 3487 ("Smaller transactions, defined as those with targets having less than ~1 million subscribers, have been excluded from the analysis to isolate the impact of scale on valuation.").

[459]  ¶¶ 155-161.

[460]  8/31/2009 Hr. Tr. at 40:19-20 (Taylor) ("I think Lazard's analysis in their final valuation report is absolutely clear and absolutely correct.").

[461]  ¶ 140.

(b)     Since the terms of the Plan were announced publicly on February 12, 2009,

no one has come forward with a better offer.[462]

(c)     As Taylor explained:

I believe the transaction we're here about, Your Honor, the value of the transaction where the bondholders are putting in a billion six behind an explicit number is the best evidence of what the value really was in November. . . .The 1.6 billion dollars is coming in at a value of 15.4 billion. That -- it's not just the valuation Lazard came up with. That's actually the transaction value implied by the price that they're investing at for the 1.6 billion. . . .And this isn't just a reorg where folks are doing a debt for equity exchange. This is a new money investment of a very material amount. And that's extremely good evidence of what the values really were.[463]

**16.     Charter Has Continued To Underperform Management Projections On Revenues**

141.    Charter has continued to underperform management projections on revenues.  In a

misleading attempt to rehabilitate the July Long Range Plan, Charter trumpets that its EBITDA

growth was slightly above what was projected in the July Long Range Plan, conveniently failing to

disclose to the Court that Charter actually began missing its EBITDA projections again in July

2009.  Taylor demonstrated that the only way Charter has been able to increase EBITDA in the

first quarter of 2009 in light of lower-than-expected revenues is by cutting back on capital

---

[462] 8/24/2009 Hr. Tr. at 31:8-18 (Goldstein), 31:22-25 (Goldstein) ("Q. And I think you've testified that no one's offered to purchase Charter since the company announced the terms of its restructuring on February 12, 2009, correct?  A. That is correct."); Goldstein Decl. ¶ 20 ("[A]fter the Company issued its December 12, 2008 press release announcing its restructuring initiatives in mid-December [Charter did not receive] any indication of interest from any party in pursuing any alternative transaction or plan structure. Likewise, after the Petition Date and the filing of the Plan [Charter did not receive] any indication of interest from any party in pursuing any alternative transaction or plan structure.").

[463] 8/31/2009 Hr. Tr. at 43:17-44:3 (Taylor).

expenditures. She explained that when cable companies like Charter cut back on capital expenditures, future earnings suffer.[464]

(a) Taylor further testified that the July Long Range Plan needed revisions because the projections for years after 2010 were too aggressive. Charter management acknowledged this fact and issued a revised, more conservative Long Range Plan in December 2008. [465]

(b) Lazard used Charter's more conservative December 2008 projections in its valuation. The Lazard Valuation showed no surplus.[466]

**D. Taylor Credibly Testified That, As Of November 5, 2008, CCH And CIH Were Unable To Pay Their Debts As They Become Due**

142. Taylor testified that, in her expert opinion, CCH and CIH were unable to pay debts as they become due as of November 5, 2008.[467]

143. Taylor is a valuation professional with particular expertise in valuing distressed companies.[468]

144. Taylor's testimony was credible.

---

[464] 8/31/2009 Hr. Tr. at 124:14-25 (Taylor).

[465] JPX 87.

[466] ¶ 135.

[467] 8/31/2009 Hr. Tr. at 18:23-24 (Taylor) ("As of November 5th, 2008, CIH and CCH were not able to pay their debts as they become due.").

[468] 8/31/2009 Hr. Tr. at 17:21-24, 18:4-10 (Taylor).

145.     Taylor's analysis showed that that there was an inability to pay debts at the CCH and CIH levels because:

(a)     CCH had no cash on its balance sheet, and CIH had only $2 million in cash on its balance sheet as of October 31, 2008.[469]

(b)     CCH and CIH were cut off from equity distributions because of lack of surplus at CCH I.[470]

(c)      Intercompany accounts were insufficient to make upcoming debt payments in January 2009 and April 2009.[471]

(d)     There were no viable capital market solutions.[472]

---

[469]   JPX 272 at 23, Graphic 6.

[470]   JPX 8/31/2009 Hr. Tr. at 25:8-18 (Taylor).

[471]   JPX 59; JPX 272 at 23 (Graphic 6); JPX 8/31/2009 Hr. Tr. at 25:8-18 (Taylor) ("So what I did was roll that forward and say if they had used the 133 million, they could have made in November the seventy-one million of payments. Then you roll forward to January. And they're nine million dollars short of making the January payment. Now, if you roll forward to April and May, you can see the shortfall as of very, very quickly. So what this essentially shows is there's a shortfall in January but there's very large shortfalls coming up thereafter. All the intercompany accounts are exhausted fairly quickly and there's an inability to pay debts as they become due as of October of 2008.").

[472]   8/31/2009 Hr. Tr. at 22:14-15 (Taylor) ("Then the last one is there were no viable capital market solutions."); JDX 8.

146. As Taylor explained, all reliable indicators of value confirmed that CCH I did not have surplus as of November 5, 2008.

(a)      The trading values of all of the comparable companies indicated no surplus.[473]

(b)      The trading value of Charter's own securities indicated no surplus.[474]

(c)      Duff & Phelps' draft October DCF, after the corrections described above (¶ 107), indicates no surplus.[475]

(d)      Den Uyl's DCF, after corrections described below (¶¶ 162-164), indicates no surplus.[476]

(e)      There were no reliable precedent transactions.

(f)      The only transaction that is meaningful to the analysis is the transaction before the Court today.  The Plan's value of Charter indicated no surplus.[477]

---

[473] 8/31/2009 Hr. Tr. at 47:19-48:19 (Taylor); JPX 57 at CTR 40016.

[474] 8/31/2009 Hr. Tr. at 50:17-21 (Taylor) ("So you can see that consistent over time the comps are trading in a consistent range, 5.1 to 5.2 times forward 2009 EBITDA. That is billions of dollars away from what's required for surplus.  Charter is trading consistently in that range.").

[475] 8/31/2009 Hr. Tr. at 34:16-19 (Taylor) ("So Duff & Phelps' numbers when you just make these first two corrections [for tax step-up and capex], it reduces the valuation by billions and it brings it down to where there's clearly no surplus to CCH I.  It's below the 18.7 billion.").

[476] 8/31/2009 Hr. Tr. at 38:21-23 (Taylor) ("So if you just correct those errors -- in fact, if you correct one of those errors, either one of them, there's no surplus in all three of Mr. Den Uyl's sensitivities."); JDX 12.

[477] 8/31/2009 Hr. Tr. at 36:7-10 (Taylor) ("Lazard has testified that the plan value is approximately six and a quarter times.  So if you look at that, you see your three billion dollars below the level required for surplus.").

### E. Den Uyl's Analysis Did Not Address The Relevant Questions, Was Flawed And Was Contradicted By Lazard And Taylor

#### 1. Den Uyl Offered No Opinion On Ability To Pay

147.    Charter's expert witness, Den Uyl, offered no opinion on CCH's and CIH's ability to pay debts as they become due as of November 5, 2008.[478]

#### 2. Den Uyl Likewise Offered No Opinion On Whether There Was Enough Surplus To Make The January 2009 Or April 2009 Interest Payments

148.    Den Uyl expressly limited his testimony to the claim that CCH I had sufficient surplus to pay its $63 million distribution to CIH on November 17, 2008.[479]

149.    CIH had $63 million in interest payments due on November 17, 2008.[480]

150.    Den Uyl did not opine on whether there was more than $63 million in surplus.

151.    Den Uyl offered no opinion on whether either the January 2009 or April 2009 interest payments of CCH and CIH could be made through distributions from CCH I.[481]

#### 3. Den Uyl's Comparable Companies Analysis Indicated No Surplus At CCH I

152.    Den Uyl's comparable companies analysis indicated a value, even with a very high 40% control premium, at which there was no surplus at CCH I in November 2008.[482]

153.    This approach was a reliable indicator of value.

---

[478] 8/3/2009 Hr. Tr. at 131:17-132:12, 132:20-133:6, 134:6-22 (Den Uyl) (testifying that he had no opinion as to the ability of CIH or CCH to pay their debts as they become due as of November 5, 2008).

[479] 8/3/2009 Hr. Tr. at 80:3-10 (Den Uyl) ("I intend to testify whether Charter had surplus at November 17, 2008."), 130:25-131:3 (Den Uyl) ("Q. And you're opinion's not that they had 2.8 billion dollars of surplus, it's just that they had adequate surplus to make a 63 million dollar distribution, correct? A. That's correct."), 141:19-21 (Den Uyl) ("You're not valuing the company as of November 5, 2008, is that correct? A. That's right. It's November 17th.").

[480] JPX 75 at CTR 40040.

[481] 8/3/2009 Hr. Tr. at 130:2-15.

[482] 8/3/2009 Hr. Tr. at 115:9-11 (Den Uyl) ("Q. And using only the guideline company approach, would there had been surplus at CCH I in November? A. No, there would not.").

154.     When told about Den Uyl's opinion on the application of control premiums, Lazard's Steven Goldstein exclaimed: "I'd like to discuss that with him.  I've never seen a control premium apply to the debt portion of a capital structure."[483]

### 4.     Den Uyl's Precedent Transactions Analysis Was Flawed

155.     Den Uyl's precedent transactions analysis (i) is based on outdated transactions and (ii) includes transactions that are not comparable in scale to Charter because they involved less than one million subscribers.

156.     Den Uyl made no adjustment to this to normalize for changes in the market.  While Lazard adjusted its analysis to account for declines in the S&P 500 that occurred in the years since the only available precedent transactions had closed, Den Uyl made no attempt to make a similar adjustment.[484]

157.     Den Uyl gave equal weight to small transactions as to larger transactions.[485]  Den Uyl testified that Lazard was wrong to exclude transactions with subscribers less than 1 million,

---

[483] 8/24/2009 Hr. Tr. at 99:21-23 (Goldstein).

[484] 8/31/2009 Hr. Tr. at 42:11-17 (Taylor) ("Well, he put up a whole bunch of precedent transactions, but all of them were 2002 to early 2007.  As Your Honor has seen, the market for cable companies began declining in the fall of 2007, continued declining, and then actually declined again sort of in -- another sort of step function down in the fall of 2008, and you really cannot go use those old transactions."); 8/3/2009 Hr. Tr. at 183:1-3 (Den Uyl).

[485] JPX 266, Ex. D at 6 (noting that the relevance of precedent transactions analysis is greatly reduced because "[m]any of the transactions that have occurred over the past six years have been executed under drastically different fundamental, credit and other market conditions from those prevailing in the current marketplace"); JPX 261 at LAZ/CH 3487 ("Smaller transactions, defined as those with targets having less than ~1 million subscribers, have been excluded from the analysis to isolate the impact of scale on valuation. . . . There have been no transactions of significant scale (i.e. greater than ~1 million subscribers) in the cable MSO industry over the past two years."); 8/31/2009 Hr. Tr. at 42:11-17 (Taylor) ("Well, he put up a whole bunch of precedent transactions, but all of them were 2002 to early 2007.  As Your Honor has seen, the market for cable companies began declining in the fall of 2007, continued declining, and then actually declined again sort of in -- another sort of step function down in the fall of 2008, and you really cannot go use those old transactions."), 42:18-23 (Taylor)

even though Charter has over 5 million subscribers. Den Uyl included these smaller transactions in his analysis.[486]

158. Den Uyl overweighted his precedent transactions analysis.

(a) He did not testify that he actually believed it was appropriate to overweight precedent transactions. He based his weighting on a misunderstanding of what Millstein told the Board during the special meeting on November 14, 2008.[487]

(b) As Goldstein testified, "just to be clear we did use Jim Millstein's methodology with respect to the bankruptcy valuation in March of 2009."[488]

159. Den Uyl inappropriately considered Project Cosmos in his valuation of Charter, a *proposed* tax-driven partnership transaction between Time Warner and Charter in the fall of 2008 that could not be considered an asset sale, and that was, in any case, never consummated.[489]

---

(testifying that the Minnesota transaction was not applicable because it involved only 14,000 subscribers, far below the Lazard cutoff threshold of one million subscribers).

[486] 8/3/2009 Hr. Tr. at 188:6-9 (Den Uyl).

[487] 8/3/2009 Hr. Tr. at 168:20-169:14, 170:3-15 (Den Uyl).

[488] 8/24/2009 Hr. Tr. at 80:11-13 (Goldstein).

[489] 8/31/2009 Hr. Tr. at 43:1-13 (Taylor) ("So Project Cosmos was in the fall of 2008, before the market declined. There was testimony that it was an attempt at a tax driven type of partnership transaction. I think Mr. Doody said he wasn't sure if the structure actually worked. Others said that it didn't go forward because of the changes in the market. And, in any event, when you look at the documents, the document where Time Warner is proposing a transaction to work with Charter explicitly has no downside for Time Warner. They're contributing assets, and they have the right to get back their assets or the higher of their assets or their interest in the partnership. It's not a transaction you can use from a valuation standpoint, for that reason. There's no downside to Time Warner."); 8/3/2009 Hr. Tr. at 191:9-12 (Den Uyl) (agreeing that Project Cosmos was a strategic transaction that never actually happened).

160.     Den Uyl improperly included in his precedent transactions analysis a sale of cable systems by Charter in rural Minnesota that involved fewer than 15,000 subscribers, far below the Lazard cutoff threshold of one million subscribers.[490]

161.     Lazard and Taylor agree that only minimal weight could be given to precedent transactions in the valuation of Charter because the only available comparable transactions were "executed under drastically different fundamental, credit and other market conditions from those prevailing in the current marketplace."[491]

### 5.     Den Uyl's DCF Analysis Was Flawed

162.     Den Uyl's DCF analysis is flawed.  After correction for errors identified by Taylor and confirmed by Goldstein of Lazard, Den Uyl's DCF indicates a value at which there is no surplus.

163.     Den Uyl erroneously included Mediacom in his discount rate calculation.

(a)     When asked about Den Uyl's discount rate calculation, Goldstein said that Den Uyl needed "a little beta lesson."[492]

(b)     In its DCF analysis, Lazard excluded Mediacom from its weighted average cost of capital ("WACC") calculation.[493]

---

[490] JPX 261 at LAZ/CH 3487; 8/31/2009 Hr. Tr. at 42:18-23 (Taylor).

[491] ¶ 139.

[492] 8/24/2009 Hr. Tr. at 112:5-14 (Goldstein).

[493] 8/24/2009 Hr. Tr. at 108:17-25 (Goldstein) ("Q. Okay.  With the one exception of Mediacom, right?  You excluded Mediacom?  A. With respect to the beta calculation, yes, we did.  Q. Okay, and you did that because you didn't think that Mediacom was comparable?  A. Yeah. Mediacom -- and you can see this on -- back to page 5, our weighted average cost of capital -- Mediacom was an outlier because its market cap is so small relative to its debt, and so its stock trades more like an option."); 8/31/2009 Hr. Tr. at 38:8-17 (Taylor) ("The second one has to do with Mediacom.  And I think, actually, Your Honor heard an explanation from Mr. Goldstein about Mediacom.  And, you know, when you've looked at distressed companies in doing a WACC calculation, when you see a highly levered company where, as Mr. Goldstein

(c)	As Goldstein explained, this was proper because of Mediacom's small market capitalization relative to its debt that makes its stock trade more like an option.[494]

(d)	Taylor likewise testified that it was improper to include Mediacom in the discount rate calculation because it is a distressed company.[495]

(e)	Den Uyl testified that, if Mediacom is removed from the cost of equity calculation, Mediacom must be removed from all aspects of the discount rate calculation, including the debt:equity ratio and cost of debt.[496]

(f)	After removing Mediacom from the discount rate calculation, each of Den Uyl's DCF models indicates a valuation below the level needed for surplus at CCH I.[497]

164.	Den Uyl erroneously used the coupon rate instead of the market yield of debt to calculate the cost of Charter's bank debt.[498]  For highly leveraged companies, the cost of debt is

---

explained, the equity is trading like an option and the betas don't make sense and other things -- and he gave you an explanation of beta which I won't bore you and go through again.  But he's absolutely correct and you should take Mediacom out which is what Lazard did.").

[494] 8/24/2009 Hr. Tr. at 139:10-13 (Goldstein) ("Q. Okay.  But when you were justifying not using Mediacom to calculate the data, you said -- one of the things you said was that it was an illiquid stock, right?  A. Relative to the other comps and Charter, correct.").

[495] 8/31/2009 Hr. Tr. at 38:8-18 (Taylor).

[496] 8/3/2009 Hr. Tr. at 160:2-9 (Den Uyl); 8/24/2009 Hr. Tr. at 98:22-99:23 (Goldstein) ("Q. What I said to you -- what I just read to you was that [Den Uyl] said that the forty percent would be applied to your total enterprise value midpoint of 15.4.  That's what he said.  A.  I'd like to discuss that with him.  I've never seen a control premium apply to the debt portion of a capital structure.").

[497] 8/31/2009 Hr. Tr. at 38:21-23 (Taylor) ("So if you just correct those errors -- in fact, if you correct one of those errors, either one of them, there's no surplus in all three of Mr. Den Uyl's sensitivities."); JDX 12.

[498] 8/3/2009 Hr. Tr. at 215:7-11 (Den Uyl) ("Q. You didn't use --  A. -- in both 2007, 2008. Q. -- you didn't use the yield to calculate the cost of the bank debt for your DCF, correct?  A. That's right.").

properly calculated using market rates of interest.[499] Den Uyl properly used yield to maturity in his cost of bonds calculation. However, he improperly used the coupon rate, rather than yield to maturity, in his cost of bank debt calculation. It is inappropriate to ignore market rates on debt in favor of using the coupon rate.[500]

      (a)    Using yield-to-maturity rates on the bank debt instead of the coupon rate, each of Den Uyl's DCF sensitivities indicates a value that is below the level required for surplus at CCH I.[501]

      **6.**      **Den Uyl's Analysis Of NOLs Was Flawed**

165.    Den Uyl further erred in his analysis of net operating losses ("NOLs").

      (a)    NOLs are assets of CCI. They are not assets of CCH I. Because they are not an asset of CCH I, NOLs thus cannot be considered in analyzing whether CCH I had surplus.[502]

---

[499] 8/24/2009 Hr. Tr. at 92:11-12 (Goldstein) ("That's Mediacom at their book value of debt. We, in the distress situation, use market values."); 8/31/2009 Hr. Tr. at 37:22-24 (Taylor) ("[F]or cost of debt, you take the cost of debt from comparable companies. … You're supposed to use market yields, current yields on that debt.").

[500] 8/31/2009 Hr. Tr. at 37:23-38:7 (Taylor) ("You're supposed to use market yields, current yields on that debt. He used market yields for bonds for the comparable companies and then went and took the coupon rates on bank debt. So, for example -- I'll give you one example. Comcast -- he used a rate of less than one percent when the market yield on that was actually over eight percent. So if you -- I mean, it's an inconsistency in the way he did the math anyway to use one rate -- market rates on bonds and not on bank debt. So that's just a correction, in my view.").

[501] 8/31/2009 Hr. Tr. at 38:21-23 (Taylor) ("So if you just correct those errors -- in fact, if you correct one of those errors, either one of them, there's no surplus in all three of Mr. Den Uyl's sensitivities."); JDX 12.

[502] 8/31/2009 Hr. Tr. at 54:13-24 (Taylor) ("There's been lots of testimony here that CCI owns the NOLs, and you can see it from the public financials, when you compare -- Charter actually files public financials for CCI and then at a lower holding company level. You can clearly see that those NOLs are only in the CCI financials. I've consulted with my tax expert. Those NOLs were allocated up to Paul Allen and to CCI. Paul Allen's been using them for years.

(b)     Den Uyl did not do his own valuation of NOLs.[503]  He suggests a NOL

valuation of $1 billion to $1.5 billion based on values picked from certain equity analyst reports.[504]

(c)     Den Uyl failed to reconcile his $1.5 billion NOL valuation with the

valuation of NOLs by Charter's own tax advisor, Ernst & Young.  Ernst & Young valued NOLs at

approximately $350 million outside the context of a bankruptcy restructuring qualifying under

Section 382(l)(6) of the Tax Code.[505]

(d)     Under the tax laws, whether NOLs can be used by a purchaser varies

depending upon the purchaser and structure of transaction.

(e)     As a valuation professional, it was inappropriate for Den Uyl to rely on

equity analysts' valuations of NOLs.[506]

---

That's undisputed. So you can't have it both ways. And you can't put an asset in a CCH I surplus analysis that doesn't belong to CCH I or its subsidiaries. You just can't.").

[503]  8/3/2009 Hr. Tr. at 218:2-218:4 (Den Uyl) ("Q. So just to be clear, you did not develop your own valuation of Charter's NOLs, correct?  A. That's correct.").

[504]  8/31/2009 Hr. Tr. at 54:25-55:3 (Taylor) ("As far as the valuation of those NOLs, he ignores the company's own information and the company's own tax advisor's calculations in favor of plucking numbers out of the analyst's reports with no backup for them.").

[505]  JPX 261 at LAZ/CH 3479 (showing the average valuation of NOLs is 649 million); 8/31/2009 Hr. Tr. at 55:12-17 (Taylor) ("E&Y did an analysis for Lazard for the valuation, but they're considering the debt reduction.  So, yes, if you reduce the debt the NOLs are worth more.  But even then they valued in their scenario without a bankruptcy, with the debt reduction, the NOLs are worth 350.").

[506]  8/31/2009 Hr. Tr. at 54:25-55:11 ("As far as the valuation of those NOLs, he ignores the company's own information and the company's own tax advisor's calculations in favor of plucking numbers out of the analyst's reports with no backup for them. All right? Mr. Doody testified that you can't sell NOLs. The company's own  financial statements for the fall -- in -- for 2008, before the  restructure and the reduction in debt, specifically say that  they can use 213 million of the NOLs at some point in the  twenty year period. And the way GAAP financials are done that's an undiscounted number. So according to the company's  own financial statements the NOLs are worth less than 213 million."), 59:1-2 (Taylor) ("[I]t's a very biased misleading view that Mr. Den Uyl presented on analyst reports.").

166.     When Goldstein was told that Den Uyl relied on analyst reports to support his conclusions that CCI's NOLs were worth far more than the value Lazard ascribed to them, Goldstein replied, "[W]e relied on the compan[y's] tax experts, [Ernst & Young], who I can only imagine have far, far more information than JPMorgan or Citigroup research analysts." [507]

### 7.    Den Uyl's Reliance On Equity Analyst Reports Was Improper

167.     Den Uyl incorrectly relied on equity analyst reports[508] to support his valuation of Charter and critiqued Taylor for not doing so.

(a)     Valuation professionals should not rely on equity analyst reports in doing a valuation.[509]

(b)     Equity analyst reports are based only on public information, and thus equity analysts were not able to consider as part of their valuations the critical surplus problems that Charter was experiencing and that are largely unique to Charter's corporate structure.[510]

(c)     Even these equity analyst reports characterize Charter's equity as an out-of-the money call option.[511]

---

[507]  8/24/2009 Hr. Tr. at 119:9-11 (Goldstein).

[508]  *E.g.*, CX 330; CX 333; CX 341.

[509]  8/31/2009 at 139:24-25 (Taylor) ("In my professional career I have not relied on opinions of equity analysts when doing valuations.")

[510]  8/31/2009 at 58:13-19 (Taylor) ("And, also, all those equity analysts have an underlying assumption which is wrong. It's what the market knew. The market thought and knew that Charter had liquidity to make it all the way through 2009, and most of them explicitly say into 2010. So those analysts are doing their analysis with a fundamentally wrong assumption about liquidity.").

[511]  8/31/2009 at 58:8-13 (Taylor) ("But when you read the actual analyst reports they make statements like 'The equity's clear out of the money', 'It's being valued as a call option', 'There is a possibility of bankruptcy and the equity being zero', and, you know, we have different cases, anywhere from the equity being worth zero to being worth what it is under our DCF analysis.").

(d)     Den Uyl misleadingly quoted only equity analysts, and ignored the debt analysts who were telling the market to sell at the CCH I level, and not to buy anything above CCH II.[512]

(e)     The JPMorgan Credit Surveillance Reports ("CSR") were prepared based on publicly available information provided by Charter.[513]  The DCF calculation in the CSR was based on projections from Charter's January 2008 Long Range Plan.[514]  The enterprise value of Charter shown on the CSR was calculated using the book value of Charter debt added to the trading value of Charter stock.[515]

---

[512] 8/31/2009 at 58:20-59:2 (Taylor) ("Then, lastly, he only quotes equity analysts. If you go look at debt analysts you get a totally different picture. So there's a series of debt analysts that say the same things, which is sell at the CCH I level, you know, we don't think there's value, necessarily, to cover the CCH I. Even in the forties we think it's a sell. Things like that. So I think it's a very biased misleading view that Den Uyl presented on analyst reports.").

[513] 7/31/2009 Hr. Tr. at 14:21-15:15 (Ruyter) ("Q.  The financial information that's in the CSR that we see on page -- I guess it's page 3, of the exhibit -- A.  Uh-huh. Q.  Do you know where that financial information would be drawn from or pulled from? A.  I know where I would pull it from if I did it. Q.  Okay.  Where would you pull the financial information from, Ms. Ruyter? A.  Probably three sources. Q.  Okay. A.  The 10-Q and the company budget that they provided to us, and the company's compliance certificate.  Q.  Okay.  Were these prepared on any regular basis, these CSRs? A.  Quarterly.  Q.  And was it -- again, as a general matter, the goal to include publicly available quarterly financial information in the CSRs?  A.  It was public available information that is the best information we had, yes.").

[514] 8/24/2009 Hr. Tr. at 34:18-22 (Kurinskas) ("Q.  What projections was the discounted cash flow analysis based on? A.  This was based on the company's long range plan that had been provided to JPMorgan early in 2008 in connection with some capital raising that was going on at that time."), 35:11-15 (Kurinskas) ("Q.  At the time the third quarter CSR was prepared in November 2008, did JPMorgan have Charter's July 2008 long range plan updating the long range plan that was the basis for the first quarter analysis? A.  No, that had not been provided to JPMorgan.").

[515] 7/31/2009 Hr. Tr. at 16:6-10 (Ruyter) ("So this was -- the 20.8 is a market value based enterprise value.  So what that took was the total book value of the debt, so the face value of all the debt reported at Charter and added to that the current value of the stock trading on public markets, add those two numbers together."); 8/25/2009 Hr. Tr. at 34:2-12 (Kurinskas) ("Q. Okay.  The third sentence says the market value based, the enterprise value of the company is 20.9 billion dollars, 9.7 times, last twelve month, March 31 '08, EBITDA of 2.2 billion dollars. Do you see that? A.  Yes. Q.  How was the 20.9 billion dollar figure derived? A.  It's

## V. THE PLAN DENIES JPMORGAN ITS SPECIFICALLY BARGAINED-FOR ACCELERATION CROSS-DEFAULT RIGHTS

168.    Section 8(f) of the Credit Agreement makes it an Event of Default when the debt of any DHC, excluding CCOH, is accelerated for any reason, so long as the outstanding aggregate principal amount exceeds $200 million.[516]

169.    JPMorgan specifically bargained for this acceleration cross-default provision.[517]

(a)    During the negotiation of several iterations of the Credit Agreement, Charter requested that the provision be removed.

(b)    JPMorgan refused to remove the cross-default provision because it was an "important provision for the Lenders."[518]

(c)    Schmitz admitted that the provision was unique among Charter's many debt documents,[519] and that the purpose of the acceleration cross-default provision in Section 8(f) was

---

mathematically just the book value of all of the debt at the company plus the market value of the company's equity. Q.  So it's the book value not the market value of the debt, correct? A. That's right.").

[516]  JPX 2 § 8(f) (Event of Default if, for any Designated Holding Company other than Holdings, "any other event shall occur or condition exist, if such default or other event or condition, . . . results in the acceleration of such Indebtedness prior to its stated maturity . . . provided, that a default . . . shall have occurred and be continuing with respect to such Indebtedness the outstanding aggregate principal amount of which exceeds $200,000,000"); 8/25/2009 Hr. Tr. at 48:2-11 (Kurinskas).

[517]  8/25/2009 Hr. Tr. at 48:12-14 (Kurinskas) ("Q. Was this provision specifically negotiated by JPMorgan?  A. Yes.").

[518]  8/25/2009 Hr. Tr. at 48:13-17 (Kurinskas) ("Over the several iterations the credit agreement went through, from time to time the company would ask if this provision could be removed from the document.  I continued to say it had to be in here.  I felt it was an important provision for the Lenders.").

[519]  8/3/2009 Hr. Tr. at 72:14-21 (Schmitz) ("I was asking specifically about whether it's true that no other financing agreement contains a cross default provision for acceleration of designated holding company debt? A. That very specific statement is true. Q.  Okay.  And so this provision is unique to the JPM credit agreement, among all of Charter's financing agreements, true? A.  From the very specific words, yes.").

to give the Lenders "a seat at the table" in the event of trouble in Charter's financial structure and

thus an opportunity to address changed circumstances, including what it meant to their risk as

Lenders. [520]

(d)     The provision is particularly important because much of the debt on

Charter's capital structure was being serviced by cash flow from the Borrower and because a

failure to pay principal or interest with acceleration gives bondholders the right to renegotiate their

contracts with the company.[521]

(e)     Because the Borrower is one source of cash for making payments to

bondholders, the Lenders might be affected by such renegotiations and wanted the right "to come

back to the table" to negotiate if there were DHC defaults.[522]

170.    The bankruptcy filings of the DHCs accelerated their debts.

(a)     Several billion dollars of debt of CCO's affiliates was accelerated on March

27, 2009, when each of CCH, CIH, CCH I and CCH II filed a petition for bankruptcy in

accordance with the plan support agreements.[523]

---

[520]  7/31/2009 Hr. Tr. at 81:8-81:15 (Schmitz) ("Q. Okay. And was your understanding that the Lenders wanted to be protected against the deteriorating financial condition of designated holding companies? . . . . A. No. I think that my understanding is that they wanted to stay out of the way if there was no acceleration. But to the extent there was an acceleration, they wanted a seat at the table.").

[521]  8/25/2009 Hr. Tr. at 48:16-49:2 (Kurinskas) ("I felt it was an important provision for the Lenders because, again, it all came back to the fact that all the debt that was on CCI's capital structure that wasn't an obligation of our borrower at the bank level, was being serviced by cash flow from our borrower.  And, to the extent something went wrong at one of the designated holding companies, and the company wasn't able to service those obligations, and there were defaults, and that was going to give the opportunity for the creditors, the bondholders at the designated holding companies, to come back to the table and reopen their deals and have a negotiation, the banks deserved the same opportunity.").

[522]  8/25/2009 Hr. Tr. at 49:4-8 (Kurinskas).

[523]  JPX 277; JPX 278; JPX 279; JPX 280.

(b)　Each such DHC had over $200 million in debt governed by indentures which contain identical or nearly identical provisions that provide that a filing of bankruptcy is a default and that provide acceleration of all outstanding Notes upon a bankruptcy default.

(c)　Schmitz claimed at trial that none of the debt of the DHCs has been accelerated, but offered no basis for her claim.[524]

(d)　Her testimony is irreconcilable with the plain language of the Indentures. For example, under 6.01 of CCH's Indentures, an Event of Default "occurs if . . . (g) the Company, the Guarantor or any of their Significant Subsidiaries pursuant to or within the meaning of Bankruptcy Law . . . commences a voluntary case."  Section 6.02 of CCH's indentures provides: "In the case of an Event of Default arising from clause (g) or (h) of Section 6.01, with respect to the Company or the Guarantor, all outstanding Notes shall become due and payable immediately without further action or notice."  CIH, CCH I and CCH II's indentures contain substantially identical provisions.[525]

---

[524] 8/3/2009 Hr. Tr. at 73:10-15 (Schmitz).

[525] JPX 369 (CCH Indenture) at 6.01 (An "Event of Default" occurs if . . . (g) the Company, the Guarantor or any of their Significant Subsidiaries pursuant to or within the meaning of Bankruptcy Law: (i) commences a voluntary case, (ii) consents to the entry of an order for relief against it in an involuntary case, (iii) consents to the appointment of a custodian of it or for all or substantially all of its property, or (iv) makes a general assignment for the benefit of its creditors") and 6.02 ("In the case of an Event of Default arising from clause (g) or (h) of Section 6.01, with respect to the Company or the Guarantor, all outstanding Notes shall become due and payable immediately without further action or notice."); JPX 370 (CCH Indenture) at 6.01 and 6.02; JPX 371 (CCH Indenture) 6.01 and 6.02; JPX 372 (CCH Indenture) 6.01 and 6.02; JPX 373 (CIH Indenture) at 6.01 and 6.02; JPX 374 (CCH I Indenture) at 6.01 and 6.02; and JPX 375 (CCH II Indenture) at 6.01 and 6.02.

171.     The acceleration provisions in the DHC Indentures are independent of, and not based on, the financial condition or bankruptcy of CCO.[526]  CCO is solvent.[527]

## VI.     CHARTER CAN AFFORD TO PAY LENDERS A MARKET RATE OF INTEREST

172.     Charter can afford to pay the Lenders a market rate of interest upon the outstanding amount of the first-lien loans.

(a)     Using projections from Charter's disclosure statement, JPMorgan "modeled what the interest burden would look like if the debt were marked to market."[528]  JPMorgan found that "the company has the ability to service the debt at the market rate and still have sufficient liquidity."[529]

(b)     The Declaration of Stephen Goldstein, dated August 21, 2009 ("Goldstein Declaration"), stated that as of February 2009, paying market interest rates may potentially jeopardize the feasibility of the Plan.[530]  The Goldstein Declaration did *not* state that Lazard

---

[526] 7/20/2009 Hr. Tr. at 24:25 (Basta) ("CCO is solvent."); 8/31/2009 Hr. Tr. at 102:15-21 (Doody) (Q. And CCO's a solvent entity, right?  A. Yes, it is. Q. So it's recovering fully under that receivables under your liquidation analysis, right?  A. I'm sorry, could you repeat that? Q. Sure.  CCO's solvent in the liquidation analysis, right?  A. That's true.").

[527] *Id.*

[528] 8/25/2009 Hr. Tr. at 51:24-52:6 (Kurinskas).

[529] 8/25/2009 Hr. Tr. at 51:24-52:6 (Kurinskas).

[530] Goldstein Decl. ¶ 18 ("In February 2009, although the Debtors could not be certain as to what interest rate the Court would conclude is appropriate in a cram down of the debtholders in question, the prevailing interest rates at that time were significantly higher than the terms in the debt sought to be reinstated . . . .  Moreover, there was a risk that the increased interest rate from a loss of reinstatement of the debt in question could jeopardize the feasibility of the Plan, even putting aside the question of credit market capacity for such a large amount of borrowing.").

searched for and could not find a replacement for Charter's Credit Agreement in February 2009 or that it could not find a replacement today.[531]

(c)     Lazard has not done any analysis to determine whether Charter would be able to pay market interest rates today.[532]

(d)     Goldstein admitted during examination that market conditions have changed and that Lazard is no longer offering the opinion that failure to grant reinstatement here is going to jeopardize the feasibility of the Plan.[533]

173.    With $742 million in cash and projected $2 billion in free cash flow through 2014,[534] Charter could easily pay the Lenders the interest implied if the revolving facility is reinstated at current market interest rates, with little impact except to potentially decrease the Takeover Group's extraordinarily high projected IRRs by a few percentage points.

---

[531]  8/24/2009 Hr. Tr. at 41:1-5 (Goldstein) ("Q. Okay. And so to the extent Charter needed, let's say, an eight billion dollar credit facility, you didn't go out and try and get that for them before you got up there on the stand today, correct? A. No, I have not.").

[532]  8/24/2009 Hr. Tr. at 38:3-22 (Goldstein) ("Q. Okay. Now there was -- you also, I think, testified through your declaration, in February 2009 there was a risk that the increased interest rate from a loss of reinstatement of the debt could jeopardize feasibility of the plan, is that right? A. Yes. . . . Q. And you think that's your view today, just to be clear? A. It's unclear. I mean, look, the markets have certainly gotten better. We haven't come to the official view of what would happen but clearly at that time there was much, much more dislocation of markets and it would be much, much more expensive to reprice that debt. Q. All right. So just to be clear, the failure to grant reinstatement here is not going to jeopardize the feasibility of the plan, is that correct? A. I don't think we've come to that conclusion whatsoever.").

[533]  8/24/2009 Hr. Tr. at 38:3-13 (Goldstein)("Q. Okay. Now there was -- you also, I think, testified through your declaration, in February 2009 there was a risk that the increased interest rate from a loss of reinstatement of the debt could jeopardize feasibility of the plan, is that right? A. Yes. … Q. And you think that's your view today, just to be clear? "A. It's unclear. I mean, look, the markets have certainly gotten better. We haven't come to the official view of what would happen but clearly at that time there was much, much more dislocation of markets and it would be much, much more expensive to reprice that debt.").

[534]  JPX 154 at Charter-e 93863 ("[W]e expect the company to accumulate $3.4 billion of cumulative cash through the end of 2013, which in addition to $742 million of existing cash on the balance sheet post restructuring, would leave the Company with ~ $2.0 billion of excess cash on hand by the end of 2013 after satisfying debt maturities.").

(a)     Because they were hoping to reinstate the bank debt, the Takeover Group was concerned about keeping the Lenders out of the restructuring negotiations.[535]  The Takeover Group's overriding goal was to make sure the Lenders "do not have a voice in the restructuring since it would be more costly to replicate the Company's bank debt deal in the current environment."[536]

(b)     After re-organization, Apollo and Crestview anticipate 40.3% and 52.4% IRRs on their new money investments, respectively, based in significant part on the assumption that the bank debt will be reinstated.[537]

(c)     Under the bondholders' own projections, Charter will have $742 million dollars on the balance sheet upon emergence from bankruptcy, and will generate $2 billion in free cash flow through 2014.[538]

(d)     Under the Value Creation Plan, Smit and Schmitz will receive large, seven-figure bonuses if Charter emerges successfully from reorganization with $600 million cash on hand.[539]  The Value Creation Plan also would provide management incentives going forward.

---

[535] 7/28/2009 Hr. Tr. at 152:2-153:2 (Zinterhofer) ("Q. Now fundamental to this restructuring proposal which would enable you to acquire as part of this restructuring equity in Charter, convert your debt holdings into equity, that required that the senior creditors of CCO did not have a voice in the restructuring, is that not correct?  A. We were hoping to reinstate – we hoped to reinstate that debt….Q. Okay.  And you wanted to keep the banks out of the room during the negotiations because it would be more costly to replicate the company's bank debt in the current environment, is that correct?  A. We would have been concerned about that, absolutely.").

[536] JPX 154 at Charter-e 93858.

[537] JPX 154 at Charter-e 93864; JPX 158 at Charter-e 133069.

[538] JPX 154 at Charter-e 93863 ("[W]e expect the company to accumulate $3.4 billion of cumulative cash through the end of 2013, which in addition to $742 million of existing cash on the balance sheet post restructuring, would leave the Company with ~ $2.0 billion of excess cash on hand by the end of 2013 after satisfying debt maturities.").

[539] JPX 134, Ex. A at Charter 3479; 7/22/2009 Hr. Tr. at 67:12-18 (Smit) ("Q. And on confirmation is when you get your six million dollar bonus, right?  A. That's incorrect.  Q.

(e)     If Charter has $742 million dollars on hand upon emergence from

bankruptcy, and $250 million of that cash is paid to JPMorgan, then Charter will have less than

$600 million cash on hand and Smit and Schmitz will not receive their bonuses.[540]

174.     Under the Plan, Allen is receiving cash and securities worth $359 million, $209

million of which Vulcan specifically attributes to "change of control," that also could be used to

service the bank debt at the market rate.[541]

175.     Respecting the Lenders' express contractual rights and allowing the Lenders "the

right to enter into a negotiation with the company" will not prevent Charter from reorganizing or

from continuing operations.[542]  Nor will it be atypical:  Liang, who heads the distressed debt group

at Oaktree and is a veteran of upwards of 50 restructurings, could not recall a single restructuring

in which senior debt was reinstated.[543]  It will only prevent the economic loss to the Lenders and

---

Okay.  When do you get your six million dollar bonus?  A. Once we've reached 600 million
dollars of liquidity, then the fees get paid including the VCP which is the value creation plan
for management."); 8/24/2009 Hr. Tr. at 49:1-9 (Goldstein) ("Q. Okay.  Well he gets a big
bonus under the valuation creation plan, right?  A. Yes. Q. And so does Ms. Schmitz, correct?
A. Yes. Q. Okay.  And -- but that bonus only kicks in -- only kicks in when the company has
600 million dollars cash on hand, isn't that right?  A. I believe that is correct.").

[540]  8/24/2009 Hr. Tr. at 49:1-22 (Goldstein) ("Q. So if the company has to pay back JPMorgan
250 million dollars and they only have 750 million dollars cash on hand, that means Mr. Smit
and Ms. Schmitz don't get their bonus, isn't that right?  A. You know, actually on the 742
million dollars, now that I think about it, I don't think that's the correct number that's in the
disclosure statement.  I think that was Apollo's estimate of what the emergence cash would be
as of whatever the date of that memo is. Q. Whatever the point is, if there's not 600 million
dollars in cash on hand at emergence they don't get their bonus, right?  A. Yes, and I don't
think there will be 600 million dollars is my point.  That threshold has changed.").

[541]  LDTX 215 at VUL-W_57.

[542]  8/24/2009 Hr. Tr. at 38:3-22 (Goldstein); 8/25/2009 Hr. Tr. 52:24-53:4 (Kurinskas).

[543]  7/29/2009 Hr. Tr. at 219:13-220:1 (Liang) ("Q.  And you've been involved in, I think you've
said, about twenty-five to fifty restructurings in which you've participated? A.  I think twenty-
five to fifty bondholder ad hoc type --  Q.  Yes. A.  -- committees, yes. Q.  And how many of
those restructurings involved the reinstatement of debt? A.  None that I recall. Q.  Okay.  And
how many of those restructurings involved a focus as to whether a change of control would be

prevent the new equity holders of Charter, the Takeover Group, from receiving "the benefit for that economic deprivation."[544]

**CONCLUSIONS OF LAW**

I.   **CHARTER HAS THE BURDEN OF PROVING COMPLIANCE WITH EACH REQUIREMENT OF 11 U.S.C. § 1129(A), INCLUDING LACK OF IMPAIRMENT UNDER 11 U.S.C. § 1124**

A.   **11 U.S.C. § 1129(a)**

176.   The proponent of a Chapter 11 plan must prove by a preponderance of the evidence that each of the requirements of Section 1129(a) has been met.  .  *See In re Adelphia Commu'ns Corp.*, 368 B.R. 140, 252 (Bankr. S.D.N.Y. 2007) (citing *In re Featherworks Corp.*, 25 B.R. 634, 642 (Bankr. E.D.N.Y. 1982), *aff'd*, 36 B.R. 460 (E.D.N.Y. 1984) ("As the proponent of the plan, the debtor had the burden of establishing that it met the requirements of the Code.")); *In re Cellular Info. Sys., Inc.*, 171 B.R. 926, 937 (Bankr. S.D.N.Y. 1994) (adopting preponderance of evidence standard under Section 1129 set forth by the Fifth Circuit in *In re Briscoe Enters., LTD., II*, 994 F.2d 1160, 1164-65 (5th Cir. 1993)); *see In re Prudential Energy Co.*, 58 B.R. 857, 862 (Bankr. S.D.N.Y. 1986) ("absent satisfaction of each of the requirements of § 1129(a), confirmation may not be ordered.  In this the plan's proponents, here the Debtors, have the burden of proof.") (citation omitted).  Here, Charter, as the Plan proponent, must prove by a preponderance of the evidence that each requirement of Section 1129(a) has been met.

177.   "The burden of proposing a plan that satisfies the requirements of the Code always falls on the party proposing it, but it falls particularly heavily on the debtor-in-possession . . . since

---

triggered under a debt instrument?  A.  You know, I -- you know, maybe one or two, but I really can't recall.").

[544]   8/25/2009 Hr. Tr. at 53:5-12 (Kurinskas).

they stand in a fiduciary relationship to the estate's creditors." *See In re Perez*, 30 F.3d 1209, 1214 (9th Cir. 1994) (citing *CFTC v. Weintraub*, 471 U.S. 343, 355 (1985)).

178.     Section 1129(a)(1) requires a Plan proponent to prove that the plan complies with all applicable provisions under Chapter 11, including the reinstatement provisions of Section 1124. 11 U.S.C. § 1129(a)(1) (proponent must prove the "plan complies with the applicable provisions under this title"); *Acequia, Inc. v. Clinton*, 787 F.2d 1352, 1360 n.13 (9th Cir. 1986) (holding that debtor did not meet its burden under Section 1129(a)(1) because the plan improperly characterized an objecting creditor as unimpaired).

179.     Section 1129(a)(8) requires a plan proponent to prove that "[w]ith respect to each class of claims or interests" either "(A) such class has accepted the plan; or (B) such class is not impaired under the plan." 11 U.S.C. § 1129(a)(8).

180.     Where the question of compliance under Section 1129(a) turns on whether or not a creditor is impaired under Section 1124, Charter bears the burden of showing that a creditor is not impaired. *In re Fur Creations By Varriale, Ltd.*, 118 B.R. at 760 (in order to establish compliance with Section 1129(a)(10) debtor had the burden of proving that a creditor voting for the plan was impaired within the meaning of Section 1124(1)); *In re Virginia Funk Haardt*, 65 B.R. 697, 701 (Bankr. E.D. Pa. 1986) (denying confirmation for failure to meet the requirement of Section 1129(a)(8) because "Debtor has not met its burden of convincing the Court that a class of claims is not impaired").

181.     Charter's burden thus includes proving compliance with the reinstatement provisions of Section 1124. 11 U.S.C. § 1129(a)(1) (proponent must prove the "plan complies with the applicable provisions of this title"); *In re Acequia, Inc.*, 787 F.2d 1352, 1360 n.13 (9th

Cir. 1986) (debtor did not meet its burden under Section 1129(a)(1) because the plan improperly characterized an objecting creditor as unimpaired).

**B.      11 U.S.C. § 1124**

182.      Section 1124 of the Bankruptcy Code "determines who has the right to vote" on a proposed plan of reorganization. *Di Pierro v. Taddeo (In re Taddeo)*, 685 F.2d 24, 28 (2d Cir. 1982).

183.      Parties with "impaired" claims or interests can vote. *Id.*

184.      Under Section 1124(1), a class is impaired unless the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest." 11 U.S.C. § 1124(1).

185.      Section 1124 of the Bankruptcy Code defines impairment "in the broadest possible terms." *Id.*

186.      Any alteration, even one that enhances a creditor's rights, constitutes impairment. *Downtown Athletic Club of N.Y. City, Inc. v. Caspi Dev. Corp. (In re Downtown Athletic Club of N.Y. City, Inc.)*, No. 98 B 41419 JLG, 1998 WL 898226, at *6 (Bankr. S.D.N.Y. Dec. 21, 1998) ("Because [Section 1124] focuses on whether a proposed plan of reorganization changes a creditor's rights, any alteration, even one that enhances those rights, constitutes impairment."); *In re 7th St. & Beardsley P'ship*, 181 B.R. 426, 431 (Bank. D. Ariz. 1994) ("[A]ny change in creditor's rights, whether for the better or for the worse, constitutes impairment. . . .'").

187.      The Lenders are clearly impaired under Section 1124(1) because their legal, equitable and/or contractual rights are being altered and, in fact, denied.

188.      Section 1124(2) allows a class of claims or interests to be treated as unimpaired if the Plan satisfies *all* of the following 5 requirements:

(A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of this title or of a kind that section 365(b)(2) expressly does not require to be cured;

(B) reinstates the maturity of such claim or interest as such maturity existed before such default;

(C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law;

(D) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and

(E) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

11 U.S.C. § 1124(2).

189.     For the Plan to be confirmed, Charter must establish, by a preponderance of the evidence, compliance with all 5 requirements set forth in Section 1124(2).

190.     The Lenders will be impaired under Section 1124 if CCO breached the Credit Agreement and the Plan fails to cure that breach.  11 U.S.C. §§1124(1), (2)(A); *see also In re Charter Commc'ns*, No. 09-01132 , 2009 WL 2460713, at *6 (Bankr. S.D.N.Y. July 7, 2009) ("determination of the existence of defaults under the Credit Agreement . . . would 'likely be dispositive' of whether or not reinstatement of the Credit Agreement is permissible as contemplated in Debtors' plan.") (citation omitted); *In re Kizzac Mgmt. Corp.*, 44 B.R. 496, 501 (Bankr. S.D.N.Y. 1984) (in order to reinstate under Section 1124 all non-*ipso facto* defaults must be cured).

191.     Thus, a debtor that sponsors a plan reinstating a loan agreement has the burden of proving that the Plan "leaves unaltered the legal, equitable, and contractual rights" of the lenders under the loan agreement or cures all defaults that are not excluded from cure under Section 365(b)(2).

### C.     Burden Of Proof On Surplus And Change Of Control

192.     Furthermore, the case law holds that, as Plan proponent, Charter bears the burden on the two primary factual issues in dispute:  surplus and change of control.  *See In re Prudential Energy Co.*, 58 B.R. at 865-66, 868 (denying confirmation because the debtor failed to offer sufficient evidence on the issue of surplus); *In re Constar Int'l*, No. 08-13432, slip op. at 8 (D. Del. May 14, 2009) (burden of proving no default under change in control provision was on the debtor seeking confirmation of plan).

193.     In *Prudential Energy*, certain debenture holders objected to confirmation because they arguably would receive more in a liquidation.  *See* 58 B.R. at 864.  The debtor claimed that the debenture holders were actually former equity holders who exchanged their equity for debt when the debtor lacked surplus and, thus, were not entitled to anything in a liquidation.  *Id.* at 864-65.  The debtor cited authority suggesting that debt holders who acquired their debt in a swap, that was consummated to achieve a preference should be subordinated.  *Id.* at 865.  The Court rejected the debtor's argument and denied confirmation because the debtor did not offer proof establishing that the debtor lacked surplus when the debt for equity swap occurred.  *Id.* at 865, 868.

194.     Similarly, in *Constar*, a case offered to this Court by Charter and the Takeover Group, the court held the burden was on the debtor to prove the objecting lenders were not impaired because there was no default under the change-of-control provision in the lenders' credit agreement.  *See In re Constar Int'l*, No. 08-13432, slip op. at 8.

D.     **This Court Has Already Decided That The Issues Raised In The Adversary Proceeding Are Objections To Plan Confirmation**

195.    That the Lenders filed a separate adversary proceeding asserting that there has been a default under the Credit Agreement has no bearing on Charter's burden of proof for confirmation.

196.    Charter fought vigorously to have the issues raised by the adversary proceeding decided in the context of confirmation under Section 1129 rather than in a separate litigation. Charter argued that the Lenders' adversary proceeding was "core" because "in determining whether the credit agreement may be reinstated, the Court will need to determine whether Events of Default have occurred under the Credit Agreement—the precise issues that JPMorgan has raised in its adversary complaint." Debtors' Mot. to Dismiss at 6 [Docket #141].

197.    The Court agreed, noting that "this Court will need to address the reinstatement question presented in the Complaint in deciding whether the plan may be confirmed." *In re Charter Commu'ns*, 2009 WL 2460713 at *6. This Court determined that that JPMorgan's adversary proceeding was substantively an objection to Plan confirmation and was a core proceeding properly litigated within the context of and contemporaneously with the Plan confirmation hearing. *Id.* at 13 ("Similarly, resolution of the reinstatement controversy framed by the Complaint is the pivotal issue to be decided as a condition to confirmation and, as such, stands to significantly impact the Debtors' overall prospects for reorganization under the proposed plan."). This Court previously explained that:

> By means of this adversary proceeding or otherwise, this Court will need to address the reinstatement question presented in the Complaint in deciding whether the plan may be confirmed. The aggressive posture chosen by JPMorgan—a preemptive direct attack on reinstatement calculated to put pressure on the plan process—should not change the jurisdictional outcome nor should it have any impact on the authority of the bankruptcy court to adjudicate the right to reinstate

indebtedness under the Credit Agreement. ***Whether brought as an adversary proceeding or as an objection to confirmation, the issues to be decided are identical.***

*Id.* at 15 (emphasis added).

198.    Having chosen to litigate these claims in an expedited proceeding in the confirmation context in which it indisputably has the burden of proof, Charter cannot now disclaim the burden of proving that the Lenders are unimpaired.  It would be inconsistent with policies underlying the Code to shift the burden to the Lenders on their objections.  The confirmation of a plan has preclusive effect that can have far reaching impacts.  *See Sure-Snap Corp. v. St. Street Bank and Trust Co.*, 948 F.2d 869, 873 (2d Cir. 1991) (confirmed plan has *res judicata* effect binding creditors).  In order to protect creditors' rights, even where no objection to confirmation has been raised, a bankruptcy court has an independent duty to determine whether a plan proponent has satisfied its burden under Section 1129(a).  *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 284 (Bankr. S.D.N.Y. 1990) (citing *In re Williams*, 850 F.2d 250, 253 (5th Cir. 1988); *see also In re Prudential*, 58 B.R. at 862 ("Regardless of whether a valid objection to confirmation has been asserted, however, the Code imposes upon the Court the responsibility to determine whether the requirements of § 1129(a) of the Code have been met.").

199.    The fact that courts recognize that the preclusive effect of confirmation should not be taken lightly is further evidenced by the fact that some courts find that a debtor needs to offer evidence proving by *clear and convincing* evidence—rather than by a preponderance—before confirmation can be granted.  *See In re Midland Plaza Assocs.*, 247 B.R. 877, 883 (Bankr. S.D. Fla. 2000) ("The appropriate standard of proof at a hearing on confirmation is the clear and convincing evidence standard, rather than the preponderance of the evidence standard.")

## II. THE PLAN RESULTS IN CHANGE OF CONTROL DEFAULTS UNDER SECTIONS 8(k)(ii) AND 8(k)(i) OF THE CREDIT AGREEMENT, THEREBY IMPAIRING THE LENDERS' CONTRACTUAL RIGHTS

### A. The Plan Will Cause A Change Of Control Default Under Section 8(k)(ii)

200.    Section 8(k)(ii) provides that it is a Default or Event of Default if "the consummation of any transaction (including, without limitation, any merger or consolidation) the result of which is that any 'person' or 'group' (as such terms are used in Section 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), other than the Paul Allen Group has the power, directly or indirectly, to vote or direct the voting of Equity Interests having more than 35% (determined on a fully diluted basis) of the ordinary voting power for the management of the Borrower, unless the Paul Allen Group has the power, directly or indirectly, to vote or direct the voting of Equity Interests having a greater percentage (determined on a fully diluted basis) of the ordinary voting power for the management of the Borrower than such 'person' or 'group.'" ¶ 4.

### 1. "Group" Under Section 8(k)(ii) Of The Credit Agreement

201.    Under Section 8(k)(ii) of the Credit Agreement, a change of control occurs if any "group"—as defined in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934 ("Exchange Act")—obtains the power "directly or indirectly, to vote or direct the voting of Equity Interests" having "greater voting power for the management of the Borrower" than Paul Allen. ¶ 4.

202.    Section 13(d) of the Exchange Act provides that a group exists when "two or more persons act as a . . . group for the purpose of acquiring, holding, or disposing of securities." 15 U.S.C. § 78m(d)(3).

203.    "[T]he touchstone of a group within the meaning of Section 13(d) is that the members combined in furtherance of a common objective." *Wellman v. Dickinson*, 682 F.2d 355, 363 (2d Cir. 1982).

204.     There is "no requirement . . . that the members [of a Section 13(d) group] be committed to acquisition, holding, or disposition on any specific set of terms." *Id.; see also Morales v. Quintel Entm't, Inc.,* 249 F.3d 115, 125 (2d Cir. 2001).

205.     "[T]he concerted action of the group's members need not be expressly memorialized in writing." *Id.*

206.     To constitute a "group," there only need be a showing that the group members "acted together in furtherance of a common objective with regard to acquiring, holding, voting or disposing of securities of the issuer." *Roth v. Jennings*, 489 F.3d 499, 504 (2d Cir. 2007) (internal citations omitted).

207.     "The existence of a group turns on whether there is sufficient direct or circumstantial evidence to support the inference of a formal or informal understanding between members for the purpose of acquiring, holding, or disposing of securities." *CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*, 562 F. Supp. 2d 511, 552 (S.D.N.Y. 2008) (internal quotations omitted).

208.     Evidence that members "went to considerable lengths to cover their tracks" is circumstantial evidence of the existence of a group. *Id.* at 553. In addition, receipt of a shared right to purchase additional equity supports the existence of a group. *See, e.g.*, *Schaffer ex rel. LaSersight Inc. v. CC Invs., LDC*, No. 99 Civ. 2821 (VM), 2002 WL 31869391, at *9-*10 (S.D.N.Y. 2002).

209.     There is no exception or safe harbor under Section 13(d) of the Securities Exchange Act for concerted action to acquire equity in the context of a Chapter 11 restructuring. *Great Sw. Corp.*, SEC No-Action Letter, Fed. Sec. L. Rep. (71-72 CCH Dec.) ¶ 78,714 (Mar. 3, 1972).

Concerted action to aqcuire, hold, or dispose of securities is enough even if initiated by a third party. *Morales*, 249 F.3d at 127 (parties' agreement to lockup provision insisted upon by issuer that governed holding and disposing of securities was sufficient basis to find existence of § 13(d) group); *Schaffer v. CC Invs., LDC*, No. 99 Civ. 2821 (VM) 2002 WL 31869391, at *9-10 (S.D.N.Y. 2002) (preferred shareholders that agreed to terms of stock agreement effecting ultimate disposition of their preferred shares constituted a § 13(d) group despite fact that refinancing discussions were initiated by issuer).

210.    Where acceptance of a plan of reorganization by certain individual creditors is dependent upon its acceptance by other creditors, such creditors are acting in concert for the purpose of the refinancing transaction and constitute a "group" under Section 13(d) of the Securities Exchange Act. *Id.* Any such reorganization transaction in which the group acquires common stock would require compliance with Section 13(d)(1). *Id.*

211.    Because Apollo, Oaktree, Crestview and Franklin have acted and act as a group for the purpose of acquiring and holding equity securities of CCI, they constitute a "group" as such term is used in Section 13(d) of the Exchange Act.

212.    Because consummation of the Plan would result in the Apollo, Oaktree, Crestview and Franklin group having 35% or more of the voting interest in CCI, and the Paul Allen Group not having a greater percentage of voting control than this group, it would breach Section 8(k)(ii) of the Credit Agreement and impair the Lenders' rights.

> **2.      The Plan Will Result In The Takeover Group Having The Power To Vote Equity Interests Having The Same Or Greater Voting Power For The Management Of The Borrower Than Paul Allen**

213.    The 4 members of the Takeover Group—Apollo, Oaktree, Crestview and Franklin—are acting together as a group for the purpose of acquiring and holding equity of CCI. ¶¶ 19-48.

214.     The Plan, if confirmed, will result in the Takeover Group having the power to vote equity interests having the same or greater voting power for the management of the Borrower than Paul Allen for 3 separate reasons.  ¶¶ 49-57.

215.     *First*, the Takeover Group will have a greater voting interest in the combined new Class A and new Class B equity of CCI than Paul Allen.  ¶¶ 49-50.

216.     *Second*, the Takeover Group will have the voting power to elect a majority of the CCI Board.  ¶¶ 51-54.

217.     In the context of a classified Board, voting power of the company is based on the fraction of the board that a class of shareholders have the power to elect.  *See In re Dairy Mart Convenience Stores, Inc.*, No. 14716, 1999 WL 350473, at *14 (Del. Ch. May 24, 1999) (describing "voting power" of classified stock in terms of number of directors each class was entitled to elect); *Savin Bus. Machs. Corp. v. Rapifax Corp.*, No. 5331, 1978 WL 2498 at * 1 (Del. Ch. Feb. 15, 1978) (same); Rev. Rul. 84-6, 1984-1 C.B. 178 ("The voting power held by a shareholder of any class of stock is the shareholder's proportionate share of the percentage of the total number of directors that that class of stock is entitled to elect as a class."); Rev. Rul. 69-126, 1969-1 C.B. 218 (providing that for purposes of determining "control" under the Internal Revenue Code, "voting power" of classified stock is determined based on number of directors the class of stock is entitled to elect).  ¶¶ 51-54.

218.     Even if Paul Allen secures the support of every single holder of Class A equity other than the Takeover Group, he still will only be able to appoint his 4 Class B directors.  The Takeover Group can outvote him and everyone else as to the 7 Class A directors.

219.     Even prior to the first annual meeting, the Takeover Group will have the voting power, independent of voting percentages, to elect or appoint an equal or greater number of

directors to the CCI Board than Paul Allen. ¶ 52. Whether the Takeover Group is viewed as appointing 4 or 5 directors, that is more than 35% of the Board, and this, too, is an Event of Default under Section 8(k)(ii).

220.  *Third*, excluding Franklin from the Takeover Group would not change anything. Apollo, Oaktree and Crestview would still have power to elect 7 members of CCI's 11-member Board, which is still more than the 4 members Paul Allen will appoint. ¶ 55. This is because Apollo, Oaktree and Crestview will own a majority of new Class A equity of CCI upon consummation of the Plan.

221.  Because the Takeover Group has a majority of the new Class A shares and thus the power to elect the 7 Class A directors on CCI's classified Board and the Paul Allen Group will only have the power to elect the 4 Class B directors, confirmation of the Plan would result in the Takeover Group having more than 35% voting control of CCI and control of the Board, and the Paul Allen Group not having a greater percentage of voting control of the Board. Thus, consummation of this transaction would breach Section 8(k)(ii) of the Credit Agreement and cause impairment of the Lenders' rights.

222.  Charter argues that even if Apollo, Crestview, Oaktree and Franklin, acted as a group to acquire equity, they purportedly have no specific agreement to "hold," "vote" or "dispose" of that equity post-confirmation and, therefore, the Takeover Group simply disappears on the Effective Date. The Credit Agreement, however, requires a common objective in "acquiring, voting, holding, *or* disposing of equity interests"—concerted action with respect to *any one* of the four elements is sufficient to establish the existence of a group. Whether there are agreements to vote, hold or dispose of equity interests that will be consummated post-acquisition is not a question that must be answered by the Court.

223.    A simple example underscores the lack of merit in Charter's argument.  Suppose the Takeover Group entered into an agreement with each other outside the context of bankruptcy to acquire a controlling stake in CCI equity by buying out Allen in a traditional LBO.  Under Charter's interpretation of the Credit Agreement, this would not constitute a change-of-control under Section 8(k)(ii) because the group would "disappear" after the acquisition was consummated.  Nothing in the Credit Agreement allows such an absurd result.

224.    Nor is there any exception in the Credit Agreement or legal "safe harbor" for concerted action to acquire equity in the context of a Chapter 11 restructuring.  Indeed, the SEC has opined that debt holders who act in concert to acquire stock in the context of a restructuring "constitute a group and a person within the purview of Section 13(d)(3) of the Act."  *Great Sw. Corp.,* SEC No-Action Letter, Fed. Sec. L. Rep. (71-72 CCH Dec.) ¶ 78,714 (Mar. 3, 1972).

225.    In *Great Southwest*, the SEC concluded that because "[a]cceptance of the plan of refinancing by each individual creditor is dependent upon its acceptance by all other creditors . . . the recipients of the warrants are acting in concert for the purpose of the refinancing transaction." *Id.*  The SEC went on to state that "[a]ny transaction in which such group acquires common stock . . . would require compliance with Section 13(d)(1)." *Id.*

226.    Like the creditors in *Great Southwest*, acceptance of the Plan by each member of the Takeover Group is dependent on its acceptance by the other Group members.  Accordingly, the members Takeover Group are "acting in concert" and "constitute a group and a person within the purview of Section 13(d)." *Id.*  Neither Charter nor the debtors and the Takeover Group cites any contrary authority.[545]

---

[545]    In *In re Constar International Inc.*, No. 08-13432 slip op. (Bankr. D. Del. May 14, 2009), the court specifically found that "[t]here was no agreement among the members of the Ad Hoc Committee . . . there was never any agreement . . . to act together for the purpose of acquiring,

227.     Notably, the creditors in *Great Southwest* did not receive stock in connection with the restructuring, but rather warrants that were not exercisable for more than a year after the consummation of the plan.  Because the warrants were not immediately exercisable, they did not constitute "equity securities" for purposes of the Exchange Act, *id* at 5, and, therefore, the SEC concluded that the relevant time for determining whether a group existed was not the consummation of the refinancing transaction but a year later when the warrants were exercisable and the equity would be acquired.  For purposes of the no action letter, the SEC accepted the creditors' representation that they would not be acting as a group a year down the road.  It is clear, however, that if the creditors had received stock at the consummation of the refinancing transaction (like the Takeover Group here) rather than warrants, they would have had a duty to file as a group under Section 13(d).  *Id.* ("Any transaction in which such group acquires common stock . . . would require compliance with Section 13(d)(1).").

### 3.     The So-Called Savings/Dilution Clause Is Irrelevant

228.     The so-called dilution or savings clause in the Amended and Restated Certificate of Incorporation will have no impact on the actual voting power of the Takeover Group.  ¶¶ 56-57.  The dilution clause is irrelevant for at least 3 reasons.

229.     *First*, the dilution clause will have no effect on the makeup of the initial Board of CCI post-emergence from bankruptcy.  *Id.*

---

holding, voting or disposing of any equity securities."  *Id.* at 28.  Such a holding is not possible on the current record.  In *Constar* there were no lock-up agreements requiring the group members to support or vote for the restructuring plan and no restrictions on their ability to sell their debt securities.  *Id.*  The opposite is true here and in *Great Southwest*.  *See Great SW. Corp., SEC No-Action Letter, Fed Sec. L. Rep. (71-72 CCH Dec.) ¶ 73, 714 (Mar. 3, 1972).*  The members of the Takeover Group concede that they negotiated and signed on to the "same agreement" to invest up to $1.6 billion in new money to acquire CCI equity.

230.    *Second*, even if the dilution clause is triggered, the Takeover Group will still own a majority of the Class A equity and will still have the power to select all 7 Class A directors, 64% of voting power for management of the borrower.  *Id.*

231.    *Third*, if the dilution clause were to have any practical effect on the Takeover Group's voting power (which it does not), the Board (the majority of which will be appointed by the Takeover Group) has the power to waive it.  *Id.*

## B.    The Plan Leaves Allen With Zero Votes For CCO's Management In Breach Of Section 8(k)(i) Of The Credit Agreement

232.    Section 8(k)(i) of the Credit Agreement provides that it is a Default or Event of Default if "the Paul Allen group shall cease to have the power, directly or indirectly, to vote or direct the voting of Equity Interests having at least 35% (determined on a fully diluted basis) of the ordinary voting power for the management of the Borrower."  ¶ 4.

233.    CCI is currently the "Manager" of CCO.  ¶ 59(e).

234.    Under the CCO Limited Liability Agreement, CCI can be removed as Manager at any time upon a vote of the majority of member "Votes."  As a sole member of CCO, CCOH has 100% of the member Votes and, therefore, 100% of the ordinary voting power for the management of CCO.  ¶ 59(f).

235.    Paul Allen currently has 91% voting control over CCI, which gives Allen complete control over the Board of Directors of CCI.  Because Allen controls CCI, he has the ability to control all of CCI's subsidiaries.  In particular, Allen controls CCOH and has the indirect power to direct the voting of CCOH's equity interests for the management of CCO.  ¶ 17

236.    If the Plan is confirmed, Allen will no longer control the Board of CCI.  Without majority control over CCI's Board, Allen cannot direct the voting of any CCOH Equity Interests for the management of CCO.  He will cease to have *any* "voting power for the management of the

Borrower," triggering a change of control under Section 8(k)(i) of the Credit Agreement. ¶¶ 58-59.

237.    The Plan, if confirmed, would cause a change in control default and thus impair the Lenders' rights.

## III.    CCO'S FALSE REPRESENTATIONS IN CONNECTION WITH ITS NOVEMBER 5, 2008 AND FEBRUARY 3, 2009 BORROWING REQUESTS ARE EVENTS OF DEFAULT THAT ARE NOT CURED BY THE PLAN AND CANNOT BE CURED

### A.    Section 8(b) Of The Credit Agreement

238.    Section 8(b) of the Credit Agreement provides for an Event of Default where "any representation or warranty made or deemed made by any Loan Party herein . . . *shall prove to have been inaccurate* in any material respect *on or as of the date made or deemed made*." ¶ 4 (emphasis added).

239.    An inaccurate representation is an Event of Default under Section 8(b) whether or not the Borrower knew or should have known its representation was false. ¶¶ 67-69.

240.    When CCO makes a borrowing request under the Credit Agreement, it is deemed to represent that no Event of Default has occurred or is ongoing. *Id.*

241.    In representing that no Event of Default has occurred and is continuing, CCO necessarily represents that there is no Event of Default under Section 8(g)(v), among other Sections of the Credit Agreement. *Id.*

### B.    Section 8(g)(v) Of The Credit Agreement

242.    Section 8(g)(v) of the Credit Agreement provides that it is an Event of Default if "any Designated Holding Company . . . shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due." ¶ 70-73.

### 1.       Section 8(g)(v) Sets Forth A Prospective Test

243.     By its plain language, Section 8(g)(v) contains both a backward-looking test and a forward-looking test.

244.     "Where the contract is unambiguous, courts must effectuate its plain language." *Seabury Constr. Corp. v. Jeffrey Chain Corp*., 289 F.3d 63, 68 (2d Cir. 2002).[546]

245.     The first clause of Section 8(g)(v) provides that it is an Event of Default when "any Designated Holding Company . . . shall generally not . . . pay its debts as they become due."  This test is backward looking.

246.     The second clause of Section 8(g)(v) provides that it is an Event of Default when "any Designated Holding Company . . . shall be unable to . . . pay its debts as they become due."  By its plain language, which is clear and unambiguous, this is a prospective test.

247.     The first clause of Section 8(g)(v) already makes it an Event of Default if  "any Designated Holding Company . . . shall generally not . . . pay its debts as they become due."  Interpreting the inability to pay debts as they become due language to be backward looking as well would render that provision superfluous in light of the first clause of Section 8(g)(v).

248.     It is a well-settled principle of contract interpretation that a contract should not be construed so as to make the clause superfluous or meaningless.  *LaSalle Bank Nat'l Ass'n* v. *Nomura Asset Cap. Corp.,* 424 F.3d 195, 206 (2d Cir. 2005) ("[A]n interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless … is not preferred and will be avoided if possible.").

249.     Courts faced with language virtually identical to the language in Section 8(g)(v) have consistently held that ability to pay debts as they become due is a forward-looking test.

---

[546]  The Credit Agreement is governed by New York state law.  JPX 2 § 10.11.

*Drexel Burnham Lambert Prod. Corp.* v. *MCorp.,* No. 88C-NO-80, 1989 Del. Super. LEXIS 69, at

*3-4, *13 (Del. Super. Ct. Feb. 23, 1989) (holding that the phrase "unable to pay its debts

generally as they become due" dictates a prospective test of ability to pay); *see also In re Hamilton*

*Creek Metro. Dist.,* 143 F.3d 1381, 1386-87 (10th Cir. 1998) (holding that "unable to pay . . . debts

as they become due" under the Bankruptcy Code is a forward-looking test and that a debtor need

not actually miss any payments to be deemed "unable to pay . . . debts as they become due"); *In re*

*Town of Westlake, Tex.,* 211 B.R. 860, 865 (Bankr. N.D. Tex. 1997) (same); *In re City of*

*Bridgeport,* 129 B.R. 332, 336-37 (Bankr. D. Conn. 1991) (same).

250.    In *Drexel Burnham Lambert Production Corp.,* the court addressed similar

contractual language, and held that the language dictated a prospective test, in part because, "it is

clear that the purpose of [this provision] was to afford one party the opportunity to get out of this

Agreement before the other party goes bankrupt."  1989 Del. Super. LEXIS 69, at *13, *34 (Del.

Super. Ct. Feb. 23, 1989).

251.    The *In re Town of Westlake* court recognized that "unable to pay debts as they

become due" is a different test than "generally not paying its debts as they become due."  The

latter asks the backward-looking question of whether the DHCs are current on their obligations.

The latter merely tests whether the debtor is "current on all its obligations."  211 B.R. at 865; *see*

*also In re City of Bridgeport*, 129 B.R. at 336-37.  It is different than the forward-looking question

of whether the DHC shall be "unable to pay debts as they become due."

252.    In *In re City of Bridgeport,* the court flatly rejected the same claim that Charter is

making here—*i.e.*, that because the borrower had never missed any debt payments, it was "able" to

pay debts as they become due.  The court held that the test for "unable to pay its debts as they

become due" is prospective. 129 B.R. at 336-37.  In *Drexel Burnham Lambert Production Corp. v.*

*MCorp.,* the court addressed contractual language similar to that of Section 8(g)(v) and held that the language dictated a prospective test, in part because, "it is clear that the purpose of [this provision] was to afford one party the opportunity to get out of this Agreement before the other party goes bankrupt." 1989 Del. Super. LEXIS 69 at *13. As in *MCorp.*, the second clause of Section 8(g)(v) must be applied prospectively in order to protect the original contractual purpose of including this clause, which was to give the Lenders an early warning signal of financial distress at Charter and an early indication of any change of risk at CCO. ¶ 73(c). There is no basis in the plain language of the Credit Agreement, the trial evidence, or the case law for the Court to apply anything but a forward-looking test.

> **2.  Charter's Attempt To Read The "Unable To Pay Debts As They Become Due" Language Out Of The Contract Should Be Rejected**

253.    Charter's reading of the second clause of Section 8(g)(v)—"unable to pay debts as they become due"—as retrospective is untenable because it would render this clause superfluous and thereby violate well-settled principles of contract interpretation. *LaSalle Bank Nat'l Ass'n* v. *Nomura Asset Cap. Corp.,* 424 F.3d 195, 206 (2d Cir. 2005) ("[A]n interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible.").

254.    Other provisions of the Credit Agreement already address the failure of DHCs to pay debts that have already become due. For instance, the first clause of Section 8(g)(v) provides for an Event of Default if any DHC "shall generally not … pay its debts as they become due"—in other words, when a DHC has failed to meet its *past* debt obligations. ¶ 4. Section 8(f) also provides for an Event of Default if a DHC, excluding CCOH, fails to pay a debt and that failure triggers acceleration of more than $200 million of debt. ¶ 4.

255.    "[A]n interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless … is not preferred and will be avoided if possible." *LaSalle Bank Nat. Ass 'n* v. *Nomura Asset Cap. Corp.,* 424 F.2d 195,206 (2d Cir. 2005).

256.    Charter has argued that Section 8(g)(v) conflicts with Section 7.6 of the Credit Agreement.  Section 7.6 allows CCO to make a distribution to a DHC to pay interest within 15 days when due so that DHCs will not "warehouse" the Borrower's money.  ¶ 74(a).  This does not conflict with Section 8(g)(v).  Section 8(g)(v) does not require the DHCs to have cash in hand.  It simply requires that the DHCs have access to sources of liquidity (such as distributions) so they have the ability to pay debts as they become due.  Here, the DHCs were unable to pay debts as they become due on November 5, 2008 because CIH and CCH lacked access to liquidity, including distributions, due to CCH I's inability to make distributions to them.  ¶¶ 60-167.

257.    Under Section 4.21, CCO is not required to represent that each of the DHCs is Solvent, as that term is defined in the Credit Agreement.  The words of Section 8(g)(v) track the cash flow test for insolvency.[547]  Section 5.2 requires CCO to represent at each borrowing that each DHC meets the Section 8(g)(v) test.  CCO need not represent that each DHC is, in fact solvent, but must represent that each DHC is able to pay its debts as they become due.

### C.    CCO's Misrepresentations

258.    On November 5, 2008, CCO represented, among other things, that all DHCs were able to pay their debts as they become due.  ¶ 89.

259.    CCO made the same representation again on February 3, 2009.  ¶ 89.

260.    These representations were false because, as of November 5, 2008, CCH and CIH could not pay their debts as they become due.  ¶¶ 60-167.

---

[547] JPX 2 § 4.21.

261.     In valuation analysis "parties may rely on the bankruptcy reorganization plan confirmed in 1989 as some evidence of value, notwithstanding the fact that that plan did not exist as of the" valuation date at issue in the litigation. *Dempster v. Dempster*, 204 A.D.2d 1070, 1070, 613 N.Y.S.2d 78, 79 (N.Y. App. Div., 4th Dept. 1994.; *The Union Illinois Ill. 1995 Inv. Ltd. Ptnrs. v. Union Fin. Gr.*, 847 A.2d 340, 357 (Del. Ch. 2004) ("our case law recognizes that when there is an open opportunity to buy a company, the resulting market price is reliable evidence of fair value."). The valuation in the Lazard Valuation was approximately $15.4 billion. ¶ 135, 140.

262.     The business judgment rule has no bearing on whether there was a default under the Credit Agreement in this case. The language of the Credit Agreement governs whether there was a Default or Event of Default.[548] There is no exception for contractual breaches based on a good faith "business judgment." *Nichols v. Am. Risk Mgmt.*, No. 89 CIV. 2999 (JSM), 1998 WL 655526, at *4 (S.D.N.Y. Sept. 24, 1998) (holding that business judgment rule is not a defense in a breach of contract action); *see also Weaver v. Mobile Diagnostic*, Civ. No. 02-1719, 2009 WL 1230297 (W.D. Pa. Apr. 30, 2009) (same).

### D.     The Plan Does Not Cure CCO's Misrepresentations

263.     The Plan does not purport to, and cannot in fact, cure CCO's Section 8(b) defaults.

264.     CCO cannot retract or cure its prior misrepresentations because they are "historical facts" that cannot be undone. *See, e.g., In re New Breed Realty Enters.*, 278 B.R. 314, 320 (Bankr. E.D.N.Y. 2002) (holding that the debtor's failure to close the sale on the contractually specified date "constitutes a non-monetary default which cannot be cured because it is a historical fact"); *In re Toyota of Yonkers, Inc.*, 135 B.R. 471, 477 (Bankr. S.D.N.Y. 1992) (recognizing that if default

---

[548] *Clarke v. Parkinson*, 225 F. Supp. 2d 345, 349 (S.D.N.Y. 2002) (upholding the lower court's interpretation because it flows from the plain language of the Loan Agreement); *Citibank, N.A. v. Outdoor Resorts of Am., Inc.*, No. 91 CIV. 1407 (MBM), 1992 WL 162926, at *4 (S.D.N.Y. June 29, 1992) (applying the plain language of Loan Agreements).

of provision requiring continuous operation of dealership occurred, "it is incapable of cure or remedy because the debtor cannot undo this historical fact").

265.    In any event, the Plan does not even purport to try to cure the misrepresentation defaults.

266.    Thus, the Lenders' rights are impaired under the Plan.

## IV.    THE CREDIT AGREEMENT CANNOT BE REINSTATED BECAUSE THE PLAN DOES NOT CURE DEFAULTS UNDER SECTION 8(F) OF THE CREDIT AGREEMENT AS REQUIRED BY SECTION 1124(2)(A)

### A.    The Non-Obligor DHCs' Debt Accelerated And Thus CCO Is In Breach Under Section 8(f) Of The Credit Agreement

267.    Section 8(f) of the Credit Agreement makes it an Event of Default when the debt of any DHC, excluding CCOH, is accelerated for any reason, so long as the outstanding aggregate principal amount exceeds $200 million.  ¶¶ 168-171.

268.    Each of CCH, CIH, CCH I and CCH II had over $200 million in indebtedness accelerated when they each filed for bankruptcy on March 27, 2009 in accordance with the plan support agreements.  Each of those DHCs had outstanding debt, the principal amount of which was in excess of $200 million and that debt was automatically accelerated due to its bankruptcy filing. ¶ 170.

269.    Federal policy requires that all of the Lenders' contractual rights, including the right to acceleration under the Credit Agreement, be enforced because the debtor CCO is solvent.

270.    In *Chicago, Milwaukee, St. Paul & Pac. Railroad Co.*, Judge Posner addressed whether bank debt of a solvent debtor that accelerated should be paid in full or reinstated.  791 F.2d 524 (7th Cir. 1986).  He concluded that the accelerated bank debt must be paid in full because, where—as here—all other creditors of the solvent debtor at issue are being paid in full, a

creditor's contractual rights (including the right to acceleration) must be enforced. *Id.* at 528.

Judge Posner's analysis is applicable here:

> [The debtor] has offered to give the debenture holders an ironclad guarantee that they will get 5 percent a year until 2055 and the full principal then; and given [the debtor]'s net worth, such a guarantee should not be hard to arrange. So the debenture holders will do no worse than if there had been no default.
>
> Nevertheless, the district judge did not err in allowing acceleration. *The only good reason for refusing to give a creditor in reorganization all that he bargained for when he extended credit is to help other creditors, the debtor's assets being insufficient to pay all creditors in full.* All of the [debtor's] creditors will be paid in full, even if the debenture holders are paid out at the highest valuation of their claim. The only competing equities are those of [the debtor]'s shareholders, and are weak . . . .

*Id.* at 527.

271.     The law in every Circuit is that where, as here, the debtor is solvent, a bankruptcy court's role is simply to enforce creditors' rights according to the terms of the contracts that created those rights. *Gencarelli v. UPS Cap. Bus. Credit*, 501 F.3d 1, 7 (1st Cir. 2007) (when a debtor is solvent "the bankruptcy rule is that where there is a contractual provision, valid under state law, . . . the bankruptcy court will enforce the contractual provision") (alteration in original); *Official Comm. of Unsecured Creditors v. Dow Corning Corp. (In re Dow Corning Corp.)*, 456 F.3d 668, 679 (6th Cir. 2006) ("When a debtor is solvent, then, the presumption is that a bankruptcy court's role is merely to enforce the contractual rights of the parties . . . ."); *Ruskin v. Griffiths*, 269 F.2d 827, 832 (2d Cir. 1959) (where the debtor is solvent, "it seems to us the opposite of equity to allow the debtor to escape the expressly-bargained-for result of its act").

**B.     These Cross-Acceleration Defaults Are Not *Ipso Facto* Defaults**

272.     These cross-acceleration defaults are not an *ipso facto* defaults under Section 1124(2)(A).

273.     Section 1124(2)(A) makes an exception to the cure requirements for "a default of a kind specified in section 365(b)(2) of this title or of a kind that section 365(b)(2) expressly does not require to be cured."  11 U.S.C. § 1124(2)(A).

274.     Section 365(b)(2) sets forth two relevant categories of defaults that need not be cured:  those relating to "(A) the insolvency or financial conditions of the debtor at any time before the closing of the case" and "(B) the commencement of a case under this title."  11 U.S.C. § 365(b)(2)(A)-(B).  Those so-called "*ipso facto* defaults" are defaults that unavoidably flow from the bankruptcy filing or financial condition of the debtor.

275.     Here, the DHC cross-acceleration defaults were *not* triggered in any way by the bankruptcy filing or financial condition of CCO.  ¶ 171  These defaults arise from the financial condition of entities that are non-obligors in CCO's case and the takeover of Charter.  Thus, these cross-acceleration defaults are not *ipso facto* defaults that are excused from cure.

276.     Courts enforce cross-defaults under Section 365(b)(2).  In *Lifemark Hospitals, Inc. v. Liljeberg Enterprises, Inc. (In re Liljeberg Enterprises, Inc.)*, the Fifth Circuit held that a cross-default tied to the obligation of a non-debtor affiliate was not an *ipso facto* default under Section 365(b)(2).  304 F.3d 410, 446 (5th Cir. 2002).  In *In re East Hampton Sand & Gravel Co.*, the court rejected the argument that a cross-default provision was an *ipso facto* default, explaining that "equity will not countenance the debtor's exercise of Section 365 to relieve itself of conditions which are clearly vested by the contracting parties as an essential part of their bargain and which do not contravene overriding federal policy."  *Bistrian v. East Hampton Sand & Gravel, Co. (In re East Hampton Sand & Gravel Co.)*, 25 B.R. 193, 198 (Bankr. E.D.N.Y. 1982).

277.     It has been recognized that "[f]ederal bankruptcy policy is offended where the non-debtor party seeks enforcement of a cross-default provision in an effort to extract priority

payments under an unrelated agreement." *Kopel v. Campanile (In re Kopel)*, 232 B.R. 57, 65, 67 (Bankr. E.D.N.Y. 1999) (enforcing the cross-default in a lease under Section 365 where a default occurred under a note). But that is not happening here. Rather, the cross-acceleration defaults in the CCO Credit Agreement are an important part of the bargain and do not offend federal bankruptcy policy. They are unique in Charter's capital structure; they do not exist in any other Charter credit agreement or indenture. The testimony of witnesses on both sides confirm that Section 8(f) was a negotiated provision, important to the bargain and designed to give the Lenders a seat at the table in the event of acceleration of the DHCs' debt—a seat they have now been denied. ¶ 169(c). The failure to enforce the cross-defaults would offend, rather than be consistent with, federal bankruptcy policy.

278.    The *ipso facto* concept will not allow a debtor like CCO "to relieve itself of conditions which are clearly vested by the contracting parties as an essential part of their bargain and which do not contravene overriding federal policy." *In re East Hampton Sand & Gravel Co.*, 25 B.R. at 198 (Bankr. E.D.N.Y 1982). *East Hampton* involved the sale of a business, which was partially funded by a promissory note, and a lease for that the premises of that business, which provided that a default under the note constituted a default under the lease. *Id*. at 196. The debtor had defaulted on the note and sought to assume the lease, arguing that the court should read the cross-default provision out of the lease because those provisions "frustrate federal bankruptcy policy by unnecessarily encumbering a valuable asset that plays an important role in the debtor's reorganization." *Id*. at 198. The court rejected the debtor's arguments because it could "discern no federal policy which requires severance of a lease condition solely because it makes a debtor's reorganization more feasible" and thus limited its equitable considerations to the intent of the parties in conditioning the lease on payment of the note. *Id*. at 199. The court also recognized that

"[s]everance of the note from the lease would deny the creditor the benefit of the bargain and would result in an unjust windfall for the debtor." *Id.*

### C. The Plan Does Not Cure CCO's Section 8(f) Defaults

279. "Curing a default commonly means taking care of the triggering event and returning to pre-default conditions. The consequences are thus nullified. This is the concept of 'cure' used throughout the Bankruptcy Code." *Taddeo*, 685 F.2d at 26-27.

280. The Plan does not remedy the triggering events—the bankruptcy filings of the DHCs or the missed principal payments of CCH—and therefore does not return the parties to the pre-default conditions. Nor does the Plan nullify the consequences of the cross-acceleration defaults.

281. Instead, the Plan permanently alters the parties' rights and obligations under the Credit Agreement. The cross-acceleration defaults were included precisely to vest the Lenders with the option in such event to: (i) accelerate CCO's outstanding obligations, or alternatively, (ii) negotiate a waiver or amendment with CCO and remain as lenders on the credit. In each case, the Lenders would have the right to make their decision based on their sense of the risks that led to the cross-defaults and the impact the proposed "fix" of the defaults would have on them as CCO's creditors.

282. The Plan, however, would deprive the Lenders of exactly that bargained-for right by forcing upon them a fundamental change in the corporate structure, ownership and capitalization of the DHCs.

283. Charter is essentially asking the Court not to require these cross-defaults to be cured because otherwise its Plan would be not feasible. This argument has been rejected elsewhere and should be rejected here because Section 1124 expressly requires CCO to cure the DHC cross-defaults in order to reinstate the Credit Agreement. *In re East Hampton Sand & Gravel Co.*, 25

B.R. at 199 (rejecting argument that cross-default should not be enforced because it makes a debtor's reorganization more feasible).

## V.  THE PLAN CANNOT BE CONFIRMED

284.    For the reasons set forth above, Charter has not carried its burden of proving by a preponderance of the evidence that each requirement of Section 1129(a) has been met.

285.    Specifically, Charter has not shown compliance with Section 1129(a)(8) or Section 1129(a)(1) because the Lenders are impaired under Section 1124.

286.    Even assuming *arguendo* that the burden of proof rested on the Lenders, the evidence establishes by a preponderance of the evidence impairment under Section 1124 and non-compliance with Sections 1129(a)(1) and 1129(a)(8).

287.    Thus, the Plan cannot be confirmed.

Dated:  New York, New York
        September 18, 2009

                                        Respectfully submitted,

                                        SIMPSON THACHER & BARTLETT LLP

                                        By:    /s Peter V. Pantaleo
                                               Peter V. Pantaleo
                                               Bruce D. Angiolillo
                                               Mary Elizabeth McGarry
                                               Bryce L. Friedman
                                               George S. Wang

                                        425 Lexington Avenue
                                        New York, New York  10017
                                        (212) 455-2000
                                        (212) 455-2502 (fax)

                                        *Attorneys for JPMorgan Chase Bank, N.A.*